UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

EUGENIA VI VENTURE HOLDINGS, LTD.,                :
                                                  :
                              Plaintiff,          :
                                                  :        07 CIV 9417
        - against –                               :        (Batts, J.)
                                                  :        (Eaton, M.J.)
MAPLEWOOD EQUITY PARTNERS, L.P.,                   :
                                                  :
                              Defendant.          :
                                                  :
-------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISQUALIFY GIBSON, DUNN & CRUTCHER LLP,
DENNIS FRIEDMAN, DAVID WILF, SCOTT KISLIN, AND HYEON LEE**

STEVENS & LEE, P.C.
485 Madison Avenue, 20th Floor
New York, New York 10022-5803
Telephone: (212) 319-8500
Facsimile: (212) 319-8505

*Counsel* for *Defendant*

{M2621651;5}

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................i

TABLE OF AUTHORITIES............................................................................................ ii

Preliminary Statement ....................................................................................................1

Statement of Facts ...........................................................................................................3

    A.    The Attorney-Client Relationship Between MapleWood Equity and GD&C Attorneys.............................................................................................4

    B.    The Attorney-Client Relationship Between the AMC Investor Entities and GD&C Attorneys ...................................................................................5

    C.    The Parties' Affiliates Sign A Conflict Waiver Letter ............................................6

    D.    The AMC Investor Entities Guarantee AMC Computer's Obligations; Eugenia Prohibits The AMC Investors From Conducting Any Business Or Accumulating Any Assets ........................................................................6

    E.    Eugenia Files Suit Against The AMC Investor Entities To Recover Alleged Damages Arising From AMC Computer's Breach of the Credit Agreement ...................................................................................................8

    F.    Eugenia Files Its First "Alter Ego" Action .............................................................9

    G.    Eugenia Files Its Second "Alter Ego" Action ......................................................10

Argument ......................................................................................................................10

    I.    GD&C AND THE INDIVIDUAL ATTORNEYS ARE CONFLICTED AND PROHIBITED FROM REPRESENTING EUGENIA. ...............................10

        A.    Disqualification Should Be Granted Because the Attorneys' Current Representation Would Breach Prior Client Confidences. ...........10

        B.    GD&C has Breached the Conflict Waiver Agreement................................14

    II.    DISQUALIFICATION SHOULD BE IMPUTED TO THE ENTIRE GD&C FIRM................................................................................................18

        A.    Kislin's Departure Does Not Expunge GD&C's Conflict of Interest ...............................................................................................20

        B.    The Record Establishes that GD&C Did Not Erect Any "Ethical Screen"......................................................................................22

Conclusion....................................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*562 Eglinton, Inc. v. Merlo,*
    277 A.D.2d 1027, 716 N.Y.S.2d 228 (N.Y. App. Div. 2000) ...........................................13

*Blue Planet Software, Inc. v. Games Int'l, LLC,*
    331 F. Supp. 2d 273 (S.D.N.Y. 2004) .......................................................................10

*Ceramco, Inc. v. Lee Pharmaceuticals,*
    510 F.2d 268 (2d Cir. 1975) .....................................................................................16

*Cheng v. GAF Corp.,*
    631 F.2d 1052 (2d Cir. 1980),
    *vacated on other grounds and remanded,* 450 U.S. 903 (1981) ...............................12, 13

*Chinatown Apartments, Inc. v. New York City Transit Authority,*
    100 Misc.2d 495, 421 N.Y.S.2d 958 (N.Y. Sup. Ct. 1978)......................................13, 16

*Forest Park Assoc. Ltd. Partnership v. Kraus,*
    175 A.D.2d 60, 572 N.Y.S.2d 317 (N.Y. App. Div. 1991) .............................................13

*Hull v. Celanese Corp.,*
    513 F.2d 568 (2d Cir. 1975) ...............................................................................12, 16

*In re Manshul Constr. Corp.,*
    1998 WL 405039, at *4 (S.D.N.Y. July 20, 1998) ......................................................16

*Interstate Properties v. Pyramid Co.,*
    547 F. Supp. 178 (S.D.N.Y. 1982) ...........................................................................17

*Kassis v. Teacher's Ins. and Annuity Assoc.,*
    93 N.Y.2d 611, 717 N.E.2d 674 (N.Y. 1999).....................................................18, 19, 23

*Papyrus Tech. Corp. v. New York Stock Exchange, Inc.,*
    325 F. Supp. 2d 270 (S.D.N.Y. 2004) ...........................................................11, 13, 19, 20

*Solow v. W.R. Grace & Co.,*
    83 N.Y.2d 303 (1994).............................................................................................21

*Tekni-Plex, Inc. v. Meyner & Landis,*
    89 N.Y.2d 123, 651 N.Y.S.2d 954, 674 N.E.2d 663 (N.Y. 1996)........................11, 14, 16

*United States Football League v. National Football League,*
    605 F. Supp. 1448 (S.D.N.Y. 1985) .................................................................12, 19, 24

*Westinghouse Elec. Corp. v. Gulf Oil Corp.,*
    588 F.2d 221 (7th Cir. 1978) ...................................................................................17

**Rules**

12 U.S.C. § 1813(u) .................................................................................................................. 15

17 C.F.R. § 229.405 ................................................................................................................. 15

19 U.S.C. § 1677(33) ............................................................................................................... 16

New York Disciplinary Rule 5-105(D) ................................................................................... 18

New York Disciplinary Rule 5-108(A)(1) ............................................................................... 10

Defendant MapleWood Equity Partners, L.P. ("MapleWood Equity") respectfully submits this Motion to Disqualify Gibson, Dunn & Crutcher LLP ("GD&C") and Dennis Friedman, David Wilf, Scott Kislin, and Hyeon Lee from representing plaintiff Eugenia VI Venture Holdings, Ltd. ("Eugenia") in this action.

