# EXHIBIT A

# AMENDED AND RESTATED CREDIT AGREEMENT

Dated as of January 30, 2002

among

AMC Computer Corp.
as Borrower,

THE OTHER CREDIT PARTIES SIGNATORY HERETO,
as Credit Parties, and

EUGENIA VI VENTURE HOLDINGS, LTD.,
as Lender

Page

1.AMOUNT AND TERMS OF CREDIT ..................................................... 2

    1.1    Credit Facilities ................................................................................... 2

          (a)    Revolving Credit Facility ................................................... 2

          (b)    Term Loan ............................................................................. 3

    1.2    [INTENTIONALLY DELETED] ........................................................ 3

    1.3    Prepayments ........................................................................................ 3

          (a)    Voluntary Prepayments ....................................................... 3

          (b)    Mandatory Prepayments ...................................................... 3

          (c)    Application of Certain Mandatory Prepayments .............. 4

    1.4    Use of Proceed .................................................................................... 5

    1.5    Interest and Applicable Margins ...................................................... 5

    1.6    Eligible Accounts ............................................................................... 6

    1.7    Eligible Inventory .............................................................................. 8

    1.8    Cash Management Systems ............................................................. 10

    1.9    Fees ..................................................................................................... 10

    1.10    Receipt of Payments ........................................................................ 10

    1.11    Application and Allocation of Payments ...................................... 11

    1.12    Loan Account and Accounting ....................................................... 11

    1.13    Indemnity ........................................................................................... 11

    1.14    Access ................................................................................................. 13

    1.15    Taxes .................................................................................................. 13

          (a)    No Deductions ...................................................................... 13

i

Page

       (b)      Changes in Tax Laws ................................................................................... 13

1.16     Single Loan ............................................................................................................. 14

2.CONDITIONS PRECEDENT ................................................................................................... 14

2.1     Conditions to the Initial Loans ............................................................................ 14

       (a)      Credit Agreement; Loan Documents ...................................... 14

       (b)      Repayment of GECC Credit Facility; Satisfaction of Outstanding
                  L/Cs ...................................................................................................... 15

       (c)      Approvals. .......................................................................................... 15

       (e)      Payment of Fees. .............................................................................. 15

       (f)      Capital Structure; Other Indebtedness. ...................................... 15

       (g)      Due Diligence. ................................................................................... 15

       (h)      Consummation of Related Transactions. .................................. 15

2.2     Further Conditions to Each Loan ........................................................................ 16

3.REPRESENTATIONS AND WARRANTIES .......................................................................... 16

3.1     Corporate Existence; Compliance with Law...................................................... 16

3.2     Executive Offices; FEIN ........................................................................................ 17

3.3     Corporate Power, Authorization, Enforceable Obligations ................................ 17

3.4     Financial Statements and Projections.................................................................. 17

       (c)      Projections........................................................................................... 18

3.5     Material Adverse Effect ......................................................................................... 18

3.6     Ownership of Property; Liens .............................................................................. 19

3.7     Labor Matters ......................................................................................................... 19

3.8     Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ...... 20

ii

Page

3.9     Government Regulation ............................................................ 20

3.10    Margin Regulations ................................................................ 20

3.11    Taxes. ................................................................................ 21

3.12    ERISA ................................................................................ 21

        (a)     Disclosure Schedule (3.12) ......................................... 21

3.13    No Litigation ....................................................................... 22

3.14    Brokers .............................................................................. 22

3.15    Intellectual Property ............................................................. 23

3.16    Full Disclosure .................................................................... 23

3.17    Environmental Matters .......................................................... 23

3.18    Insurance ............................................................................ 24

3.19    Deposit and Disbursement Accounts ......................................... 24

3.20    Government Contracts ........................................................... 24

3.21    Customer and Trade Relations ................................................ 24

3.22    Agreements and Other Documents ........................................... 24

3.23    Solvency ............................................................................ 25

4.11    Performance of Agreements .................................................... 25

3.25    Inventory Trade Financing. ..................................................... 25

4. FINANCIAL STATEMENTS AND INFORMATION ............................... 25

4.1     Reports and Notices .............................................................. 25

4.2     Communication with Accountants ............................................ 25

5. AFFIRMATIVE COVENANTS ........................................................... 26

iii

Page

5.1    Maintenance of Existence and Conduct of Business ..................................... 26

5.2    Payment of Charges. ........................................................................... 26

5.3    Books and Records. ............................................................................ 26

5.4    Insurance; Damage to or Destruction of Collateral. ................................... 27

5.5    Compliance with Laws. ........................................................................ 28

5.6    Supplemental Disclosure. ..................................................................... 28

5.7    Intellectual Property. ........................................................................... 29

5.8    Environmental Matters. ........................................................................ 29

5.9    Landlords' Agreements, Mortgagee Agreements and Bailee Letters. .................. 30

5.10   Further Assurances. ............................................................................ 30

6. NEGATIVE COVENANTS ............................................................................ 31

6.1    Mergers, Subsidiaries, Etc. ................................................................... 31

6.2    Investments; Loans and Advances. ........................................................... 31

6.3    Indebtedness. .................................................................................... 32

6.4    Employee Loans and Affiliate Transactions. ............................................... 32

6.5    Capital Structure and Business. .............................................................. 33

6.6    Guaranteed Indebtedness. ..................................................................... 33

6.7    Liens. ............................................................................................. 33

6.8    Sale of Stock and Assets. ...................................................................... 33

6.9    ERISA. ............................................................................................ 34

6.10   Financial Covenants. ........................................................................... 34

6.11   Hazardous Materials. ........................................................................... 34

Page

6.12  Sale-Leasebacks. ........................................................................... 34

6.13  Cancellation of Indebtedness. ....................................................... 34

6.14  Restricted Payments. ..................................................................... 35

6.15  Change of Corporate Name or Location; Change of Fiscal Year. ......... 35

6.16  No Impairment of Intercompany Transfers. .................................. 36

6.17  No Speculative Transactions. ........................................................ 36

6.18  Real Estate. ................................................................................... 36

6.19  Changes Relating to Subordinated Debt and Inventory Trade Financing;
      Material Contracts. ....................................................................... 36

6.20  Credit Parties Other than Borrower and Eligible Subsidiaries. ........... 36

6.21  Modifications of Certain Documents. ............................................ 37

6.23  Inventory Trade Financing. ........................................................... 37

7. TERM 37

7.1   Termination. .................................................................................. 37

7.2   Survival of Obligations Upon Termination of Financing Arrangements. ............ 38

8. EVENTS OF DEFAULT; RIGHTS AND REMEDIES ................................. 38

8.1   Events of Default. .......................................................................... 38

8.2   Remedies. ...................................................................................... 40

8.3   Waivers by Credit Parties. ............................................................ 40

9. ASSIGNMENT AND PARTICIPATIONS ................................................ 40

9.1   Assignment and Participations. .................................................... 40

9.2   Lender's Reliance, Etc. .................................................................. 41

9.3   Setoff and Sharing of Payments. .................................................. 41

v

Page

10. SUCCESSORS AND ASSIGNS .................................................................................. 42

    10.1   Successors and Assigns ............................................................................ 42

11. MISCELLANEOUS ................................................................................................... 42

    11.1   Complete Agreement; Modification of Agreement. ................................ 42

    11.2   Amendments and Waivers. ...................................................................... 42

    11.3   Fees and Expenses ................................................................................... 42

    11.4   No Waiver. ............................................................................................... 44

    11.5   Remedies. ................................................................................................ 44

    11.6   Severability. ............................................................................................ 44

    11.7   Conflict of Terms. ................................................................................... 44

    11.8   Confidentiality. ........................................................................................ 45

    11.9   GOVERNING LAW. ................................................................................ 45

    11.10  Notices ..................................................................................................... 46

    11.11  Section Titles ........................................................................................... 47

    11.12  Counterparts. ........................................................................................... 47

    11.13  WAIVER OF JURY TRIAL. ................................................................... 47

    [11.14 Press Releases. ........................................................................................ 48

    11.15  Reinstatement. ......................................................................................... 48

    11.16  Advice of Counsel ................................................................................... 48

    11.17  No Strict Construction. ............................................................................ 48

    11.18  No Fiduciary Relationship; Limitation of Liabilities. ............................ 48

## INDEX OF APPENDICES

| | | |
|---|---|---|
| Exhibit 1.1(a)(i) | - | Form of Notice of Revolving Credit Advance |
| Exhibit 1.1(a)(ii) | - | Form of Revolving Note |
| Exhibit 1.1(b) | - | Form of Term Note |
| Exhibit 2.1(h-1) | | Form of Investor Rights Agreement |
| Exhibit 2.1(h-2) | | Form of Certificate of Amendment to Certificate of Incorporation |
| Exhibit 4.1(b) | - | Form of Borrowing Base Certificate |
| Schedule 1.1(a) | - | Responsible Individual |
| Schedule 1.1(b) | - | EBITDA Adjustments |
| Schedule 1.4 | - | Sources and Uses; Funds Flow Memorandum |
| Schedule 3.1 | - | Corporate Existence; Compliance with Law |
| Schedule 3.2 | - | Executive Offices; FEIN |
| Schedule 3.4(a) | - | Financial Statements |
| Schedule 3.4(b) | - | Pro Forma |
| Schedule 3.4(b) | - | Projections |
| Schedule 3.5 | - | Material Adverse Effect |
| Schedule 3.6 | - | Real Estate and Leases |
| Schedule 3.7 | - | Labor Matters |
| Schedule 3.8 | - | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.11 | - | Tax Matters |
| Schedule 3.12 | - | ERISA Plans |
| Schedule 3.13 | - | Litigation |
| Schedule 3.15 | - | Intellectual Property |
| Schedule 3.17 | - | Hazardous Materials |
| Schedule 3.18 | - | Insurance |
| Schedule 3.19 | - | Deposit and Disbursement Accounts |
| Schedule 3.20 | - | Government Contracts |
| Schedule 3.22 | - | Material Agreements |
| Schedule 5.1 | - | Trade Names |
| Schedule 6.3 | - | Indebtedness |
| Schedule 6.4(a) | - | Transactions with Affiliates |
| Schedule 6.7 | - | Existing Liens |
| Annex A (Recitals) | - | Definitions |
| Annex B (Section 1.8)- | | Cash Management System |
| Annex C (Section 2.1(a)) | - | Closing Checklist |
| Annex D (Section 4.1(a)) | - | Financial Statements and Projections – Reporting |
| Annex E (Section 4.1(b)) | - | Collateral Reports |

AMENDED AND RESTATED CREDIT AGREEMENT, dated as of January 30, 2003 among AMC COMPUTER CORP., a New York corporation (together with its successors and assigns, "Borrower"); the other Credit Parties signatory hereto. AMC Computer Corp. (NJ), a New Jersey corporation, which is the sole subsidiary of Borrower as of the Closing Date, and EUGENIA VI VENTURE HOLDINGS, LTD., a British Virgin Islands company (in its individual capacity, "Eugenia"), as Lender.

