(b)     No Credit Party shall enter into any lending or borrowing transaction with any employees of any Credit Party except to the extent permitted by Section 6.2(c).

6.5     Capital Structure and Business.  No Credit Party shall (a) make any changes in any of its business objectives, purposes or operations that could in any way adversely affect the repayment of the Loans or any of the other Obligations or could reasonably be expected to have or result in a Material Adverse Effect, (b) make any change in its capital structure as described in Disclosure Schedule (3.8), including the issuance of any shares of Stock, warrants or other securities convertible into Stock or any revision of the terms of its outstanding Stock, provided that Borrower may issue (i) stock dividends on the Preferred Stock in accordance with the terms of Borrower's certificate of incorporation; and (ii) shares of its common Stock so long as (A) the proceeds thereof are applied in prepayment of the Obligations as required by Section 1.3(b)(iii), and (B) no Change of Control occurs after giving effect thereto, or (c) amend its charter or bylaws or other organizational documents (including, without limitation, in respect of the Preferred Stock) without Lender's consent.  No Credit Party shall engage in any business other than the businesses currently engaged in by it or businesses reasonably related thereto.  Neither Holdings nor Holdings II shall have any business operations or shall have any Subsidiaries or hold any beneficial interest in any Stock other than Borrower.

6.6     Guaranteed Indebtedness.  No Credit Party shall create, incur, assume or permit to exist any Guaranteed Indebtedness except (a) by endorsement of instruments or items of payment for deposit to the general account of any Credit Party, and (b) for Guaranteed Indebtedness incurred for the benefit of any other Credit Party if the primary obligation is expressly permitted by this Agreement.

6.7     Liens.  No Credit Party shall create, incur, assume or permit to exist any Lien on or with respect to its Accounts or any of its other properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

6.8     Sale of Stock and Assets.  No Credit Party shall sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets, including the Stock of any of its Subsidiaries (whether in a public or a private offering or otherwise) or any of its Accounts, other than:

(a) the sale of Inventory in the ordinary course of business;

(b) the sale, transfer, conveyance or other disposition by a Credit Party in the ordinary course of business of Equipment or Fixtures that is obsolete or no longer used or useful in such Credit Party's business; and

(c) the sale of investments permitted under clause (b) of Section 6.2 in the ordinary course of business.

With respect to any disposition of assets or other properties permitted pursuant to clause (b) above, Lender agrees on reasonable prior written notice to release its Lien on such assets or other properties in order to permit the applicable Credit Party to effect such

33

disposition and shall execute, at Borrower's expense, appropriate UCC-3 termination statements and other releases as reasonably requested and prepared by Borrower

6.9    ERISA.  No Credit Party shall, or shall cause or permit any ERISA Affiliate to, cause or permit to occur an event which is reasonably expected to result in: (i) the imposition of a Lien under Section 412 of the IRC or Section 302 or 4068 of ERISA; (ii) an ERISA Affiliate's classification as an "employee benefit plan" as defined in Section 3(3) of ERISA, or (iii) the underlying assets of an ERISA Affiliate constituting "plan assets" (within the meaning of 29 C.F.R. Section 2510.3-101).  No Credit Party shall, or cause or permit any ERISA Affiliate to, cause or permit to occur an ERISA Event to the extent such ERISA Event could reasonably be expected to have a Material Adverse Effect.

6.10    Financial Covenants.  Borrower shall not breach or fail to comply with any of the following financial covenants (the "Financial Covenants"), each of which shall be calculated in accordance with GAAP consistently applied:

(a)  Maximum Capital Expenditures.  Borrower and its Subsidiaries on a consolidated basis shall not make Capital Expenditures during the following periods that exceed in the aggregate the amounts set forth opposite each of such periods:

| Period | Maximum |
| --- | --- |
| January 1, 2003 – December 31, 2003 | $150,000 |
| January 1, 2004 – December 31, 2004 | $150,000 |
| January 1, 2005 – December 31, 2005 | $150,000 |
| January 1, 2006 – December 31, 2006 | $150,000 |

(b)    Minimum EBITDA.  Borrower and its Subsidiaries on a consolidated basis shall have, at the end of each Fiscal Quarter during the term of this Agreement, EBITDA for such Fiscal Quarter of not less than 85% of the quarterly budgeted EBITDA for such Fiscal Quarter as set forth in the Operating Plan most recently delivered to Lender pursuant to clause (c)(I) of Annex D and approved by Lender.

6.11    Hazardous Materials.  No Credit Party shall cause or permit a Release of any Hazardous Material on, at, in, under, above, to, from or about any of the Real Estate where such Release would (a) violate in any respect, or form the basis for any Environmental Liabilities under, any Environmental Laws or Environmental Permits or (b) otherwise adversely impact the value or marketability of any of the Real Estate or any of the Collateral, other than such violations or Environmental Liabilities which could not reasonably be expected to have a Material Adverse Effect.

6.12    Sale-Leasebacks.  No Credit Party shall engage in any sale-leaseback, synthetic lease or similar transaction involving any of its assets.

6.13    Cancellation of Indebtedness.  No Credit Party shall cancel any claim or debt owing to it, except for reasonable consideration negotiated on an arm's-length basis and in the ordinary course of its business consistent with past practices.

6.14 <u>Restricted Payments</u>. No Credit Party shall make any Restricted Payment, except:

(a) dividends and distributions by Subsidiaries of Borrower paid to Borrower;

(b) dividends in kind on the Preferred Stock in accordance with the terms of Borrower's certificate of incorporation;

(c) redemptions of the Series D Preferred and payment of accrued dividends thereon;

(d) payment of cash dividends on the Series C Preferred to Chabra in an amount not to exceed $597,120 per year; and

(e) after September 1, 2003, a quarterly management fee not to exceed 0.50% of Borrower's net sales projected for each subsequent quarter;

provided, that (x) no Default or Event of Default has occurred and is continuing or would result after giving effect to any payment pursuant to clause (e) above, (y) Borrower shall have Borrowing Availability of at least $2,000,000 after giving effect to any payment pursuant to clause (e) above; and (z) the timing of the Restricted Payments referred to in clause (e) above shall be set at dates that permit the delivery of the Financial Statements necessary to determine compliance with the Financial Covenants of the immediately preceding Fiscal Quarter prior to each such payment; provided, further, that installments of the quarterly management fee payable to MapleWood pursuant to clause (e) above shall be subject to off-set and deduction by an amount equal to the difference between the management fee paid based on projected sales during any prior period commencing on or after September 1, 2003 and the amount that would have been permitted hereunder if actual sales for such prior period instead of projected sales had been used in the calculation in clause (e) above.

6.15 <u>Change of Corporate Name or Location; Change of Fiscal Year</u>. No Credit Party shall (a) change its corporate name or trade name, (b) change its jurisdiction of organization, (c) change its organizational identification number, or (d) change its chief executive office, principal place of business, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral, in each case without at least 30 days prior written notice to Lender and after Lender's written acknowledgment that any reasonable action requested by Lender in connection therewith, including to continue the perfection of any Liens in favor of Lender, in any Collateral, has been completed or taken, and <u>provided</u> that any such new location shall be in the continental United States of America. Without limiting the generality of the foregoing, no Credit Party shall change its name, identity or corporate structure in any manner that might make any financing or continuation statement filed in connection herewith seriously misleading within the meaning of Section 9-405 of the Code or any other then applicable provision of the Code except upon prior written notice to Lender and after Lender's written acknowledgment that any reasonable action requested by Lender in

connection therewith, including to continue the perfection of any Liens in favor of Lender, in any Collateral, has been completed or taken.  No Credit Party shall change its Fiscal Year.

