# EXHIBIT G

Page 1

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK : PART 60
 2   -----------------------------------------X
 3   CASITA, LP,
 4                        Plaintiff(s),
 5                                          Index No.
 6           - against -                    603525/05
 7
 8   MAPLEWOOD EQUITY PARTNERS (OFFSHORE) LTD.,
 9
10                        Defendant(s).
11   -----------------------------------------X
12                     November 10, 2005
                       60 Centre Street
13                     New York, New York
14   B E F O R E:     HONORABLE BERNARD J. FRIED, JSC
15
16   A P P E A R A N C E S:
17
18           GIBSON, DUNN & CRUTCHER LLP
                 Attorneys for Plaintiff
19               200 Park Avenue
                 New York, New York
20           BY: MITCHELL KARLAN, ESQ.
                 RICHIE FALEK, ESQ.
21
22           STEVENS & LEE
                 Attorneys for Defendant
23               485 Madison Avenue
                 New York, New York
24           BY:  CHESTER B. SALOMON, ESQ.
                  BRIAN P. MILLER, ESQ., Pro hac vice
25
```

FILED

FEB 22 2006

NEW YORK
COUNTY CLERK'S OFFICE

Rachel C. Simone, Senior Court Reporter

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

1    THE COURT:  All right.  I have a lot of

2  papers.  Let me make sure I have what I should have.

3  But before I start, why don't you give me just your

4  names, last names, starting from the left so that I

5  will know who I am facing here in the courtroom.

6    MR. SALOMON:  Chester Salomon, S-a-l-o-m-o-n.

7    MR. MILLER:  Good morning, your Honor.  Brian

8  Miller, pro hac vice.

9    MR. KARLAN:  Good morning your Honor,

10  Mitchell Karlan for the plaintiff.  With me at counsel

11  table is my colleague, Richard Falek, F-a-l-e-k.

12    THE COURT:  All right.  I have three motion

13  sequences, and for administrative purposes let me just

14  make sure I have what I should have.

15    The first sequence which is really not --

16  well, the first is the original order to show cause.

17  And I have the papers that were filed; the complaint,

18  the memo in support of that, and an affidavit of

19  Mitchell Karlan with all of the attached papers.  That

20  was, essentially, held in abeyance.  Well, I probably

21  shouldn't use those words because that may not be

22  correct.

23    The next is sequence number 03, and in that I

24  have the memorandum of law in support of the motion to

25  disqualify with an affidavit of Robert Reale, an

Rachel C. Simone, Senior Court Reporter

1431917d-2820-4407-a5f3-c12ae1224557

1  affidavit of Robert Glaser, an affirmation of

2  Mr. Karlan in opposition, an affirmation of a

3  Mr. Kislin, an affirmation of Richie Falek in

4  opposition, the memorandum in opposition, and reply

5  memo in support of the motion.

6          Then I have what is sequence number 02 which

7  is the application to intervene. I have the motion to

8  intervene, the memorandum in support of that motion, an

9  affidavit of a Constantine Pourakis.

10         So those are the papers that I have. Do I

11 have everything that I should have?

12         MR. KARLAN: Your Honor, we got a call from

13 chambers -- I think it was from chambers -- yesterday

14 asking that we deliver courtesy copies of everything to

15 you. At that time we also tried -- and I hope

16 succeeded -- in delivering to you a transcript of an

17 oral argument.

18         THE COURT: Yes, that's attached. The one

19 before Judge Chin?

20         MR. KARLAN: Yes.

21         THE COURT: That's attached to one of the

22 affidavits.

23         MR. KARLAN: Very good.

24         THE COURT: And the reason we called for

25 courtesy copies is part of these files got mislaid. I

Proceedings

1   was reading the papers and I realized I didn't have

2   everything.

3           Okay.  So do you I have everything I should

4   have, Mr. Miller?

5           MR. MILLER:  Your Honor, do you have the

6   complaint and Mr. Karlan's affidavit in support of the

7   TRO papers?  I apologize because we did not attach

8   those to our papers, but I have an extra copy as well.

9           THE COURT:  I have the original complaint in

10  this action, and I have the affirmation of Mr. Karlan

11  in support of the order --

12          MR. MILLER:  Okay.

13          THE COURT:  -- seeking the TRO and

14  preliminary injunction.

15          MR. MILLER:  Okay.  We have extra copies in

16  case your Honor needed them.

17          THE COURT:  No.  I have those papers.

18          All right.  So this is a motion to

19  disqualify.  I will hear the application.

20          MR. MILLER:  Your Honor, if it is all right,

21  I would like to argue on behalf of the defendant.

22          Brian Miller, of Akerman Senterfitt, which is

23  in Miami.  I believe we filed pro hac vice papers.

24          THE COURT:  And I think I signed them,

25  didn't I?

Rachel C. Simone, Senior Court Reporter

