Proceedings

1              If your Honor looks at Page 46 of those

2      articles, you will see that the company shall require

3      the manager, MapleWood Management, to undertake a

4      management agreement which does exist.  Essentially,

5      the management of the company, the management of the

6      MapleWood Offshore Company -- I'm sorry, MapleWood

7      Offshore Fund.

8              THE COURT:  Well, it says in Paragraph 83

9      that the board shall, pursuant to a management

10     agreement, retain the manager to exercise, subject to

11     the board's oversight all management, control and

12     functions of the company.

13             MR. MILLER:  Correct.

14             THE COURT:  It is that section that gives

15     them control over the Offshore?

16             MR. MILLER:  Yes, your Honor.

17             THE COURT:  And having control over Offshore,

18     that means that they are an affiliate of MapleWood

19     Partners?

20             MR. MILLER:  That's correct, your Honor.

21             THE COURT:  And that the representation of

22     MapleWood Partners is, therefore, implicitly the same

23     thing as the representation of Offshore?

24             MR. MILLER:  Yes.  And I would go beyond

25     that.  I believe that the Gibson Dunn attorneys

Proceedings

Page 33

```
 1        actually represented the MapleWood Offshore Fund.  They

 2        negotiated the subscription agreement with Casita,

 3        regardless of whether there was a retainer agreement

 4        between those two parties.  And I think it is more

 5        relevant to the conflict waiver agreement which we are

 6        citing.

 7               THE COURT:  On the theory that they are an

 8        affiliate because they exercise control?

 9               MR. MILLER:  Right.

10               THE COURT:  Therefore, the demonstration of

11        that is the articles of association.

12               MR. MILLER:  Yes, your Honor.  Therefore they

13        are entitled to rely on that conflict waiver agreement.

14               Now, the plaintiff has set forth some

15        arguments as the why the conflict waiver agreement

16        doesn't apply.  I don't think those have any merit.

17        The main argument that they have is that it relates to

18        some ancillary agreement --

19               THE COURT:  That's a scope argument.

20               MR. MILLER:  Correct, your Honor.  It is our

21        position that the scope of the waiver includes this

22        litigation because it is all related to the failure of

23        AMC Computer.  I think that's clear and I think your

24        Honor need look no further really than the affidavit

25        that the plaintiff --
```

Proceedings

1          THE COURT:  Let's look at the language of

2    that waiver agreement and tell me why it is clear.  It

3    is an exhibit to the order to show cause.

4          MR. MILLER:  It is an exhibit.

5          THE COURT:  Exhibit A to the Karlan

6    affidavit.

7          MR. MILLER:  Yes.  It is also attached to our

8    moving papers.

9          THE COURT:  I have more than one copy.  All

10   right, I have it in my hand.

11         MR. MILLER:  Okay.  You will see that it

12   refers to representation of Casita, the plaintiff, in

13   connection with the proposed restructuring of AMC

14   Computer currently being contemplated.  That's all it

15   says.

16         THE COURT:  Okay.

17         MR. MILLER:  So what is that restructuring,

18   quote, unquote, of the transition that Gibson Dunn was

19   referring to?

20         As a threshold matter, Gibson Dunn

21   represented MapleWood at this time, and didn't set

22   forth in this letter that they considered that to be

23   narrowly construed.  This is a recent --

24         THE COURT:  Narrowly construed to what?

25         MR. MILLER:  To the agreement to restructure

Rachel C. Simone, Senior Court Reporter

1431917d-2820-4407-a5f3-c12ae1224557

1    certain equity and debt of a gentleman named Sonny

2    Chabra.

3            THE COURT:  Why would they do that when the

4    opening sentence says that it is in connection with the

5    proposed structuring agreement?  Isn't it self-evident?

6            MR. MILLER:  If your Honor will permit me, I

7    have another chart.

8            THE COURT:  Are you done with that chart?

9            MR. MILLER:  Yes, your Honor.

10           THE COURT:  Do you have a small version of

11   what you have there?

12           MR. MILLER:  Yes, your Honor.  (Handing)

13           Your Honor was asking whether the conflict

14   waiver relates to this Chabra agreement, which Casita

15   now contends it relates to.