## Preliminary Statement

GD&C has already been disqualified from representing Eugenia's affiliate, Casita L.P. ("Casita"), in a related action against MapleWood Equity's parallel fund, MapleWood Equity Partners (Offshore) Ltd. ("the MapleWood Offshore Fund"). *See* February 21, 2006 Order disqualifying GD&C in *Casita, L.P. v. MapleWood Equity Partners (Offshore) Ltd.*, Supreme Court of the State of New York, New York County, Index No. 603525/2005 (Fried, J.S.C.) (the "Related Action"), attached to Declaration of Chester B. Salomon, Esq. ("Salomon Dec."), Ex. F.

GD&C was disqualified in the Related Action because attorneys from GD&C created the MapleWood Offshore Fund and drafted all of the governing documents that underlie the parties' dispute (in both this action and the Related Action). The New York state Supreme Court carefully considered the disqualification issues, and in a sixteen-page order, detailed the specific findings that supported its holding that GD&C should be disqualified from representing Casita in the Related Action. *Id.*

Casita appealed, and after a second round of comprehensive briefing and oral argument, on November 9, 2006, five judges of the New York Supreme Court Appellate Division – First Department (the "First Department") unanimously affirmed the order that disqualified GD&C. Salomon Dec. Ex. J. In a well-reasoned three-paragraph opinion, the First Department summarily rejected GD&C's contention that no attorney-client relationship existed between the

MapleWood Offshore Fund and GD&C attorneys.  *Id.*  In particular, the First Department confirmed that the:

> [e]vidence in the record established that an attorney with the firm representing plaintiff had previously performed substantial work, at a prior law firm, on [the MapleWood Offshore Fund's] formation and its relationship with several affiliated entities, as well as on investment issues.

*Id.*  Casita's motion for leave to further appeal was denied by the First Department, Salomon Dec. Ex. K, and GD&C finally (and reluctantly) withdrew as counsel of record in the Related Action.[1]

Now, GD&C has filed the instant action, on behalf of Eugenia, Casita's affiliate, seeking to hold the MapleWood Offshore Fund's sister fund, MapleWood Equity, liable based on a purported alter-ego theory, under a guaranty executed by AMC Investors, LLC and AMC Investors II, LLC (together, the "AMC Investors Entities") in favor of Eugenia.  GD&C and the individual attorneys listed herein should be disqualified from representing Eugenia in this action asserting claims for alter ego/misuse of corporate form and declaratory relief.  Even a cursory reading of the Complaint reveals that — exactly like the Related Action — the central issue in this case will be the structure of and relationship between MapleWood Equity and the AMC Investors Entities, which was created by the conflicted attorneys before they switched sides.

The entire structure of the MapleWood entities (including MapleWood Equity and the AMC Investors Entities), the creation of each entity, preparation of their governing documents, and the relationship between each entity, was formulated by the GD&C attorneys.  ***Because GD&C attorneys drafted MapleWood Equity and the AMC Investor Entities' governing documents and rendered legal advice as to their interpretation and effect when MapleWood***

---

[1]  In the Related Action, after Casita substituted counsel of record because of GD&C's disqualification, on February 21, 2007, GD&C requested a conference with the Court to discuss GD&C's motion to be reinstated as counsel of record based on Kislin's departure.  The court appropriately rejected that attempt.

*Equity and the AMC Investor Entities were their clients, GD&C and the individual attorneys identified herein have an irreconcilable conflict of interest.*  GD&C and the individual attorneys identified must be disqualified to protect against the possibility that they could use confidential and privileged communications from their prior representation of MapleWood Equity and the AMC Investor Entities to serve the interests of their current client, Eugenia.[2]

There is no dispute that the interests of GD&C's former and current clients are materially adverse in this litigation.

Finally, GD&C itself has recognized the serious nature of its conflict of interest, because it asked for and obtained a conflict waiver agreement in September 2002 to permit GD&C to represent Eugenia in the negotiation of the Credit Agreement that underlies the subject matter of this litigation.  That agreement provided that GD&C would not represent Eugenia in litigation between the parties.  GD&C has now breached that agreement by suing MapleWood Equity.

As the conflict that required disqualification in the Related Action is no different than the conflict that arises in this action, GD&C again must be disqualified as Eugenia's counsel.

## Statement of Facts

The MapleWood structure includes MapleWood Partners LP ("MapleWood Partners"), MapleWood Holdings LLC ("MapleWood Holdings"), MapleWood Management L.P. ("MapleWood Management"), MapleWood Equity and its parallel fund, the MapleWood Offshore Fund (together, the "MapleWood Funds").  Affidavit of Robert V. Glaser ("Glaser Aff.") ¶ 3.

---

[2]  Incredibly, Hyeon Lee, one of the attorneys who created AMC Investors II, LLC while at GD&C, now works for Eugenia. Lee now works directly for Eugenia and Casita. Reale Aff. ¶ 6.  Despite his prior representation of MapleWood Equity and the AMC Investor Entities, and his receipt of privileged and confidential information, Lee is personally involved in litigation related to these issues, having already given an affidavit, on Casita's behalf, in a related case.

A.    **The Attorney-Client Relationship Between MapleWood Equity and GD&C Attorneys**

The MapleWood entities were created in 1999, and, starting in 1997, attorneys who now are partners at GD&C performed all legal work for MapleWood Partners, MapleWood Holdings and MapleWood Management in connection with their formation, including creating their governing documents, and creating the entities. *Id.* ¶ 5. The conflicted counsel in question here represented MapleWood Partners, MapleWood Holdings and MapleWood Management in the creation of the MapleWood Funds. *Id.*

The MapleWood Funds raised approximately $135 million in capital. *Id.* ¶ 6. One investor in the MapleWood Funds is a company called Casita, L.P. ("Casita"). Casita is an investment arm of a wealthy German individual named Hans Werner Hector, one of the co-founders of German software behemoth SAP. *Id.* ¶ 7. Eugenia is another of Mr. Hector's investment vehicles. *Id.* ¶ 8.