## RECITALS

WHEREAS, the Borrower and Eugenia are parties to a Loan and Security Agreement dated as of September 4, 2001 (as amended, the "Existing Credit Agreement"), as in effect immediately prior to the Closing Date (as defined herein);

WHEREAS, the parties hereto have agreed to amend and restate the Existing Credit Agreement as provided in this Agreement, which Agreement shall become effective upon the satisfaction of the conditions precedent set forth in subsection 2.1 hereof;

WHEREAS, it is the intent of the parties hereto that this Agreement not constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement or evidence repayment of any of such obligations and liabilities and that this Agreement amend and restate in its entirety the Existing Credit Agreement and re-evidence the obligations of the Company outstanding thereunder;

WHEREAS, Borrower has requested that Lender extend revolving and term credit facilities to Borrower of up to SIXTEEN MILLION DOLLARS ($16,000,000) in the aggregate for the purpose of refinancing certain indebtedness of Borrower and to provide (a) working capital financing for Borrower, and (b) funds for other general corporate purposes of Borrower (to the extent permitted in Section 1.4); and for these purposes, Lender is willing to make certain loans and other extensions of credit to Borrower of up to such amount upon the terms and conditions set forth herein; and

WHEREAS, Borrower has agreed to secure all of its obligations under the Loan Documents by granting to Lender a security interest in and lien upon all of its existing and after-acquired personal and real property; and

WHEREAS, AMC Investors LLC, a Delaware limited liability company ("Holdings") and AMC Investors II LLC, a Delaware limited liability company ("Holdings II") are willing to guaranty all of the obligations of Borrower to Lender under the Loan Documents and to pledge to Lender all of the capital stock of Borrower which it owns to secure such guaranty; and

WHEREAS, capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex A, and, for purposes of this Agreement and the other Loan Documents, the rules of construction set forth in Annex A shall govern. All Annexes, Disclosure Schedules, Exhibits and other attachments (collectively, "Appendices") hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together with this Agreement, shall constitute but a single agreement. These Recitals shall be construed as part of the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, the parties hereto agree that on the Closing Date (as defined below) the Existing Credit Agreement shall be amended and restated in its entirety as follows:

1.  AMOUNT AND TERMS OF CREDIT

    1.1   Credit Facilities.

        (a)   Revolving Credit Facility.

           (i)   Subject to the terms and conditions hereof, the Lender agrees to make available from time to time until the Commitment Termination Date advances (each, a "Revolving Credit Advance"). Until the Commitment Termination Date, Borrower may from time to time, as set forth below, borrow, repay and reborrow under this Section 1.1(a); provided, that the amount of any Revolving Credit Advance to be made at any time under this Section 1.1(a) shall not exceed Borrowing Availability at such time, and provided, further, that Revolving Credit Advances shall be made no more frequently than twice weekly, and only on a Tuesday or Friday that is a Business Day (any such day an "Advance Date") or less frequently, in Lender's sole discretion. Borrowing Availability may be reduced by Reserves imposed by Lender in its sole discretion. Each Revolving Credit Advance shall be made on notice by Borrower to Lender at the address specified in Section 11.10. Any such notice must be given no later than 11:00 a.m. (New York time) on (x) the Friday before a proposed Revolving Credit Advance to be made on a Tuesday of any week, and (y) the Wednesday before a proposed Revolving Credit Advance to be made on a Friday of any week, and in any event, no later than 11:00 a.m. (New York time) at least two (2) Business Days before the proposed Revolving Credit Advance. Each such notice (a "Notice of Revolving Credit Advance") must be given in writing (by email and telecopy or overnight courier) substantially in the form of Exhibit 1.1(a)(i), and shall include the information required in such Exhibit and such other information as may be reasonably required by Lender. If Lender does not receive a Notice of Revolving Credit Advance by 11:00 a.m. (New York time) on the day on which such notice is required to be given, then no Revolving Credit Advance shall be made until the next Advance Date. Notwithstanding the foregoing, Borrower shall have the right no more frequently than once a calendar month to request that an Advance Date be a day of the week other than a Tuesday or Friday but that is otherwise a Business Day; provided that, Borrower must provide (a) written notice (by email and telecopy or overnight courier) of such requested change no later than 11:00 a.m. (New York time) at least five (5) Business Days before the proposed Advance Date and (b) a written Notice of Revolving Credit Advance no later than 11:00 a.m. (New York time) at least two (2) Business Days before the proposed Revolving Credit Advance, in each case to Lender at the address specified in Section 11.10; provided, further, that in no event shall Revolving Credit Advances be made more frequently than twice weekly.

           (ii)   Borrower shall execute and deliver to Lender a note to evidence Lender's Revolving Loan Commitment. The note shall be in the principal amount of Lender's Revolving Loan Commitment, dated the Closing Date and

substantially in the form of <u>Exhibit 1.1(a)(ii)</u> (the "<u>Revolving Note</u>"). The Revolving Note shall represent the obligation of Borrower to pay the amount of Lender's Revolving Loan Commitment together with interest thereon as prescribed in <u>Section 1.5</u>. The entire unpaid balance of the Revolving Loan and all other non-contingent Obligations shall be immediately due and payable in full in immediately available funds on the Commitment Termination Date.

        (b)    <u>Term Loan</u>.

        (i)    Subject to the terms and conditions hereof, Lender agrees to make a term loan on the Closing Date to Borrower (the "<u>Term Loan</u>") in the original principal amount of its Term Loan Commitment. The Term Loan shall be evidenced by a promissory note substantially in the form of Exhibit 1.1(b) (the "<u>Term Note</u>"). The Term Note shall represent the obligation of Borrower to pay the amount of Lender's Term Loan Commitment, together with interest thereon as prescribed in Section 1.5.

        (ii)    Borrower shall pay the principal amount of the Term Loan in thirty-six (36) consecutive monthly installments of $83,333.33 each on the last Business Day of the first eleven months of each Fiscal Year and $83,333.37 on the last Business Day of the twelfth month of each Fiscal Year, commencing February 28, 2003.

        (iii)    Notwithstanding the foregoing, the aggregate outstanding principal balance of the Term Loan shall be due and payable in full in immediately available funds on the Commitment Termination Date, if not sooner paid in full. No payment with respect to the Term Loan may be reborrowed.

    1.2    [INTENTIONALLY DELETED]

    1.3    <u>Prepayments</u>.

        (a)    <u>Voluntary Prepayments</u>. Borrower may at any time upon written or telephonic notice to Lender on or prior to 11:00 A.M. (New York City time) on the date of prepayment, voluntarily prepay all or part of the Term Loan; <u>provided</u> that any such prepayments shall be in a minimum amount of $250,000. In addition, Borrower may at any time upon written or telephonic notice to Lender on or prior to 11:00 A.M. (New York City time) on the date of termination, terminate the Revolving Loan Commitment in whole or in part; <u>provided</u> that upon such termination in whole, all Loans and other Obligations shall be immediately due and payable in full and upon such termination in part, Loans and other Obligations shall be immediately due and payable to the extent of such termination. Upon any such prepayment and termination of the Revolving Loan Commitment, Borrower's right to request Revolving Credit Advances shall simultaneously be terminated. Any partial prepayments of the Term Loan made by Borrower shall be applied to prepay the scheduled installments of the Term Loan in inverse order of maturity.

        (b)    <u>Mandatory Prepayments</u>.

        (i)    If at any time the outstanding balance of the Revolving Loan exceeds the lesser of (A) the Maximum Amount and (B) the Borrowing Base, Borrower

shall immediately repay the aggregate outstanding Revolving Credit Advances to the extent required to eliminate such excess.

(ii)    Immediately upon receipt by any Credit Party of proceeds of any asset disposition (excluding proceeds of asset dispositions permitted by Section 6.8(a)) or any sale of Stock of any Subsidiary of any Credit Party, Borrower shall prepay the Loans in an amount equal to all such proceeds, net of (A) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by Borrower in connection therewith (in each case, paid to non-Affiliates), (B) transfer taxes, (C) amounts payable to holders of senior Liens (to the extent such Liens constitute Permitted Encumbrances hereunder), if any, and (D) an appropriate reserve for income taxes in accordance with GAAP in connection therewith.  Any such prepayment shall be applied in accordance with Section 1.3(c).

(iii)    If Holdings, Holdings II or Borrower issues Stock or incurs Indebtedness, except for (A) issuances of Stock or Indebtedness to a Credit Party, or to Lender, (B) Indebtedness of the type referred to in Section 6.3(a)(i), (ii) or (iii) or (C) issuances of Stock dividend payments under Borrower's Preferred Stock, no later than the Business Day following the date of receipt of the proceeds thereof, Borrower shall prepay the Loans in an amount equal to 50% of such proceeds, net of underwriting discounts and commissions and other reasonable costs paid to non-Affiliates in connection therewith. Any such prepayment shall be applied in accordance with Section 1.3(c).

(iv)    Until the Termination Date, Borrower shall prepay the Obligations on the date that is 10 days after the earlier of (A) the date on which Borrower's annual audited Financial Statements for the immediately preceding Fiscal Year (commencing with the Fiscal Year ending December 31, 2002) are delivered pursuant to Annex D or (B) the date on which such annual audited Financial Statements were required to be delivered pursuant to Annex D, in an amount equal to fifty percent (50%) of Excess Cash Flow for the immediately preceding Fiscal Year.  Any prepayments from Excess Cash Flow paid pursuant to this clause (iv) shall be applied in accordance with Section 1.3(c).  Each such prepayment shall be accompanied by a certificate signed by Borrower's chief financial officer certifying the manner in which Excess Cash Flow and the resulting prepayment were calculated, which certificate shall be in form and substance reasonably satisfactory to Lender.

(v)    Immediately upon receipt of condemnation or insurance proceeds in accordance with Section 5.4(c) Borrower shall prepay the Loans in an amount equal to all such proceeds.  Any such prepayment shall be applied in accordance with Section 1.3(c).