6.16     No Impairment of Intercompany Transfers.  No Credit Party shall directly or indirectly enter into or become bound by any agreement, instrument, indenture or other obligation (other than this Agreement and the other Loan Documents) that could directly or indirectly restrict, prohibit or require the consent of any Person with respect to the payment of dividends or distributions or the making or repayment of intercompany loans by a Subsidiary of Borrower to Borrower.

6.17     No Speculative Transactions.  No Credit Party shall engage in any transaction involving commodity options, futures contracts or similar transactions, except solely to hedge against fluctuations in the prices of commodities owned or purchased by it and the values of foreign currencies receivable or payable by it and interest swaps, caps or collars.

6.18     Real Estate. No Credit Party shall purchase fee simple ownership in Real Estate.

6.19     Changes Relating to Inventory Trade Financing; Material Contracts.

(a)     No Credit Party shall change or amend the terms of the Inventory Trade Financing (or any indenture or agreement in connection therewith) if the effect of such amendment is to:  (i) increase the interest rate on such Inventory Trade Financing; (ii) change any default or event of default other than to delete or make less restrictive any default provision therein, or add any covenant with respect to such Inventory Trade Financing; (iii) grant any security or collateral to secure payment of such Inventory Trade Financing; or (iv) change or amend any other term if such change or amendment would materially increase the obligations of the Credit Party thereunder or confer additional material rights on the holder of such Inventory Trade Financing in a manner adverse to any Credit Party or Lender.

(b)     No Credit Party shall change or amend the terms of any of the following material contracts: Amended and Restated Employment Agreement (the "Chabra Employment Agreement") dated November 21, 2002 between Borrower and Chabra; Employment Agreements dated May 1, 2000 between Borrower and each of Michael Israel and Steven Israel, as amended by Amendments No. 1 dated May 1, 2000 (the "Israel Employment Agreements"); Employment Agreement dated May 3, 2000 between Borrower and Narinder Chhabra, as amended by Amendment No. 1 dated May 3, 2000; Employment Agreement dated May 3, 2000 between Borrower and Angel Pineiro, as amended by Amendment No. 1 dated May 3, 2000; and Employment Agreement dated January 4, 2001 between Borrower and Gregory H. Wagner, as amended by Amendment No. 1 dated May 3, 2000.

6.20     Credit Parties Other than Borrower.  None of the Credit Parties other than Borrower shall engage in any trade or business, or own any assets (other than Stock of

36

their Subsidiaries) or incur any Indebtedness or Guaranteed Indebtedness (other than the Obligations).

6.21    Modifications of Certain Documents.  No Credit Party shall, without the written consent of Lender, change any bank account to which payments are deposited that relate to Accounts which are paid pursuant to credit or debit cards or otherwise affect the manner of payment to a Credit Party with respect to such Accounts.

6.22    Inventory Trade Financing.  No Credit Party shall incur at any time Indebtedness, together with interest fees and costs, under the Inventory Trade Financing Documents in excess of the Inventory Letters of Credit.

6.23    Sun Microsystems.  Borrower shall maintain the Sun Microsystems Agreement (the "Sun Microsystems Agreement"), dated April 29, 2002, by and between the Borrower and Sun Microsystems, Inc. and the licensing arrangement set forth therein in at least the same form as it exists on the Closing Date and shall not agree to any adverse change to the Sun Microsystems Agreement, or release in any part such license without Lender's consent.

6.24    AMC-New Jersey.  AMC-New Jersey shall not at any time engage in any business, incur any obligations or own any assets.  No Credit Parties shall transfer any assets or properties to or make any advances to or investments in AMC-New Jersey.

6.25    Holdings.  Neither Holdings nor Holdings II shall at any time engage in any business, incur any obligations or own any assets other than (I) holding the capital stock of Borrower and (II) entering into and performing its obligations under the Loan Documents.

6.26    Issuance of Capital Stock.  The Borrower shall not, without first obtaining the approval of the Lender, take any action that results in the issuance of any equity securities of the Borrower, including stock options, warrants or other rights to purchase equity securities, other than (A) shares of common stock (including any of such shares which are repurchased) issued to officers, directors, employees and consultants of the Borrower pursuant to stock option or purchase plans approved by the Lender or in existence prior to the Closing Date; (B) shares of common stock issued upon conversion of the Series D Preferred; (C) shares of Series D Preferred issued as dividend shares or as payment of interest pursuant to this Agreement; or (D) shares of Series C Preferred issued as Series D dividend shares.

6.27    Operating Budget.  The Borrower shall not, without first obtaining the approval of the Lender, make any changes to the Operating Budget after delivery thereof to Lender under clause (c)(I) of Annex D.

7.  **TERM**

7.1    Termination.  The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

7.2    <u>Survival of Obligations Upon Termination of Financing Arrangements</u>. Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Credit Parties or the rights of Lender relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date.  Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Credit Parties, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Termination Date; provided, that the provisions of <u>Section 11</u>, the payment obligations under <u>Sections 1.15 and 1.13</u>, and the indemnities contained in the Loan Documents shall survive the Termination Date.

## 8.  EVENTS OF DEFAULT: RIGHTS AND REMEDIES

8.1    <u>Events of Default</u>.  The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "<u>Event of Default</u>" hereunder:

(a)    Borrower (i) fails to make any payment of principal of, or interest on, or Fees owing in respect of, the Loans or any of the other Obligations when due and payable, or (ii) fails to pay or reimburse Lender for any expense reimbursable hereunder or under any other Loan Document within 10 days following Lender's demand for such reimbursement or payment of expenses.

(b)    Any Credit Party fails or neglects to perform, keep or observe any of the provisions of <u>Sections 1.4</u>, <u>1.8</u>, <u>5.4</u> or <u>6</u>, or any of the provisions set forth in <u>Annexes C</u> or <u>G</u>, respectively.

(c)    Borrower fails or neglects to perform, keep or observe any of the provisions of <u>Section 4</u> or any provisions set forth in <u>Annexes E</u> or <u>F</u>, respectively, and the same shall remain unremedied for 3 days or more.

(d)    Any Credit Party fails or neglects to perform, keep or observe any other provision of this Agreement or of any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this <u>Section 8.1</u>) and the same shall remain unremedied for 30 days or more.

(e)    A default or breach occurs under any other agreement, document or instrument to which any Credit Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness or Guaranteed Indebtedness (other than the Obligations) of any Credit Party in excess of $500,000 in the aggregate (including (x) undrawn committed or available amounts and (y) amounts owing to all creditors under any combined or syndicated credit arrangements), or (ii) causes, or permits any holder of such

38

Indebtedness or Guaranteed Indebtedness or a trustee to cause, Indebtedness or Guaranteed Indebtedness or a portion thereof in excess of $500,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, or cash collateral in respect thereof to be demanded, in each case, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(f)    Any information contained in any Borrowing Base Certificate is untrue or incorrect in any respect, or any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate (other than a Borrowing Base Certificate) made or delivered to Lender by any Credit Party is untrue or incorrect in any material respect as of the date when made or deemed made.

(g)    Assets of any Credit Party with a fair market value of $250,000 or more shall be attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Credit Party and such condition continues for 30 days or more.

(h)    A case or proceeding is commenced against any Credit Party seeking a decree or order in respect of such Credit Party (i) under the Bankruptcy Code, or any other applicable federal, state or foreign bankruptcy or other similar law, (ii) appointing a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) for such Credit Party or for any substantial part of any such Credit Party's assets, or (iii) ordering the winding-up or liquidation of the affairs of such Credit Party, and such case or proceeding shall remain undismissed or unstayed for 60 days or more or a decree or order granting the relief sought in such case or proceeding shall be entered by a court of competent jurisdiction.