```
1              MR. MILLER:  I believe you may have, your
2    Honor.  I can't recall because there are several
3    different lawsuits, and I know that Mr. Salmon's
4    colleague who is in court in White Plains this morning
5    advised that he received an order either from you or
6    from Justice Freedman.  And I am sorry but I don't
7    recall which it was.
8              THE COURT:  Is there a pending matter
9    involving these parties before Justice Freedman?
10             MR. MILLER:  A related matter.  It is not
11   between these two exact parties.
12             THE COURT:  Why are they in two different
13   parts?  Was it not designated as a related case if it
14   is related?
15             MR. MILLER:  As the defendant, I don't think
16   I could answer that question, your Honor.
17             THE COURT:  Mr. Karlan?
18             MR. KARLAN:  Your Honor, the case that is
19   before Justice Freedman was actually before you
20   briefly.  It was brought on by order to show cause.  It
21   is a motion for summary judgment in lieu of the
22   complaint.  There was an application to disqualify
23   filed --
24             THE COURT:  There was an application to do
25   what?
```

Proceedings

Page 6

1      MR. KARLAN:  To disqualify counsel in that

2  case as well, and your Honor set it down for hearing.

3  Justice Freedman was out that day.

4      Your Honor, it is -- it is different parties.

5  The lawyers are the same, but the parties are

6  different.

7      THE COURT:  I get a lot of orders to show

8  cause for her when she is away on vacation or on a

9  trip; and so unless somebody told my, I wouldn't have

10  bothered to check it against my files.

11      MR. KARLAN:  It is a different plaintiff and

12  different defendant, your Honor.

13      THE COURT:  A different plaintiff?  It is not

14  Casita or Casita-related parties?

15      MR. KARLAN:  The plaintiff in this case is

16  Casita.  The plaintiff in that case is called Eugenia.

17      THE COURT:  Isn't Eugenia an investor in

18  Casita, or is it AMC?

19      MR. KARLAN:  Eugenia made a loan to AMC.

20  Casita is a shareholder in the offshore fund.

21      THE COURT:  Why would they not be kept

22  together as a related matter?  I mean, isn't it the

23  same overall transaction?

24      MR. KARLAN:  Your Honor, I have no objection

25  to being in front of the same justice.

Proceedings

1    THE COURT:  Well, I am not looking for

2    additional work.  I am just curious as to why --

3    MR. KARLAN:  The case in front of Justice

4    Freedman was filed first.

5    THE COURT:  I did this by order to show cause

6    in the summertime.  There was a TRO application here,

7    correct?

8    MR. KARLAN:  In the Casita case, yes.  And

9    the clerk sent us up here to see you.  We needed an

10    immediate TRO, and you were the judge we were sent to

11    see.

12    I have absolutely no objection to the two

13    cases being in front of the same judge.  I only point

14    out the plaintiffs and the defendants are different.

15    THE COURT:  I understand that.  And I have

16    been through these papers enough to know that this is a

17    confusing transaction, and hopefully you will all

18    elucidate it for me this morning.  But the question is:

19    Has she held any proceedings on the disqualification

20    motion?

21    MR. KARLAN:  The answer is no, your Honor.

22    We will have oral argument on the disqualification

23    motion today at 2:30 in front of Justice Freedman.

24    THE COURT:  And it is the same group of

25    lawyers?

Proceedings

1        MR. KARLAN:  Yes.

2        MR. MILLER:  Yes.

3        MR. KARLAN:  We scheduled it that way so that

4    Mr. Miller would not have to fly up twice -- excuse me,

5    your Honor, but I am told it is at 2:00 and not 2:30.

6        MR. MILLER:  Your Honor, with respect to the

7    courts in which these cases appear, we really have no

8    view one way or the other whether they are both heard

9    in front of you, in front of Justice Freedman, or in

10   front of some other person.  They are scheduled for

11   oral argument in front of you right now and in front of

12   her this afternoon.  So I am not sure how your Honor

13   would like to proceed with that.

14       THE COURT:  I'll tell you what I am going to

15   do.  I am going to listen to the arguments here now.

16   When I finish, I am going to talk to Judge Freedman at

17   lunchtime.  I wish I had known this before because I

18   would have already spoken to her.  Not that we have the

19   right to take the cases out of ordinary sequence, but

20   if the issues are the same -- are they the same issues?

21       MR. MILLER:  They are not exactly parallel,