16           I think that the evidence shows that this is

17   a recently concocted theory.  For example, you see the

18   agreement with Mr. Chabra which was attached to

19   Mr. Karlan's papers in this case was dated November 21,

20   2002.  In the first e-mail you see in the chart in

21   front of you, on November 27 after that agreement was

22   executed, Mr. Ekkehart Hassels-Weiler sent an e-mail to

23   MapleWood Partners' employee Robert Reale asking him

24   for a set of the documents for this agreement with

25   Sonny Chabra to provide to Gibson Dunn -- I'm sorry.

Proceedings

Page 36

```
 1    Casita is not a party to that Chabra agreement.  Gibson
 2    Dunn's name doesn't appear anywhere in it.  We
 3    submitted affidavit evidence from the MapleWood people
 4    that says Gibson Dunn was not involved in the
 5    negotiations of that.  And this e-mail is further
 6    corroboration of the fact that Gibson Dunn wasn't even
 7    involved in the negotiation of the agreement with
 8    Chabra.  Therefore, how is it that a conflict waiver
 9    letter they signed relates to a transaction they didn't
10    participate in?  I think it is a much more logical
11    reading to conclude that this conflict waiver letter
12    relates to the restructuring of AMC Computer's credit
13    facility which Casita's affiliate Eugenia negotiated
14    starting in September 2002 with Gibson Dunn as its
15    counsel until that agreement was executed in
16    January 30, 2003.
17              THE COURT:  How can I take a waiver letter
18    that in most unambiguous terms refers to one matter and
19    take some other document and then read it differently?
20    How can I do that?
21              MR. MILLER:  I'm sorry, your Honor?
22              THE COURT:  How can I take the letter which
23    is unambiguous in its terms in connection with a
24    proposed restructuring of AMC and accept an extrinsic
25    document, this November 21, 2002 letter, and conclude
```

Proceedings

Page 37

1    that the waiver means something that it says in its

2    plain terms, at least without conducting an evidentiary

3    hearing, if that's necessary?  And if it is

4    unambiguous, there is no reason to do that.

5            MR. MILLER:  I believe it is unambiguous, and

6    it is unambiguous that it relates to the Eugenia loan.

7    That's the restructuring Gibson Dunn was -- that's the

8    restructuring that they had meant to discuss shortly

9    before this waiver letter.  In our affidavits that we

10   submitted we provided the evidence and views of the

11   MapleWood people that that's what the waiver letter

12   agreement related to.  What evidence does Casita

13   provide you to say that it relates to something else?

14   Nothing.  They provided an affidavit from Ms. Becker

15   who drafted this agreement which, if you read

16   carefully, your Honor you will see that it is

17   conspicuously silent in any affirmation by her that

18   this conflict waiver related to the Chabra agreement

19   which they contend in their papers it related to.  I

20   think that absence is telling, your Honor.  Gibson Dunn

21   knows perfectly well that this waiver was in connection

22   with the loan transaction that underlies the failure of

23   AMC Computer and all related litigation.  I think the

24   agreement is unambiguous in that regard, and I think we

25   submitted ample documentary and testamentary evidence

Proceedings

Page 38

1      from the MapleWood people as to what the conflict

2      waiver letter really related to.  So we think that the

3      conflict waiver clearly applies in this case, and that

4      your Honor should enforce it.  It is unconscionable

5      that Gibson Dunn can draft and send its client a

6      conflict waiver letter that says they won't participate

7      in litigation between the parties' affiliates and then

8      turn around and ignore that, which is what they are

9      doing here.

10               Unless your Honor has further questions --

11               THE COURT:  I don't.

12               MR. MILLER:  I will be seated.  Thank you,

13     your Honor.

14               THE COURT:  I turn now to Mr. Karlan.

15               Mr. Karlan, I have the same question for you

16     I asked Mr. Miller, and that is:  Is there a sufficient

17     record before me to decide the question, for example,

18     of affiliation, scope of the agreement and matters of

19     that sort, or do I need to conduct an evidentiary

20     hearing or refer it for an evidentiary hearing?

21               MR. KARLAN:  May I take a running start at

22     that question?

23               THE COURT:  A running start or a jump start?

24               MR. KARLAN:  A running start.

25               THE COURT:  Go ahead.  Take your time.

Proceedings

1          MR. KARLAN:  They have got the burden of

2    proof here.  If the record before you is not adequate

3    to persuade you as a matter of fact they have

4    established what they need to establish in order to

5    disqualify us, then the motion should be denied.

6          THE COURT:  But you put in evidence in

7    opposition.

8          MR. KARLAN:  I have.

9          THE COURT:  And there may be a factual

10   dispute raised by that.  And then the question is --

11   let me back up to be completely precise, and if I'm not

12   precise you will tell me.

13          The burden of going forward is on them.  They

14   have to meet that burden in the papers they have

15   submitted.  And if I am satisfied they have met it,

16   then the burden is yours to disprove or rebut.  And the

17   question that I have, assuming that I am satisfied that

18   they met their burden to go forward, of going forward,

19   are there now factual issues that are raised from the

20   opposing set of papers, or can I resolve it on the

21   reading of the papers themselves?