After their formation, the MapleWood Funds worked to identify companies in which to invest. The GD&C attorneys listed herein provided legal assistance to MapleWood Partners and the MapleWood Funds in that effort. *Id.* ¶ 9. One of the companies identified was AMC Computer Corporation ("AMC Computer"), a New York computer services and hardware company that entered into the Credit Agreement with Eugenia that underlies this litigation. *Id.* These GD&C attorneys conducted due diligence on AMC Computer, in addition to their work on the acquisition agreement and financing agreement. *Id.* In August 2000, Mr. Hector co-invested with the MapleWood Funds in AMC Computer, through his Casita entity, which purchased membership interests in a newly formed entity named AMC Investors, LLC. *Id.* ¶¶ 10-11.

The two MapleWood Funds were the majority investors in AMC Investors, LLC. *Id.* ¶ 11. In addition to the MapleWood Funds, the members of AMC Investors, LLC include Casita

and several other entities who were investors in the funds. *Id.* Casita and the other investors decided to "co-invest" additional monies in AMC Computer, in addition to the monies that were indirectly invested through the MapleWood Funds. *Id.*

### B.    The Attorney-Client Relationship Between the AMC Investor Entities and GD&C Attorneys

AMC Investors, LLC was formed by the attorneys in question here, on their recommendation. *See* Glaser Aff. ¶ 10. Moreover, these GD&C attorneys drafted all of AMC Investors, LLC's governing documents, and provided legal advice with regard to its structure and operations. *Id.* The only assets that AMC Investors, LLC ever owned were the cash that was invested in AMC Computer, together with accrued interest, and shares of common stock in AMC Computer. *Id.*

As regular outside counsel to the MapleWood entities, the GD&C attorneys represented MapleWood Partners, MapleWood Management, MapleWood Holdings, MapleWood Equity, AMC Investors, LLC, and other affiliates in effectuating MapleWood Partners' affiliates' investment in AMC Computer through AMC Investors, LLC. Glaser Aff. ¶ 12. Shortly thereafter, the individual attorneys moved, *en masse*, to GD&C. *Id.*

GD&C continued to serve as primary counsel to MapleWood Partners, MapleWood Equity, their affiliates and AMC Computer, and also represented MapleWood Partners, MapleWood Equity and their affiliates in a subsequent investment in AMC Computer effected in 2001 through an entity called AMC Investors II, LLC. Affidavit of Robert J. Reale ("Reale Aff.") ¶ 7. GD&C also created AMC Investors II, LLC. *Id.* All told, the AMC Investors Entities invested nearly $35 million in AMC Computer, *id.*, Glaser Aff. ¶ 13, $2.5 million of which was invested by Casita. *Id.*

### C.    The Parties' Affiliates Sign A Conflict Waiver Letter

In the late summer of 2002, AMC Computer began to negotiate a new credit facility with Mr. Hector's representatives.  *See* Reale Aff. ¶ 9.  At that point, Greenberg Traurig represented AMC Computer.  *Id.*  Casita requested that GD&C represent Casita and its affiliate Eugenia.[3]  *Id.*  GD&C, recognizing that they had a conflict of interest due to their earlier representation, requested and drafted a conflict waiver letter (the "Conflict Waiver Agreement"), which was executed by GD&C, AMC Computer, MapleWood Partners on behalf of itself and all of its affiliates (including MapleWood Equity), and Casita on behalf of itself and all of its affiliates (including Eugenia).  *See id.* ¶¶ 9-10.  It is important to note that ***it was GD&C who requested and drafted the waiver***.[4]  *Id.*  The Conflict Waiver Agreement expressly provided that GD&C would not represent any party in litigation:

> In the event that any litigation or dispute resolution proceedings should arise among MapleWood, Casita and AMC in connection with the Transaction [i.e., the proposed restructuring of AMC Computer's debt], [GD&C] would not act as counsel to any of such parties.

Reale Aff. Ex. A.  The "Transaction" in question was the restructuring of AMC Computer's debt.  Reale Aff. ¶ 11.

### D.    The AMC Investor Entities Guarantee AMC Computer's Obligations; Eugenia Prohibits The AMC Investors From Conducting Any Business Or Accumulating Any Assets

AMC Computer entered into two different credit facilities with Eugenia, Casita's affiliate.  Reale Aff. ¶ 3.  The first credit facility was paid in full.  *Id.*  The second credit facility

---

[3]  Ultimately, the money was lent to AMC Computer by Eugenia, which at that time also served as a lender to AMC Computer under a facility to provide financing for anticipated future sales, or "pre-bills."

[4]  The assertion that GD&C and its attorneys learned confidential information regarding MapleWood and its affiliates during the scope of GD&C's representation is further supported by the fact that GD&C asked for the Conflict Waiver Agreement before taking on a representation adverse to MapleWood.

with Eugenia was entered into pursuant to an Amended and Restated Credit Agreement dated January 30, 2003 (the "Credit Agreement"). Salomon Dec. Ex. A. On that same date, the AMC Investors Entities executed an unconditional guaranty in favor of Eugenia, guaranteeing the payment of AMC Computer's obligations to Eugenia (the "Guaranty") under the Credit Agreement. Salomon Dec. Ex. B.

Neither of the AMC Investors Entities has ever had any office, operations, employees, real estate, or any other property. This fact is confirmed by the Credit Agreement that underlies this litigation. In Section 3.8 of the Credit Agreement, Eugenia required the AMC Investors Entities to represent that:

> None of the [AMC Investors Entities] has any assets (except Stock of their Subsidiaries) or any Indebtedness or Guaranteed Indebtedness (except the [guaranties under the Credit Agreement]).

Salomon Dec. Ex. A. Similarly, in Section 6.20, Eugenia required the AMC Investors Entities to affirmatively covenant that:

> None of the [AMC Investors Entities] shall engage in any trade or business, or own any assets (other than Stock of their Subsidiaries) or any Indebtedness or Guaranteed Indebtedness (except the [guaranties under the Credit Agreement]).

*Id.*

In May 2005, Eugenia declared AMC Computer to be in default under the second of these credit facilities (the Credit Agreement), and has instituted countless lawsuits in both state and federal court against Glaser and MapleWood Partners' affiliates and certain officers and directors of AMC Computer, alleging breach of contract, fraud, and breach of fiduciary duty.[5] Casita has also initiated various lawsuits.