(c)    Application of Certain Mandatory Prepayments.  Any prepayments made by Borrower pursuant to Sections 1.3(b)(ii), (b)(iii), (b)(iv) or (b)(v) above shall be applied as follows: first, to Fees and reimbursable expenses of Lender then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Term Loan; third, to prepay the scheduled principal installments of the Term Loan in inverse order of maturity, until such Loan has been prepaid in full; fourth, to interest

4

then due and payable on the Revolving Credit Advances; and <u>fifth</u>, to the extent there are mandatory prepayment amounts remaining after such application, the Revolving Credit Loan Commitment shall be permanently reduced in an amount equal to such excess, and the Borrower shall comply with <u>Section 1.3(b)(i)</u>.

(d)    Nothing in this <u>Section 1.3</u> shall be construed to constitute Lender's consent to any transaction that is not permitted by other provisions of this Agreement or the other Loan Documents.

1.4    <u>Use of Proceeds</u>.  Borrower shall utilize the proceeds of the Term Loan and the Revolving Loans solely for the Refinancing (and to pay any related transaction expenses), and for the financing of Borrower's ordinary working capital and general corporate needs; <u>provided</u> that Borrower shall not be permitted to use proceeds of the Loans for payment of amounts due for past services rendered payable pursuant to Section 3.4 of the Israel Employment Agreements without the prior written consent of Lender which shall be given in Lender's sole discretion.

1.5    <u>Interest and Applicable Margins</u>.

(a)    Borrower shall pay interest to Lender, in arrears on each applicable Interest Payment Date, at the following rates:  (i) with respect to the Revolving Credit Advances, a rate per annum equal to sixteen percent (16%), based on the aggregate daily Revolving Credit Advances outstanding from time to time, which sixteen percent shall be divided between (x) twelve percent (12%) per annum payable in cash and (y) four percent (4%) per annum payable in additional shares of Series D Preferred (the "<u>PIK Interest</u>"); <u>provided</u> that the shares of Series D Preferred representing PIK Interest due on each Interest Payment Date shall be entered into the stock register of the Borrower on such Interest Payment Date and all such registered but nonissued PIK Interest shall be issued on (A) the last Interest Payment Date of each fiscal year and (B) the Commitment Termination Date; and (ii) with respect to the Term Loan (the "<u>Term Loan Interest Rate</u>"), a rate per annum equal to nine percent (9%) payable in cash.

(b)    If any payment on any Loan becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)    All computations of Fees calculated on a per annum basis and interest shall be made by Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such interest and Fees are payable.  In computing interest on any Loan, the date of funding of the Loan shall be included and the date of payment of such Loan shall be excluded; <u>provided</u> that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.  Each determination by Lender of an interest rate and Fees hereunder shall be final, binding and conclusive on Borrower, absent manifest error.

5

(d)    So long as a Default or Event of Default has occurred and is continuing, the interest rates applicable to the Loans shall be increased by two percent (2%) per annum above the rates of interest otherwise applicable hereunder ("Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the initial date of such Default or Event of Default until that Default or Event of Default is cured or waived and shall be payable upon demand.

(e)    Notwithstanding anything to the contrary set forth in this Section 1.5, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Lender, is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Sections 1.5(a) through (e), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply. In no event shall the total interest received by Lender pursuant to the terms hereof exceed the amount that Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this Section 1.5(f), a court of competent jurisdiction shall finally determine that a Lender has received interest hereunder in excess of the Maximum Lawful Rate, Lender shall, to the extent permitted by applicable law, promptly apply such excess in the order specified in Section 1.11 and thereafter shall refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

1.6    Eligible Accounts. All of the Accounts of Borrower reflected in the most recent Borrowing Base Certificate, if applicable, delivered by Borrower to Lender shall be "Eligible Accounts" for purposes of this Agreement, except any Account to which any of the exclusionary criteria set forth below applies. Lender shall have the right to establish, modify or eliminate Reserves against Eligible Accounts from time to time in its sole discretion. In addition, Lender reserves the right, at any time and from time to time after the Closing Date, to adjust any of the criteria set forth below and to establish new criteria with respect to Eligible Accounts, in its sole discretion. Eligible Accounts shall not include any Account of Borrower:

(a)    that does not arise from the sale of goods or the performance of services by Borrower in the ordinary course of its business;

(b)    (i) upon which Borrower's right to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever or (ii) as to which Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process, or (iii) if the Account represents a progress billing, other than progress billings up to $250,000 in the aggregate at any one time relating to maintenance agreements entered into by Borrower in the ordinary course of business, consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the Account Debtor's obligation to pay that invoice is subject to Borrower's completion of further performance under such contract or is subject to the equitable lien of a surety bond issuer;

(c)    to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Account;

(d)    that is not a true and correct statement of bona fide indebtedness incurred in the amount of the Account for merchandise sold to or services rendered and accepted by the applicable Account Debtor;

(e)    with respect to which an invoice has not been sent to the applicable Account Debtor;

(f)    that (i) is not owned by Borrower or (ii) is subject to any right, claim, security interest or other interest of any other Person, other than Liens in favor of Lender;

(g)    except as disclosed and acceptable to Lender, that arises from a sale to any director, officer, other employee or Affiliate of any Credit Party, or to any entity that has any common officer or director with any Credit Party;

(h)    that is the obligation of an Account Debtor that is the United States government or a political subdivision thereof, or any state, county or municipality or department, agency or instrumentality thereof unless Lender, in its sole discretion, has agreed to the contrary in writing and Borrower, if necessary or desirable, has complied with respect to such obligation with the Federal Assignment of Claims Act of 1940, or any applicable state, county or municipal law restricting assignment thereof;

(i)    that is the obligation of an Account Debtor located in a foreign country;

(j)    to the extent Borrower or any Subsidiary thereof is liable for goods sold or services rendered by the applicable Account Debtor to Borrower or any Subsidiary thereof but only to the extent of the potential offset;

(k)    that arises with respect to goods that are leased by Borrower to an Account Debtor or delivered on a bill-and-hold, cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor is or may be conditional;

7

(l)    that is in default; provided, that, without limiting the generality of the foregoing, an Account shall be deemed in default upon the occurrence of any of the following:

(i)    such Account remains unpaid for more than sixty (60) days after the due date specified in the original invoice, or for more than ninety (90) days after the original invoice date if no date was specified (or, if the Account Debtor is a Hospital, 90 days following the due date specified in the original invoice or 180 days following the original invoice date if no date was specified);

(ii)    the Account Debtor obligated upon such Account suspends business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due; or

(iii)    a petition is filed by or against any Account Debtor obligated upon such Account under any bankruptcy law or any other federal, state or foreign (including any provincial) receivership, insolvency relief or other law or laws for the relief of debtors;

(m)    that is the obligation of an Account Debtor if fifty percent (50%) or more of the Dollar amount of all Accounts owing by that Account Debtor are ineligible under the other criteria set forth in this Section 1.6;

(n)    as to which Lender's Lien thereon is not a first priority perfected Lien;

(o)    as to which any of the representations or warranties in the Loan Documents with respect to such Account is untrue;

(p)    to the extent such Account is evidenced by a judgment, Instrument or Chattel Paper;

(q)    to the extent that such Account, together with all other Accounts owing to such Account Debtor and its Affiliates as of any date of determination exceed ten percent (10%) (or thirty five percent (35%) in the case of Accounts as to which the Account Debtor has a corporate rating of A from Standard & Poor's Ratings Services) of all Eligible Accounts;

(r)    that is payable in any currency other than Dollars; or

(s)    that is otherwise unacceptable to Lender in its sole discretion.

1.7    Eligible Inventory.  All of the Inventory owned by Borrower and reflected in the most recent Borrowing Base Certificate delivered by Borrower to Lender shall be "Eligible Inventory" for purposes of this Agreement, except any Inventory to which any of the exclusionary criteria set forth below applies. Lender shall have the right to establish, modify or eliminate Reserves against Eligible Inventory from time to time in its sole discretion. Lender reserves the right, at any time and from time to time after the Closing Date, to adjust any of the criteria set forth below and to establish new criteria to adjust

8

advance rates with to Eligible Inventory in its sole discretion. Eligible Inventory shall not include any Inventory of Borrower that:

(a)    is not owned by Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments and the rights of a surety that has issued a bond to assure Borrower's performance with respect to that Inventory), except the Liens in favor of Lender and Permitted Encumbrances in favor of landlords and bailees to the extent permitted in <u>Section 5.9</u> hereof (subject to Reserves established by Lender in accordance with <u>Section 5.9</u> hereof);

(b)    is (i) not located on premises owned or leased by Borrower and set forth in Disclosure Schedule 3.2 or (ii) is stored at a leased location, unless Lender has given its prior consent thereto and unless either (x) a reasonably satisfactory landlord waiver has been delivered to Lender, or (y) Reserves reasonably satisfactory to Lender have been established with respect thereto, or (iii) is stored with a bailee or warehouseman unless a reasonably satisfactory, acknowledged bailee letter has been received by Lender and Reserves reasonably satisfactory to Lender have been established with respect thereto, or (iv) is located at an owned location subject to a mortgage in favor of a lender other than Lender unless a reasonably satisfactory mortgagee waiver has been delivered to Lender, or (v) is located at any site if the aggregate book value of Inventory at any such location is less than $100,000;

(c)    is placed on consignment, or is in transit, except for Inventory in transit between domestic locations of Credit Parties as to which perfection has been achieved at origin and destination;

(d)    is covered by a negotiable document of title, unless such document has been delivered to Lender with all necessary endorsements, free and clear of all Liens except those in favor of Lender;

(e)    is excess, obsolete, unsalable, shopworn, seconds, damaged or unfit for sale below such Credit Party's cost;

(f)    consists of display items or packing or shipping materials, manufacturing supplies or work-in-process Inventory;

(g)    consists of goods which have been returned by the buyer;

(h)    is not of a type held for sale in the ordinary course of Borrower's business;

(i)    is not subject to a first priority lien in favor of Lender;

(j)    breaches any of the representations or warranties pertaining to Inventory set forth in the Loan Documents;

(k)    consists of any costs associated with "freight-in" charges;

9

(l)    consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available;

(m)    is not covered by casualty insurance reasonably acceptable to Lender; or

(n)    is otherwise unacceptable to Lender in its sole discretion.