(i)    Any Credit Party (i) files a petition seeking relief under the Bankruptcy Code, or any other applicable federal, state or foreign bankruptcy or other similar law, (ii) consents or fails to contest in a timely and appropriate manner the institution of proceedings thereunder or to the filing of any such petition or the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) for such Credit Party or for any substantial part of any such Credit Party's assets, (iii) makes an assignment for the benefit of creditors, or (iv) takes any corporate action in furtherance of any of the foregoing, or (v) admits in writing its inability to, or is generally unable to, pay its debts as such debts become due.

(j)    A final judgment or judgments for the payment of money in excess of $500,000 in the aggregate at any time are outstanding against one or more of the Credit Parties and the same are not, within 30 days after the entry thereof, discharged or execution thereof stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay.

(k)    Any material provision of any Loan Document for any reason ceases to be valid, binding and enforceable in accordance with its terms (or any Credit Party shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan

Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(l)    Any "Change of Control" occurs.

(m)    Without limiting any other provision hereof, a default or breach occurs under any Inventory Trade Financing Document, that is not cured within any applicable grace period (it being understood for purposes hereof that payment defaults shall be deemed to have no grace periods).

8.2    <u>Remedies</u>. If any Default or Event of Default has occurred and is continuing, Lender may, without notice, suspend the Revolving Loan facility with respect to additional Advances whereupon any additional Advances shall be made or incurred in Lender's sole discretion so long as such Default or Event of Default is continuing. If any Default or Event of Default has occurred and is continuing, Lender may, without notice except as otherwise expressly provided herein, increase the rate of interest applicable to the Loans to the Default Rate.

(a)    If any Event of Default has occurred and is continuing, Lender may, without notice; (i) terminate the Revolving Loan facility with respect to further Advances; (ii) declare all or any portion of the Obligations, including all or any portion of any Loan to be forthwith due and payable, all without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Borrower and each other Credit Party; or (iii) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Code; <u>provided</u>, that upon the occurrence of an Event of Default specified in <u>Sections 8.1(h)</u> or <u>(i)</u>, the Revolving Loan facility shall be immediately terminated and all of the Obligations, including the Revolving Loan, shall become immediately due and payable without declaration, notice or demand by any Person.

8.3    <u>Waivers by Credit Parties</u>. Except as otherwise provided for in this Agreement or by applicable law, each Credit Party waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which any Credit Party may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

# 9.  ASSIGNMENT AND PARTICIPATIONS

9.1    <u>Assignment and Participations</u>.

(a)    Lender may make an assignment to any Person of, or sell participations in, at any time or times, the Loan Documents, Loans, and any Commitment or any portion thereof or interest therein, including Lender's rights, title, interests, remedies, powers or duties thereunder. In the case of an assignment by Lender under this Section 9.1, the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as Lender hereunder. Lender shall be relieved of its obligations hereunder with respect to its Commitments or assigned portion thereof from and after the date of such assignment. Borrower hereby acknowledges and agrees that any assignment shall give rise to a direct obligation of Borrower to the assignee and that the assignee shall be considered to be a "Lender". In the event Lender assigns or otherwise transfers all or any part of the Obligations, Lender shall so notify Borrower and Borrower shall, upon the request of Lender, execute new Notes in exchange for the Notes, if any, being assigned.

(b)    Upon the effective date of any such assignment pursuant to clause (a) of this Section 9.1, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment and acceptance agreement, shall have the same rights, benefits and obligations as it would if it were a Lender hereunder and (ii) Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment and acceptance agreement, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an assignment and acceptance agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, Lender shall cease to be a party hereto); provided that, upon any such assignment by Lender, the parties hereto agree to enter into such amendments to the Loan Documents as are necessary to accommodate multiple Lenders for voting, administrative and other customary purposes. Lender may furnish any information concerning Borrower and its Subsidiaries in the possession of that Lender from time to time to assignees (including prospective assignees); provided, however, that, prior to any such disclosure, the assignee or proposed assignee shall agree to preserve the confidentiality of any confidential information received by it from Lender.

9.2    Lender's Reliance. Etc. Neither Lender nor any of its Affiliates nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for damages caused by its or their own gross negligence or willful misconduct. Without limiting the generality of the foregoing, Lender: (a) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts; and (b) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice (telephonic or otherwise), consent, certificate or other instrument or writing (which may be by telecopy, telegram, cable or telex) believed by it to be genuine and signed or sent by the proper party or parties.

9.3    Setoff and Sharing of Payments. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, Lender is hereby authorized at any time or from time to time, without notice to any Credit Party or to

any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of Borrower or any Guarantor (regardless of whether such balances are then due to Borrower or such Guarantor) and any other properties or assets at any time held or owing by Lender to or for the credit or for the account of Borrower or any Guarantor against and on account of any of the Obligations that are not paid when due.

## 10. SUCCESSORS AND ASSIGNS

10.1   Successors and Assigns. This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of each Credit Party, Lender, Lender and their respective successors and assigns (including, in the case of any Credit Party, a debtor-in-possession on behalf of such Credit Party), except as otherwise provided herein or therein. No Credit Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by any Credit Party without the prior express written consent of Lender shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Credit Party, Lender with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

## 11. MISCELLANEOUS

11.1   Complete Agreement; Modification of Agreement. The Loan Documents constitute the complete agreement between the parties with respect to the subject matter thereof and may not be modified, altered or amended except as set forth in Section 11.2. Any letter of interest, commitment letter, fee letter (other than the Eugenia Fee Letter) or confidentiality agreement between any Credit Party and Lender or any of their respective Affiliates, predating this Agreement and relating to a financing of substantially similar form, purpose or effect shall be superseded by this Agreement.

11.2   Amendments and Waivers. Except for actions expressly permitted to be taken by Lender, no amendment, modification, termination or waiver of any provision of this Agreement or any other Loan Document, or any consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by Lender and Borrower. Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given. No amendment, modification, termination or waiver shall be required for Lender to take additional Collateral pursuant to any Loan Document.

11.3   Fees and Expenses. Borrower shall reimburse Lender for (i) all reasonable fees, costs and expenses (including the reasonable fees and expenses of all of its counsel, advisors, consultants and auditors) and (ii) all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors (including environmental and management consultants and appraisers) in each case incurred in

connection with the negotiation and preparation of the Loan Documents and for advice, assistance, or other representation incurred in connection with:

(a)    the forwarding to Borrower or any other Person on behalf of Borrower by Lender of the proceeds of any Loan (including a wire transfer fee of $25 per wire transfer);

(b)    any amendment, modification or waiver of, consent with respect to, or termination of any of the Loan Documents or Related Transactions Documents or advice in connection with the administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(c)    any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to Lender by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided, that no Person shall be entitled to reimbursement under this clause (c) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct;

(d)    any attempt to enforce any remedies of Lender against any or all of the Credit Parties or any other Person that may be obligated to Lender by virtue of any of the Loan Documents; including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (d) in respect of any litigation, contest, dispute, suit, proceeding or action solely to the extent any of the foregoing results from such Person's gross negligence or willful misconduct;

(e)    any workout or restructuring of the Loans during the pendency of one or more Events of Default; and

(f)    efforts to (i) monitor the Loans or any of the other Obligations, (ii) evaluate, observe or assess any of the Credit Parties or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

including, as to each of clauses (a) through (f) above, all reasonable attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings; and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 11.3, all of which shall be payable, on demand, by

43

Borrower to Lender. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants, paralegals and costs set forth in the Eugenia Fee Letter; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

11.4   No Waiver. Lender's failure, at any time or times, to require strict performance by the Credit Parties of any provision of this Agreement or any other Loan Document shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance herewith or therewith. Any suspension or waiver of an Event of Default shall not suspend, waive or affect any other Event of Default whether the same is prior or subsequent thereto and whether the same or of a different type. Subject to the provisions of Section 11.2, none of the undertakings, agreements, warranties, covenants and representations of any Credit Party contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by any Credit Party shall be deemed to have been suspended or waived by Lender, unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender and directed to Borrower specifying such suspension or waiver. No failure or delay on the part of Lender in the exercise of any power, right or privilege hereunder or under the other Loan Documents shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

11.5   Remedies. Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies which Lender may have under any other agreement, including the other Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

11.6   Severability. Wherever possible, each provision of this Agreement and the other Loan Documents shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement or any other Loan Document shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement or such other Loan Document.