22   your Honor, but they are similar.

23       As you note from our papers, all the

24   entities, Eugenia and Casita, are affiliated, and all

25   of the MapleWood entities are affiliated on the other

Proceedings

Page 9

1    side.  And this all relates to the failure of AMC

2    Computer in which Eugenia alleges they suffered loss

3    because their loan went into default.

4          THE COURT:  At the very least somebody is

5    going to have to understand the same complex

6    transactions to resolve it here and in the afternoon,

7    is that correct?

8          MR. MILLER:  It certainly would be helpful.

9          THE COURT:  Do you agree with that,

10   Mr. Karlan?

11         MR. KARLAN:  Your Honor, are you asking

12   whether the two cases are related on the merits?  The

13   merits have absolutely not --

14         THE COURT:  They are not.  I understand that.

15         Maybe I should keep my mouth shut because the

16   lawyers know more about a case than a judge would ever

17   know.  If you didn't relate it, it is not related.

18         I am going to proceed to with this case here.

19   I will mention to Justice Freedman that I heard

20   argument in the case where it may have the same issues,

21   and she will talk to you this afternoon and do whatever

22   she wants to do.  I don't have the right to take a case

23   from her.  I don't have the right to do that under the

24   rules.  We have a random assignment.  But let me just

25   mention it to her so she will know about it and won't

Proceedings

1    be surprised, and you can discuss it with her.

2           So, counsel, let's start with this case.  I

3    think I understand some of these transactions.  I read

4    Judge Chin's transcript with great interest.  I gather

5    he has not yet decided the question, though he did

6    indicate he had grave doubts at the end about whether

7    the disqualification motion should be granted or not.

8    Is that a fair reading?

9           MR. MILLER:  I would characterize it that he

10   looked at some of the papers.  He felt there was enough

11   to look at, and by the end of the hearing he had, sort

12   of, talked himself into a position that he wasn't sure

13   whether he was going to grant disqualification, but he

14   has not ruled.

15          THE COURT:  That's a fair characterization.

16   Okay, let me hear from you.

17          MR. MILLER:  Your Honor, I think that this

18   case is probably a little more open and shut than the

19   case in front of Judge Chin.  All of these different

20   matters relate to a company called AMC Computer which

21   went defunct in the summer of 2005.  It is in an

22   assignment for benefit of creditors.  The secured

23   creditor, the only, was a company called Eugenia which

24   is controlled by, indirectly by a man named Hans

25   Werner-Hector.

Proceedings

1          THE COURT:  Eugenia was a creditor of AMC,

2     correct?

3          MR. MILLER:  Correct.

4          THE COURT:  Set up a credit facility with

5     AMC?

6          MR. MILLER:  Sorry?

7          THE COURT:  There was a credit facility set

8     up between AMC and Eugenia?

9          MR. MILLER:  Correct.

10          THE COURT:  When did that take place, was it

11     in 2002?

12          MR. MILLER:  As of January 30, 2003.

13          THE COURT:  Okay.

14          MR. MILLER:  And it was declared in default

15     on May 6, I believe, of 2005.

16          All of the various lawsuits, about ten or

17     eleven lawsuits in total, some in state court, some in

18     federal Court, some filed by Eugenia, this one filed by

19     Casita; they all arise out of a failure of AMC Computer

20     and Eugenia's resulting loss.  They sued directors,

21     officers.  They brought breach of contract claims,

22     fraud claims, breach of fiduciary duty claims.  They

23     are in various proceedings all seriatim rather than

24     consolidated.

25          Casita is the plaintiff in this case.  Casita

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

Page 12

1    is an equity investor.  And an equity fund, MapleWood

2    Offshore Fund, is the defendant here.  Also, Casita is

3    an equity investor in AMC Computer through another

4    special purpose vehicle called AMC Investors.  So think

5    of it this way, your Honor; Casita is the equity

6    investor in AMC Computer, and Eugenia is the lender.

7    Also just to make sure your Honor is clear, the

8    MapleWood Offshore Fund, the defendant here, also is a

9    co-investor in this entity, AMC Investors, with Casita

10   which in turn owns stock in AMC Computer.  So Casita is

11   an indirect equity investor in AMC through two

12   different angles.  One, through MapleWood Offshore.  It