22          MR. KARLAN:  Judge --

23          THE COURT:  Is that clear?

24          MR. KARLAN:  It is.  I answer you this way:

25   I think that on this record, with all due respect,

Proceedings

Page 40

1   there are only two possible things you can do. And it

2   is basically where Judge Chin came out yesterday. You

3   can either deny the motion or conclude that you need

4   some additional evidence before denying it. It is that

5   that Judge Chin is trying to decide. He essentially

6   ruled out the possibility of granting the motion on

7   these papers, and I respectfully suggest that you

8   should too.

9          The different factual issues that you have

10  raised really warrant separate discussion, and with

11  your indulgence, I would like to go through them.

12         THE COURT: Sure. We have a half hour yet.

13         MR. KARLAN: I don't think I will use it all

14  unless you have questions.

15         Just for purposes of clarity, I would like to

16  start with the waiver letter, deal with that in its

17  entirety. I don't know that it is analytically helpful

18  to jump back and forth. They are separate grounds for

19  disqualification.

20         With respect to the letter agreement, there

21  are three reasons, I respectfully suggest, why there is

22  not a basis for disqualification here. The first is

23  that there is no evidence to support the proposition

24  that Partners, which is the MapleWood referred to in

25  the letter, and the Offshore --

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

Page 41

1            THE COURT:  Partners what?  I didn't hear
2      what you said.
3            MR. KARLAN:  Partners is the MapleWood that
4      is referred to in the letter.
5            THE COURT:  I understand.
6            MR. KARLAN:  There is no evidence to support
7      the contention of Mr. Miller that Partners is an
8      affiliate of the Offshore Fund, which is the defendant
9      in this case.  And if they are not affiliates, then the
10     letter has no application.
11           Let me quickly -- let me tell you what I
12     think the other two bases are, and I will talk about
13     each of them.
14           The second reason the letter is not a reason
15     for disqualification is that the sentence in the letter
16     which Ms. Becker says that we are not going to
17     represent you in litigation only applies to lawsuits
18     that are, quote, in connection with the transaction.
19     And even if Mr. Miller's interpretation of this letter
20     is accepted, and the transaction is meant to mean the
21     loan by Eugenia which is not a party here to AMC --
22           THE COURT:  I'm sorry.  The phone rang and I
23     got distracted.  Tell me again.
24           MR. KARLAN:  I am telling you the second
25     reason.

Proceedings

1              THE COURT:  Start from the beginning.

2              MR. KARLAN:  The second reason the letter

3       doesn't apply is that it applies -- the promise not to

4       represent applies only to litigation that is, quote, in

5       connection with a transaction.  And Mr. Miller wants to

6       interpret the word "transaction" in this letter -- and

7       just for now I will go with him and let him have his

8       way.  Mr. Miller says the word "transaction" in that

9       letter should mean the loan from Eugenia, which is not

10      a party to this lawsuit, to AMC, which is not a party

11      to this lawsuit.  Let's just assume for right now

12      that's what the word "transaction" in this letter

13      means.  This lawsuit is not in connection with that

14      loan.  Eugenia is not a party, AMC is not a party.

15      That loan agreement is irrelevant, okay?

16              The third reason why the letter is not a

17      basis for disqualification here is that there is no

18      evidence that anyone other than Ms. Becker ever signed

19      the letter.  Mr. Miller represented to you -- maybe he

20      didn't intend to, but during his oral argument he said

21      it was signed by everybody.  Mr. Reale testifies in his

22      affidavit that he can't find any copies in his files

23      that are executed by anybody.  We cannot find any

24      copies in our files that are executed by anybody.  I

25      asked Mr. Miller yesterday if he had exhausted his

Proceedings

Page 43

1    search in that regard, and I have not heard back from

2    him to the contrary, so there is absolutely no evidence

3    the letter was ever signed.  And for those reasons, we

4    just don't think the letter has any applicability here.

5              The question of whether Partners and the

6    Offshore Fund are or are not affiliates is not one that

7    can be dispensed with in a couple of sentences, but we

8    do discuss it in the papers, but let me hit a couple of

9    highlights.

10             If you look at the articles of association

11   that Mr. Miller called your attention to earlier --

12             THE COURT:  Yes.

13             MR. KARLAN:  -- on Page 45 in Sections 78 and

14   thereafter there is a section entitled Powers and

15   Duties of the Board, which begins, quote, The business

16   of the company shall be managed by the directors.