---

[5] According to the report and testimony of Eugenia's own expert witness, the entire amount loaned by Eugenia to AMC Computer in the second credit facility has been paid in full. Eugenia's claimed "losses," if any, relate to foregone profits in the form of interest and fees.

E.    **Eugenia Files Suit Against The AMC Investor Entities To Recover Alleged Damages Arising From AMC Computer's Breach of the Credit Agreement**

In one of these lawsuits, on June 6, 2005, Eugenia filed a complaint against MapleWood affiliates and the AMC Investors Entities in an action styled *Eugenia VI Venture Holdings, Ltd. v. AMC Investors, LLC and AMC Investors II, LLC*, Case No. 05-CV-5362, United States District Court, Southern District of New York (the "First Guaranty Action"). Salomon Dec. Ex. C. The complaint in the First Guaranty Action alleged that the AMC Investors Entities entered into a guaranty agreement with Eugenia whereby the AMC Investors Entities guaranteed AMC's underlying debt owed to Eugenia. *Id.* The complaint further alleged that AMC defaulted on its debt obligations to Eugenia and that the AMC Investors Entities were liable to Eugenia for an amount exceeding $75,000. *Id.* Eugenia subsequently voluntarily dismissed the First Guaranty Action, without prejudice, and re-filed in the New York Supreme Court in September 2005 (the "Second Guaranty Action").

The Second Guaranty Action filed on September 8, 2005, by Eugenia against the AMC Investors Entities, sought payment on the Guaranty and was styled *Eugenia VI Venture Holdings, Ltd. v. AMC Investors LLC and AMC Investors II, LLC*, Index No. 603193/2005. Salomon Dec. Ex. D. The Second Guaranty Action alleged that AMC Computer defaulted on its debt obligations to Eugenia and that the AMC Investors Entities were liable to Eugenia for approximately $8.9 million. *Id.* The AMC Investors Entities did not contest liability incurred by AMC Computer to Eugenia pursuant to the Guaranty, but instead contested the amount of damages — if any — that were owed to Eugenia from AMC Computer. Judgment was entered against them for $8.2 million without any trial, and the AMC Investors Entities appealed the judgment.

On December 5, 2006, the Appellate Division, First Department of the Supreme Court of New York, unanimously reversed the $8.2 million judgment against the AMC Investors Entities, vacated the judgment, and remanded the case for a trial on damages. Salomon Dec. Ex. L. After a bench trial on damages in June 2007, a $10,710,455.00 judgment was entered against the AMC Investors Entities on June 20, 2007. The AMC Investor Entities have again appealed the amount of the judgment to the Appellate Division, First Department of the Supreme Court of New York, and the appeal is due to be perfected in April 2008. Salomon Dec. ¶ 16.

### F.    Eugenia Files Its First "Alter Ego" Action

In the meantime, just a few months after the First Guaranty Action was filed in the Southern District of New York against the AMC Investors Entities, on January 4, 2006, Eugenia filed suit in state court against MapleWood Equity, alleging that MapleWood Equity was the alter ego of the AMC Investors Entities, and seeking to enforce the AMC Investors Entities guaranty against MapleWood Equity. *See* action styled *Eugenia VI Venture Holdings, Ltd. v. MapleWood Equity Partners, L.P.*, Index No. 600021/06, New York Supreme Court, New York County (the "First Alter Ego Action"). Salomon Dec. Ex. E.

After MapleWood Equity filed its motion to dismiss the First Alter Ego Action and to disqualify GD&C, Eugenia attempted to voluntarily dismiss the action, without prejudice. MapleWood Equity objected to the "without prejudice" dismissal because Eugenia had waited to dismiss the action until <u>after</u> MapleWood Equity had expended significant sums on a motion to dismiss and motion to disqualify. On April 20, 2006, the court dismissed the First Alter Ego Action, <u>with</u> prejudice. Eugenia appealed the "with prejudice" aspect of the dismissal, and ultimately obtained an order directing that the dismissal should be without prejudice.

**G.      Eugenia Files Its Second "Alter Ego" Action**

The instant lawsuit that was filed in federal court (the "Second Alter Ego Action"),

followed the state court judgment against the AMC Investors Entities on the guaranty. Even

though the judgment entered against the AMC Investors Entities in New York Supreme Court in

the Second Guaranty Action is on appeal, Eugenia is now seeking to hold MapleWood Equity

responsible for the $10.7 million judgment.[6]  In its Second Alter Ego Action, Eugenia again

alleges two causes of action: (i) alter ego/misuse of corporate form against MapleWood Equity

with respect to its relationship to the AMC Investors Entities; and (ii) a declaratory judgment that

MapleWood Equity is liable for AMC Investors Entities' obligations to Eugenia under the

Guaranty.

Without question, the critical issue in this litigation relates to the relationship between

MapleWood Equity and the AMC Investors Entities, each of which were created by attorneys

now with Eugenia's current counsel, GD&C. Eugenia's counsel's conflict could not be any

clearer.

<u>**Argument**</u>

**I.      GD&C AND THE INDIVIDUAL ATTORNEYS ARE CONFLICTED AND
PROHIBITED FROM REPRESENTING EUGENIA.**

**A.      Disqualification Should Be Granted Because the Attorneys' Current
Representation Would Breach Prior Client Confidences.**

Under the applicable ethical rules, neither GD&C nor the individual attorneys may

represent Eugenia adverse to prior clients if the prior representation was substantially related to

the present matter and the interests of their former and current client are materially adverse.

New York Disciplinary Rule 5-108(A)(1).  *See, e.g., Blue Planet Software, Inc. v. Games Int'l,*

---

[6]  Eugenia chose not to file suit against the MapleWood Offshore Fund, the fund in which Casita invested.
This is additional evidence that Eugenia is only engaging in tactical maneuvering.

*LLC*, 331 F. Supp. 2d 273, 276 (S.D.N.Y. 2004) (disqualifying Latham & Watkins because plaintiff's counsel, while employed at another law firm, had previously represented predecessor of defendant in similar litigation over intellectual property rights and learned confidential information from defendant's predecessor during such prior representation); *Tekni-Plex, Inc. v. Meyner & Landis*, 89 N.Y.2d 123, 132, 651 N.Y.S.2d 954, 958-59, 674 N.E.2d 663, 667-668 (N.Y. 1996) (affirming disqualification of law firm in litigation concerning merger agreement when law firm represented adverse party in negotiation of such agreement); *see also* February 21, 2006 disqualification order in the Related Action.