1.8    Cash Management Systems.  On or prior to the  Closing Date, Borrower will establish and will maintain until the Termination Date, the cash management systems described in Annex B (the "Cash Management Systems").

1.9    Fees.

(a)    Borrower shall pay to Eugenia, individually, the following fees and expenses, at the times specified for payment:

(i)    On the Closing Date, a Closing Fee equal to 2.75% of the Commitments, which is equal to $440,000.

(ii)    On the Closing Date and on each anniversary of the Closing Date, so long as the Loans are outstanding, an Agency Fee in the amount of $100,000.

(iii)    Costs and expenses of Lender in connection with up to two field examinations per year (provided, however, that if a Default or Event of Default shall have occurred and be continuing field examinations shall be conducted at Lender's discretion) after the Closing Date, it being understood that so long as no Default or Event of Default shall have occurred and be continuing, no single examination pursuant to this clause (iii) shall exceed $15,000.

All fees set forth in this clause (a) will be deemed to be fully earned on the date of required payment thereof and shall be non-refundable when paid.

(b)    As additional compensation for the Revolving Lender, Borrower shall pay to Lender, in arrears, on the first Business Day of each month prior to the Commitment Termination Date and on the Commitment Termination Date, a Fee for Borrower's non-use of available funds in an amount equal to one-half percent (0.50%) per annum (calculated on the basis of a 360 day year for actual days elapsed) multiplied by the difference between (x) the Maximum Amount (as it may be reduced from time to time) and (y) the average for the period of the daily closing balances of the Revolving Loan outstanding during the period for which such Fee is due.

1.10    Receipt of Payments.  Borrower shall make each payment under this Agreement not later than 2:00 p.m. (New York time) on the day when due in immediately available funds in Dollars to the Collection Account.  For purposes of computing interest and Fees and determining Borrowing Availability as of any date, all payments shall be

10

deemed received on the Business Day on which immediately available funds therefor are received in the Collection Account prior to 2:00 p.m. New York time. Payments received after 2:00 p.m. New York time on any Business Day or on a day that is not a Business Day shall be deemed to have been received on the following Business Day.

1.11    Application and Allocation of Payments.

(a)    So long as no Default or Event of Default has occurred and is continuing, (i) payments consisting of proceeds of Accounts received in the ordinary course of business shall be applied to the Revolving Loan; (ii) payments matching specific scheduled payments then due shall be applied to those scheduled payments; (iii) voluntary prepayments shall be applied as set forth in Section 1.3(a); and (iv) mandatory prepayments shall be applied as set forth in Sections 1.3(b)(i) and 1.3(c). As to each such payment, and as to all payments made when a Default or Event or Default has occurred and is continuing or following the Commitment Termination Date, Borrower hereby irrevocably waives the right to direct the application of any and all payments received from or on behalf of Borrower, and Borrower hereby irrevocably agrees that Lender shall have the continuing exclusive right to apply any and all such payments against the Obligations as Lender may deem advisable notwithstanding any previous entry by Lender in the Loan Account or any other books and records. In the absence of a specific determination by Lender with respect thereto, payments shall be applied to amounts then due and payable in the following order: (1) to Fees and Lender's expenses reimbursable hereunder; (2) to interest on the Loans, ratably in proportion to the interest accrued as to each Loan; (3) to principal payments on the Loans; and (4) to all other Obligations including expenses of Lender to the extent reimbursable under Section 11.3.

(b)    Lender is authorized to, and at its sole election may, charge to the Revolving Loan balance on behalf of Borrower and cause to be paid all Fees, expenses, Charges, costs (including insurance premiums in accordance with Section 5.4(a)) and interest and principal, other than principal of the Revolving Loan, owing by Borrower under this Agreement or any of the other Loan Documents if and to the extent Borrower fails to pay promptly any such amounts as and when due. At Lender's option and to the extent permitted by law, any charges so made at any time shall constitute part of the Revolving Loan hereunder, even if the amount of such charges exceed Borrowing Availability at such time.

1.12    Loan Account and Accounting. Lender shall maintain a loan account (the "Loan Account") on its books to record: all Advances and the Term Loan, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Loans or any other Obligations. The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Lender by Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations.

1.13    Indemnity; Illegality.

11

(a)     Each Credit Party that is a signatory hereto shall jointly and severally indemnify and hold harmless Lender and its Affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and reasonable expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, that no such Credit Party shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

(b)     If Lender shall have determined that any law, treaty, governmental (or quasi-governmental) rule, regulation, guideline or order regarding capital adequacy, reserve requirements or similar requirements or compliance by any Lender with any request or directive regarding capital adequacy, reserve requirements or similar requirements (whether or not having the force of law), in each case, adopted after the Closing Date, from any central bank or other Governmental Authority increases or would have the effect of increasing the amount of capital, reserves or other funds required to be maintained by such Lender and thereby reducing the rate of return on such Lender's capital as a consequence of its obligations hereunder, then Borrower shall from time to time upon demand by such Lender pay to Lender, additional amounts sufficient to compensate such Lender for such reduction. A certificate as to the amount of that reduction and showing the basis of the computation thereof submitted by such Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.

(c)     If, due to either (i) the introduction of or any change in any law or regulation (or any change in the interpretation thereof) or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in each case adopted after the Closing Date, there shall be any increase in the cost to Lender of agreeing to make or making, funding or maintaining any Loan, then Borrower shall from time to time, upon demand by Lender (with a copy of such demand to Agent), pay to Agent for the account of Lender additional amounts sufficient to

12

compensate Lender for such increased cost. A certificate as to the amount of such increased cost, submitted to Borrower by Lender, shall be conclusive and binding on Borrower for all purposes, absent manifest error.

1.14    Access. Each Credit Party that is a party hereto shall, during normal business hours as frequently as Lender reasonably determines to be appropriate: (a) provide Lender and any of its officers, employees and agents access to its properties, facilities, advisors and employees (including officers) of each Credit Party and to the Collateral, (b) permit Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from any Credit Party's books and records, and (c) permit Lender, and its officers, employees and agents, to inspect, review, evaluate and make test verifications and counts of the Accounts, Inventory and other Collateral of any Credit Party. If a Default or Event of Default has occurred and is continuing or if access is necessary to preserve or protect the Collateral as determined by the Lender, each such Credit Party shall provide such access to Lender at all times and without advance notice. Furthermore, so long as any Event of Default has occurred and is continuing, Borrower shall provide Lender with access to its suppliers and customers. Each Credit Party shall make available to Lender and its counsel, as quickly as is possible under the circumstances, originals or copies of all books and records that Lender may reasonably request. Each Credit Party shall deliver any document or instrument necessary for Lender, as it may from time to time reasonably request, to obtain records from any service bureau or other Person that maintains records for such Credit Party, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Credit Party.

1.15    Taxes.

(a)    No Deductions. Any and all payments by Borrower hereunder or under the Notes or the Series D Preferred issued to Lender shall be made, in accordance with this Section 1.15, free and clear of and without deduction for any and all present or future Taxes (including, without limitation, U.S. withholding taxes). If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under the Notes, (i) the sum payable shall be increased as much as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.15) Lender shall receive an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with applicable law. Within 30 days after the date of any payment of Taxes, Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof.

(b)    Changes in Tax Laws. In the event that, subsequent to the Closing Date, (i) any changes in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive enacted or any interpretation or application thereof, or (iii) compliance by Lender with any request or directive (whether or not having the force of law) from any governmental authority, agency or instrumentality:

13

(i) does or shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the other Loan Documents or any Loans made hereunder, or change the basis of taxation of payments to Lender of principal, fees, interest or any other amount payable hereunder (except for net income taxes, or imposed in lieu of net income taxes, imposed generally by the taxing authorities of the Lender's jurisdiction of incorporation with respect to interest or commitment or other fees payable hereunder or changes in the rate of tax on the overall net income of Lender); or

(ii) does or shall impose on Lender any other condition or increased cost in connection with the transactions contemplated hereby; and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan hereunder, as the case may be, or to reduce any amount receivable hereunder,

then, in any such case, Borrower shall promptly pay to Lender, upon its demand, any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount receivable, as determined by Lender with respect to this Agreement or the other Loan Documents. If Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify Borrower of the event by reason of which Lender has become so entitled. Upon actual notice of any change in law or event described above that will result in additional cost or reduced amount receivable for which Lender shall be entitled to claim compensation under this clause (b), Lender shall notify Borrower of such change or event. A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.

(c)    Each Credit Party that is a signatory hereto shall indemnify and, within 10 Business Days of demand therefor, pay Lender for the full amount of Taxes or other costs (including any Taxes imposed by any jurisdiction on amounts payable under this Section 1.15) paid by Lender, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted.

1.16    Single Loan. All Loans to Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of Borrower secured, until the Termination Date, by all of the Collateral.

2.  **CONDITIONS PRECEDENT**

2.1    Conditions to the Initial Loans. Lender shall not be obligated to make any Loan on the Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner satisfactory to Lender, or waived in writing by Lender:

(a)    Credit Agreement; Loan Documents. This Agreement or counterparts hereof shall have been duly executed by Borrower, each other Credit Party,

14

and Lender and delivered to Lender; and Lender shall have received such documents, instruments, agreements and legal opinions as Lender shall request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including all those listed in the Closing Checklist attached hereto as <u>Annex C</u>, each in form and substance reasonably satisfactory to Lender.

       (b)    <u>Repayment of GECC Credit Facility; Satisfaction of Outstanding L/Cs</u>. (i) Lender shall have received a fully executed original pay-off letter reasonably satisfactory to Lender confirming that the GECC Credit Facility will be repaid in full from the proceeds of the Term Loan and the initial Revolving Credit Advance and terminated; (ii) all Liens upon any of the property of Borrower or any of its Subsidiaries in favor of Prior Lender shall be terminated by Prior Lender; and (iii) all letters of credit issued or guaranteed by Prior Lender shall have been cash collateralized as mutually agreed upon by Lender, Borrower and First Union.

       (c)    <u>Approvals</u>. Lender shall have received (i) satisfactory evidence that the Credit Parties have obtained all required consents and approvals of all Persons including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement and the other Loan Documents and the consummation of the Related Transactions or (ii) an officer's certificate in form and substance reasonably satisfactory to Lender affirming that no such consents or approvals are required.

       (d)    <u>Payment of Fees</u>. Borrower shall have paid the Fees required to be paid on the Closing Date in the respective amounts specified in Section 1.9, and shall have reimbursed Lender for all fees, costs and expenses of closing presented as of the Closing Date.