11.7   Conflict of Terms. Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement conflicts with any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

11.8    <u>Confidentiality</u>. Lender agree to use commercially reasonable efforts (equivalent to the efforts Lender applies to maintain the confidentiality of its own confidential information) to maintain as confidential all confidential information provided to them by the Credit Parties and designated as confidential for a period of two (2) years following receipt thereof, except that Lender may disclose such information (a) to Persons employed or engaged by Lender in evaluating, approving, structuring or administering the Loans and the Commitments; (b) to any bona fide assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this <u>Section 11.8</u> (and any such bona fide assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in <u>clause (a)</u> above); (c) as required or requested by any Governmental Authority or reasonably believed by Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Lender's counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any Litigation to which Lender is a party; or (f) that ceases to be confidential through no fault of Lender.

11.9    <u>GOVERNING LAW</u>.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE  LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.  EACH CREDIT PARTY HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, CITY OF NEW YORK, NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE CREDIT PARTIES, AGENT AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, <u>PROVIDED</u>, THAT AGENT, LENDER AND THE CREDIT PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF NEW YORK COUNTY, CITY OF NEW YORK, NEW YORK AND, <u>PROVIDED</u>, <u>FURTHER</u> THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENT.  EACH CREDIT PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH CREDIT PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH CREDIT PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR <u>FORUM NON CONVENIENS</u> AND HEREBY CONSENTS TO THE GRANTING OF SUCH

LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH CREDIT PARTY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH CREDIT PARTY AT THE ADDRESS SET FORTH IN ANNEX G OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH CREDIT PARTY'S ACTUAL RECEIPT THEREOF OR 3 DAYS AFTER DEPOSIT IN THE UNITED STATES MAILS, PROPER POSTAGE PREPAID.

11.10  Notices.  All notices, requests and other communications under this Agreement and any other Loan Document shall be in writing (including by facsimile transmission, provided that any matter transmitted by Borrower by facsimile shall be immediately confirmed by a telephone call to the recipient at the number specified on Annex G hereto) unless otherwise provided for herein and shall be personally served, or sent by facsimile, overnight service or mail, in each case, to the following address or facsimile number:

(A) If to Lender, at

> Eugenia VI Venture Holdings, Ltd.
> c/o Eagle Investors, Inc.
> 299 Park Avenue, 24th Floor
> New York, New York 10171
> Attention: David L. Alexander
> Telecopier No.:  (212) 821-3700
> Telephone No.:  (212) 821-4324
> alexander@eagleadvisors.com

> with copies to:

> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, New York 10166
> Attention: Dennis Friedman, Esq.
> Telecopier No.: (212) 351-3900
> Telephone No.: (212) 351-4035

(B) If to Borrower, at

> AMC Computer Corp.
> 129 West 27th Street
> New York, New York 10001
> Attention: Surinder (Sonny) Chabra
> Telecopier No.: (212) 620-3085
> Telephone No.: (212) 620-0700 Ext. 1280

With copies to:

Greenberg Traurig, P.A.
450 S. Orange Avenue, Suite 650
Orlando, Florida 32801
Attention: Frank Ioppolo, Jr., Esq.
Telecopier No.: (407) 650-8416
Telephone No.: (407) 418-2420

MapleWood Management LP
255 Aragon Avenue, Suite 300
Coral Gables, FL 33134
Attention: Mr. Robert J. Reale
Telecopier No.: (305) 350-6810
Telephone No.: (305) 350-6800

or to such other address as shall be designated by such party in a written notice to the other parties as provided herein, except that notices of changes of address or facsimile shall be effective only upon receipt. All such notices, requests, consents, waivers and communications shall: (1) when deposited by mail, postage prepaid, be effective five (5) Business Days after deposit in the mail; (2) when facsimiled, be effective upon receipt by the transmitting party of confirmation of complete transmission; (3) when delivered by a recognized overnight courier, be effective two (2) Business Days after delivery to such overnight courier properly addressed; and (4) when delivered in person, be effective when hand delivered; provided, however, that any notices or communications to Lender shall not be effective until received by Lender.

11.11   Section Titles. The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

11.12   Counterparts. This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

11.13   WAIVER OF JURY TRIAL. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AMONG AGENT, LENDER AND ANY CREDIT PARTY ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO THE

47

RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO.

11.14  Press Releases. Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of Eugenia or its affiliates or referring to this Agreement, the other Loan Documents or the Related Transactions Documents.

11.15  Reinstatement. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Borrower for liquidation or reorganization, should Borrower become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of Borrower's assets, and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

11.16  Advice of Counsel. Each of the parties represents to each other party hereto that it has discussed this Agreement and, specifically, the provisions of Sections 11.9 and 11.13, with its counsel.

11.17  No Strict Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

11.18  No Fiduciary Relationship; Limitation of Liabilities.

(a)  No provision in this Agreement or in any of the other Loan Documents and no course of dealing between the parties shall be deemed to create any fiduciary duty by Lender to Borrower.

(b)  Lender shall not, nor shall any Affiliate (other than the Borrower), officer, director, shareholder, employee, attorney, or agent of Lender, have any liability with respect to, and Borrower hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Borrower in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents. Borrower hereby waives, releases, and agrees not to sue Lender or Lender's Affiliates (other than Borrower), officers, directors, employees, attorneys, or agents for punitive damages in respect of any

48

claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the transactions contemplated hereby.

49

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**BORROWER**

**AMC COMPUTER CORP.**

By: _____
    Name:  Gregory H. Wagner
    Title:    Chief Financial Officer

**EUGENIA VI VENTURE HOLDINGS, LTD., as Lender**

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**BORROWER**

**AMC COMPUTER CORP.**

By:_____

     Name:

     Title:

**EUGENIA VI VENTURE HOLDINGS, LTD., as Lender**

By:_____

     Name:

                  EN GILLOOLY

     Title:            Director

50

The following Persons are signatories to this Agreement in their capacity as Credit Parties and not as Borrowers.

AMC INVESTORS LLC

By: MAPLEWOOD MANAGEMENT LP, as Manager

By: MapleWood Holdings LLC, its general partner

By: _____
    Name:  Robert J. Reale
    Title:   Attorney-in-Fact

AMC INVESTORS II LLC

By: MAPLEWOOD MANAGEMENT LP, as Manager

By: MapleWood Holdings LLC, its general partner

By: _____
    Name:  Robert J. Reale
    Title:  Attorney-in-Fact

With respect to Sections 3.26 and 6.24 herein.

AMC COMPUTER CORP. (NJ)

By: _____
    Name:  Surinder (Sonny) Chabra
    Title:   President

The following Persons are signatories to this Agreement in their capacity as Credit Parties and not as Borrowers.

AMC INVESTORS LLC

By: MAPLEWOOD MANAGEMENT LP, as Manager

By: MapleWood Holdings LLC, its general partner

By: _____
      Name:  Robert J. Reale
      Title:   Attorney-in-Fact

AMC INVESTORS II LLC

By: MAPLEWOOD MANAGEMENT LP, as Manager

By: MapleWood Holdings LLC, its general partner

By: _____
      Name:  Robert J. Reale
      Title:  Attorney-in-Fact

With respect to Sections 3.26 and 6.24 herein,

AMC COMPUTER CORP. (NJ)

By: _____
      Name:   Surinder (Sonny) Chabra
      Title:   President

ANNEX A (<u>Recitals</u>)
to
<u>CREDIT AGREEMENT</u>

## <u>DEFINITIONS</u>

Capitalized terms used in the Loan Documents shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Agreement:

"<u>Account Debtor</u>" means any Person who may become obligated to any Credit Party under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a payment intangible).