13   invested something like $22 million in the offshore

14   fund, a large portion of that was used to invest in AMC

15   Computer.  And Casita invested $2.5 million separately

16   into AMC Computer through this other vehicle, AMC

17   Investors.

18           I understand that it is probably very

19   confusing to your Honor.  It is confusing to me as

20   well.

21           THE COURT:  Actually, it is quite clear the

22   way you said it.

23           MR. MILLER:  That may be the first time I

24   explained it clearly, so thank you.

25           Now, the lawyers involved that we are seeking

Rachel C. Simone, Senior Court Reporter

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

1        to disqualify at Gibson Dunn have a long history

2        related to MapleWood and AMC Computer.

3                THE COURT:  You use the word "MapleWood."

4        You need to be careful.  Isn't there a MapleWood

5        Partners and a MapleWood Equity?  And if I read the

6        papers correctly -- and you will explain why I may be

7        mistaken -- Partners is the manager of Equity, and they

8        are two separate entities; is that correct?

9                MR. MILLER:  Yes.  I could try to elucidate

10       that for your Honor as well.

11               The various MapleWood entities are all under

12       one umbrella, so to speak.  There is an entity called

13       MapleWood Holdings, and there is a gentleman named

14       Robert Glaser who is the managing member of MapleWood

15       Holdings.  MapleWood Holdings in turn is the general

16       partner in MapleWood Partners as well as another entity

17       called MapleWood Management.

18               THE COURT:  MapleWood Partners has two

19       holders, two partners.  The general partner is one, and

20       is MapleWood Holdings -- and who are the others?

21               MR. MILLER:  Your Honor, the limited partners

22       are five or six individuals including Mr. Glaser and

23       other employees and former employees of MapleWood

24       Partners.  MapleWood Partners is where the people are.

25       All of the employees who are involved in management and

Rachel C. Simone, Senior Court Reporter

Proceedings

1    advisory services to these funds in the portfolio

2    companies are all employed by MapleWood Partners.

3    MapleWood Partners provides advisory services to the

4    two equity funds, one of which is a defendant here,

5    MapleWood Offshore Fund, and the other one which is a

6    parallel fund called the MapleWood Domestic Fund.

7            THE COURT:  What?  Domestic?

8            MR. MILLER:  I will call it for purposes of

9    this hearing --

10           THE COURT:  Domestic?

11           MR. MILLER:  Yes.  Technically it is

12   MapleWood Equity Partners LP.

13           THE COURT:  I saw that.

14           MR. MILLER:  And the technical name of the

15   defendant here is MapleWood Equity Partners Offshore

16   Limited.

17           Together these two funds raised $135 million,

18   approximately, to invest in a number of portfolio

19   companies, one of which was AMC Computer.

20           Now, if your Honor would permit me, I have a

21   graphic which I provided to opposing counsel which I

22   would like to use to try to demonstrate some of this.

23           THE COURT:  I assume, Mr. Karlan, you have

24   no objection to these?

25           MR. KARLAN:  No.  We got these yesterday in

Rachel C. Simone, Senior Court Reporter

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

Page 15

1    front of Judge Chin.

2              THE COURT:  Maybe I should just give this all

3    to Judge Chin?

4              MR. KARLAN:  We are happy to do that, your

5    Honor.

6              MR. MILLER:  Why not, your Honor.

7              THE COURT:  Go ahead, Mr. Miller.

8              MR. MILLER:  Your Honor, the board that I

9    have put in front of you is the chronology of the

10   representation that is at issue and the entire AMC

11   Computer saga.  As you will see, Gibson Dunn has

12   represented MapleWood Partners' executive Mr. Glaser

13   for years and years.  So it is a long-standing history.

14   That's not the reason we are seeking to disqualify

15   them.

16              THE COURT:  Tell me the name of the executive

17   again, please?

18              MR. MILLER:  Glaser, G-l-a-s-e-r.  Robert is

19   his first name.

20              As I mentioned previously, your Honor, he is

21   the managing member of MapleWood Holdings, the

22   MapleWood parent company.

23              THE COURT:  I understood that.

24              MR. MILLER:  Now, in 1998, the Gibson Dunn

25   attorneys that we are seeking to disqualify established

Proceedings