17             The notion that Mr. Glaser is sort of the

18   keeper of this offshore fund who dictates, you know,

19   everything that the fund does is both not common sense,

20   but, more importantly, is belied by the articles of

21   association.  There is no evidence about who is on the

22   board.  Mr. Miller has represented to you that he is

23   one of three members of the board.  Let's assume that

24   he is right.  Mr. Glaser is not controlling this fund,

25   the board is controlling the fund.  Partners is surely

Proceedings

1    not controlling the fund.  Partners has a contractual

2    relationship with the Fund, and that's all Partners

3    has.

4            THE COURT:  What is the meaning, as you view

5    it, of Paragraph 82 B on Page 46 which uses the word

6    "control"?  I'm sorry, it's Paragraph 83.

7            MR. KARLAN:  The board shall?

8            THE COURT:  Yes, sir.

9            MR. KARLAN:  The board shall, pursuant to a

10   management agreement, retain the manager to exercise,

11   subject to the board's oversight, all management.

12           Your Honor, let's not get caught up in the

13   fanciness of this Cayman Islands company.  Any domestic

14   corporation has a board of directors and executives who

15   serve the board and are hired and fired by the board.

16   This has a written management agreement.

17           THE COURT:  So all the management agreement

18   gives the manager is it delegates control that would

19   otherwise be residing in the board, and the actual

20   control is the board of directors?

21           MR. KARLAN:  Exactly.

22           The paragraph Mr. Miller read to you, 82 A,

23   with all respect, I don't know he did it intentionally

24   but he omitted the first few words:  To the extent

25   deemed necessary or appropriate by the board, the

Proceedings

Page 45

1    company shall require.

2         The board can do this itself, your Honor.  If

3    you look at 83 on Page 46 toward the end of that very

4    first full block paragraph there is a sentence

5    beginning:  Without limiting the generality of the

6    foregoing -- I am now on Page 46, Paragraph 83 toward

7    the end of the big block just before A.

8         THE COURT:  I see it.

9         MR. KARLAN:  Without limiting the generality

10   of the foregoing, the board is authorized and the board

11   may authorize the manager.

12        So, your Honor, the power resides in the

13   board, and the board is free, if it wishes to do so, to

14   enter into a written agreement which, by the way, you

15   have not been given and neither have we.

16        Now, beyond all that, you have testimony from

17   the woman who wrote the letter saying what she thought

18   the word "affiliates" meant in that letter.  No one

19   else appears to have ever signed the letter, and you

20   don't have testimony from anybody else indicating what

21   they thought the word meant.

22        So, your Honor, I would respectfully suggest

23   that Partners and the Offshore Fund are not affiliates,

24   and this suit is not in connection with the Eugenia

25   loan to AMC.  The letter just completely is beside the

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

1    point.

2           THE COURT:  Incidentally, I may have

3    blundered before.  The suit that is involved with

4    Justice Freedman involves Eugenia?

5           MR. KARLAN:  It does.

6           THE COURT:  You know, I don't think I will

7    call her.  These cases are completely separate.  She

8    will do what she thinks is appropriate, as will I.

9           Go ahead.

10           MR. KARLAN:  Unless your Honor has questions,

11    I am going to turn to the second prong of the

12    disqualification motion.

13           THE COURT:  I don't, so go ahead.

14           MR. KARLAN:  I would like to, if I could,

15    underscore a couple of facts that I am not sure are

16    coming through cleanly enough.

17           First of all, the work that was done in 1998

18    which Mr. Miller has described, Mr. Miller has told

19    that you it was done by Gibson Dunn & Crutcher lawyers.

20    I think I know what he means by that, but I want to

21    make sure your Honor knows what he means by that.  It

22    was done by the law firm of Chadbourne & Parke, not

23    Gibson Dunn & Crutcher.  In 1998 Scott Kislin and

24    Dennis Friedman, the two corporate lawyers who are the

25    focus of this entire motion, didn't work at Gibson

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

1   Dunn, they worked at Chadbourne & Parke.  They didn't

2   come to Gibson Dunn until the middle of the year 2000.

3   So when he uses "Gibson Dunn" and "lawyers," I know he

4   is talking about Mr. Kislin and Mr. Friedman, but in

5   '98 when they did that work, they were at Chadbourne &

6   Parke.

7          Now, Mr. Friedman has put in an affidavit

8   which is attached to my affidavit in which he says I

9   never billed any time to any MapleWood Partners matter

10  ever.  Mr. Miller has the invoices which have the

11  timesheets, and if that were false, he would have

12  called it to your Honor's attention.

13         Mr. Kislin has given an affidavit in which he

14  describes what he did when he was at Chadbourne, and he

15  says, I haven't done any Partners work or MapleWood

16  work in two years.  And that appears to be undisputed.