Courts apply a three-part test in deciding whether to grant a motion to disqualify. A party seeking disqualification must prove "(1) the existence of a prior attorney-client relationship between the moving party and opposing counsel, (2) that the matters involved in both representations are substantially related, and (3) that the interests of the present client and former client are materially adverse." *Tekni-Plex*, 89 N.Y.2d at 132, 651 N.Y.S.2d at 958-59, 674 N.E.2d at 667-668; *see also Papyrus Tech. Corp. v. New York Stock Exchange, Inc.*, 325 F. Supp. 2d 270, 276-277 (S.D.N.Y. 2004) (applying New York state-law standard in disqualifying counsel in federal court). When these three inquiries are answered in the affirmative, an "irrebuttable presumption of disqualification arise[s]." *Tekni-Plex*, 89 N.Y.2d at 132, 651 N.Y.S.2d at 958, 674 N.E.2d at 667.

The first prong is easily satisfied. MapleWood Equity is a former client of GD&C. Glaser Aff. ¶¶ 5, 6, 9, 10, 12-15. Indeed, GD&C attorneys created MapleWood Equity, drafted its Articles, and provided legal advice with regard to the corporate form that is the subject matter of this litigation. *See* February 21, 2006 disqualification order in the Related Action.

Furthermore, GD&C attorneys created the AMC Investors Entities, and drafted all of their organizational documents.

The second prong also is satisfied. A "substantial relationship" is established when "the facts giving rise to an issue which is material in both the former and the present litigations are as a practical matter the same." *United States Football League v. National Football League*, 605 F. Supp. 1448, 1459 (S.D.N.Y. 1985). "General legal representation can be relevant to a later litigation . . . if the later litigation fairly puts in issue the entire background of the movant." *Id.* That is clearly the case here.

The substantial relationship test permits the Court to "assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation." *Cheng v. GAF Corp.*, 631 F.2d 1052, 1056 (2d Cir. 1980), *vacated on other grounds and remanded*, 450 U.S. 903 (1981). That inference is not even necessary here, because MapleWood Equity has produced an affidavit that confirms that relevant confidences were in fact imparted to the GD&C attorneys. Any doubts as to the existence of a conflict should be resolved in favor of disqualification. *See, e.g. Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975).

The Court should not inquire into the exact substance of the confidences revealed to GD&C attorneys. "Such an inquiry would be improper; it would put the movant to the choice of either revealing its confidences in order to prevail on the motion or else refraining from moving to disqualify, thereby running the risk that its adversary will use its confidences against it in the litigation." *United States Football League*, 605 F. Supp. at 1461. Indeed,

> given the obvious relationship between [GD&C's creation of MapleWood Equity] and the subject matter of the instant lawsuit, the issue of confidentiality is of no moment. . . . Where the lawyer, or the firm, has represented the former client in matters related to

the subject matter of the current proceeding, <u>that alone would be sufficient to warrant disqualification irrespective of whether or not the lawyer in fact obtained any confidential information in the course of the prior employment</u>. Disqualification of the attorneys under such circumstances flows from the continuing sensitive nature of the attorney-client relationship and the ethical considerations which dictate that 'the first client is entitled to freedom from apprehension and to certainty that his interests will not be prejudiced in consequence of representation of the opposing litigant by the client's former attorney.'

*Forest Park Assoc. Ltd. Partnership v. Kraus*, 175 A.D.2d 60, 61, 572 N.Y.S.2d 317, 318 (N.Y. App. Div. 1991) (disqualifying Proskauer Rose law firm in light of relationship between firm and former client underlying transaction of subject litigation) (emphasis added; citations omitted); *see also 562 Eglinton, Inc. v. Merlo*, 277 A.D.2d 1027, 716 N.Y.S.2d 228, 229 (N.Y. App. Div. 2000) ("Whether the law firm obtained 'any confidential information in connection with [prior] employment is not determinative.' [The former client is] entitled to certainty that [its] interests will not be prejudiced based on that prior representation.") (citations omitted); *Chinatown Apartments, Inc. v. New York City Transit Authority*, 100 Misc.2d 495, 496-97, 421 N.Y.S.2d 958, 959 (N.Y. Sup. Ct. 1978) ("The actual transmittal of confidential information has been found to be irrelevant to a determination to disqualify . . .") (citations omitted).

In any event, it is permissible to provide redacted evidence in support of a disqualification motion. *Cheng*, 631 F.2d at 1056. However, the Court need not even accept an invitation to review evidence of confidential communications *in camera*. *Papyrus*, 325 F. Supp. 2d at 273 n.5.[7]

In this case, there is a substantial relationship between the GD&C attorneys' prior representation and the subject matter of this litigation. For example, the complaint alleges that

---

[7] Nonetheless, should the Court desire, MapleWood Equity will submit additional supporting materials *in camera*.

the AMC Investors Entities "had no funding, offices, operations, meetings, minutes or activity of any kind" and "did not observe corporate procedures and requirements, maintain proper corporate records, or have any employees, operations or business."  Complaint, ¶¶ 9, 27. Moreover, the complaint alleges that MapleWood Equity "failed to adequately capitalize the AMC Investors for their businesses, purposes, and potential liabilities, including the Guaranty." *Id*, ¶ 31.

Under these allegations, the critical issue in this case will be the formation of MapleWood Equity and the AMC Investors Entities and the relationship between these entities. GD&C attorneys formed these entities and indisputably provided extensive legal advice regarding the relationship between these entities.  Glaser Aff. ¶¶ 5, 10; Reale Aff. ¶¶ 7-8. GD&C has an irreconcilable conflict of interest concerning a substantially related matter.