       (f)    <u>Capital Structure; Other Indebtedness</u>. The capital structure of each Credit Party shall be acceptable to Lender in its sole discretion and no Credit Party shall have any Indebtedness outstanding other than Indebtedness hereunder and Indebtedness set forth on Schedule 6.3.

       (g)    <u>Due Diligence</u>. Lender shall have completed its business and legal due diligence, including a roll forward of its previous Collateral audit, with results satisfactory to Lender.

       (h)    <u>Consummation of Related Transactions</u>. On or prior to the Closing Date, the Borrower, having received full consideration therefor, shall have issued $1,600,000 of Series D Preferred Stock to Lender on terms and conditions acceptable to Lender, including without limitation execution by the Borrower and Surinder (Sonny) Chabra of the Investor Rights Agreement, substantially in the form attached hereto as Exhibit 2.1(h-1), due adoption and filing with the Secretary of State for the State of New York of the Certificate of Amendment to the Certificate of Incorporation in the form attached hereto as Exhibit 2.1(h-2), execution by Surinder (Sonny) Chabra of the Series C Consent, and the completion of all other matters reasonably related thereto as requested by Lender.

15

2.2     <u>Further Conditions to Each Loan</u>.  Except as otherwise expressly provided herein, Lender shall not be obligated to fund any Advance if, as of the date thereof:

(a)     any representation or warranty by any Credit Party contained herein or in any other Loan Document is untrue or incorrect as of such date, or, to the extent that such representation or warranty expressly relates to an earlier date, as of such earlier date;

(b)     any event or circumstance that alone or together with other events or circumstances could reasonably be expected to have a Material Adverse Effect has occurred since the date hereof as determined by the Lender or Lender has determined not to make such Advance as a result of the fact that such event or circumstance has occurred;

(c)     any Default or Event of Default has occurred and is continuing or would result after giving effect to any Advance, and Lender shall have determined not to make any Advance as a result of that Default or Event of Default;

(d)     After giving effect to any Advance, the outstanding principal amount of the Revolving Loan would exceed the lesser of the Borrowing Base and the Maximum Amount.

The request and acceptance by Borrower of the proceeds of any Advance shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower that the conditions in this <u>Section 2.2</u> have been satisfied and (ii) a reaffirmation by Borrower of the granting and continuance of Lender's Liens, pursuant to the Collateral Documents.

3.   **REPRESENTATIONS AND WARRANTIES**

To induce Lender to make the Loans, the Credit Parties executing this Agreement, jointly and severally, make the following representations and warranties to Lender with respect to all Credit Parties, each and all of which shall survive the execution and delivery of this Agreement.

3.1     <u>Corporate Existence; Compliance with Law</u>.  Each Credit Party (a) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of its respective jurisdiction of organization set forth on <u>Disclosure Schedule (3.1)</u>; (b) is duly qualified to conduct business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not result in exposure to losses, damages or liabilities in excess of $50,000; (c) has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; (d) subject to specific representations regarding Environmental Laws, has all material licenses, permits, consents or approvals from or by, and has made all material filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (e) is in compliance with its charter and by-laws or partnership or operating agreement, as applicable; and (f) subject to specific representations set forth herein regarding ERISA, Environmental Laws, tax and

16

other laws, is in compliance with all applicable provisions of law, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

3.2    Executive Offices; FEIN.  As of the Closing Date, the current location of each Credit Party's chief executive office and the warehouses and premises at which any Collateral is located are set forth in Disclosure Schedule (3.2), and none of such locations has changed within the twelve (12) months preceding the Closing Date.  In addition, Disclosure Schedule (3.2) lists the federal employer identification number of each Credit Party.

3.3    Corporate Power, Authorization, Enforceable Obligations.  The execution, delivery and performance by each Credit Party of the Loan Documents to which it is a party and the creation of all Liens provided for therein: (a) are within such Person's organizational power; (b) have been duly authorized by all necessary organizational and shareholder or membership action; (c) do not contravene any provision of such Person's charter or bylaws or equivalent organizational or charter or other constituent documents; (d) do not violate any law or regulation, or any order or decree of any court or Governmental Authority; (e) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture, mortgage or deed of trust to which such Person is a party or by which such Person or any of its property is bound; (f) do not conflict with or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any lease, agreement or other instrument involving payments individually or in the aggregate in excess of $250,000 or which, if breached, terminated or accelerated, could reasonably be expected to have a Material Adverse Effect, to which such Person is a party or by which such Person or any of its property is bound; (g) do not result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor of Lender pursuant to the Loan Documents; and (h) do not require the consent or approval of any Governmental Authority or any other Person, except those referred to in Section 2.1(c), all of which will have been duly obtained, made or complied with prior to the Closing Date.  Each of the Loan Documents shall be duly executed and delivered by each Credit Party that is a party thereto and each such Loan Document shall constitute a legal, valid and binding obligation of such Credit Party enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principals (whether enforcement is sought by proceedings in equity or at law).

3.4    Financial Statements and Projections.  Except for the Projections, all Financial Statements concerning Borrower and its Subsidiaries that are referred to below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and normal year-end audit adjustments) and present fairly in all material respects the financial position of the Persons covered thereby as at the dates thereof and the results of their operations and cash flows for the periods then ended.

17

(a)    The following Financial Statements attached hereto as <u>Disclosure Schedule (3.4(a))</u> have been delivered on the date hereof:

(i)    The audited consolidated balance sheets at December 31, 1999, 2000 and 2001 and the related statements of income and cash flows of Borrower and its Subsidiaries for the Fiscal Years then ended, certified by Ernst & Young LLP for Fiscal Year 1999 and PricewaterhouseCoopers LLP for Fiscal Years 2000 and 2001.

(ii)    The unaudited balance sheets at March 31, 2002, June 30, 2002, September 30, 2002 and December 31, 2002, and the related statements of income and cash flows of Borrower and its Subsidiaries for the Fiscal Quarters then ended, certified by the Chief Financial Officer of Borrower that (x) such financial information presents fairly in accordance with GAAP (subject to normal year-end adjustments and lack of footnotes) the financial position, results of operations and statements of cash flows of Borrower and its Subsidiaries, on both a consolidated and consolidating basis, as at the end of such Fiscal Quarter and for that portion of the Fiscal Year then ended, and (y) any other information presented is true, correct and complete in all material respects.

(b)    <u>Projections</u>. The Projections delivered on the date hereof and attached hereto as <u>Disclosure Schedule (3.4(b))</u> have been prepared by Borrower in light of the past operations of Borrower's businesses and reflect projections for the five (5) year period beginning on January 1, 2003 on a month by month basis for the first two years and on a year-by-year basis thereafter. The Projections are based upon estimates and assumptions stated therein, all of which Borrower believes to be reasonable and fair in light of current conditions and current facts known to Borrower and, as of the Closing Date, reflect Borrower's good faith and reasonable estimate of the future financial performance of Borrower and of the other information projected therein for the period set forth therein, it being recognized by Lender that such projections as to future events are not to be viewed as facts and that actual results during the periods covered by the Projections may vary from projected results.

3.5    <u>Material Adverse Effect</u>. Between December 31, 2001 and the Closing Date, no Credit Party has incurred any obligations, contingent or noncontingent liabilities, liabilities for Charges, long-term leases or unusual forward or long-term commitments that are not reflected in the financial statements delivered under Section 3.4(b) and that, alone or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Since the date of the most recently delivered financing statements under Annex D, no Credit Party has incurred any obligations, contingent or noncontingent liabilities, liabilities for Charges, long-term leases or unusual forward or long-term commitments that are not reflected in such financial statements and that, alone or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Since the date hereof, (a) no contract, lease or other agreement or instrument has been entered into by any Credit Party or has become binding upon any Credit Party's assets and no law or regulation applicable to any Credit Party has been adopted that has had or could reasonably be expected to have a Material Adverse Effect, and (b) no Credit Party is in default and to the best of Borrower's knowledge no third party is in default under any material contract, lease or other agreement or instrument, that alone or in the aggregate could reasonably be expected to have a

18

Material Adverse Effect. Since the date hereof, no event or circumstance has occurred, that alone or together with other events or circumstances, could reasonably be expected to have a Material Adverse Effect.

3.6    Ownership of Property; Liens. As of the Closing Date, the real estate ("Real Estate") listed in Disclosure Schedule (3.6) constitutes all of the real property owned, leased, subleased, or used by any Credit Party. Each Credit Party owns good and marketable fee simple title to all of its owned Real Estate, and valid and marketable leasehold interests in all of its leased Real Estate, all as described on Disclosure Schedule (3.6), and copies of all such leases or a summary of terms thereof reasonably satisfactory to Lender have been delivered to Lender. Notwithstanding anything to the contrary contained herein, as of the Closing Date the Credit Parties own no Real Estate. Disclosure Schedule (3.6) further describes any Real Estate with respect to which any Credit Party is a lessor, sublessor or assignor as of the Closing Date. Each Credit Party also has good and marketable title to, or valid leasehold interests in, all of its personal property and assets. As of the Closing Date, none of the properties and assets of any Credit Party are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances or conditions  known to any Credit Party that may result in any Liens (including Liens arising under Environmental Laws) other than Permitted Encumbrances. Each Credit Party has received all deeds, assignments, waivers, consents, nondisturbance and attornment or similar agreements, bills of sale and other documents, and has duly effected all recordings, filings and other actions necessary to establish, protect and perfect such Credit Party's right, title and interest in and to all such Real Estate and other properties and assets. Disclosure Schedule (3.6) also describes any purchase options, rights of first refusal or other similar contractual rights pertaining to any Real Estate. As of the Closing Date, no portion of any Credit Party's Real Estate has suffered any material damage by fire or other casualty loss that has not heretofore been repaired and restored in all material respects to its original condition or otherwise remedied. As of the Closing Date, all material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect.