"<u>Accounting Changes</u>" has the meaning ascribed thereto in clause (c) of <u>Annex A</u>.

"<u>Accounts</u>" means all "accounts," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, or Instruments), (including any such obligations that may be characterized as an account or contract right under the Code), (b) all of each Credit Party's rights in, to and under all purchase orders or receipts for goods or services, (c) all of each Credit Party's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all rights to payment due to any Credit Party for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Credit Party or in connection with any other transaction (whether or not yet earned by performance on the part of such Credit Party), including the right to receive the proceeds of said purchase orders and contracts, (e) all health care insurance receivables, and (f) all collateral security and guaranties of any kind, given by any Account Debtor or any other Person with respect to any of the foregoing.

"<u>Advance</u>" means any Revolving Credit Advance.

"<u>Advisory Agreement</u>" means that certain Advisory Agreement dated as of the date hereof between MapleWood Partners LP and Borrower.

"<u>Affiliate</u>" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, five percent (5%) or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, (c) each of such Person's officers, directors, joint

A-1

venturers and partners and (d) in the case of Borrower, the immediate family members, spouses and lineal descendants of individuals who are Affiliates of Borrower. For the purposes of this definition, "control" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, however, that the term "Affiliate" shall specifically exclude Lender.

"Agreement" means the Amended and Restated Credit Agreement by and among Borrower, the other Credit Parties party thereto and Lender, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"AMC – New Jersey" means AMC Computer Corp. (NJ), a New Jersey corporation, which is the sole Subsidiary of Borrower as of the Closing Date.

"Appendices" has the meaning ascribed to it in the recitals to the Agreement.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§101 et seq.

"Blocked Accounts" has the meaning ascribed to it in Annex B.

"Borrower" shall have the meaning assigned thereto in the preamble to the Agreement.

"Borrowing Availability" means as of any date of determination the lesser of (a) the Maximum Amount and (b) the Borrowing Base, in each case less the Revolving Loan then outstanding.

"Borrowing Base" means, as of any date of determination by Lender, an amount equal to the sum at such time of:

(i)     85% of the book value of Borrower's Eligible Accounts; plus

(ii)    60% of the book value of Borrower's Eligible Inventory valued at the lower of cost (determined on a first in, first out basis) or market; minus

(iii)   any Reserves established by Lender at such time.

"Borrowing Base Certificate" means a certificate to be executed and delivered from time to time by Borrower in the form attached to the Agreement as Exhibit 4.1(b).

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York or the Cayman Islands.

"Capital Expenditures" means, with respect to any Person, all expenditures (by the expenditure of cash or the incurrence of Indebtedness) by such Person during any measuring period for any fixed assets or improvements or for replacements, substitutions or additions thereto and that are required to be capitalized under GAAP.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, would be required to be classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligation" means, with respect to any Capital Lease of any Person, the amount of the obligation of the lessee thereunder that, in accordance with GAAP, would appear on a balance sheet of such lessee in respect of such Capital Lease.

"Cash Management Systems" has the meaning ascribed to it in Section 1.8.

"Chabra" means Surinder (Sonny) Chabra, an individual residing at 30 Eagle Court, Muttontown, New York 11791.

"Chabra Employment Agreement" has the meaning ascribed to it in Section 6.19(b).

"Change of Control" means any event, transaction or occurrence as a result of which Maplewood and Sonny Chabra, an individual residing at 30 Eagle Court, Mutton Town, New York 11791, together cease to beneficially own and control, directly or indirectly, at least sixty percent (60%) of the issued and outstanding shares of each class of capital stock of Borrower entitled (without regard to the occurrence of any contingency) to vote for the election of a majority of the members of the board of directors of Borrower.

"Charges" means all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes owed to the PBGC at the time due and payable), levies, assessments, charges, liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of any Credit Party, (d) any Credit Party's ownership or use of any properties or other assets, or (e) any other aspect of any Credit Party's business.

"Chattel Paper" means any "chattel paper," as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by any Credit Party.

"Closing Date" means January 30, 2003.

"Closing Checklist" means the schedule, including all appendices, exhibits or schedules thereto, listing certain documents and information to be delivered in connection with the Agreement, the other Loan Documents and the transactions contemplated thereunder, substantially in the form attached hereto as Annex C.

A-3

"<u>Code</u>" means the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York; <u>provided</u>, <u>that</u> to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; <u>provided further</u>, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "<u>Code</u>" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"<u>Collateral</u>" means the property covered by the Security Agreement, the Pledge Agreement, the Intellectual Property Security Agreement and the other Collateral Documents and any other property, real or personal, tangible or intangible now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of Lender to secure the Obligations.

"<u>Collateral Documents</u>" means the Security Agreement, the Pledge Agreement, the Lock Box Agreements, the Guaranty, the Intellectual Property Security Agreement and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations.

"<u>Collateral Reports</u>" means the reports with respect to the Collateral referred to in <u>Annex E</u>.

"<u>Collection Account</u>" means that certain account of Lender, account number #26-05109 in the name of Lender at The Northern Trust Company, ABA No. 071000152, or such other account as may be specified in writing by Lender as the "Collection Account".

"<u>Commitment Termination Date</u>" means the earliest of (a) January 31, 2006, (b) the date of termination of Lender' obligations to make Advances or permit existing Loans to remain outstanding pursuant to <u>Section 8.2(b)</u>, (c) the date of indefeasible prepayment in full by Borrower of the Loans and the permanent reduction of all Commitments to zero dollars ($0), in each case, in accordance with the provisions of <u>Section 1.3(a)</u>; and (d) the Disposition Date.

"<u>Commitments</u>" means the aggregate of Lender's Revolving Loan Commitment and Term Loan Commitment, which aggregate commitment shall be SIXTEEN MILLION DOLLARS ($16,000,000) on the Closing Date, as such Commitments may be reduced, amortized or adjusted from time to time in accordance with the Agreement.

"<u>Compliance Certificate</u>" has the meaning ascribed to it in <u>Annex D</u>.

A-4

"Contracts" means all "contracts," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, in any event, including all contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which any Credit Party may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"Copyright License" means any and all rights now owned or hereafter acquired by any Credit Party under any written agreement granting any right to use any Copyright or Copyright registration.

"Copyrights" means all of the following now owned or hereafter adopted or acquired by any Credit Party: (a) all copyrights and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof, and (b) all reissues, extensions or renewals thereof.

"Credit Parties" means Holdings, Holdings II, Borrower and each of their respective Subsidiaries.

"Default" means any event that, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning ascribed to it in Section 1.5(d).

"Deposit Accounts" means all "deposit accounts" as such term is defined in the Code, now or hereafter held in the name of any Credit Party.

"DFS" means Deutsche Financial Services Corporation.

"Disbursement Accounts" has the meaning ascribed to it on Annex B.

"Disclosure Schedules" means the Schedules prepared by Borrower and denominated as Disclosure Schedules (1.4) through (6.7) in the Index to the Agreement.

"Disposition Date" means the date on which either (a) Eugenia and Casita LP (the "Eugenia Group") cease to beneficially own and control, directly or indirectly, at least fifty percent (50%) of the issued and outstanding shares of capital stock of Borrower owned by the Eugenia Group on the Closing Date or (b) Maplewood ceases to beneficially own and control, directly or indirectly, at least fifty percent (50%) of the issued and outstanding shares of capital stock of Borrower owned by Maplewood on the Closing Date.

"Documents" means all "documents," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located.