```
 1        the entire structure of MapleWood and its constituent

 2        companies.  They drafted the documents for the

 3        MapleWood Offshore Fund, they drafted the subscription

 4        agreement that is at issue in this case.  They

 5        negotiated that subscription agreement with Casita, the

 6        plaintiff in this case, they drafted the various

 7        documents setting up the corporate structure of all the

 8        various MapleWood entities, and they provided advice to

 9        MapleWood with respect to the default provisions.

10        Again, the governing documents of the MapleWood

11        Offshore Fund at issue in this case.  So, these

12        attorneys provided advice on issues substantially

13        related --

14                THE COURT:  Is there any issue realistically

15        with regard to the documents in the sense that one

16        would need to take extrinsic evidence or documents

17        themselves, for -- for example, the various provisions

18        that I saw, are those provisions, the meaning of them,

19        in dispute that would require parole evidence?

20                MR. MILLER:  Yes, your Honor.  As set forth

21        in our reply papers, there are.  I think probably the

22        clearest issue is that in the complaint in

23        Paragraphs 5, 18, 22, 24 and 27, Casita alleges that

24        the --

25                THE COURT:  Just give me a second to get to
```

```
1        it.
2                MR. MILLER:  Certainly, your Honor.
3                        (Brief pause)
4                THE COURT:  Paragraph 5 refers to the capital
5        call.
6                MR. MILLER:  Yes, your Honor.
7                THE COURT:  What could be the issue in the
8        agreement as to the capital call?  It was bona fide
9        under the agreement or not?
10               MR. MILLER:  The plaintiffs are contending
11       that the capital call is invalid because, among other
12       reasons, it is to be used to fund what they deemed to
13       be illegitimate expenses of the MapleWood Offshore
14       Fund.
15               THE COURT:  How does that call into question
16       the drafting of this agreement?
17               MR. MILLER:  The plaintiffs have cited to no
18       provision in the agreement that sets forth what
19       expenses are legitimate or illegitimate.  So I think
20       since they can't cite any particular provision in the
21       agreement that clearly addresses this issue, then by
22       definition there is going to have to be some extrinsic
23       evidence that the plaintiff puts on in order to prove
24       its allegation that the expenses underlying the capital
25       call are, in fact, illegitimate.
```

Proceedings

Page 18

```
1              THE COURT:  The people who signed it
2    understood what it meant, didn't they?
3              MR. MILLER:  There could be testimony from
4    the people who signed it as to their understanding of
5    it.  And they probably would be speaking regarding
6    their understanding of it based on their discussions
7    with the Gibson Dunn attorneys who drafted the
8    document.
9              THE COURT:  On this particular issue, if it
10   came to that, then maybe disqualification is necessary,
11   but is it premature to seek to disqualify before this
12   becomes a ripe issue.
13             MR. MILLER:  I don't believe it is premature,
14   your Honor, because the complaint is pretty clear that
15   they think the capital call is invalid because the
16   expenses are illegitimate.  They outlined that
17   position, and that's something we are going to have to
18   start addressing immediately in this case whether
19   Gibson Dunn is counsel or not.  And there is no reason
20   to wait for a trial or some proceeding later on in the
21   case when we have gone down the road.
22             THE COURT:  What other issues are there on
23   the face of this complaint which calls into question
24   the representation by Gibson Dunn who, as you say and I
25   think it is not disputed, drafted the subscription
```

Proceedings

Page 19

1    agreement?

2            MR. MILLER:  The issues I think are relevant

3    here are with respect to the illegitimacy of the

4    capital call.  The capital call relates to three

5    different items, if I recall correctly.

6            First, there is payment on a guarantee by the

7    offshore fund related to AMC Computer.  Second, there

8    were indemnification expenses to be paid related to

9    Eugenia's litigation.  And third, there are

10   indemnification expenses to be paid related to

11   litigation involving another portfolio company that has

12   nothing at all to do with AMC Computer.

13           Now, with respect to the first of those

14   items, the guarantee, the Gibson Dunn attorneys

15   provided legal advice -- and I apologize that we don't

16   have this in our papers but my client advised me last

17   night about this.  I have an e-mail I would be happy to

18   provide to counsel and to your Honor that we proffer

19   this, and we would be happy to submit additional

20   affidavit evidence, if necessary.

21           THE COURT:  I don't think I can at this

22   juncture consider what is not in the papers.  So let's

23   deal with what is in the paper.

24           MR. MILLER:  Okay.  But, your Honor, we may

25   have to renew based on that issue.

Rachel C. Simone, Senior Court Reporter

Proceedings

Page 20

1           THE COURT:  That may be, but let's deal with

2     what is before me and what the attorneys have had an

3     opportunity to respond to.

4           MR. MILLER:  With respect to the expenses for

5     indemnification related to the AMC Computer fiasco; as

6     set forth in our papers, there will be

7     cross-examination of the MapleWood witnesses by Gibson

8     Dunn related to who was responsible for the alleged

9     fraud at AMC Computer, who knew what when.  That's

10    something that is extrinsic to the agreements that were

11    drafted.

12          The plaintiff contends in its objection to

13    the capital call that the indemnification expenses are

14    improper because the MapleWood people participated in

15    some kind of alleged fraud or breach of fiduciary duty

16    with respect to AMC Computer.  So in order to prove

17    that the expenses are illegitimate in that regard, it

18    will be necessary for Gibson Dunn to get into issues

19    related to its representation of these people with

20    respect to AMC Computer, with respect to their

21    oversight of AMC Computer, and other issues.  That's

22    something that is also extrinsic to the documents in

23    question.

24          Other issues within the documents in question

25    are as follows:

```
 1                   Casita contends that the capital call was
 2        invalid because it was made after May 2004.  That gets
 3        into interpretation of the contract as to when the
 4        final termination date under the agreement was, and,
 5        therefore, whether a capital call after May 2004 is
 6        valid or not; as well as the provision we cited in our
 7        papers in the agreement that provides that expenses --
 8        I'm sorry, let me rephrase that.  As well as a
 9        provision in the agreements that we cited that the fund
10        can make an additional capital call even after that
11        termination date, whatever it may be, to fund expenses
12        which the indemnity and the guarantee relate to.
13                   So it would be necessary to interpret what
14        that provision means, whether the fund is allowed in
15        its governing documents to make a capital call after
16        May 2004 or not.
17                   Bear with me a second, please?
18                   THE COURT:  Yes.
19                       (Brief pause)
20                   MR. MILLER:  The other issue that Casita
21        complained about in its complaint was that they claimed
22        the capital call was invalid because it was unclear
23        whether it was made on behalf of the MapleWood Domestic
24        Fund or the MapleWood Offshore Fund, and exactly what
25        the amount of Casita's investment was.
```

1    The capital call referred to a $17.8 million

2    figure which they contend was confusing.  So that will

3    get into issues whether under the subscription

4    agreement and the governing documents that the Gibson

5    Dunn attorneys drafted, whether that provides a

6    legitimate basis to --

7        THE COURT:  I am going to hear in a moment, I

8    know, from Mr. Karlan in response, but what I don't

9    understand as I listen to you is if the subscription

10   agreement is essentially what is at issue here, is it

11   your position that the extrinsic evidence from the

12   witnesses who participated in and executed that

13   agreement will somehow breach a -- or require

14   disclosure of confidential communication between the

15   parties, Gibson Dunn and those parties?

16       MR. MILLER:  It may require breach of that if

17   they obtained advice from Gibson Dunn with respect to

18   what the governing documents mean, which they did

19   obtain advice.

20       THE COURT:  Wouldn't they be required to

21   testify as to their understanding of the document,

22   their understanding?  What is not at issue will be what

23   the attorneys told them, unless there is some kind of

24   defense of counsel here.  But isn't it their

25   understanding and not the source of that understanding?

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

Page 23

1      But isn't what is relevant their own understanding of

2      what the terms of the documents meant as they executed

3      and signed them?  Isn't that the issue in this case?

4                MR. MILLER:  Yes.  But where did they gain

5      that understanding?  They gained that understanding

6      from their attorneys.  And that's why this case is

7      substantially related to the prior representation.

8                THE COURT:  I still understand that you

9      haven't gone through the chart yet for me, but I have a

10     threshold question.

11               If I am presented with -- if my attorney

12     gives me advice and I sign some kind of a contract, and

13     you inquire of me what my understanding of that

14     contract is and I describe to you what my understanding

15     of the contract is; isn't that what is relevant, not

16     what I was told, unless there is some defense that I am

17     relying on advice of counsel?

18               MR. MILLER:  Well, your Honor --

19               THE COURT:  Am I missing something?

20               MR. MILLER:  That is relevant, but the test

21     in disqualification is not whether -- your Honor, this

22     is not a seeking to disqualify them based on as a

23     witness, a lawyer witness.  That's not what we are

24     seeking here.

25               THE COURT:  I understand.

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

Page 24

1           MR. MILLER:  The test is whether the prior
2    representation is substantially related to the present
3    case.  The present case involves interpretation of
4    agreements.  The prior representation was
5    interpretation and drafting of those agreements.  So
6    the Court need not inquire into what the confidences
7    were that were discussed, what was disclosed.
8           THE COURT:  It is the substantial
9    relationship prong of the disqualification cases that
10   you are relying on?
11          MR. MILLER:  Correct, your Honor.  Because
12   these matters are substantially related.  And that's