17         None of the Gibson Dunn litigators working on

18  this matter in front of you, Judge, were ever at

19  Chadbourne & Parke, ever represented MapleWood, or know

20  anything about any of this stuff, okay?

21         A couple of times Mr. Miller has called me up

22  short and suggested I have said something inaccurate

23  with respect to some of this, and sometimes he is

24  actually right.  And my defense is only that I wasn't

25  there.  I wasn't at Chadbourne, I didn't do any of this

Proceedings

1      Fund was a client of Gibson Dunn, we still think the

2      motion should be denied for several other reasons.

3              First of all, part of the test, as set forth

4      by the Court of Appeals, is that there has to be a

5      conclusion that the former client will be adversely

6      affected by the existing suit.  Now, if the Offshore

7      Fund is not a former client of Gibson Dunn & Crutcher,

8      and the only former client we are talking about is

9      Partners here, Partners is not going to be adversely

10     affected by the outcome of this suit.  I read the reply

11     papers, I don't perceive them to be arguing to the

12     contrary.  Partners has no financial or other stake in

13     the outcome of this suit; or if it does, there is

14     certainly nothing in the record to reflect it.

15             The other piece under Tekni-Plex and Solow is

16     that the prior representation and the current

17     representation have to be substantially related, which

18     the First Department Appellate Division along with the

19     federal courts in New York have interpreted to mean

20     identical.  And, clearly, the prior representation of

21     Mr. Kislin while he was at the Chadbourne firm in

22     creating these documents, does not present an identical

23     set of issues to this litigation.  The case here turns

24     on whether or not the subscription agreement permits

25     the fund to make a capital call this late in the game.

Proceedings

1    There are unambiguous provisions in the agreement which

2    your Honor has before you which don't require parole

3    evidence.  We would certainly not tender any parole

4    evidence, and we would oppose the submission of any

5    parole evidence on this question.

6         In Paragraph 15 of the complaint we talk

7    about Section 1.3 A 3 of the subscription agreement

8    which says that the plaintiff is not required to make

9    capital contribution after the expiration of the

10   investment period.

11        And there is going to be a question of fact

12   about when the investment period termination date

13   occurred.  We allege that it occurred in May of 2004.

14   I have read the reply papers and the moving papers on

15   this motion submitted by Mr. Miller.  Nowhere does he

16   deny that's correct.  I am not sure exactly what

17   defense they propose to make on that question, but you

18   are not going to need parole evidence.  What we are

19   going to need is testimony, I assume, from some manager

20   person at the fund who may have to, you know, bring out

21   some records.  But what the signatories thought when

22   they signed the document?  No.  That's not this kind of

23   case.  The representation simply doesn't overlap.

24   There is no possibility of misuse.  Even if Mr. Kislin

25   was a litigator and assigned to this case, there is no

Proceedings

1    possibility of misuse of confidential information.

2    Finally, Judge, the Solow case, which

3    involved as this one does, a lawyer moving from one

4    firm to another firm, points out the contemporary

5    reality of legal practice.  It is unfair to clients to

6    deny them counsel of their choice because former

7    counsel moved from one firm to another.  Mr. Kislin is

8    a corporate transaction lawyer.  He has been screened

9    off from this case.  He submitted an affidavit saying

10   he doesn't know anything relevant to this case.  He has

11   not talked to us about anything relevant in this case,

12   and he is not going to.

13   The Solow case says that there is no

14   reasonable possibility that I as the litigator have

15   acquired confidential information concerning the former

16   client that is relevant to this case.  That

17   disqualification of the entire firm is inappropriate.

18   We have no problem if your Honor enters an order -- we

19   think it is unnecessary, but if you want to enter an

20   order, fine, directing that Mr. Kislin and Mr. Friedman

21   be walled off and not spoken to and not have access to

22   files, etcetera, fine.  But the notion that Eugenia

23   which has been represented -- excuse me, Casita which

24   has been represented by Gibson Dunn for some years now

25   should be denied access to counsel of choice because of

Proceedings

1    the fact that Mr. Kislin changed firms is inconsistent

2    with Solow.

3            THE COURT:   I asked the question of

4    Mr. Miller whether or not there was some prematurity to

5    this motion, and I understand that his response was

6    that it needs to be decided now and can be decided now.

7            Is there anything about this which is

8    premature, or is it completely at this point ripe for

9    decision?

10           MR. KARLAN:   I think you are both right.

11           THE COURT:   That's the most diplomatic answer

12   I have heard in the courtroom in a long time.

13           MR. KARLAN:   I think this motion should be

14   denied now.   I am hardpressed to make the argument -- I

15   would like to be able to make the argument, but I can't

16   think of a way to make it -- that Mr. Miller is somehow

17   precluded in a year or six months from making a motion

18   again if he has additional information or if the

19   situation has changed.