Finally, under the third prong of the New York test, the interests of GD&C's present client, Eugenia, are materially adverse to the interests of its former clients.  *Tekni-Plex*, 674 N.E.2d at 667-668.  Eugenia is suing MapleWood Equity to recover damages (purportedly) in excess of $10.7 million, pursuant to a Guaranty given by the AMC Investors Entities.  These interests clearly are adverse.

*In short, GD&C and the individual attorneys identified herein have an irreconcilable conflict of interest because they could use confidential and privileged communications from their prior formation of the corporate structure of MapleWood Equity and the AMC Investors Entities to represent their current client.*

The conflict could not be any clearer.  Disqualification is warranted in this case.

**B.      GD&C has Breached the Conflict Waiver Agreement.**

GD&C also should be disqualified because it has breached the Conflict Waiver Agreement, which expressly provides that GD&C would not represent any party to that

agreement in related litigation. The Conflict Waiver Agreement was executed by MapleWood Partners on behalf of all affiliates, including MapleWood Equity.

The defendant here, MapleWood Equity, is an "affiliate" of MapleWood Partners. Glaser Aff. ¶ 4. Further, MapleWood Management is MapleWood Equity's General Partner. *Id.* MapleWood Management also is the Manager of the AMC Investors Entities. *Id.; see also* Complaint, ¶ 18.

For purposes of New York ethical rules in deciding whether counsel should be disqualified, a "party" includes "corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation's 'alter egos') or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel." *Flores v. Willard J. Price Assocs., LLC,* 20 A.D.3d 343, 344, 799 N.Y.S.2d 43, 45 (N.Y. App. Div. 2005) (reversing denial of disqualification motion). MapleWood Management's actions in its capacity as "Partner" and "Manager" to MapleWood Equity would be imputed to MapleWood Equity.

Similarly, under the federal securities laws, "affiliate" is defined as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified." 17 C.F.R. § 229.405. For example, under the Federal Deposit Insurance Act, an "institution-affiliated party" is defined as any director, officer, employee, controlling shareholder, or agent, and therefore has a fiduciary relationship with a depository institution. 12 U.S.C. § 1813(u). By way of further example, under the anti-dumping statute, an "affiliated person" includes "[a]ny officer or director of an organization and such organization[, p]artners[, e]mployer and employee[, a]ny person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or

shares of any organization and such organization[, or] two or more persons directly or indirectly *controlling, controlled by, or under common control with*, any person. 19 U.S.C. § 1677(33) (emphasis added). In short, MapleWood Equity would be considered an "affiliate" of MapleWood Partners and MapleWood Management under any interpretation, and therefore may avail itself of the Conflict Waiver Agreement.

Eugenia and Casita are similarly affiliates. As testified to in related litigation, Eugenia and Casita "are two entities or companies related through common ownership stakes." Salomon Dec. Ex. M (Deposition of Ekkehart Hassels-Weiler, p. 78).

This Court should construe the Conflict Waiver Agreement as broadly as possible in order to protect the public interest in ensuring that client confidences are protected and to safeguard the public's perception of the legal profession. "An attorney . . . 'must avoid not only the fact, but even the appearance, of representing conflicting interests." *Tekni-Plex*, 674 N.E.2d at 667 (citations omitted). To be sure, while disqualification rests within the Court's discretion, any doubt should be resolved in favor of disqualification; a party's right to counsel of its choice "'must yield to considerations of ethics which run to very integrity of our judicial process.'" *In re Manshul Constr. Corp.*, 1998 WL 405039, at *4 (S.D.N.Y. July 20, 1998) (citing *Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir. 1975) (disqualifying former in-house corporate counsel; among other things it was alleged that principal of corporation was "alter ego" of corporation). Indeed, "the first client's rights to loyalty takes precedence over the second client's individual preference for a particular counsel." *Chinatown Apartments,* 421 N.Y.S.2d at 960. Similarly, disqualification can be a necessary and desirable remedy "to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information." *Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268, 271 (2d Cir. 1975)

(affirming denial of disqualification motion where plaintiff's counsel contacted defendant's employees without proper identification as counsel).

GD&C's conduct in this case is such an affront to the integrity of the judicial process. GD&C is one of the nation's largest and foremost law firms, which drafted a Conflict Waiver Agreement for its client to sign, and shockingly now seeks to disregard that agreement by quibbling over the definition of "affiliate" and "Transaction." GD&C would misuse confidential information from its prior representation, just because it stands to make more money from Eugenia than it could from MapleWood Equity.

Even without the Conflict Waiver Agreement's express prohibition on GD&C's participation in litigation, MapleWood Equity could not be held to have waived its right to object to use of its confidential information against itself in litigation. *See, e.g., Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 229 (7th Cir. 1978) (advance "consent to the mere representation of a client with adverse interests does not amount to either consent to breach of confidential disclosure or to the use of that information against the consenting party in litigation"); *cf. Interstate Properties v. Pyramid Co.*, 547 F. Supp. 178, 180 (S.D.N.Y. 1982) (refusing to disqualify firm when client had signed advance waiver that provided that firm could "continue to act as general counsel for [client] in any and all pending and future matters *including any adversary proceedings* that might arise between" parties (emphasis added)).

In addition, as the Conflict Waiver Agreement recognizes, GD&C represented MapleWood Partners in other matters, and has represented MapleWood Partners and its principals for decades. This relationship has not been insubstantial. One of MapleWood Partners' executives shared office space with GD&C for years. Glaser Aff. ¶ 15. GD&C

continued to represent MapleWood Partners until after the date that it first filed these related cases. *Id.* at ¶ 16.

In further apparent recognition of its conflict of interest, GD&C belatedly sent a self-serving letter to MapleWood Partners on June 9, 2005 purporting to "terminate" the relationship, after GD&C had already sued several MapleWood Partners' affiliates. *Id.* It is obvious that GD&C has now chosen to serve one client over another. This Court should protect the integrity of the judicial process and disqualify GD&C and the individual attorneys.