3.7    Labor Matters. As of the Closing Date (a) no strikes or other material labor disputes against any Credit Party are pending or, to any Credit Party's knowledge, threatened; (b) hours worked by and payment made to employees of each Credit Party comply with the Fair Labor Standards Act and each other federal, state, local or foreign law applicable to such matters; (c) all payments due from any Credit Party for employee health and welfare insurance have been paid or accrued as a liability on the books of such Credit Party; (d) except as set forth in Disclosure Schedule (3.7), no Credit Party is a party to or bound by any collective bargaining agreement, management agreement, consulting agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement (and true and complete copies of any agreements described on Disclosure Schedule (3.7) have been delivered to Lender); (e) there is no organizing activity involving any Credit Party pending or, to any Credit Party's knowledge, threatened by any labor union or group of employees; (f) there are no representation proceedings pending or, to any Credit Party's knowledge, threatened with the National Labor Relations Board, and no labor organization or group of

19

employees of any Credit Party has made a pending demand for recognition; (g) except as set forth in Disclosure Schedule (3.7), there are no material complaints or charges against any Credit Party pending or, to the knowledge of any Credit Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by any Credit Party of any individual; and (h) based on current law, no Credit Party is reasonably expected to incur any material liability under any Plan or applicable tax laws resulting from the retroactive reclassification of any non-employee service provider as a common law employer.

3.8    Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness. Except as set forth in Disclosure Schedule (3.8), as of the Closing Date, no Credit Party has any Subsidiaries, is engaged in any joint venture or partnership with any other Person, or is an Affiliate of any other Person. All of the issued and outstanding Stock of each Credit Party is owned by each of the Stockholders and in the amounts set forth in Disclosure Schedule (3.8)(a). All of the issued and outstanding Stock of each Credit Party immediately prior to the Closing Date and the consummation of the Related Transactions is owned by each of the Stockholders and in the amounts set forth in Disclosure Schedule (3.8)(b). Except as set forth on Disclosure Schedule (3.8), there are no outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or other equity securities or any Stock or other equity securities of its Subsidiaries. All outstanding Indebtedness and Guaranteed Indebtedness (except for the Obligations) of each Credit Party is described in Section 6.3 (including Disclosure Schedule (6.3)) and Section 6.6. None of the Credit Parties other than Borrower has any assets (except Stock of their Subsidiaries) or any Indebtedness or Guaranteed Indebtedness (except the Obligations).

3.9    Government Regulation. No Credit Party is an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940. No Credit Party is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, or any other federal or state statute that restricts or limits its ability to incur Indebtedness or to perform its obligations hereunder. The making of the Loans by Lender to Borrower, the application of the proceeds thereof and repayment thereof and the consummation of the Related Transactions will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.10    Margin Regulations. No Credit Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" as such terms are defined in Regulation U of the Federal Reserve Board as now and from time to time hereafter in effect (such securities being referred to herein as "Margin Stock"). No Credit Party owns any Margin Stock, and none of the proceeds of the Loans or other extensions of credit under this Agreement will be used, directly or indirectly, for the purpose of purchasing or carrying any Margin Stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any Margin Stock or for any other purpose that

20

might cause any of the Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulations T, U or X of the Federal Reserve Board. No Credit Party will take or permit to be taken any action that might cause any Loan Document to violate any regulation of the Federal Reserve Board.

3.11    Taxes. All tax returns, reports and statements, including information returns, required by any Governmental Authority to be filed by any Credit Party have been filed with the appropriate Governmental Authority and, except as set forth in Disclosure Schedule (3.11) all Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof (or any such fine, penalty, interest, late charge or loss has been paid), excluding (i) Charges or other amounts being contested in accordance with Section 5.2(b) and (ii) Taxes involving Charges of less than $25,000 in the aggregate from the Closing Date, including any fines, penalties, interest or late charges assessed thereon. Proper and accurate amounts have been withheld by each Credit Party from its respective employees for all periods in full and complete compliance with all applicable federal, state, local and foreign laws and such withholdings have been timely paid to the respective Governmental Authorities. Disclosure Schedule (3.11) sets forth as of the Closing Date those taxable years for which any Credit Party's tax returns are currently being audited by the IRS or any other applicable Governmental Authority and any assessments or threatened assessments in connection with such audit, or otherwise currently outstanding. Except as described in Disclosure Schedule (3.11), no Credit Party has executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges. None of the Credit Parties and their respective predecessors are liable for any Charges: (a) under any agreement (including any tax sharing agreements) or (b) to each Credit Party's knowledge, as a transferee. As of the Closing Date, no Credit Party has agreed or been requested to make any adjustment under IRC Section 481(a), by reason of a change in accounting method or otherwise, which would have a Material Adverse Effect.

3.12    ERISA.

(a)    Disclosure Schedule (3.12) lists (i) all ERISA Affiliates and (ii) all Plans and separately identifies all Pension Plans, including Title IV Plans, Multiemployer Plans, ESOPs and Welfare Plans, including all Retiree Welfare Plans. Copies of all such listed Plans, together with a copy of the latest IRS/DOL 5500-series form for each such Plan, have been delivered to Lender. Except with respect to Multiemployer Plans, each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, the trusts created thereunder have been determined to be exempt from tax under the provisions of Section 501 of the IRC, or is a standardized prototype plan as to which the plan sponsor has received a qualification letter from the IRS, and to the knowledge of the Borrower, nothing has occurred that would cause the loss of such qualification or tax-exempt status. Each Plan is in material compliance with the applicable provisions of ERISA and the IRC, including the timely filing of all reports required under the IRC or ERISA, including the statement required by 29 CFR Section 2520.104-23. Neither any Credit Party nor ERISA Affiliate has failed to make any contribution or pay any amount with respect to any Plan as required by either Section 412 of the IRC or Section 302 of

21

ERISA or the terms of any such Plan. Neither any Credit Party nor ERISA Affiliate has engaged in a "prohibited transaction", as defined in Section 406 of ERISA and Section 4975 of the IRC, in connection with any Plan, that would subject any Credit Party to a material tax on prohibited transactions imposed by Section 502(i) of ERISA or Section 4975 of the IRC. To the best of their knowledge, each Credit Party and ERISA Affiliate has performed all of its material obligations under all Plans. No Credit Party or ERISA Affiliate qualifies as an "employee benefit plan" as defined in Section 3(3) of ERISA, and none of their underlying assets constitutes or is reasonably expected to constitute "plan assets" (within the meaning of 29 C.F.R. Section 2510.3-101) of one or more such plans.

(b)     Except as set forth in Disclosure Schedule (3.12): (i) no Title IV Plan has any Unfunded Pension Liability; (ii) no ERISA Event or event described in Section 4062(e) of ERISA with respect to any Title IV Plan has occurred or is reasonably expected to occur; (iii) there are no pending, or to the knowledge of any Credit Party, threatened claims (other than claims for benefits in the normal course), sanctions, actions or lawsuits, asserted or instituted against any Plan or any Person as fiduciary or sponsor of any Plan; (iv) no Credit Party or ERISA Affiliate has incurred or reasonably expects to incur any liability as a result of a complete or partial withdrawal from a Multiemployer Plan; (v) within the last five years no Title IV Plan of any Credit Party or ERISA Affiliate has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, nor has any Title IV Plan of any Credit Party or any ERISA Affiliate (determined at any time within the last five years) with Unfunded Pension Liabilities been transferred outside of the "controlled group" (within the meaning of Section 4001(a)(14) of ERISA) of any Credit Party or ERISA Affiliate (determined at such time); (vi) except in the case of any ESOP, Stock of all Credit Parties and their ERISA Affiliates makes up, in the aggregate, no more than 10% of fair market value of the assets of any Plan measured on the basis of fair market value as of the latest valuation date of any Plan; and (vii) no liability under any Title IV Plan has been satisfied with the purchase of a contract from an insurance company that is not rated AAA by the Standard & Poor's Ratings Services or an equivalent rating by another nationally recognized rating agency.

3.13    No Litigation. No action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of any Credit Party, threatened against any Credit Party, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "Litigation"), that (a) challenges any Credit Party's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder, or (b) that has a reasonable risk of being determined adversely to any Credit Party and that, if so determined, could be reasonably be expected to have a Material Adverse Effect. Except as set forth on Disclosure Schedule (3.13), as of the Closing Date there is no Litigation pending or, to any Credit Party's knowledge, threatened that seeks damages in excess of $100,000 or injunctive relief against, or alleges criminal misconduct of, any Credit Party.

3.14    Brokers. No broker or finder brought about the obtaining, making or closing of the Loans, and no Credit Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

22

3.15     Intellectual Property.  As of the Closing Date, each Credit Party owns or has rights to use all Intellectual Property necessary to continue to conduct its business as now or heretofore conducted by it or proposed to be conducted by it, and each Patent, Trademark, Copyright and License is listed, together with application or registration numbers, as applicable, in Disclosure Schedule (3.15).  To the knowledge of Credit Parties, each Credit Party conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect.  Except as set forth in Disclosure Schedule (3.15), no Credit Party is aware of any pending or threatened claim that such Credit Party is infringing or otherwise violating the rights of any other Person with respect to any Intellectual Property.

3.16     Full Disclosure.  No information contained in this Agreement, any of the other Loan Documents, any Projections, Financial Statements or Collateral Reports or other written reports from time to time delivered hereunder or any written statement furnished by or on behalf of any Credit Party to Lender pursuant to the terms of this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  The Liens granted to Lender, pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Encumbrances.

3.17     Environmental Matters.

(a)     Except as set forth in Disclosure Schedule (3.17), as of the Closing Date: (i) the Real Estate is free of contamination from any Hazardous Material except for such contamination that would not adversely impact the value or marketability of such Real Estate and that would not result in Environmental Liabilities that could reasonably be expected to exceed $250,000; (ii) no Credit Party has caused or suffered to occur any Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate that could be expected to exceed $250,000; (iii) the Credit Parties are and have been in compliance with all Environmental Laws, except for such noncompliance which would not result in Environmental Liabilities that could reasonably be expected to exceed $250,000; (iv) the Credit Parties have obtained, and are in compliance with, all Environmental Permits required by Environmental Laws for the operations of their respective businesses as presently conducted or as proposed to be conducted, except where the failure to so obtain or comply with such Environmental Permits would not result in Environmental Liabilities which could reasonably be expected to exceed $250,000, and all such Environmental Permits are valid, uncontested and in good standing; (v) no Credit Party is involved in operations or knows of any facts, circumstances or conditions, including any Releases of Hazardous Materials, that are likely to result in any Environmental Liabilities of such Credit Party which could reasonably be expected to exceed $100,000, and no Credit Party has permitted any current or former tenant or occupant of the Real Estate to engage in any such operations; (vi) there is no Litigation arising under or related to any Environmental Laws, Environmental Permits or Hazardous Material that seeks damages, penalties, fines, costs or expenses in excess of $25,000 or injunctive relief against, or that alleges criminal misconduct by, any Credit Party; (vii) no

23

notice has been received by any Credit Party identifying it as a "potentially responsible party" or requesting information under CERCLA or analogous state statutes, and to the knowledge of the Credit Parties, there are no facts, circumstances or conditions that may result in any Credit Party being identified as a "potentially responsible party" under CERCLA or analogous state statutes; and (viii) the Credit Parties have provided to Lender copies of all existing environmental reports, reviews and audits and all written information pertaining to actual or potential Environmental Liabilities, in each case relating to any Credit Party.