A-5

"Dollars" or "$" means lawful currency of the United States of America.

"EBITDA" means with respect to any Person, without duplication, an amount equal to (a) consolidated net income of such Person for such period determined in accordance with GAAP, minus (b) the sum of (i) income tax credits, (ii) interest income, (iii) gain from extraordinary items for such period, (iv) any aggregate net gain (but not any aggregate net loss) during such period arising from the sale, exchange or other disposition of capital assets by such Person (including any fixed assets, whether tangible or intangible, all inventory sold in conjunction with the disposition of fixed assets and all securities), (v) any other non-cash gains that have been added in determining consolidated net income, in each case to the extent included in the calculation of consolidated net income of such Person for such period in accordance with GAAP, but without duplication, plus (c) the sum of (i) any provision for income taxes, (ii) Interest Expense, (iii) loss from extraordinary items for such period, (iv) the amount of non-cash charges relating to depreciation and amortization for such period, (v) amortized debt discount for such period, and (vi) the amount of any deduction to consolidated net income as the result of any grant to any members of the management of such Person of any Stock, in each case to the extent included in the calculation of consolidated net income of such Person for such period in accordance with GAAP, but without duplication.  For purposes of this definition, the the following items shall be excluded in determining consolidated net income of a Person: (1) the income (or deficit) of any other Person accrued prior to the date it became a Subsidiary of, or was merged or consolidated into, such Person or any of such Person's Subsidiaries; (2) the income (or deficit) of any other Person (other than a Subsidiary) in which such Person has an ownership interest, except to the extent any such income has actually been received by such Person in the form of cash dividends or distributions; (3) the undistributed earnings of any Subsidiary of such Person to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation or requirement of law applicable to such Subsidiary; (4) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of income accrued during such period; (5) any write-up of any asset; (6) any net gain from the collection of the proceeds of life insurance policies; (7) any net gain arising from the acquisition of any securities, or the extinguishment, under GAAP, of any Indebtedness, of such Person, (8) in the case of a successor to such Person by consolidation or merger or as a transferee of its assets, any earnings of such successor prior to such consolidation, merger or transfer of assets, and (9) any deferred credit representing the excess of equity in any Subsidiary of such Person at the date of acquisition of such Subsidiary over the cost to such Person of the investment in such Subsidiary.

"Eligible Accounts" has the meaning ascribed to it in Section 1.6.

"Eligible Inventory" has the meaning ascribed to it in Section 1.7.

"Chabra Employment Agreement" has the meaning ascribed to it in Section 6.19(b).

A-6

"Environmental Laws" means all applicable federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any applicable judicial or administrative interpretation thereof, including any applicable judicial or administrative order, consent decree, order or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Materials Transportation Authorization Act of 1994 (49 U.S.C. §§ 5101 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136 et seq.); the Solid Waste Disposal Act (42 U.S.C. §§ 6901 et seq.); the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.); the Clean Air Act (42 U.S.C. §§ 7401 et seq.); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.); and the Safe Drinking Water Act (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state, local and foreign counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" means all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" means all "equipment," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located and, in any event, including all such Credit Party's machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment , including embedded software and peripheral equipment, and all engineering, processing and manufacturing equipment, office machinery, furniture, materials handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights

A-7

with respect thereto, and all products and proceeds thereof and condemnation awards and insurance proceeds with respect thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to any Credit Party, any trade or business (whether or not incorporated) that, together with such Credit Party, are treated as a single employer within the meaning of Sections 414(b), (c), (m) or (o) of the IRC.

"ERISA Event" means, with respect to any Credit Party or any ERISA Affiliate, (a) any event described in Section 4043(c) of ERISA with respect to a Title IV Plan; (b) the withdrawal of any Credit Party or ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from any Multiemployer Plan; (d) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA; (e) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC; (f) the failure by any Credit Party or ERISA Affiliate to make when due required contributions to a Multiemployer Plan or Title IV Plan unless such failure is cured within 30 days; (g) any other event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or for the imposition of liability under Section 4069 or 4212(c) of ERISA; (h) the termination of a Multiemployer Plan under Section 4041A of ERISA or the reorganization or insolvency of a Multiemployer Plan under Section 4241 or 4245 of ERISA; (i) the loss of a Qualified Plan's qualification or tax exempt status; or (j) the termination of a Plan described in Section 4064 of ERISA.

"ESOP" means a Plan that is intended to satisfy the requirements of Section 4975(e)(7) of the IRC.

"Eugenia" means Eugenia VI Venture Holdings, Ltd., a British Virgin Islands company.

"Event of Default" has the meaning ascribed to it in Section 8.1.

"Excess Cash Flow" means, without duplication, with respect to any Fiscal Year of Borrower and its Subsidiaries, consolidated net income plus (a) depreciation, amortization and Interest Expense to the extent deducted in determining consolidated net income, minus (b) Capital Expenditures during such Fiscal Year (excluding the financed portion thereof and excluding any Capital Expenditures in such Fiscal Year to the extent in excess of the amount permitted to be made in such Fiscal Year pursuant to clause (a) of Section 6.10), minus (c) Interest Expense paid or accrued (excluding any original issue discount, interest paid in kind or amortized debt discount, to the extent included in determining Interest Expense) and scheduled principal payments paid or payable in respect of Funded Debt, plus or minus (as the case may be), (d) extraordinary gains or losses

A-8

which are cash items not included in the calculation of net income, <u>minus</u> (e) mandatory prepayments paid in cash pursuant to <u>Section 1.3</u> other than mandatory prepayments made pursuant to <u>Sections 1.3(b)(i)</u> or <u>1.3(b)(iv)</u>, <u>plus</u> (f) taxes deducted in determining consolidated net income to the extent not paid for in cash.

"<u>Fair Labor Standards Act</u>" means the Fair Labor Standards Act, 29 U.S.C. §201 <u>et seq</u>.

"<u>Federal Reserve Board</u>" means the Board of Governors of the Federal Reserve System.

"<u>Fees</u>" means any and all fees payable to Lender pursuant to the Agreement or any of the other Loan Documents.

"<u>Financial Covenants</u>" has the meaning ascribed to it in Section 6.10.

"<u>Financial Statements</u>" means the consolidated income statements, statements of cash flows and balance sheets of Borrower delivered in accordance with <u>Section 3.4</u> and <u>Annex D</u>.

"<u>Fiscal Month</u>" means any of the monthly accounting periods of Borrower.

"<u>Fiscal Quarter</u>" means any of the quarterly accounting periods of Borrower, ending on March 31, June 30, September 30 and December 31 of each year.

"<u>Fiscal Year</u>" means any of the annual accounting periods of Borrower ending on December 31 of each year.

"<u>Fixtures</u>" means all "fixtures" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party.

"<u>Funded Debt</u>" means, with respect to any Person, without duplication, all Indebtedness for borrowed money evidenced by notes, bonds, debentures, or similar evidences of Indebtedness that by its terms matures more than one year from, or is directly or indirectly renewable or extendible at such Person's option under a revolving credit or similar agreement obligating the lender or Lender to extend credit over a period of more than one year from the date of creation thereof, and specifically including Capital Lease Obligations, current maturities of long-term debt, revolving credit and short-term debt extendible beyond one year at the option of the debtor, and also including, in the case of Borrower, the Obligations and, without duplication, Guaranteed Indebtedness consisting of guaranties of Funded Debt of other Persons.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, consistently applied, as such term is further defined in clause (c) of <u>Annex A</u> to the Agreement.

"<u>GECC Credit Facility</u>" means the credit facilities provided under the Credit Agreement, dated as of August 25, 2000, as amended, among Borrower, Holdings,

A-9

Holdings II, AMC-New Jersey, and General Electric Capital Corporation, as agent for the lenders signatory thereto.