13   what your Honor needs to decide, not whether there is
14   going to be testimony from Gibson Dunn.
15          THE COURT:  I appreciate that.  And a part of
16   the substantial connection, substantial relationship
17   test is that the document itself is substantially
18   related to this, or the issue is related to the issues
19   in this case?  I am trying to understand how they are
20   related.
21          MR. MILLER:  Well, they are related by
22   looking at the complaint.  You can see what the
23   plaintiff is seeking here is to declare that it need
24   not respond to a capital call under the subscription
25   agreement and the articles of association that the same

1    lawyers drafted and provided advice to.  That's what

2    this entire case relates to.  It relates to whether

3    they are obligated to pay our client $700,000 under

4    these documents or not.

5              THE COURT:  Why don't you go back to the

6    chronology. You were telling me that in 1998 the

7    structure was --

8              MR. MILLER:  Right.  That's when the

9    structure was set up, the articles were drafted.  The

10   subscription agreement was negotiated with Casita, and

11   we put in affidavit evidence that the Gibson Dunn

12   attorneys participated in the negotiation of that

13   agreement with Casita.

14             Only briefly, I will discuss the rest of the

15   timeline because I think it is important background and

16   it is relevant to the question of whether the expenses

17   are illegitimate or not.

18             Gibson Dunn continued to provide meaningful

19   and substantial advice to MapleWood and their

20   investment at AMC Computer, ongoing advice with respect

21   to the investment at AMC Computer and other matters all

22   the way up until June of 2005 after they filed

23   litigation related to this that they unilaterally

24   decided that they were no longer representing

25   MapleWood.

Proceedings

1          I think that ties into the other aspect of

2   our motion to disqualify, which is the conflict waiver

3   that Gibson Dunn asked for and obtained in this case.

4          THE COURT:  The waiver I read.  It doesn't

5   involve any of the -- it doesn't involve this MapleWood

6   entity.

7          MR. MILLER:  The waiver on the one hand

8   clearly was signed by Casita.  I don't think there is

9   any question about that.

10          THE COURT:  Right.

11          MR. MILLER:  On the other side it was signed

12   by MapleWood Partners, the advisor to the MapleWood

13   Offshore Fund, and in the conflict waiver agreement.

14          THE COURT:  It uses the word "affiliates."

15          MR. MILLER:  Yes.

16          THE COURT:  Is that a factual question that I

17   need to decide by way of a hearing or reference, or are

18   the papers sufficient for me on what has been submitted

19   to conclude that MapleWood Partners -- I want to get

20   the names right because I think it is important -- that

21   MapleWood Partners and MapleWood Offshore are

22   affiliates?  Do I have enough in the papers to be able

23   to conclude one way or the other?

24          MR. MILLER:  I believe you do, your Honor.

25   Of course if you want to have further evidence, I

Proceedings

1    think --

2            THE COURT:  I am asking you whether you are

3    satisfied that I have sufficient evidence before me to

4    decide that, because I believe it is a factual

5    question.  Is that correct?

6            MR. MILLER:  Yes, I do believe you have

7    sufficient evidence before you.

8            THE COURT:  Okay.

9            MR. MILLER:  You have affidavits from the

10   MapleWood employees attesting to the structure of these

11   companies and the fact that they are all affiliated.

12   You have affidavit evidence with respect to Mr. Glaser

13   and MapleWood Holdings being the general partner -- I'm

14   sorry, the managing member of MapleWood Partners which

15   is in turn advisor to the MapleWood Funds.

16           So I think that you do have adequate evidence

17   to show on this side of the table that MapleWood

18   Partners and MapleWood Offshore Fund are affiliated.

19           THE COURT:  Is the word "affiliate" a word

20   that has an agreed upon definition or is it a word that

21   I myself will have to construe?

22           MR. MILLER:  I believe that you will have to

23   construe it because the plaintiff contends that

24   "affiliate" is very narrowly defined to mean only an

25   entity that owns another entity.  And their evidence on

Rachel C. Simone, Senior Court Reporter

Proceedings

1    that is the unilateral and self-serving declaration of

2    Barbara Becker, a Gibson Dunn partner, who says, When I

3    drafted this that's what I meant.  Of course I never

4    told the clients that's what I meant.  I never told the