20           If certain issues became relevant to the case

21   which are not relevant now, I would not stand up -- I

22   might say he should have argued this before, but I

23   wouldn't say he is precluded from making the motion

24   again.

25           THE COURT:   I have a question which is a

1431917d-2820-4407-a5f3-c12ae1224557

Proceedings

Page 54

1    procedural question, and that is I also have an

2    application by MapleWood to intervene, MapleWood

3    Partners and MapleWood Management LP.  I received no

4    opposition, so I assume you don't have opposition to

5    them intervening for these purposes?

6              MR. KARLAN:  For these purposes, Judge.

7              THE COURT:  So the application to intervene

8    is granted.  I will deal with it on the merits, as I

9    will the entire motion.

10             It seems to me, before I have Mr. Miller

11   respond to you, that whatever happens here, that there

12   ought to be -- as I said back in October, that this has

13   to be resolved before the main action goes forward; do

14   you agree with that?

15             MR. KARLAN:  It has to be decided before the

16   PI motion?

17             THE COURT:  Yes.

18             MR. KARLAN:  Judge, just to clarify

19   something, your Honor said that the initial order to

20   show cause had been held in abeyance.  I think it is

21   more precise to say the TRO is granted.

22             THE COURT:  Correct.  That was sloppy on my

23   part.

24             MR. KARLAN:  I won one, your Honor, and I

25   don't want the record not to reflect that.

Proceedings

Page 55

1        THE COURT:  There was a TRO entered by the PI

2    hearing or determination was held in abeyance subject

3    to the motion to disqualify.

4        MR. KARLAN:  Yes.

5        THE COURT:  And that's a more precise way of

6    speaking.  I will explain to my intern later that

7    precision is most important in the courtroom.

8        Mr. Miller?

9        MR. MILLER:  Your Honor, Mr. Salomon was just

10   asking me to clarify something.  If the preliminary

11   injunction matters are held in abeyance, other

12   proceedings such as answering the complaint are also

13   held in abeyance?

14       THE COURT:  I don't have any problem with

15   that.

16       MR. MILLER:  Thank you.

17       THE COURT:  I am happy to say everything is

18   stayed until I decide this.  That's what I thought I

19   did last time.

20       MR. MILLER:  Thank you, Judge.  I will be

21   very brief in response, your Honor.

22       With respect to the conflict waiver

23   agreement, Mr. Karlan argued that it was not in

24   connection with the Eugenia loan transaction.  I

25   believe Mr. Karlan's position -- and I don't want to

1431917d-2820-4407-a5f3-c12ae1224557

```
 1          misstate it -- is that even if the conflict waiver
 2          letter relates to the Eugenia loan, he believes that
 3          this litigation, whether Casita needs to respond to the
 4          capital call, is unrelated to the Eugenia loan.    I
 5          believe that's what Mr. Karlan was expressing.
 6                    THE COURT:  That's my understanding.
 7                    MR. MILLER:  Now, the reason why this
 8          litigation is related to the loan transaction is
 9          because the capital call related to the failure of AMC
10          Computer which arises from a default on the Eugenia
11          loan.  The only reason that we are here before your
12          Honor is because Eugenia didn't get paid its money
13          under its loan.
14                    THE COURT:  That may be the reason you are
15          here, but it is not the identical transaction.
16                    MR. MILLER:  This lawsuit does not expressly
17          deal with a breach -- it is not asserting claims for a
18          breach of contract of the Eugenia credit agreement.
19                    THE COURT:  So if it doesn't assert a breach
20          of a claim -- of the subscription agreement --
21                    MR. MILLER:  It asserts a violation, and it
22          asserts that a capital call which was made in
23          connection with the Eugenia loan is invalid.  That's
24          why it relates to the same transaction.  The only
25          reason why they haven't paid the $700,000 in the
```

Proceedings

1    capital call is because their affiliate lost --

2              THE COURT:  How does the Eugenia transaction

3    enter into this at all?  If I had a jury in the box

4    right now and they were to decide whether or not the

5    call was proper, what would be the relevance of

6    Eugenia, except the fact that it occurred?

7              MR. MILLER:  Your Honor, one of the grounds

8    that Casita asserts in its complaint at Paragraph 18

9    and other places is that the capital call is invalid to

10   pay the litigation expenses related to the Eugenia

11   litigation which clearly relates to the Eugenia loan

12   transaction.  That's what this is all about.

13             THE COURT:  Isn't the only thing that comes

14   in is that the Eugenia transaction is triggering the

15   event?