## II.    <u>DISQUALIFICATION SHOULD BE IMPUTED TO THE ENTIRE GD&C FIRM.</u>

Once it is determined that an attorney should be disqualified, the Court must determine whether that disqualification should be imputed to the entire law firm. New York Disciplinary Rule 5-105(D) provides that no attorney in a firm may represent a client when one of its attorneys would be precluded from doing so. The principles of loyalty and maintaining client confidences

> give rise to the general rule that, where an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are likewise precluded from such representation.

*Kassis v. Teacher's Ins. and Annuity Assoc.*, 93 N.Y.2d 611, 717 N.E.2d 674, 677 (N.Y. 1999) (citations omitted).

*Kassis* endorsed the general rule that "where an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all attorneys in that firm are likewise precluded from such representation." 93 N.Y.2d at 616. The Court confirmed that "[a]s we made clear in *Solow*, imputed disqualification is not an irrebuttable presumption . . . ." *Id.* Rather, "the party seeking to avoid disqualification must prove that any information acquired by the disqualified lawyer is unlikely to be significant or material in the

litigation." *Id.* at 617.  If, and only if, this showing is made and the presumption is rebutted, would a "Chinese Wall" be sufficient to avoid disqualification of the entire firm.  *Id.*  In other words, to avoid disqualification of an entire firm, the law firm must establish that the disqualified attorney's information would not be significant or material to the litigation.  If that showing is not made, the law firm cannot avoid imputed disqualification, no matter the size of the law firm, nor the use of "ethical screens."[8]

In undertaking its analysis, the *Kassis* court noted that given the subject attorney's "extensive participation" in the underlying litigation, and the fact that the current law firm represents "the adversary in the same matter," the law firm's burden in "rebutting the presumption that [the subject attorney] acquired material confidences is especially heavy." *Id.* at 618-19.

Just as in *Kassis*, GD&C is unable to rebut the presumption of imputed disqualification. *See also* February 21, 2006 disqualification order in the Related Action.  In the Related Action, GD&C had the opportunity to rebut the presumption of imputed disqualification by presenting evidence that neither Kislin nor Friedman acquired material confidences during their prior representation.   The conclusory affidavits that GD&C submitted were correctly found insufficient to rebut this presumption.  Salomon Dec. Ex. F at 15.  Accordingly, the GD&C attorney, and his (now) former partner, who prepared the governing documents at question in this litigation were disqualified from representing Eugenia's affiliate, Casita, because of an irreconcilable conflict of interest. *Id.*

---

[8]  Under some circumstances, not applicable here, this presumption of disqualification may be rebutted. *See, e.g., Papyrus*, 325 F. Supp. 2d at 278; *United States Football League v. National Football League*, 605 F. Supp. 1448, 1461 n.28 (S.D.N.Y. 1985) (disqualifying entire Paul Weiss firm based on prior representation of adverse party by other Paul Weiss attorneys).  Here, where GD&C's attorneys played an "appreciable role" in the prior representation and were the "strategy-makers" in the prior representation, the entire GD&C firm should be disqualified. *Cf. Papyrus*, 325 F. Supp. 2d at 279-280.

The same result is warranted here, where GD&C's attorneys played an "appreciable role" in the prior representation and were the "strategy-makers" in the prior representation. *Cf.* *Papyrus*, 325 F. Supp. 2d at 279-280. The entire GD&C firm should be disqualified. As the Court found in the Related Action, GD&C's alleged "erection of an 'ethical screen' or 'Chinese Wall' is 'inconsequential' and, as a matter of law, insufficient to avoid firm disqualification."[9] Salomon Dec. Ex. F at 15.

## A.    Kislin's Departure Does Not Expunge GD&C's Conflict of Interest

GD&C is expected to argue that it should not be disqualified from representing Eugenia in this litigation because Kislin recently left the firm. However, Kislin's recent departure should not influence this Court's determination that GD&C suffers from a conflict of interest that requires its disqualification.

First, the record supporting GD&C's disqualification in the Related Action establishes that Friedman and Wilf, former Chadbourne attorneys, also represented MapleWood Equity, the MapleWood Offshore Fund, MapleWood Partners, MapleWood Management, MapleWood Holdings and the AMC Investor Entities. GD&C submitted no evidence indicating otherwise. Indeed, the Related Action's disqualification order (as affirmed by the Appellate Division) held that both Friedman and Kislin were disqualified from representing Casita because of their conflict of interest. Under DR 5-108(C), GD&C must be disqualified from representing Eugenia in this action, because even though Kislin left, Friedman and Wilf still remain at GD&C, and, according to the uncontroverted evidence, possess information material to this matter.

Second, Kislin was employed by GD&C during the First Guaranty Action, during most of the Second Guaranty Action, during the First Alter Ego Action, and the more than two years

---

[9]    As set forth below, the evidence establishes that there is, in fact, no ethical screen in place at GD&C.

that other Eugenia litigation has been pending.  The presumption that confidences were passed from Kislin, during his lengthy employment at GD&C, to the litigators on this matter is not negated by his belated departure.

The New York Court of Appeals decision in *Solow v. W.R. Grace & Co.*, 83 N.Y.2d 303 (1994), is useful in this analysis.  In *Solow*, an attorney represented a defendant while employed at Stroock & Stroock & Lavan ("Stroock").  *Id.* at 307.  The attorney in question left the firm, and two years later, Stroock was retained as plaintiff's co-counsel in the subject litigation.  *Id.* By that time, the associate and paralegal who assisted the subject attorney with the prior representation also had left Stroock.  *Id.*  The *Solow* court acknowledged that if "one attorney in a firm is disqualified from representing a client, then all attorneys in the firm are so disqualified." *Id.* at 306.  However, in *Solow*, the attorney who represented the moving party left the firm several years prior to the firm's retention as counsel by the non-moving party in the subject litigation. *Id.* at 307.  Her associate and paralegal also had left the firm prior to the engagement in question.  *Id.*  Significantly, given the departure of the subject attorney long before the start of the subject litigation, Stroock was able to avoid disqualification, and rebutted the presumption that the rights of the former client were jeopardized, by presenting facts that established that the firm's remaining attorneys possessed no confidences or secrets of former client.