(b)     Each Credit Party hereby acknowledges and agrees that Lender (i) is not now, and has not ever been, in control of any of the Real Estate or any Credit Party's affairs, and (ii) does not have the capacity through the provisions of the Loan Documents or otherwise to influence any Credit Party's conduct with respect to the ownership, operation or management of any of its Real Estate or compliance with Environmental Laws or Environmental Permits.

3.18     Insurance.  Disclosure Schedule (3.18) lists all insurance policies of any nature maintained, as of the Closing Date, for current occurrences by each Credit Party, as well as a summary of the terms of each such policy.

3.19     Deposit and Disbursement Accounts.  Disclosure Schedule (3.19) lists all banks and other financial institutions at which any Credit Party maintains deposit or other accounts, including any Disbursement Accounts, and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

3.20     Government Contracts.  Except as set forth in Disclosure Schedule (3.20), as of the Closing Date, no Credit Party is a party to any contract or agreement with any Governmental Authority and no Credit Party's Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. §3727) or any similar state or local law.

3.21     Customer and Trade Relations.  As of the Closing Date, there exists no actual or, to the knowledge of any Credit Party, threatened termination or cancellation of, or any material adverse modification or change in:  the business relationship of any Credit Party with any customer or group of customers whose purchases during the preceding twelve (12) months caused them to be ranked among the ten largest customers of such Credit Party; or  the business relationship of any Credit Party with any supplier material to its operations.

3.22     Agreements and Other Documents.  As of the Closing Date, each Credit Party has provided to Lender or its counsel accurate and complete term sheets showing the material terms of all of its customer agreements, each of which is listed in Disclosure Schedule (3.22), and shall promptly provide to Lender, upon Lender's request, accurate and complete copies of any documentation relating to any customer agreements that Lender may request.

24

3.23    Solvency. Both before and after giving effect to (a) the Loans to be made or incurred on the Closing Date or such other date as Loans requested hereunder are made or incurred, (b) the disbursement of the proceeds of such Loans pursuant to the instructions of Borrower, (c) the Refinancing and the consummation of the other Related Transactions and (d) the payment and accrual of all transaction costs in connection with the foregoing, each Credit Party is and will be Solvent.

3.24    Performance of Agreements. No Credit Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any contractual obligation of any such Person, and no condition exists that, with the giving of notice or the lapse of time or both, would constitute such a default.

3.25    Inventory Trade Financing. As of the Closing Date, Borrower has delivered to Lender complete and correct copies of the Inventory Trade Financing Documents. Borrower acknowledges that Lender is entering into this Agreement and is extending the Commitments in reliance upon this Section 3.25.

3.26    AMC-New Jersey. AMC-New Jersey has incurred no obligations or contingent or noncontingent liabilities, and all liabilities for Charges have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof. AMC-New Jersey conducts no business, owns no assets and is party to no contract, lease or other agreement or instrument other than this Agreement.

## 4.    FINANCIAL STATEMENTS AND INFORMATION

4.1    Reports and Notices.

(a)    Each Credit Party executing this Agreement hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to Lender the Financial Statements, notices, Projections and other information at the times, to the Persons and in the manner set forth in Annex D.

(b)    Each Credit Party executing this Agreement hereby agrees that from and after the Closing Date and until the Termination Date, it shall deliver to Lender the various Collateral Reports (including Borrowing Base Certificates in the form of Exhibit 4.1(b)) at the times, to the Persons and in the manner set forth in Annex E.

4.2    Communication with Accountants. Each Credit Party executing this Agreement authorizes Lender, not more frequently than once per Fiscal Quarter unless an Event of Default has occurred and is continuing, to communicate directly with its independent certified public accountants, including PricewaterhouseCoopers LLP, and authorizes and at Lender's request shall instruct those accountants and advisors to disclose and make available to Lender any and all Financial Statements and other supporting financial documents, schedules and information relating to any Credit Party (including copies of any issued management letters) with respect to the business, financial condition and other affairs of any Credit Party.

25

## 5.  AFFIRMATIVE COVENANTS

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that from and after the date hereof and until the Termination Date:

5.1    <u>Maintenance of Existence and Conduct of Business</u>.  Each Credit Party shall:  do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and its rights and franchises; continue to conduct its business substantially as now conducted or as otherwise permitted hereunder;  at all times maintain, preserve and protect all of its assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices; and transact business only in such corporate and trade names as are set forth in <u>Disclosure Schedule (5.1)</u>.

5.2    <u>Payment of Charges</u>.

(a)    Subject to <u>Section 5.2(b)</u>, each Credit Party shall pay and discharge or cause to be paid and discharged promptly all Charges payable by it, including (i) Charges imposed upon it, its income and profits, or any of its property (real, personal or mixed) and all Charges with respect to tax, social security and unemployment withholding with respect to its employees, (ii) lawful claims for labor, materials, supplies and services or otherwise, and (iii) all storage or rental charges payable to warehousemen or bailees, in each case, before any thereof shall become past due.

(b)    Each Credit Party may in good faith contest, by appropriate proceedings, the validity or amount of any Charges, Taxes or claims described in <u>Section 5.2(a)</u>; <u>provided</u>, that (i) adequate reserves with respect to such contest are maintained on the books of such Credit Party, in accordance with GAAP, (ii) no Lien shall be imposed to secure payment of such Charges (other than payments to warehousemen and/or bailees) that is superior to any of the Liens securing payment of the Obligations and such contest is maintained and prosecuted continuously and with diligence and operates to suspend collection or enforcement of such Charges, (iii) none of the Collateral becomes subject to forfeiture or loss as a result of such contest, (iv) such Credit Party shall promptly pay or discharge such contested Charges, Taxes or claims and all additional charges, interest, penalties and expenses, if any, and shall deliver to Lender evidence reasonably acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to such Credit Party or the conditions set forth in this <u>Section 5.2(b)</u> are no longer met; and (v) Lender has not advised Borrower in writing that Lender reasonably believes that nonpayment or nondischarge thereof could have or result in a Material Adverse Effect.

5.3    <u>Books and Records</u>.  Each Credit Party shall keep adequate books and records with respect to its business activities in which proper entries, reflecting all financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements attached as <u>Disclosure Schedule (3.4(a))</u>.

26

5.4    Insurance; Damage to or Destruction of Collateral.

(a)    The Credit Parties shall, at their sole cost and expense, maintain the policies of insurance described on Disclosure Schedule (3.18) as in effect on the date hereof or otherwise in form and amounts and with insurers reasonably acceptable to Lender. Such policies of insurance (or the loss payable and additional insured endorsements delivered to Lender) shall contain provisions pursuant to which the insurer agrees to provide 30 days prior written notice to Lender in the event of any non-renewal, cancellation or amendment of any such insurance policy. If any Credit Party at any time or times hereafter shall fail to obtain or maintain any of the policies of insurance required above or to pay all premiums relating thereto, Lender may at any time or times thereafter obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that Lender deems advisable. Lender shall have no obligation to obtain insurance for any Credit Party or pay any premiums therefor. By doing so, Lender shall not be deemed to have waived any Default or Event of Default arising from any Credit Party's failure to maintain such insurance or pay any premiums therefor. All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable on demand by Borrower to Lender and shall be additional Obligations hereunder secured by the Collateral.

(b)    Lender reserves the right at any time upon any change in any Credit Party's risk profile (including any change in the product mix maintained by any Credit Party or any laws affecting the potential liability of such Credit Party) to require additional forms and limits of insurance to, in Lender's opinion, adequately protect Lender's interests in all or any portion of the Collateral and to ensure that each Credit Party is protected by insurance in amounts and with coverage customary for its industry. If reasonably requested by Lender, each Credit Party shall deliver to Lender from time to time a report of a reputable insurance broker, reasonably satisfactory to Lender, with respect to its insurance policies.

(c)    Each Credit Party shall deliver to Lender, in form and substance reasonably satisfactory to Lender, endorsements to (i) all "All Risk" and business interruption insurance naming Lender as loss payee, and (ii) all general liability and other liability policies naming Lender as additional insured. Each Credit Party irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender), so long as any Default or Event of Default has occurred and is continuing or the anticipated insurance proceeds exceed $250,000, as each Credit Party's true and lawful agent and attorney-in-fact for the purpose of making, settling and adjusting claims under such "All Risk" policies of insurance, endorsing the name of each Credit Party on any check or other item of payment for the proceeds of such "All Risk" policies of insurance and for making all determinations and decisions with respect to such "All Risk" policies of insurance. Lender shall have no duty to exercise any rights or powers granted to it pursuant to the foregoing power-of-attorney. Borrower shall promptly notify Lender of any loss, damage, or destruction to the Collateral in the amount of $100,000 or more, whether or not covered by insurance. After deducting from such proceeds the expenses, if any, incurred by Lender in the collection or handling thereof, Lender may at its option, apply such proceeds to the reduction of the Obligations in accordance with Section

27

1.3(b)(v), provided that in the case of insurance proceeds pertaining to any Credit Party other than Borrower, such insurance proceeds shall be applied to the Loans owing by Borrower, or permit or require each Credit Party to use such money, or any part thereof, to replace, repair, restore or rebuild the Collateral in a diligent and expeditious manner with materials and workmanship of substantially the same quality as existed before the loss, damage or destruction. Notwithstanding the foregoing, if the casualty giving rise to such insurance proceeds could not reasonably be expected to have a Material Adverse Effect and such insurance proceeds do not exceed $1,000,000 in the aggregate, Lender shall permit the applicable Credit Party to replace, restore, repair or rebuild the property; provided that if such Credit Party has not completed or entered into binding agreements to complete such replacement, restoration, repair or rebuilding within 180 days of such casualty, Lender may apply such insurance proceeds to the Obligations in accordance with Section 1.3(b)(v); provided further that in the case of insurance proceeds pertaining to any Credit Party other than Borrower, such insurance proceeds shall be applied to the Loans owing by Borrower. To the extent not used to replace, repair, restore or rebuild the Collateral, such insurance proceeds shall be applied in accordance with Section 1.3(b)(v); provided that in the case of insurance proceeds pertaining to any Credit Party other than Borrower, such insurance proceeds shall be applied to the Loans owing by Borrower.