"General Intangibles" means all "general intangibles," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, including all right, title and interest that such Credit Party may now or hereafter have in or under any Contract, all payment intangibles, customer lists, Licenses, Copyrights, Trademarks, Patents, and all applications therefor and reissues, extensions or renewals thereof, rights in Intellectual Property, interests in partnerships, joint ventures and other business associations, licenses, permits, copyrights, trade secrets, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Trademark or Trademark License), all rights and claims in or under insurance policies (including insurance for fire, damage, loss and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit, checking and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, rights of indemnification, all books and records, correspondence, credit files, invoices and other papers, including without limitation all tapes, cards, computer runs and other papers and documents in the possession or under the control of such Credit Party or any computer bureau or service company from time to time acting for such Credit Party.

"Goods" means all "goods" as defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, including, without limitation, embedded software to the extent included in "goods" as defined in the Code.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranteed Indebtedness" means, as to any Person, any obligation of such Person guaranteeing, providing comfort or otherwise supporting any Indebtedness, lease, dividend, or other obligation ("primary obligation") of any other Person (the "primary obligor") in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against

A-10

loss in respect thereof. The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness; or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"Guarantors" means Holdings, Holdings II, AMC-New Jersey, and each other direct or indirect Subsidiary of Borrower and each other Person, if any, which executes a guarantee or other similar agreement in favor of Lender in connection with the transactions contemplated by the Agreement and the other Loan Documents.

"Guaranty" means, collectively, the guaranty of even date herewith executed by Holdings, Holdings II, and each Subsidiary of Borrower in favor of Lender, and any other guaranty executed by any Guarantor in favor of Lender in respect of the Obligations, as the same may be amended, supplemented or otherwise modified from time to time.

"Hazardous Material" means any substance, material or waste that is regulated by, or forms the basis of liability now or hereafter under, any Environmental Laws, including any material or substance that is (a) defined as a "solid waste," "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste," "restricted hazardous waste," "pollutant," "contaminant," "hazardous constituent," "special waste," "toxic substance" or other similar term or phrase under any Environmental Laws, or (b) petroleum or any fraction or by-product thereof, asbestos, polychlorinated biphenyls (PCB's), or any radioactive substance.

"Holdings" has the meaning ascribed thereto in the recitals to the Agreement.

"Holdings II" has the meaning ascribed thereto in the recitals to the Agreement.

"Hospital" means any hospital or health care facility acceptable to Agent in its sole discretion.

"IBM" means IBM Credit Corporation.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred six (6) months or more, but excluding obligations to trade creditors incurred in the ordinary course of business that are unsecured and not overdue by more than six (6) months unless being contested in good faith, (b) all reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such

A-11

Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations and the present value of future rental payments under all synthetic leases, (f) all obligations of such Person under commodity purchase or option agreements or other commodity price hedging arrangements, in each case whether contingent or matured, (g) all obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured, (h) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, and (i) the Obligations.

"Indemnified Liabilities" has the meaning ascribed to it in Section 1.13.

"Indemnified Person" has the meaning ascribed to it in Section 1.13.

"Instruments" means all "instruments," as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, wherever located, and, in any event, including all certificated securities, all certificates of deposit, and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, Patents, Copyrights, Trademarks, and the goodwill associated with such Trademarks.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement made in favor of Lender by each Credit Party that is a signatory thereto, as the same may be amended, supplemented or otherwise modified from time to time.

"Interest Expense" means, with respect to any Person for any fiscal period, interest expense (whether cash or non-cash) of such Person determined in accordance with GAAP for the relevant period ended on such date, including, in any event, interest expense with respect to any Funded Debt of such Person and interest expense for the relevant period that has been capitalized on the balance sheet of such Person.

"Interest Payment Date" means the first Business Day of each month to occur while such Loan is outstanding; and provided that, in addition to the foregoing, each of (x) the date upon which all of the Commitments have been terminated and the Loans have been paid in full and (y) the Commitment Termination Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under the Agreement.

"Inventory" means all "inventory," as such term is defined in the Code, now owned or hereafter owned or acquired by any Credit Party, wherever located, and in any

A-12

event including inventory, merchandise, goods and other personal property that are held by or on behalf of any Credit Party for sale or lease or are furnished or are to be furnished under a contract of service, or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Credit Party's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"Inventory Letters of Credit" means those certain standby letters of credit issued for the benefit of DFS and IBM with face amounts of $3,000,000 and $250,000, respectively.

"Inventory Trade Financing" means the purchase of Inventory through DFS or IBM pursuant to the Inventory Trade Financing Documents.

"Inventory Trade Financing Documents" means collectively that certain Agreement for Wholesale Financing dated as of August 25, 2000, as amended January 22, 2001 and July 17, 2002, with, and that certain $3,000,000 standby letter of credit in favor of, DFS and Agreement for Wholesale Financing dated as of August 22, 2000 with, and that certain $250,000 standby letter of credit in favor of, IBM.

"Investment Property" means all "investment property" as such term is defined in Section 9-115 of the Code now owned or hereafter acquired by any Credit Party, wherever located, including (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of any Credit Party, including the rights of such Credit Party to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all securities accounts of any Credit Party; (iv) all commodity contracts held by any Credit Party; and (v) all commodity accounts of any Credit Party.

"IRC" means the Internal Revenue Code of 1986.

"IRS" means the Internal Revenue Service.

"Israel Employment Agreements" has the meaning ascribed to it in Section 6.19(b).

"Lender" means Eugenia, and, if Lender shall decide to assign all or any portion of the Obligations, such term shall include any assignee of Lender.

"License" means any Copyright License, Patent License, Trademark License or other license of rights or interests in Intellectual Property now held or hereafter acquired by any Credit Party.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or

A-13

encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"Litigation" has the meaning ascribed to it in Section 3.13.

"Loan Account" has the meaning ascribed to it in Section 1.12.

"Loan Documents" means the Agreement, the Notes, the Collateral Documents, and all other agreements, instruments, documents and certificates identified in the Closing Checklist executed and delivered to, or in favor of, Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Credit Party, or any employee of any Credit Party, and delivered to Lender in connection with the Agreement or the transactions contemplated thereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loans" means the Revolving Loan and the Term Loan.

"Lock Boxes" has the meaning ascribed to it in Annex B.

"MapleWood" means MapleWood Equity Partners LP and MapleWood Equity Partners (Offshore) Ltd.

"Margin Stock" has the meaning ascribed to it in Section 3.10.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or financial or other condition of any Credit Party, or Holdings, Holdings II and their Subsidiaries taken as a whole, (b) Borrower's ability to pay any of the Loans or any of the other Obligations in accordance with the terms of the Agreement or any other Loan Document, (c) the Collateral or Lender's Liens on the Collateral or the priority of such Liens, or (d) Lender's rights and remedies under the Agreement and the other Loan Documents. Without limiting the generality of the foregoing, any event or occurrence adverse to one or more Credit Parties which results or could reasonably be expected to result in costs and/or liabilities or loss of revenues, individually, or in the aggregate, to any Credit Party in any 30-day period in excess of the lesser of $250,000 and 10% of Borrowing Availability as of any date of determination shall constitute a Material Adverse Effect.

"Maximum Amount" means, as of any date of determination, an amount equal to the Revolving Loan Commitment of Lender as of that date.

A-14

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which any Credit Party or ERISA Affiliate is making, is obligated to make or has made or been obligated to make within the six-year period preceding the Closing Date, contributions on behalf of participants who are or were employed by any of them.

"Notes" means, collectively, the Revolving Notes and the Term Notes.

"Notice of Revolving Credit Advance" has the meaning ascribed to it in Section 1.1(a).

"Obligations" means all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by any Credit Party to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Agreement or any of the other Loan Documents. This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against any Credit Party in bankruptcy, whether or not allowed in such case or proceeding), Fees, Charges, expenses, attorneys' fees and any other sum chargeable to any Credit Party under the Agreement or any of the other Loan Documents.