5    clients that this is a limited definition of

6    "affiliate."

7            THE COURT:  So how do I resolve on the papers

8    the issue of what is or what is not referred if there

9    is conflicting evidence submitted by way of affidavits?

10           MR. MILLER:  We have cited to case law and

11   statutes, your Honor --

12           THE COURT:  You have?

13           MR. MILLER:  -- which I would point out that

14   the plaintiff completely ignored, which define what an

15   affiliate means.

16           An affiliate is broadly construed to say that

17   somebody who owns a small part, somebody who owns a

18   large part, somebody who controls, somebody who is

19   under common control with.

20           So let's take the MapleWood Offshore Fund.

21   It is certainly within common control with MapleWood

22   Partners, the signatory of the conflict waiver

23   agreement.  As I outlined, Mr. Glaser controls

24   MapleWood Partners through his managing member interest

25   in MapleWood Holdings and its general partnership

Proceedings

1      interest in MapleWood Partners.

2              With respect to MapleWood Offshore Fund, it

3      is managed and it is advised, in other words, it is

4      controlled --

5              THE COURT:  It doesn't necessarily mean

6      control, does it?

7              MR. MILLER:  I believe it does.  The fund can

8      only operate through its manager under the agreements

9      and its advisor.  A manager in MapleWood Management,

10     which is another entity, under common control with

11     MapleWood Holdings --

12             THE COURT:  Well, offshore is a separately

13     created entity, is it not?

14             MR. MILLER:  It is.

15             THE COURT:  And as a member of that

16     separately created -- and MapleWood Partners is not a

17     member of that, it is simply a manager?

18             MR. MILLER:  It is a Cayman Islands

19     corporation, your Honor.  If you look at the articles

20     of incorporation which were attached to Mr. Karlan's

21     affidavit and submitted with the TRO papers --

22             THE COURT:  I don't think I remember them.

23     Let me see.  What am I looking for?

24             MR. MILLER:  It is exhibit D to Mr. Karlan's

25     TRO.

Proceedings

1              THE COURT:  D as in David?

2              MR. MILLER:  Yes.  To Mr. Karlan's TRO

3       affidavit.

4              THE COURT:  I have it in front of me.

5              MR. MILLER:  If you look at page -- after the

6       title page in the table of contents --

7              THE COURT:  My exhibit d is a letter.

8              MR. MILLER:  Let me look again.

9              Is your Honor looking at Mr. Karlan's

10      affidavit in support of order to show cause for a

11      temporary restraining order?

12             THE COURT:  I am indeed, but it may be out of

13      sequence.  What does the document look like?

14             MR. MILLER:  The document is entitled

15      Articles of Association --

16             THE COURT:  Okay, I have it.  Mine is

17      Exhibit E.

18             MR. KARLAN:  So is mine.

19             THE COURT:  Okay.  MapleWood Equity Partners

20      Offshore Limited, 1999.

21             MR. MILLER:  Yes.  Exhibit E, I'm sorry.

22             THE COURT:  Not a problem.  What paragraph?

23             MR. MILLER:  After the table of contents on

24      the very first page you will see the advisor listed as

25      MapleWood Partners.

Rachel C. Simone, Senior Court Reporter

Proceedings

1          THE COURT:   "Advisor" means MapleWood

2     Partners LP, yes?

3          MR. MILLER:   If you turn to Page 8 of the

4     articles, you will see the definition of "manager"

5     which is defined as MapleWood Management.

6          THE COURT:   I have that.

7          MR. MILLER:   Also, if you look back on the

8     first page you will see the definite board of

9     directors.

10          THE COURT:   Board of directors?

11          MR. MILLER:   Yes.   That consists of

12     Mr. Glaser, another gentleman named Mr. Dagrosa, and a

13     third gentleman whose name escapes me now, that were

14     all MapleWood people put on the board of the

15     association.   I could supplement and represent that is

16     the case, but it was not set forth in the affidavits.

17          THE COURT:   It is your position that this

18     article -- that these articles of association which set

19     forth who the advisor and who the manager is must mean

20     that these individuals, MapleWood Management and

21     MapleWood Partners therefore have control over

22     MapleWood Offshore?

23          MR. MILLER:   That's correct.   Therefore, they

24     control and they are under common control with

25     MapleWood Holdings.

Rachel C. Simone, Senior Court Reporter

1431917d-2820-4407-a5f3-c12ae1224557