16             MR. MILLER:  They would contend --

17             THE COURT:  Can they dispute at trial here

18   anything to do with the Eugenia insolvency or AMC's

19   insolvency?

20             MR. MILLER:  If you read the complaint, what

21   they would be asserting at trial based on this

22   complaint is that Casita is not required to pay the

23   money to fund the litigation related to the Eugenia

24   loan because those indemnity expenses are unwarranted.

25   And I presume that they would assert as Eugenia has in

Proceedings

1    other lawsuits that the MapleWood people committed

2    fraud and breached duties.  So there would be issues in

3    the trial in this case as to whether or not the Eugenia

4    litigation has merit, because those would directly go

5    to whether the indemnity is required or not, which was

6    one of the purposes of the capital call.  That's why

7    the current litigation before your Honor is related to

8    the Eugenia loan transaction that is the subject of the

9    conflict waiver.

10            Mr. Karlan also stated that there is no

11    evidence that the conflict waiver letter was signed by

12    any of the other parties.  It was signed by Gibson Dunn

13    & Crutcher which is the party against whom we are

14    seeking to enforce this.

15            Now, this issue wasn't addressed in the

16    opposition, but I would submit to your Honor that based

17    on normal statute of frauds cases and analysis, if you

18    are asserting a claim against a party that signed it,

19    you can enforce it against that party because that

20    party signed it.

21            THE COURT:  I don't think the argument is

22    that it is not enforceable against Gibson Dunn.  I

23    thought the argument was that since it was only signed

24    by Ms. Becker that it is her understanding of what that

25    agreement contemplated that is relevant here.  And

1431917d-2820-4407-a5f3-c12ae1224557

1    since Mr. Glaser didn't sign it, his understanding of

2    it has no real relevance.

3              MR. MILLER:  If that's what the argument was

4    I would go back to what I argued previously, that your

5    Honor has to look at the standard definition of

6    "affiliate" and your Honor needs to construe that

7    waiver against Gibson Dunn who drafted it, who did not

8    put anywhere in there to its own client that it clearly

9    had a duty to at this time that it viewed the

10   definition of "affiliate" to be narrowly construed.

11             THE COURT:  I understand that argument.  I

12   think I do.

13             MR. MILLER:  I hope I have been clear, your

14   Honor.

15             With respect to the definition of

16   "affiliates," the cases that we cited also include

17   within definition of "affiliates" directors.  So I

18   think even if Mr. Glaser is only one of the three

19   directors, he would still be considered an affiliate,

20   and, therefore, all of the MapleWood entities would

21   become affiliates based on the director status.  So I

22   don't think that's a dispositive issue.

23             THE COURT:  Anything else?

24             MR. MILLER:  Lastly, I would submit to your

25   Honor that because Casita has made arguments about an

Proceedings

1   ethical screen implementing Gibson Dunn -- and we don't

2   know anything about that, but I think the cases say you

3   should presume, whether it is a big firm, a

4   multi-office firm, what have you, presume that a

5   conflict is imputed to the entire firm.  If your Honor

6   wants to go beyond that to not impute to the entire

7   firm, I think at a minimum we would need to know a lot

8   more about what Mr. Kislin swears in his affidavit.

9   When this screen was imposed?  Was it imposed on the

10  front end?  Did they segregate documents, etcetera?  So

11  I think a lesser remedy would be premature at this

12  point.

13            THE COURT:  Thank you.

14            Mr. Karlan, I have a question for you on the

15  issue that was raised by Mr. Miller concerning

16  indemnification.  I didn't remember that in the

17  complaint, and I am interested in hearing your response

18  to that argument.

19            MR. KARLAN:  I apologize, your Honor, I am

20  having trouble hearing you.

21            THE COURT:  I'm sorry.  I mumble.

22            The argument made by Mr. Miller is that

23  because of the indemnification for the Eugenia

24  litigation which is denied, that you are responsible

25  for that in Paragraph 18, I think he said, of the

1    complaint, that that, according to his argument, makes

2    this related to and meets the test of the cases.

3              MR. KARLAN:  Judge, Paragraph 18 is longer

4    than it should be, and I hate to have my own drafting

5    read back to me in court.  But with all respect to

6    Mr. Miller -- and I know we are all hungry -- but

7    Paragraph 18 doesn't say what he told you it said.  I

8    ask that your Honor take the time at another time to

9    read it.