The facts of *Solow* do not save GD&C from imputed disqualification in the instant action. As noted above, Friedman and Wilf, two of the disqualified GD&C attorneys that previously represented the MapleWood Offshore Fund, the Parallel Fund, MapleWood Partners, MapleWood Management, and MapleWood Holdings are still employed by GD&C.  Moreover, Kislin was employed by GD&C until just a few months ago, and, given the relatedness between

this and other MapleWood and AMC Computer-related litigation, the risk of shared confidences materialized long prior to Kislin's departure.

Particularly given Friedman and Wilf's continued employment at GD&C, and confirmation that Friedman consulted with GD&C's litigators (as discussed below), GD&C again must be disqualified. This Court must not be distracted by Kislin's irrelevant belated departure.

## B.    The Record Establishes that GD&C Did Not Erect Any "Ethical Screen"

Furthermore, as the court in the Related Action previously held, the evidence disproves GD&C's claims that it erected any ethical screen.

During oral argument to the Court in the Related Action on November 10, 2005, Eugenia's counsel, Mitchell Karlan (counsel to Casita in that action), argued that, even if there was a chance that GD&C attorneys had received confidential communications, the disqualification motion should be denied because GD&C "ha[s] erected an ethical screen . . . so Mr. Kislin and Mr. Friedman are completely screened off from all of these matters." Salomon Dec. Ex. G. Of course, no mention was made of Wilf.

GD&C's claims that the conflicted attorneys have been screened off from any litigation were nothing but a "smoke screen." There is zero evidence of an ethical screen. In the Related Action, not one internal memorandum was introduced to support, and not one attorney submitted an affidavit stating, that an ethical screen ever existed. Thus, even if the GD&C attorneys were able to rebut the presumption that Kislin and Friedman's disqualification should be imputed to GD&C (which they have not, and cannot), there is absolutely no evidence that GD&C in fact insulated Kislin and Friedman from the GD&C litigators prosecuting these actions.

To the contrary, there is evidence that no such "ethical screen" or "Chinese Wall" was ever implemented. In the Related Action, both Kislin and Barbara Becker (another former

Chadbourne attorney) submitted affidavits establishing that they have communicated with GD&C litigators regarding Casita and the various MapleWood entities. Salomon Dec. Exs. H and I.

Furthermore, GD&C attorneys who formerly represented MapleWood Equity, the MapleWood Offshore Fund, MapleWood Partners, MapleWood Management, and MapleWood Holdings substantively consulted with GD&C litigation partners about MapleWood-related litigation matters. This also directly contradicts GD&C's unsworn statements in the Related Action about the existence of an ethical screen. Indeed, former MapleWood attorney Friedman appears in <u>hundreds</u> of entries in a privilege log produced by Eugenia on January 30, 2006, in related federal court actions regarding AMC Computer. Salomon Dec. Ex. N. This privilege log makes clear that Friedman played a substantial role in strategy and discussions in the litigation: Friedman appears in 223 out of 981 entries on Eugenia's privilege log, from May 1, 2005 (after the dispute first arose) to the present — almost 23% of the entries.[10]  *Id.*  The evidence establishes that no ethical screen ever existed.

In any event, the existence of an ethical screen does not automatically rebut imputed disqualification. *See* February 21, 2006 disqualification order in the Related Action; *see also Kassis*, 93 N.Y.2d at 615, 619 (record evidence of a written screen; firm nonetheless disqualified because, like here, "conclusory averments that [attorney] did not acquire such confidences during the prior representation failed to rebut that presumption as a matter of law. The erection of a

---

[10] Another GD&C corporate attorney, Barbara Becker, appears in 66 entries in the privilege log — almost 7%. Becker drafted and signed the Conflict Waiver Agreement that the Moving Parties contend also requires the disqualification of GD&C. She provided an affidavit in a related action (the veracity of which has been called into question) that states that she has not been involved in the pending litigation "other than to answer factual questions put to me by [GD&C] litigators of the relationships, if any, between [Eugenia], Casita, and various MapleWood entities." Sixty-six (66) entries on a privilege log is certainly more than "answer[ing] factual questions." Kislin also appears in Eugenia's privilege log (in at least 3 entries, dated June 8, 2005, more than a month after the dispute between Eugenia and MapleWood arose).

'Chinese Wall' in this case, therefore, was inconsequential."). Finally, even if a confidentiality screen were to be put into place now, it is too late for such prophylactic measures, because conflicted GD&C lawyers already have shared confidential information. Salomon Dec. Ex. N; *see, e.g., United States Football League v. National Football League*, 605 F. Supp. 1448, 1467 (S.D.N.Y. 1976) (finding ineffective screen imposed after conflict arose).

## Conclusion

Based on GD&C's breach of its own Conflict Waiver Agreement, and GD&C's former representation of MapleWood Equity and other MapleWood affiliates in substantially related matters, attorneys Dennis Friedman, Scott Kislin, Hyeon Lee, and any others who previously represented MapleWood Equity or any other MapleWood affiliates should be disqualified from serving as counsel to Eugenia in this matter, and such disqualification should be imputed to the entire GD&C firm. Furthermore, attorneys Dennis Friedman, Scott Kislin, Hyeon Lee, should be enjoined from communicating any confidential information imparted to them by MapleWood Equity, or its affiliates, to Eugenia or its new counsel.

Dated: New York, New York
      November 27, 2007

**STEVENS & LEE, P.C.**
Attorneys for Defendant

By: _____

    Chester B. Salomon (CS-2319)
    Constantine D. Pourakis (CP-0730)
    485 Madison Avenue, 20th Floor
    New York, New York 10022-5803
    Telephone: (212) 319-8500
    Facsimile:  (212) 319-8505

-and-

**AKERMAN SENTERFITT**
Attorneys for Defendant
One Southeast Third Avenue, 25th Floor
Miami, Florida 33131-1714
Telephone: (305) 374-5600
Facsimile:  (305) 374-5095
Attn:  Brian P. Miller, Esq.
(*pro hac vice* admission pending)

TO:    Gibson Dunn & Crutcher LLP
       200 Park Avenue
       New York, NY 10166-0193
       Attn:  Mitchell A. Karlan, Esq.

{M2621651;5}