(d)    Borrower shall at all times maintain in full force and effect with an insurance company satisfactory to Lender, a key man life insurance policy insuring the life of Chabra in an amount no less than $5,000,000 (or, upon delivery by Borrower of a letter of undertaking under Section 5.11(b), $10,000,000), naming Lender as beneficiary under such insurance policy and assigned to Lender by Borrower (which assignment will be consented to by the issuer of such insurance), and otherwise on terms reasonably satisfactory in all respects to the Lender. Borrower hereby assigns and grants to Lender a security interest in and lien upon, all right, title and interest of Borrower in and to such policy and all proceeds thereof to secure the Obligations. Upon receipt by Lender of any cash proceeds of such key man life insurance, Lender may at its option apply such proceeds to the prepayment of principal of the Loans in accordance with Section 1.3(b)(v). In the event any payment of such insurance proceeds is later rescinded, revoked or reduced or must otherwise be restored or returned for any reason, any such payment or prepayment of any Obligations shall be reinstated and deemed reduced only by such proceeds paid and not rescinded, reduced or returned. At any time and from time to time, upon the written request of Lender and at the sole expense of Borrower, Borrower shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as Lender may deem desirable to obtain the full benefits of such assignment and security interest and of the rights and powers herein granted.

5.5    Compliance with Laws.  Each Credit Party shall comply with all federal, state, local and foreign laws and regulations applicable to it, including those relating to ERISA and labor matters and Environmental Laws and Environmental Permits, except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.6    Supplemental Disclosure.  From time to time as may be reasonably requested by Lender, the Credit Parties shall supplement each Disclosure Schedule hereto,

28

or any representation herein or in any other Loan Document, with respect to any matter hereafter arising that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such Disclosure Schedule or as an exception to such representation or that is necessary to correct any information in such Disclosure Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Disclosure Schedule, such Disclosure Schedule shall be appropriately marked to show the changes made therein); provided that (a) no such supplement to any such Disclosure Schedule or representation shall amend, supplement or otherwise modify any Disclosure Schedule or representation, or be or be deemed a waiver of any Default or Event of Default resulting from the matters disclosed therein, except as consented to by Lender in writing, and (b) no supplement shall be required or permitted as to representations and warranties that relate solely to the Closing Date.

5.7    Intellectual Property.  Each Credit Party will conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any material respect.

5.8    Environmental Matters.  Each Credit Party shall and shall cause each Person within its control to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws and Environmental Permits other than noncompliance that could not reasonably be expected to have a Material Adverse Effect; (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws and Environmental Permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, in, under, above, to, from or about any of its Real Estate; (c) notify Lender promptly after such Credit Party becomes aware of any violation of Environmental Laws or Environmental Permits or any Release on, at, in, under, above, to, from or about any Real Estate that is reasonably likely to result in Environmental Liabilities in excess of $250,000; and (d) promptly forward to Lender a copy of any order, notice, request for information or any communication or report received by such Credit Party in connection with any such violation or Release or any other matter relating to any Environmental Laws or Environmental Permits that could reasonably be expected to result in Environmental Liabilities in excess of $250,000, in each case whether or not the Environmental Protection Agency or any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter.  If Lender at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or Environmental Permits by any Credit Party or any Environmental Liability arising thereunder, or a Release of Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, that, in each case, could reasonably be expected to have a Material Adverse Effect, then  each Credit Party shall, upon Lender's written request (i) cause the performance of such environmental audits including subsurface sampling of soil and groundwater, and preparation of such environmental reports, at Borrower's expense, as Lender may from time to time reasonably request, which shall be conducted by reputable environmental consulting firms reasonably acceptable to Lender and shall be in form and substance reasonably acceptable to Lender, and (ii) permit Lender or its representatives to have access to all Real Estate for the purpose of conducting such environmental audits and

29

testing as Lender deems appropriate, including subsurface sampling of soil and groundwater. Borrower shall reimburse Lender for the costs of such audits and tests and the same will constitute a part of the Obligations secured hereunder.

      5.9   <u>Landlords' Agreements, Mortgagee Agreements and Bailee Letters</u>. Each Credit Party shall obtain a landlord's agreement, mortgagee agreement or bailee letter, as applicable, from the lessor of each leased property, mortgagee of owned property, if any, or bailee with respect to any warehouse, processor or converter facility or other location where Collateral is stored or located, which agreement or letter shall contain a waiver or subordination of all Liens or claims that the landlord, mortgagee or bailee may assert against the Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to Lender. With respect to such locations or warehouse space leased or owned as of the Closing Date and thereafter, if Lender has not received a landlord or mortgagee agreement or bailee letter as of the Closing Date (or, if later, as of the date such location is acquired or leased), Borrower's Eligible Inventory at that location shall, in Lender's discretion, be excluded from the Borrowing Base or be subject to such Reserves as may be established by Lender in its sole discretion. After the Closing Date, no real property or warehouse space shall be leased by any Credit Party and no Inventory of any Credit Party shall be shipped to a processor or converter under arrangements established after the Closing Date without the prior written consent of Lender (which consent, in Lender's discretion, may be conditioned upon the exclusion from the Borrowing Base of Eligible Inventory at that location or the establishment of Reserves acceptable to Lender) or, unless and until a reasonably satisfactory landlord agreement or bailee letter, as appropriate, shall first have been obtained with respect to such location. Each Credit Party shall timely and fully pay and perform its obligations under all leases and other agreements with respect to each leased location or public warehouse where any Collateral is or may be located. To the extent otherwise permitted hereunder, if any Credit Party proposes to acquire a fee ownership interest in Real Estate after the Closing Date, it shall first provide to Lender a mortgage or deed of trust granting the Lender a first priority Lien on such Real Estate, together with environmental audits, mortgage title insurance commitment, survey, local counsel opinion(s), and, if required by Lender, supplemental casualty insurance and flood insurance, and such other documents, instruments or agreements reasonably requested by Lender, in each case, all in form and substance reasonably satisfactory to Lender.

      5.10   <u>Further Assurances</u>. Each Credit Party executing this Agreement agrees that it shall and shall cause each other Credit Party to, at such Credit Party's expense and upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement or any other Loan Document.

      5.11   <u>Post-Closing Obligations</u>.

      (a)   Borrower shall dissolve AMC-New Jersey within 150 days of the Closing Date.

(b) <u>Life Insurance</u>. Borrower shall use its best efforts to deliver to Lender a letter of undertaking regarding obtaining an increase of the key man life insurance policy in favor of Lender on the life of Chabra in an amount of not less than $5,000,000 within 150 days after the Closing Date.

(c) <u>Computer Services Agreement</u>. Borrower shall have entered into a computer services agreement with Eagle Investors, Inc. in form satisfactory to Lender within sixty (60) days of the Closing Date and which shall provide for at least 120 hours of service per annum.

## 6. NEGATIVE COVENANTS

Each Credit Party executing this Agreement jointly and severally agrees as to all Credit Parties that, without the prior written consent of the Lender, from and after the date hereof until the Termination Date:

6.1   <u>Mergers, Subsidiaries, Etc.</u>

No Credit Party shall directly or indirectly, by operation of law or otherwise, (a) form or acquire any Subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or Stock of, or otherwise combine with or acquire, any Person without Lender's prior written consent. The Accounts and Inventory of any acquired Person shall not be included in Eligible Accounts and Eligible Inventory without the prior written consent of Lender.

6.2   <u>Investments; Loans and Advances</u>. Except as otherwise expressly permitted by this <u>Section 6</u>, no Credit Party shall make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any Person, through the direct or indirect lending of money, holding of securities or otherwise, except that:

(a)   subject to Section 5.11, each Credit Party may maintain its existing investments in its Subsidiaries as of the Closing Date;

(b)   so long as no Default or Event of Default has occurred and is continuing and there is no outstanding Revolving Loan balance and subject to the provisions in Annex B, Borrower may make investments in (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency thereof maturing within one year from the date of acquisition thereof, (ii) commercial paper maturing no more than one year from the date of creation thereof and currently having the highest rating obtainable from either Standard & Poor's Ratings Services or Moody's Investors Service, Inc., (iii) certificates of deposit, maturing no more than one year from the date of creation thereof, issued by commercial banks incorporated under the laws of the United States of America, each having combined capital, surplus and undivided profits of not less than $300,000,000 and having a senior unsecured rating of "A" or better by a nationally recognized rating agency (an "<u>A Rated Bank</u>"), (iv) time deposits, maturing no more than 30 days from the date of creation thereof with A Rated

31

Banks, and (v) mutual funds and money market accounts that invest solely in one or more of the investments described in clauses (i) through (iv) above; and

(c)    Borrower may make advances to salespeople for travel and entertainment expenses in the ordinary course of business of up to $10,000.00 outstanding at any time.

6.3    Indebtedness.

(a)    No Credit Party shall create, incur, assume or permit to exist any Indebtedness, except (without duplication):

(i)    the Loans and the other Obligations;

(ii)    unfunded pension fund and other employee benefit plan obligations and liabilities to the extent they are permitted to remain unfunded under applicable law; and

(iii)    existing Indebtedness described in Disclosure Schedule (6.3) and refinancings thereof or amendments or modifications thereof that do not have the effect of increasing the principal amount thereof or changing the amortization thereof (other than to extend the same) and that, subject to Section 6.19, are otherwise on terms and conditions not materially less favorable to any Credit Party, Lender, as determined by Lender, than the terms of the Indebtedness being refinanced, amended or modified.

(b)    No Credit Party shall, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness, other than:

(i)    the Obligations; and

(ii)    Indebtedness permitted by Section 6.3(a)(iii) upon any refinancing thereof in accordance with Section 6.3(a)(iii).

6.4    Employee Loans and Affiliate Transactions.

(a)    Except as otherwise expressly permitted in this Section 6 with respect to Affiliates, no Credit Party shall enter into or be a party to any transaction with any other Credit Party or any Affiliate thereof except in the ordinary course of and pursuant to the reasonable requirements of such Credit Party's business and upon fair and reasonable terms that are no less favorable to such Credit Party than would be obtained in a comparable arm's length transaction with a Person not an Affiliate of such Credit Party. The terms of any such transaction must be disclosed in advance to Lender. All such transactions existing as of the date hereof are described on Disclosure Schedule (6.4(a)).

32