"Patent License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right with respect to any invention on which a Patent is in existence.

"Patents" means all of the following in which any Credit Party now holds or hereafter acquires any interest: (a) all letters patent of the United States or of any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or of any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State, or any other country, and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means a Plan described in Section 3(2) of ERISA.

"Permitted Encumbrances" means the following encumbrances:

(a) Liens for taxes or assessments, claims or other governmental Charges not yet due and payable or which are being contested in accordance with Section 5.2(b);

(b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security

A-15

or public liability laws or similar legislation (excluding Liens under ERISA);

(c) pledges or deposits of money securing bids made in the ordinary course of business;

(d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business in respect of amounts not yet due and payable, so long as such Liens attach only to Equipment, Fixtures and/or Real Estate;

(e) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business and securing liabilities in an outstanding aggregate amount not in excess of $100,000 at any time, so long as such Liens attach only to Inventory;

(f) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Credit Party is a party;

(g) any attachment or judgment lien not constituting an Event of Default under Section 8.1(j);

(h) zoning restrictions, easements, licenses, or other restrictions on the use of any Real Estate or other minor irregularities in title (including leasehold title) thereto, so long as the same do not materially impair the use, value, or marketability of such owned Real Estate or, with respect to leased Real Estate only, do not interfere in any material respect with the ordinary conduct of the business of Borrower or any of its Subsidiaries or result in a material diminution in the value of any Collateral as security of the Obligations;

(i) presently existing or hereafter created Liens in favor of Lender;

(j) non-exclusive licenses of Patents, Trademarks and other Intellectual Property rights granted by Credit Parties in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of any Credit Party or with Agent's security interest in the Collateral, including, without limitation, the Intellectual Property, provided that such non-exclusive license shall be terminable by such Credit Party upon not more than 30 days notice; and

(k) the cash collateralization of the Inventory Letters of Credit.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

A-16

employees of such Credit Party; and (g) any payment of management fees (or other fees of a similar nature) by such Person to any Stockholder of such Credit Party or its Affiliates.

"Retiree Welfare Plan" means, at any time, a Welfare Plan that provides for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to Section 4980B of the IRC and at the sole expense of the participant or the beneficiary of the participant.

"Revolving Credit Advance" has the meaning ascribed to it in Section 1.1(a)(i).

"Revolving Loan" means, at any time, the sum of the aggregate amount of Revolving Credit Advances outstanding to Borrower.

"Revolving Loan Commitment" means the commitment of the Lender to make Revolving Credit Advances which shall be THIRTEEN MILLION DOLLARS ($13,000,000) on the Closing Date, as such amount may be adjusted, if at all, from time to time in accordance with the Agreement.

"Revolving Note" has the meaning ascribed to it in Section 1.1(a)(ii).

"Securities Exchange Act" means the Securities Exchange Act of 1934, 15 U.S.C §§78a et seq.

"Security Agreement" means the Security Agreement of even date herewith entered into among Lender and each Credit Party that is a signatory thereto, as the same may be amended, supplemented or otherwise modified from time to time.

"Series C Consent" means the consent signed by Surinder (Sonny) Chabra dated as of January 30, 2003.

"Series C Preferred" means the Series C preferred stock of Borrower having the designations, rights and preferences set forth in Borrower's certificate of incorporation.

"Series D Preferred" means the Series D preferred stock of Borrower having the designations, rights and preferences set forth in Borrower's certificate of incorporation.

"Software' means all "software" as such term is defined in the Code, now owned or hereafter acquired by any Credit Party, other than software embedded in any category of goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Solvent" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person; (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; (c)

A-19

"Term Loan Commitment" means the commitment of Lender to make the Term Loan, which shall be THREE MILLION DOLLARS ($3,000,000) on the Closing Date.

"Term Note" has the meaning ascribed to it in Section 1.1(b)(i).

"Termination Date" means the date on which (a) the Loans have been indefeasibly repaid in full, (b) all other Obligations under the Agreement and the other Loan Documents have been completely discharged, and (c) Borrower shall not have any further right to borrow any monies under the Agreement.

"Title IV Plan" means a Pension Plan (other than a Multiemployer Plan), that is covered by Title IV of ERISA, and that any Credit Party or ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Trademark License" means rights under any written agreement now owned or hereafter acquired by any Credit Party granting any right to use any Trademark.

"Trademarks" means all of the following now owned or hereafter existing or adopted or acquired by any Credit Party: (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all goodwill associated with or symbolized by any of the foregoing.

"Unfunded Pension Liability" means, at any time, the aggregate amount, if any, of the sum of (a) the amount by which the present value of all accrued benefits under each Title IV Plan exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, all determined as of the most recent valuation date for each such Title IV Plan using the actuarial assumptions for funding purposes in effect under such Title IV Plan, and (b) for a period of five (5) years following a transaction which might reasonably be expected to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by any Credit Party or any ERISA Affiliate as a result of such transaction.

"Welfare Plan" means a Plan described in Section 3(1) of ERISA.

(a) Rules of construction with respect to accounting terms used in the Agreement or the other Loan Documents shall be as set forth in clause (c) below of this Annex A. All other undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code as in effect in the State of New York to the extent the same are used or defined therein. Unless otherwise specified, references in the Agreement or any of the Appendices to a Section, subsection or clause

refer to such Section, subsection or clause as contained in the Agreement. The words "herein," "hereof" and "hereunder" and other words of similar import refer to the Agreement as a whole, including all Annexes, Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Annex, Exhibit or Schedule.

(b)     Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the word "or" is not exclusive; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; and all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of any Credit Party, such words are intended to signify that such Credit Party has actual knowledge or awareness of a particular fact or circumstance or that such Credit Party, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

(c)     <u>Accounting Terms</u>. Unless otherwise specifically provided herein, any accounting term used in the Agreement shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP consistently applied. That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing. If any "Accounting Changes" (as defined below) occur and such changes result in a change in the calculation of the financial covenants, standards or terms used in the Agreement or any other Loan Document, then Borrower and Lender agree to enter into negotiations in order to amend such provisions of the Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating Borrower's and its Subsidiaries' financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. "<u>Accounting Changes</u>" means (i) changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions), (ii) changes in accounting principles concurred in by Borrower's certified public accountants; (iii) purchase accounting adjustments under A.P.B. 16 or 17 and EITF 88-16, and the application of the accounting principles set forth in FASB 109, including the establishment of reserves pursuant thereto and any subsequent reversal (in whole or in part) of such reserves; and (iv) the reversal of any reserves established as a result of purchase accounting adjustments. All such adjustments resulting from expenditures made subsequent to the Closing Date (including capitalization of costs and expenses or payment of pre-Closing Date liabilities) shall be treated as expenses in the period the expenditures are made and deducted as part of the calculation of EBITDA in such period. If Lender and Borrower agree upon the

A-22

required amendments, then after appropriate amendments have been executed and the underlying Accounting Change with respect thereto has been implemented, any reference to GAAP contained in the Agreement or in any other Loan Document shall, only to the extent of such Accounting Change, refer to GAAP, consistently applied after giving effect to the implementation of such Accounting Change. If Lender and Borrower cannot agree upon the required amendments within 30 days following the date of implementation of any Accounting Change, then all Financial Statements delivered and all calculations of financial covenants and other standards and terms in accordance with the Agreement and the other Loan Documents shall be prepared, delivered and made without regard to the underlying Accounting Change. For purposes of Section 8.1, a breach of a Financial Covenant contained in Section 6.10 shall be deemed to have occurred as of any date of determination by Lender or as of the last day of any specified measurement period, regardless of when the Financial Statement reflecting such breach are delivered to Lender.