10             Remember, your Honor, how this case got

11   started.  They send us a two-line letter saying, Please

12   send us $700,000 or we cancel your equity interest in

13   this fund.  We write a letter back, a nice letter,

14   saying, We have about 150 questions about this.  Why

15   are you calling a capital call for lawsuits where you

16   are not a party?  Why are you calling capital calls

17   where there is insurance that covers Mr. Reale's

18   defenses?  I think the insurance company is also paying

19   these firms.  Maybe they will represent that to you.  I

20   don't know.  And they never responded.  They said, We

21   are not answering the questions, and you have two hours

22   to get out of Dodge or you lose your equity.  The next

23   thing we did was come in here running to you.

24             We have told you at the time the TRO was

25   entered if your Honor finds that the capital call was

Proceedings

1    appropriate and that we are required to pay it, we will

2    pay it, because we cannot lose our equity investment.

3    We just didn't want to be put on the horns of a

4    dilemma.  It may be that all of these issues dropped

5    out once, if ever, the defendant's firm answers some of

6    these questions.

7         THE COURT:  Mr. Miller said, if I understand

8    it, that paragraph 18 -- I will use a phrase he didn't

9    use, and I don't mean it in a negative sense, but it

10   pulls in a review of the merits of the AMC litigation

11   because of the last sentence what justified expenses

12   can be incurred.

13        If I understood his argument, this paragraph

14   which rejects an obligation to pay for litigation

15   expenses in the AMC litigation and it would always then

16   be a question of whether they are bona fide expenses,

17   and that brings in the underlying AMC Eugenia

18   litigation.  That's what I think he is saying.

19        MR. KARLAN:  The last sentence of

20   Paragraph 18 refers to the following, Judge:  The case

21   in front of Justice Freedman is a lawsuit by Eugenia to

22   enforce an absolute unconditional guarantee against two

23   other defendants, not AMC Computer, not MapleWood

24   Funds, not MapleWood Partners, but two other companies

25   who gave an unconditional guarantee.  These two

Proceedings

Page 63

1    gentlemen were counsel in that case for those two

2    defendants as well.  We questioned when the capital

3    call came in --

4              THE COURT:  Your representation is that

5    Paragraph 18 does not intend to refer to the AMC

6    Eugenia litigation over the original loan agreement?

7              MR. KARLAN:  That is correct.  There is

8    litigation between AMC and Mr. Reale for fraud.  That's

9    referred to in here.

10             THE COURT:  What I think I will permit you to

11   do within the next seven days so that I will have it

12   clear is to file an amendment to this complaint.  That

13   will be of some value to me when I read the complaint.

14             Since what I think you can do is just file

15   a -- I will permit you to file an amended, a first

16   amended verified complaint which would be in terms of

17   what I am authorizing today, simply an amendment of

18   Paragraph 18 to reflect what it is you said to me.  It

19   ought to be made as expressly as possible.  It may or

20   may not affect the argument that Mr. Miller has made.

21             And, Mr. Miller, so there is no issue left

22   unresponded to, when you receive that amended complaint

23   within seven days, you will have seven days, if you

24   think it is appropriate, to write me a letter with

25   regard to whether that changes your position or doesn't

Page 64

1    change your position.

2            And, Mr. Karlan, I don't think I will need a

3    further letter from you because I will have it in front

4    of me.

5            Does that make sense?

6            MR. KARLAN:  Yes, Judge.  We will do that.

7            MR. MILLER:  We will do that.

8            THE COURT:  That completes the proceedings

9    here today.  I will mark this submitted.  The clerk is

10   going to tell me that I need to put a date on the

11   calendar or else the computer is not going to take it,

12   so let me put a date down arbitrarily.  I will pick a

13   date in January.  I hope to get it done before that,

14   but I will pick January 31 as an arbitrary control

15   date.

16           MR. MILLER:  Excuse me, your Honor, one

17   housekeeping matter.

18           We have the hearing in front of Judge

19   Freedman this afternoon, and unfortunately I only have

20   that one copy of those bills, so I --

21           THE COURT:  These?

22           MR. MILLER:  The invoices, the law firm

23   invoices.

24           THE COURT:  (Handing) Okay.  I am returning

25   them to you.  I wrote on it "in camera," but get a copy

Proceedings

Page 65

```
1        for the court.
2                MR. MILLER:  We will hand deliver a copy.
3                THE COURT:  Okay.
4                MR. MILLER:  What time on January 31?
5                THE COURT:  9:30, but it is not realistic.
6        It is just a control date for the computer.  I will do
7        my best to get a decision before then.
8                Counsel, I would like a transcript of this
9        proceeding.
10               Have a good holiday.  Thank you.
11                       *           *           *
12           The foregoing is hereby certified to be a true and
13       accurate transcript of the proceedings.
14
15
16       _____
17                Rachel C. Simone
18                Senior Court Reporter
19
20
21
22
23
24
25
```

1431917d-2820-4407-a5f3-c12ae1224557