| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | | |
|---|---|---|
| ------------------------------------------------------------- x | | |
| EUGENIA VI VENTURE HOLDINGS, LTD.,<br><br>                                    Plaintiff,<br><br>        - against –<br><br>MAPLEWOOD EQUITY PARTNERS, L.P.,<br><br>                                    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | 07 CIV 9417 |
| ------------------------------------------------------------- x | | |
| | | |

### AFFIDAVIT OF ROBERT V. GLASER IN SUPPORT OF
### DEFENDANT'S MOTION TO DISMISS

STATE OF FLORIDA         )
                               ) ss:
COUNTY OF MIAMI-DADE    )

      I, ROBERT V. GLASER, hereby swear as follows:

      1.      I am Robert V. Glaser, an employee of MapleWood Partners, L.P. ("MapleWood Partners"). I am over 18 years of age and competent to testify. I make this Affidavit based on my personal knowledge, in support of the Motion to Dismiss filed by MapleWood Equity Partners, L.P. ("MapleWood Equity") in the above-captioned action.

      2.      MapleWood Equity's parallel fund, MapleWood Equity Partners (Offshore) Ltd. ("MapleWood Offshore"), owns 24.5% of AMC Investors LLC, and 30.2% of AMC Investors II, LLC. MapleWood Offshore's ownership interests are reflected in Schedule I of the Amended and Restated Limited Liability Company Agreement of AMC Investors LLC, and in Schedule I of the Limited Liability Company Agreement of AMC Investors II LLC. A true and correct copy of the Amended and Restated Limited Liability Company Agreement of AMC Investors

{M2623873;1}

LLC is attached hereto as "Exhibit A." A true and correct copy of the Limited Liability

Company Agreement of AMC Investors II LLC is attached hereto as "Exhibit B."

3.    Casita L.P. ("Casita") is an affiliate company of the plaintiff in this action,

Eugenia VI Venture Holdings, Ltd. ("Eugenia"). Casita is by far the largest investor in

MapleWood Offshore, having committed to invest $25 million in the fund, which investment

commitment comprises approximately two-thirds of the total commitments of investors in

MapleWood Offshore.[1]

4.    Casita also is a co-investor and Member in AMC Investors LLC, having invested

$2.5 million into AMC Investors LLC.

5.    MapleWood Equity has numerous member partners, both in and outside of the

United States. At least two of MapleWood Equity's limited partners are citizens of foreign

countries: (1) CIBC Capital Corporation is located in Ontario, Canada; and (2) and Rippon

Limited is located in Argentina.

FURTHER AFFIANT SAYETH NAUGHT.

_____
ROBERT V. GLASER

STATE OF FLORIDA          )
                                           ) ss:
COUNTY OF MIAMI-DADE   )

The foregoing instrument was sworn to and subscribed before me this 21st day of
November, 2007, by Robert V. Glaser, who is personally known to me or who has
produced _____ (type of identification) as identification.

_____
NOTARY PUBLIC, STATE OF FLORIDA

_____
(Print, Type or Stamp Commissioned Name of Notary Public)

CARMEN B. LIMA
Notary Public - State of Florida
My Commission Expires Feb 26, 2010
Commission # DD 497893
Bonded By National Notary Assn.

---

[1]    Casita has breached its obligations under the MapleWood Offshore Articles of Association and
Subscription Agreement by failing to satisfy approximately $4 million in capital calls since October 2005. That is
the subject of litigation pending in New York Supreme Court, Hon. Bernard Fried, where MapleWood Offshore has
a pending motion to vacate a temporary restraining order against declaring Casita in default for that breach.

# EXHIBIT A

# AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## AMC INVESTORS LLC

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is made and entered into as of August 25, 2000, by and among MapleWood Equity Partners LP, a Delaware limited partnership (the "U.S. Fund"), MapleWood Equity Partners (Offshore) Ltd., an exempted company organized under the laws of the Cayman Islands (the "Offshore Fund" and, together with U.S. Fund, the "Majority Members"), the members set forth on Schedule I hereto (the "Minority Members") and MapleWood Partners LP, a Delaware limited partnership (the "Manager") pursuant to the provisions of the Delaware Limited Liability Company Act, as the same may be amended from time to time (the "Act"), to set forth in their entirety the terms and conditions with respect to the operation of AMC Investors LLC (the "Company").

WHEREAS, the Majority Members were the initial members of the Company and entered into a Limited Liability Company Agreement for the Company as of July 31, 2000 (the "Original Agreement"); and

WHEREAS, the Majority Members now desire to amend and restate the Original Agreement in its entirety as set forth herein to provide for the admission of the Minority Members, the contribution of capital and such other matters as are more fully set forth herein.

NOW THEREFORE, in consideration of the premises, mutual promises and covenants contained in this Agreement and intending to be legally bound, the parties hereto hereby agree as follows:

## ARTICLE I
## ORGANIZATIONAL MATTERS

Section 1.1. **Original Agreement.** The Original Agreement is hereby amended and restated in its entirety as set forth herein.

Section 1.2. **Name; Formation.** The Company has been formed as a Delaware limited liability company by the filing on April 3, 2000, of a certificate of formation (the "Certificate") in the Office of the Secretary of State of the State of Delaware under and pursuant to Section 18-201 of the Act. Thomas A. Scott is hereby acknowledged as an "authorized person", within the meaning of the Act, to execute, deliver and file the Certificate on behalf of the Company. The name of the Company

1

NY3: 214530.09

AMC-INV 02599

shall be AMC Investors LLC, or such other name as the Manager may from time to time hereafter designate. All actions of the Company taken since the date of the Certificate and prior to the date of this Agreement (and all actions taken on behalf of the Company) in connection with the execution and delivery of the Merger Agreement (as defined below) and the consummation of the transactions contemplated thereby are hereby ratified in all respects.

**Section 1.3.  Purpose and Powers.**  (a)  The purpose of the Company shall be to purchase, hold, vote and dispose of securities of AMC Computer Corp., a New York corporation ("AMC"), and any successor entity and to otherwise exercise all rights as an owner of such securities, including, without limitation, to enter into the Stockholders Agreement, by and among the Company, AMC and the Stockholders named therein contemplated by the Agreement and Plan of Merger, dated as of May 2, 2000, by and among the Company, AMC Acquisition Corp., AMC and the stockholders of AMC named therein (the "Merger Agreement").

(b)  The Company shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

(c)  Nothing in this Agreement shall be deemed to restrict in any way the freedom of any Member (as defined below) to conduct any other businesses or activities whatsoever without any accountability to the Company or any other Member.

**Section 1.4.  Principal Place of Business.**  (a)  The principal office of the Company shall be located at such place as the Manager may designate from time to time.

(b)  The registered office of the Company in the State of Delaware is located at 1013 Center Road, Wilmington, New Castle County, Delaware 19805. The registered agent of the Company for service of process at such address is the Corporation Service Company.

**Section 1.5.  Term.**  The term of the Company shall commence on the date of filing of the Certificate in the Office of the Secretary of State of the State of Delaware and shall continue until terminated in accordance with the terms of this Agreement.



2

AMC-INV 02600

## ARTICLE II
## MEMBERS; OWNERSHIP; DISPOSITION OF INTERESTS; REPRESENTATIONS

**Section 2.1. Members.** (a) There shall be a single class of membership interests expressed in terms of Percentage Interests (as defined below). The initial Percentage Interest of the Members shall be as set forth in Schedule I hereto.

(b)     "Member" means the Majority Members and Minority Members executing this Agreement and all other persons or entities admitted as additional or substituted Members pursuant to this Agreement and the Act.

**Section 2.2. Title to Company Property.** All property owned by the Company, whether real or personal, tangible or intangible, and wherever located, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property.

**Section 2.3. Disposition of Interests.** (a) A Member may only Transfer its Percentage Interest in the Company in accordance with the provisions of this Section 2.3. Any Transfer in violation of this Section 2.3 shall be null and void and without any force and effect.

(b)     A Minority Member may Transfer in whole or in part such Member's Percentage Interest only with the consent of the Manager in its sole and absolute discretion; provided, however, that in the case of a Transfer by a Minority Member to an Affiliate of such Minority Member, such consent of the Manager shall not be unreasonably withheld. In connection with any such Transfer, such Transferee must agree in writing, in form and substance satisfactory to the Manager, to be bound by the terms of this Agreement and become a "Minority Member" hereunder and, in the case of a Transfer to an Affiliate of a Minority Member, such Affiliate must further agree to Transfer all of the Percentage Interest so Transferred back to the Transferring Minority Member immediately prior to such Affiliate ceasing to be an Affiliate of the Transferring Minority Member. A Majority Member may Transfer in whole or in part its Percentage Interest to an Affiliate of such Majority Member, provided that such Transferee agrees in writing to be bound by the terms of this Agreement and become a "Majority Member" hereunder and agrees to Transfer such Percentage Interest back to the Transferring Majority Member in the event that such Affiliate ceases to be an Affiliate of the Transferring Majority Member. Subject to the Tag-Along Rights provided for in Section 2.7, a Majority Member may also Transfer in whole or in part its Percentage Interest to a Person who is not an Affiliate of such Majority Member. Any Transfer not in compliance with this Section 2.3 shall be void and of no effect and shall be disregarded by the Company.

(c)     As used in this Agreement,

3

AMC-INV 02601

(i)    "Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity,

(ii)    "Transfer" means, with respect Percentage Interests, to sell, assign, transfer or otherwise dispose of, place or permit any encumbrance or other restriction upon, or grant any right (voting or otherwise) or interest in, any of such Percentage Interests, whether voluntarily, involuntarily, by operation of law or otherwise Transferee and Transferring shall have correlative meanings,

(iii)    "Affiliate" means, with respect to any Person, any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such first Person specified.  For purposes of the definition of "Affiliate", "control" of a Person will mean (i) the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise or (ii) the beneficial ownership, directly or indirectly, of 50.1% or more of the equity interests in such Person.

Section 2.4.  **Additional Members.**  One or more additional Members may be admitted to the Company without the Transfer by an existing Member of all or any part of his Percentage Interest by the issuance of additional Percentage Interests with the consent of the Manager and of Members representing an aggregate of more than 50% of the Percentage Interests (a "Majority of the Members"), and upon such terms as are set for such new Percentage Interests by the Manager.  Upon the issuance of additional Percentage Interests in accordance with this Section 2.4, the Percentage Interests of the Members admitted prior to such issuance shall be adjusted by the Manager in its sole discretion such that the sum of the Percentage Interests of all Members equals 100%.

Section 2.5.  **Liability to Third Parties.**  No Member shall have any personal liability for any obligation of the Company, whether such obligations arise in contract, tort or otherwise.

Section 2.6.  **Withdrawal.**  A Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company except with the consent of the Manager and Members representing an aggregate of at least 66 2/3% of the Percentage Interests (a "Super-Majority of the Members").  Under no circumstances shall a Member be entitled to receive the fair value of such Member's Percentage Interest in the Company (or any portion thereof) prior to the dissolution and winding up of the Company without the consent of the Manager and a Super-Majority of the Members.



Section 2.7.  **Tag-Along Rights.**  Subject to Section 2.8 below, no later than thirty (30) days prior to the proposed date of consummation of a Transfer by the Majority Members or their Affiliates of more than 5% of their aggregate Percentage Interests to a Person who is not an Affiliate of a Majority Member, the Majority Members

4

AMC-INV 02602

shall provide the Minority Members with written notice of the proposed Transfer, including the name of the Person to whom or which it wishes to make such Transfer, the amount of their Percentage Interest proposed to be Transferred, and the price and other material terms and conditions of the proposed Transfer (a "Section 2.7 Notice"). Each Minority Member shall then have the right by notice given no later than ten (10) business days following receipt of the Section 2.7 Notice, to include in such Transfer up to a pro rata portion of the Percentage Interest held by such Minority Member on the same terms and conditions ("Tag-Along Rights"). The term "pro rata portion" as used above shall be determined by multiplying (A) the Percentage Interest of such Minority Member at such time and (B) the Percentage Interest proposed by the Majority Members to be Transferred; provided, however, that each Minority Member shall in all events have the right to Transfer a portion of its Percentage Interest which bears the same proportion to such Minority Member's aggregate Percentage Interest as the Percentage Interests actually Transferred by the Majority Members bears to the aggregate Percentage Interests of the Majority Members. If necessary, the Majority Members shall reduce their Percentage Interest to be included in the Transfer to permit such pro rata participation by such Minority Members.

Section 2.8. **Exceptions to Tag-Along Rights**. The Tag-Along Rights of the Minority Members shall not pertain or apply to (a) pledges of Percentage Interests which create a mere security interest, direct or indirect, pursuant to a bona fide loan transaction, or to the acquisition (by virtue of the exercise of the security interest created by such pledge in accordance with its terms) or subsequent sale of such Percentage Interests by the pledgee, (b) any Transfer among the Majority Members and any of their Affiliates or (c) any Transfer by the Majority Members within twelve (12) months of the date of this Agreement, in one or more transactions, of up to an aggregate of 40% of the Percentage Interests held as of the date of this Agreement by each Majority Member for a purchase price equal to the amount of capital contributed to the Company by the Transferring Majority Member in respect of the Percentage Interest Transferred; provided, that in the case of Transfers described in the preceding clauses (b) and (c), the Transferee agrees to be bound by the terms of this Agreement. For the avoidance of doubt, 40% of the Percentage Interest held by the U.S. Fund as of the date of this Agreement is equal to 22.34158% (40% times 55.85394%) and 40% of the Percentage Interest held by the Offshore Fund as of the date of this Agreement is equal to 9.91648% (40% times 24.79121%).

Section 2.9 **Drag-Along Rights**. (a) If the Majority Members propose to Transfer not less than 25% of their aggregate Percentage Interests to one or more Persons who are not Affiliates of the Majority Members, the Majority Members may, at their option, require each Minority Member to sell a pro rata portion (based on its respective Percentage Interest) of the Percentage Interest of such Minority Member at such time ("Drag-Along Rights") to such Person or Persons on the same terms and conditions as the Majority Members (a "Section 2.9 Sale"). The Majority Members shall provide the Minority Members with written notice of such Section 2.9 Sale not later than the fifteen

5

NY3: 214530.09

AMC-INV 02603

(15) days prior to the proposed Transfer (the "Section 2.9 Notice"). The Section 2.9 Notice shall identify the prospective Transferee, the aggregate Percentage Interest to be Transferred by the Majority Members and the Minority Members and the price and other material terms and conditions of the Transfer; provided, that the terms and conditions, including price and the right to receive any additional direct or indirect consideration to be received by the Majority Members or any of their Affiliates in connection therewith, shall, in any event, be the same for the Minority Members as for the Majority Members and their Affiliates. The Minority Members shall be required to participate in such Transfer on such terms and conditions as are set forth in the Section 2.9 Notice and to tender all of the Percentage Interests of the Minority Members required as set forth above as set forth below. Not later than the 10th day following receipt of the Section 2.9 Notice, the Minority Members shall deliver to the Manager all documents required to be executed in connection with such Section 2.9 Sale. If the Minority Members should fail to deliver such documents to the Manager, then the Manager may execute such documents pursuant to the power of attorney granted in Section 7.1.

(b)    The Majority Members shall have a period of seventy-five (75) days after the delivery to the Minority Members of the Section 2.9 Notice to consummate the Section 2.9 Sale on the terms and conditions set forth in such Section 2.9 Notice. If the Section 2.9 Sale shall not have been consummated during such period, the Majority Members shall return to the Minority Members all documents in the possession of the Majority Members executed by such Minority Members in connection with such proposed Transfer, and all the restrictions on Transfers contained in this Agreement or otherwise applicable at such time with respect to Percentage Interests of the Members (other than the restrictions contained in the penultimate sentence of Section 2.9(a)) shall again be in effect.

(c)    Concurrently with the consummation of the Transfer of Percentage Interests of the Members pursuant to this Section 2.9, the Majority Members shall give notice thereof to the Minority Members, and shall remit upon receipt to the Minority Members the total consideration (by wire transfer of immediately available funds if such consideration is in the form of cash) for the certificates previously surrendered by the Members and Transferred pursuant hereto in proportion to their relative interest therein.

2.10  **Member Representations and Warranties**.  Each Member hereby represents with respect to itself that as of the date of this Agreement:

(i)  Such Member is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all corporate or partnership power and authority to own its properties and assets and to carry on its business as it is now being conducted. Such Member has the power to execute, deliver and perform its obligations under this Agreement and has taken all action necessary to authorize the execution, delivery and performance by it of the this Agreement. Such Member has duly executed and delivered this Agreement. This Agreement constitutes a legal, valid and binding obligation of such Member

6

AMC-INV 02604

enforceable against such Member in accordance with its terms, except as such enforceability may be limited by (a) applicable bankruptcy, insolvency, reorganization, or other laws of general application affecting enforcement of creditors' rights or (b) general principles of equity that restrict the availability of equitable remedies.

(ii)    Such Member is an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended. Such Member understands that the transferability of its Percentage Interest is limited by the terms of this Agreement and that such Member may be required to hold its Percentage Interest indefinitely. Such Member (either alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Company and is capable of bearing the economic risks of such investment. Such Member is acquiring its Percentage Interest for its own account, for investment and not with a view to the public resale or distribution thereof in violation of any securities laws.

(iii)    Such Member (A) has been furnished with or has had access to the information that it considers necessary or appropriate to make an informed investment decision with respect to its investment in the Company and that it has requested from the Company or the Manager, (B) has had an opportunity to discuss with the Manager the intended business and financial affairs of the Company and to obtain information necessary to verify any information furnished to it or to which it had access and (C) can bear the economic risk of (x) an investment in the Company indefinitely and (y) a total loss in respect of such investment.

(iv)    The execution, delivery and performance by such Member of this Agreement, do not and will not contravene any applicable law, except for such contraventions as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Member to timely perform its obligations under this Agreement. The execution, delivery and performance by such Member this Agreement (i) will not (A) violate, result in a breach of or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under any contract to which such Member is a party or by which such Member is bound or to which any of its assets is subject, or (B) result in the creation or imposition of any lien upon any of the assets of such Member, except for any such violations, breaches, defaults or liens that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Member to timely perform its obligations under this Agreement, and (ii) will not conflict with or violate any provision of the certificate of incorporation or bylaws or other organizational documents of such Member.



7

AMC-INV 02605

(v)    No consent, authorization or order of, or filing or registration with, any governmental authority or other person or entity is required to be obtained or made by such Member for the execution, delivery and performance by it of this Agreement, except where the failure to obtain such consents, authorizations or orders, or make such filings or registrations, would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Member to timely perform its obligations under this Agreement.

## ARTICLE III
## CAPITALIZATION, ALLOCATIONS AND DISTRIBUTIONS

**Section 3.1. Percentage Interests and Voting Power.** (a) For all purposes of this Agreement, the term "Percentage Interest," as applied to a particular Member or Members shall mean such Member's or Members' personal property ownership right in the Company, expressed as a percentage, which shall entitle such Member or Members to share in the profits and losses of the Company and to share in distributions made by the Company in accordance with Section 3.3 hereof.

(b)    Voting power under this Agreement shall be exercised based on the Percentage Interest of each Member.

**Section 3.2. Capital Contributions.** (a) The Members are contributing an aggregate of thirty-one million dollars ($31,000,000) to the capital of the Company concurrently with the execution of this Agreement in accordance with their respective Percentage Interests and in such amounts as are set forth in Schedule I hereto.

(b)    No Member shall be required to make any additional capital contribution to the Company. Members may make additional capital contributions to the Company with the approval of the Manager. The Percentage Interests of the Members prior to any capital contribution shall be appropriately adjusted by the Manager taking into account the value of such Percentage Interests such that the sum of the Percentage Interests of all Members after such contribution equals 100%.

**Section 3.3. Allocations and Distributions.** (a) All income, gain, loss, deduction and credit of the Company, and all distributions of cash and other assets of the Company, whether distributions of cash flow, capital or otherwise, shall be allocated to the Members in accordance with their respective Percentage Interests.

(b) Distributions shall be made from time to time in such amounts as the Manager in the Manager's sole discretion shall determine; provided, however, that the Manager shall cause the Company to promptly distribute to the Members any cash proceeds realized by the Company from its investments less any reserve for expenses and

8

AMC-INV 02606

liabilities of the Company, whether accrued or unaccrued, absolute or contingent, as the Manager in its sole discretion shall determine.

(c) From and after a Public Offering (as defined below), any Member shall have the right, upon thirty (30) days written notice to the Manager, to require the Company to distribute in kind to such Member all or part of its pro rata share (determined with regard to its Percentage Interest) of securities of AMC held by the Company. The Manager may require that as a condition to such in-kind distribution of securities of AMC, such Member shall make any necessary or desirable representations, warranties and covenants as the Manager shall determine in its sole discretion (including, without limitation, with respect to any "lock-up" arrangements entered into by the Company in connection with the Public Offering). The Manager shall adjust the Percentage Interests of the Members to reflect such in-kind distribution in such manner as the Manager shall determine in its reasonable discretion. "Public Offering" means any firmly underwritten public offering of the common stock of AMC by one or more investment banks which is sold pursuant to a registration statement filed by the Corporation pursuant to the Securities Act of 1933, as amended, and for a total offering amount of not less than $40 million (before deduction of underwriters commissions and expenses) and a per share price of at least $1.25 (as adjusted for any stock splits or similar events since the date of this Agreement).

## ARTICLE IV
## MANAGEMENT AND OPERATION

**Section 4.1. Management.** MapleWood Partners LP, a Delaware limited partnership, is hereby designated as the Manager of the Company, as such term is used in the Act. Except as otherwise provided in this Agreement, the Manager shall have full, complete, and exclusive authority to manage and control the business, affairs, and properties of the Company, to make all decisions regarding the same and to perform all other acts or activities customary or incident to the management of the Company's business. No Member shall have the power to bind the Company. The Manager shall not have any Percentage Interest nor have any right to share in the profits, losses or distributions of the Company.

**Section 4.2. Liability of Manager.** Neither the Manager nor any of its Affiliates, nor any of its or their respective officers, directors, members, managing members, partners, stockholders, agents, representatives or employees of any of the foregoing (each of the foregoing an "Indemnified Party") shall be liable to the Company or to any of the Members for any acts or omissions by such Indemnified Party or for any losses, claims, damages, expenses or liabilities (including attorneys' fees and expenses) incurred or allegedly incurred by the Company or any Member arising out of any action



9

AMC-INV 02607

or inaction of any Indemnified Party except for any action or inaction determined by a court of competent jurisdiction to have constituted breach of fiduciary duty, gross negligence, fraud or willful misconduct on the part of such Indemnified Party; provided, however, that no Member (in its capacity as such) shall be an Indemnified Party for purposes of this Section 4.2. To the extent that an Indemnified Party is found by a court of competent jurisdiction to be liable to the Company under this Section 4.2 and such determination is later reversed on appeal, such Indemnified Party shall be entitled to receive interest at the Prime Rate on any assessed damages, to the extent actually previously paid by such Indemnified Party. "Prime Rate" means the rate per annum announced from time to time by Citibank, N.A. as its prime rate of interest.

Section 4.3. **Indemnification.** The Company shall indemnify and hold harmless each Indemnified Party from and against any losses, claims, damages, expenses, or liabilities (including reasonable attorneys' fees and expenses) incurred by any Indemnified Party (collectively, "Losses") arising out of or in relation to the Company (including without limitation, activities of the Manager hereunder) and/or resulting from, investigating, preparing for or defending any action, suit or proceeding, whether civil, criminal, legislative or otherwise (or any appeal thereof), to or in which any Indemnified Party may be made a party or otherwise become involved or with which any Indemnified Party may be threatened, in each case by reason of, or in connection with, the Indemnified Party being or having been associated with, or otherwise acting on behalf of or in furtherance of what the Indemnified Party reasonably believed to be in the interests of, or rendering advice to, the Company, including, without limitation, by reason of (i) having acted as a director, officer, employee, member, managing member, partner, stockholder, agent or consultant of, or in a similar capacity with, AMC Acquisition Corp., AMC Computer Corp. or any of their Affiliates or any Indemnified Party, (ii) any action or alleged action, or omission or alleged omission by any Indemnified Party in any such capacity or (iii) the activities of the Company or any Indemnified Party in respect of AMC Acquisition Corp. or AMC Computer Corp.; provided, however, that an Indemnified Party shall not be entitled to indemnification in respect of any Losses to the extent such Indemnified Party is found by a court of competent jurisdiction to have constituted breach of fiduciary duty, gross negligence, fraud or willful misconduct on the part of such Indemnified Party. To the extent that an Indemnified Party is denied indemnification pursuant to this Section 4.3 by a court of competent jurisdiction and such determination is later reversed on appeal, such Indemnified Party shall be entitled to receive interest at the Prime Rate on any out-of-pocket Losses incurred by it.

## ARTICLE V
## BOOKS AND REPORTS

Section 5.1. **Books of Account.** (a) Appropriate books of account shall be kept at the principal office of the Company, and each Member (i) shall have access to all books, records and accounts and the right to make copies thereof, and (ii) may consult



NY3: 214530.09

10

AMC-INV 02608

with the Manager, all under such reasonable conditions and restrictions as the Manager may prescribe.

(b)    The Manager shall, in its good faith judgment, determine all items of profits and losses and distributions on the Company's books of accounts at such times and in such amounts as are required to make the financial statements provided to the Members pursuant to Section 5.2 not materially misleading under the Company's method of accounting.

**Section 5.2. <u>Reports</u>.** (a) The books and records of the Company shall be audited and certified as of the end of each fiscal year by nationally recognized independent public accountants selected by the Manager. As soon as practicable after the end of each fiscal year (and no event later than 90 days after the end of such fiscal year), the Company will cause to be mailed to each Member (i) a statement prepared by the Company setting forth such Member's capital account and the amount of such Member's allocable share of the Company's items of income, gain, loss, deduction or credit for such year, in sufficient detail to enable it to prepare its federal, state and other U.S. or foreign tax returns and (ii) an audited balance sheet, statement of income and expense and statement of cash flow of the Company for such fiscal year, all prepared on a basis which the Manager determines is consistent with federal income tax requirements and/or generally accepted accounting principles and which basis is consistently applied.

(b)    As soon as practicable after the end of each of the first three fiscal quarters in a fiscal year (and no event later than 60 days after the end of each such fiscal quarter), the Manager shall deliver to each Member a balance sheet, statement of income and expense and statement of cash flow of the Company for such fiscal quarter.

(c)    The Company shall also cause to be mailed to each Member upon request such other information as shall be required by such Member in order to enable it to file any of such Member's tax returns and will also from time to time furnish such other information as such Member may reasonably request for the purpose of enabling it to comply with any reporting or filing requirements imposed by any governmental agency or authority pursuant to any statute, rule, regulation or otherwise. As soon as practicable after the end of each fiscal year (and no event later than 90 days after the end of such fiscal year), the Company shall cause to be mailed to each Member a Schedule K-1.

**Section 5.3. <u>Tax Matters</u>.** (a) The Manager shall cause the Company's accountants to prepare all federal, state and local tax returns of the Company for each year for which such returns are required to be filed and, after approval of such returns by the Manager, shall cause such returns to be timely filed. The Manager shall determine the appropriate treatment of each item of income, gain, loss, deduction and credit of the Company and the accounting methods and conventions applicable under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of any such item or any other method or procedure related to the preparation of such tax



11

NY3 214530.09

AMC-INV 02609

returns. The Manager may cause the Company to make any and all elections permitted by such tax laws (including, without limitation, an election under Section 754 of the IRC).

(b)     In the event of an income tax audit of any tax return of the Company, the filing of any amended return or claim for refund in connection with any item of income, gain, loss, deduction or credit reflected on any tax return of the Company, or any administrative or judicial proceedings arising out of or in connection with any such audit, amended return, claim for refund or denial of such claim, (i) the "Tax Matters Partner" shall be authorized to act for the Company and all Members, and (ii) all expenses incurred by the Tax Matters Partner in connection therewith (including, without limitation, attorneys', accountants' and other experts' fees and disbursements) shall be treated as expenses of the Company. The Company and each Member hereby designate the Manager as the "Tax Matters Partner" for purposes of Section 6231(a)(7) of the Internal Revenue Code of 1986, as amended, this Section 5.3(b) and for all other purposes.

**Section 5.4. <u>Fiscal Year</u>.** The fiscal year of the Company shall end on the 31st day of December of each year.

## ARTICLE VI
## DISSOLUTION, LIQUIDATION, AND TERMINATION

**Section 6.1. <u>Dissolution</u>.** The Company shall be dissolved and its affairs shall be wound up upon the first to occur of any of the following:

(a)     the Manager delivers a written notice of dissolution to the Members;

(b)     the unanimous written consent of the Members;

(c)     sixty (60) days after the date on which the Company ceases to hold any securities of AMC Computer Corp. (or any successor entity); or

(d)     the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**Section 6.2. <u>Liquidation and Termination</u>.** On dissolution of the Company, the Manager shall act as liquidator of the Company or, if the Manager is unable to act as liquidator of the Company, then a Person selected by a Majority of the Members shall act as liquidator of the Company. The liquidator shall forthwith commence the winding up of the Company's business and the liquidation of its property. The liquidator shall have full power and authority, subject to the provisions of this Section 6.2, to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner. All

12

NY3 214530 09

AMC-INV 02610

proceeds from the sale or disposition of the property of the Company shall, to the maximum extent permitted by law, be applied as in the following order of priority:

       (a)     payments to creditors, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities (including contingent or unmatured liabilities) of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for distributions owing to Members; and

       (b)     distributions to the Members in accordance with their respective Percentage Interests.

The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator(s) shall continue to operate the Company properties with all the power and authority of the Manager hereunder. The liquidator may, in its sole discretion, distribute property in kind to the Members pursuant to clause (b) above in lieu of disposing of property of the Company for cash. In kind distributions shall be made to the maximum extent practicable, unless the Members otherwise agree, ratably to the Members in accordance with their Percentage Interests.

       **Section 6.3.  <u>No Restoration of Negative Capital Accounts</u>.** Except as required under applicable laws of the State of Delaware, or in respect of any negative balance resulting from a distribution in contravention of this Agreement, at no time shall a Member with a negative balance in its capital account have any obligation to restore such negative balance.

       **Section 6.4.  <u>Cancellation of Filings</u>.** Upon completion of the distribution of Company assets as provided in Section 6.2 hereof, the Company is terminated, and the Manager shall file a certificate of cancellation with the Secretary of State of the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

**ARTICLE VII**
**GENERAL PROVISIONS**

       **Section 7.1  <u>Power of Attorney</u>.** Each Member, by execution of this Agreement or a counterpart hereof, irrevocably constitutes and appoints the Manager, with full power of substitution, his agent and attorney-in-fact in his name, place and stead to make, execute, swear to, verify, acknowledge, amend, file, record, deliver and publish (a) any certificate of limited liability company or amendments to any certificate of limited liability company required to be filed on behalf of the Company pursuant to the Act, (b) a counterpart of any amendment to this Agreement for the purpose of substituting as a Member a permitted Transferee or Transferees of a Member or for the purpose of admitting an additional Member, (c) a counterpart of this Agreement for the purpose of filing or recording such counterpart in any jurisdiction in which the Company may own



13

AMC-INV 02611

property or transact business, (d) all certificates and other instruments necessary to qualify or continue the Company as a limited liability company in the jurisdictions where the Company may own property or transact business, (e) any other instrument which is now or which may hereafter be required by law to be filed on behalf of the Company which does not increase the obligations of any Member, (f) any instrument which may be necessary to consummate a Section 2.9 Sale and (g) any other certificates or instruments necessary, advisable or appropriate to conduct the business and affairs of the Company which do not increase the obligations of any Member. The power of attorney granted by this Section 7.1 is irrevocable and shall survive the Transfer by any Member of all or any part of his interest in the Company and, being coupled with an interest, shall survive the incapacity or other legal disability of each such Member. Any person dealing with the Company may, without further inquiry, conclusively presume and rely upon the fact that any certificate or instrument described in this Section 7.1 and executed by such agent and attorney-in-fact is authorized, valid and binding.

**Section 7.2. Notices.** Except as otherwise expressly provided in this Agreement, any notice or demand required or permitted to be given or made to or upon any party hereto pursuant to any of the provisions of this Agreement shall be deemed to have been duly given or made for all purposes if (i) in writing and delivered by overnight courier or by hand against receipt, or sent by certified or registered mail, postage prepaid, return receipt requested, or (ii) sent by telegram, telecopy, telex or other electronic means and followed by a copy delivered or sent in the manner provided in clause (i) above, to such party at the following address:

|  |  |
|---|---|
| To the Manager or the the Company at: | c/o MapleWood Holdings LLC<br>201 S. Biscayne Boulevard<br>Suite 3180<br>Miami, Florida 33131<br>Telecopier: (305) 350-6810<br>Attention: Co-Investment<br>Administration Department<br>Re: AMC Investors LLC |
| with a copy to: | Chadbourne & Parke LLP<br>30 Rockefeller Plaza<br>New York, New York 10112<br>Telecopier: (212) 541-5369<br>Attention: Dennis J. Friedman, Esq.<br>Scott A. Kislin, Esq. |
| To a Member at: | its address as set forth on Schedule I hereto |

or such other address as any party hereto may at any time, or from time to time, direct by notice given to the other party in accordance with this Section 7.2. The date of giving or

14

AMC-INV 02612

making of any such notice or demand shall be the earlier of the date of actual receipt, or three business days after such notice or demand is sent, or, if sent in accordance with clause (ii), the business day next following the day such notice or demand is actually transmitted.

Section 7.3. **Amendment.** This Agreement may be amended only by an instrument in writing executed by the Manager and by a Super-Majority of the Members; provided, however, that no such amendment shall be effective if such amendment would adversely affect the rights and/or obligations of a Member (including by amending this proviso) with respect to expenses, capital contributions, allocations of income or loss and distributions hereunder without the prior consent of such Member; provided, further, that the Manager may make amendments to this Agreement without the approval of any Member for the purpose of curing any ambiguity or correcting or supplementing any provision contained herein or in any amendment hereof which may be defective or inconsistent with any other provision contained herein or in any amendment hereof, or making any amendments in order to comply with the Act, or making such other provisions in regard to matters or questions arising under this Agreement as shall not adversely affect the rights, benefits or obligations of a Member. The Manager shall provide prompt written notice of all amendments to this Agreement.

Section 7.4. **Entire Agreement.** This Agreement constitutes the entire agreement with respect to the subject matter hereof and supersedes any and all prior and contemporaneous contracts, understandings, negotiations and agreements with respect to the Company and the subject matter hereof, whether oral or written.

Section 7.5. **Severability.** Every provision in this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 7.6. **Governing Law.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby, and that provision shall be enforced to the greatest extent permitted by law.

Section 7.7. **Assignment; Successors and Assigns.** Each Member, by execution of this Agreement or a counterpart hereof, agrees that it will not assign, sell, transfer, delegate, or otherwise dispose of, whether voluntarily or involuntarily, any right or obligation under this Agreement other than as otherwise required or expressly permitted herein. Any purported assignment, transfer, or delegation in violation of this



15

AMC-INV 02613

Section 7.7 shall be null and void. Subject to the foregoing limits on assignment and delegation, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. Except for those enumerated above, this Agreement does not create, and shall not be construed as creating, any rights or claims enforceable by any person not a party to this Agreement.

**Section 7.8  Specific Performance**. Each of the Members, by execution of this Agreement or a counterpart hereof, acknowledges and agrees that in the event of any breach of this Agreement, the non-breaching Members would be irreparably harmed and could not be made whole by monetary damages. It is accordingly agreed that the Members will waive the defense in any action for specific performance that a remedy at law would be adequate and that the Members, in addition to any other remedy to which they may be entitled at law or in equity, shall be entitled to compel specific performance of this Agreement.

NY3: 214530.09

AMC-INV 02614

IN WITNESS WHEREOF, the undersigned has duly executed this
Agreement the date first set forth above.

MAPLEWOOD EQUITY PARTNERS LP
By MapleWood Management LP, its general partner
    By MapleWood Holdings LLC, its general partner

By: _____
    Name: David Kantes
    Title:


MAPLEWOOD EQUITY PARTNERS (OFFSHORE)
LTD.

By MapleWood Management LP, its manager
    By MapleWood Holdings LLC, its general partner

By: _____
    Name: David Kantes
    Title:


MAPLEWOOD PARTNERS LP, as Manager
By MapleWood Holdings LLC, its general partner

By: _____
    Name: David Kantes
    Title:


CASITA, L.P.


By: _____
    Name:
    Title:


17

AMC-INV 02615

CHADBOURNE & PARKE @018

IN WITNESS WHEREOF, the undersigned has duly executed this Agreement the date first set forth above.

MAPLEWOOD EQUITY PARTNERS LP
By MapleWood Management LP, its general partner
    By MapleWood Holdings LLC, its general partner

By:_____
    Name: David Kantes
    Title:


MAPLEWOOD EQUITY PARTNERS (OFFSHORE) LTD.

By MapleWood Management LP, its manager
    By MapleWood Holdings LLC, its general partner

By:_____
    Name: David Kantes
    Title:


MAPLEWOOD PARTNERS LP, as Manager
By MapleWood Holdings LLC, its general partner

By:_____
    Name: David Kantes
    Title:


CASITA, L.P.

By:_____
    Name: David L. Alexander
    Title: General Partner

17

NY3: 214530.09

AMC-INV 02616

GENERAL ELECTRIC CAPITAL CORPORATION

By: _____
Name: Pieter Smit
Title:   Duly Authorized Person


EMIRATES INSURANCE COMPANY

By: _____
Name:   Abdullah M. Mazrui
Title:   Chairman.

18

AUG 18 '00 12:46

** TOTAL PAGE.01 **

AMC-INV 02617

## Schedule I

| Member | Capital Contribution | Percentage Interest |
|---|---|---|
| MapleWood Equity Partners LP<br>c/o MapleWood Management LP<br>201 S. Biscayne Blvd., Suite 3180<br>Miami, FL 33131 | $17,388,575.00 | 56.09217% |
| MapleWood Equity Partners (Offshore) Ltd.<br>c/o MapleWood Management LP<br>201 S. Biscayne Blvd., Suite 3180<br>Miami, FL 33131 | $7,611,425.00 | 24.55298% |
| Casita, L.P.<br>c/o Eagle Advisors, Inc.<br>225 Liberty Street<br>31st Floor, South Tower<br>World Financial Center<br>New York, NY 10080 | $2,500,000.00 | 8.06452% |
| General Electric Capital Corporation<br>800 Connecticut Avenue<br>Two North<br>Norwalk, CT 06854 | $2,500,000.00 | 8.06452% |
| Emirates Insurance Company<br>P.O. Box 3856<br>Abu Dhabi<br>United Arab Emirates | $1,000,000.00 | 3.22581% |
| **Total** | | **100.00000%** |



19

NY1 214530 10

AMC-INV 02618

**FIRST AMENDMENT**
**TO THE**
**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**AMC INVESTORS LLC**

This First Amendment (this "Amendment") to the Amended and Restated Limited Liability Company Agreement (the "LLC Agreement") of AMC Investors LLC (the "Company"), dated as of August 20, 2002, amends the Amended and Restated Limited Liability Company Agreement, dated as of August 25, 2000, by and among MapleWood Equity Partners LP, a Delaware limited partnership (the "U.S. Fund"), MapleWood Equity Partners (Offshore) Ltd., an exempted company organized under the laws of the Cayman Islands (together with U.S. Fund, the "Majority Members"), the members set forth on Schedule I thereto and MapleWood Partners LP, a Delaware limited partnership ("MapleWood Partners").

R E C I T A L S

WHEREAS, pursuant to the LLC Agreement, MapleWood Partners was appointed manager of the Company (the "Manager");

WHEREAS, MapleWood Partners and the Majority Members desire to amend the LLC Agreement to appoint MapleWood Management LP, a Delaware limited partnership ("MapleWood Management") as the Manager;

WHEREAS, MapleWood Management is willing to serve as the Manager; and

WHEREAS, the approval of MapleWood Partners and the Majority Members is sufficient to make this Amendment.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto hereby agree as follows:

**Section 1**    **Amendment to Section 4.1.**  Effective as of the date hereof, MapleWood Partners LP has withdrawn as Manager and MapleWood Management LP is appointed as the new Manager.  Section 4.1 of the LLC Agreement is hereby amended by replacing the phrase "MapleWood Partners LP" with "MapleWood Management LP."

**Section 2**    **Continuing Effect of the LLC Agreement.**  Except as expressly amended hereby, the provisions of the LLC Agreement are and shall remain in full force and effect in accordance with its terms.

**Section 3**    **Governing Law.**  THIS AMENDMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR CONSTRUCTION OF THIS AMENDMENT TO

AMC-INV 02619

THE LAW OF ANOTHER JURISDICTION.  If any provision of this amendment or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this amendment and the application of that provision to other persons or circumstances is not affected thereby, and that provision shall be enforced to the greatest extent permitted by law.

2

AMC-INV 02620

IN WITNESS WHEREOF, the undersigned has duly executed this amendment the date first set forth above.

MAPLEWOOD EQUITY PARTNERS LP
By MapleWood Management LP, its general partner
    By MapleWood Holdings LLC, its general partner

By: _____
    Name: Robert V. Glaser
    Title:  Managing Member


MAPLEWOOD EQUITY PARTNERS (OFFSHORE) LTD.

By MapleWood Management LP, its manager
    By MapleWood Holdings LLC, its general partner

By: _____
    Name: Robert V. Glaser
    Title:  Managing Member


MAPLEWOOD PARTNERS LP
By MapleWood Holdings LLC, its general partner

By: _____
    Name: Robert V. Glaser
    Title:  Managing Member


MAPLEWOOD MANAGEMENT LP
By MapleWood Holdings LLC, its general partner

By: _____
    Name: Robert V. Glaser
    Title:  Managing Member


80224747_3.DOC

3

AMC-INV 02621

# EXHIBIT B

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## AMC INVESTORS II LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is made and entered into as of April 16, 2001, by and among MapleWood Equity Partners LP, a Delaware limited partnership (the "U.S. Fund"), Maple Wood Equity Partners (Offshore) Ltd., an exempted company organized under the laws of the Cayman Islands (the "Offshore Fund" and, together with U.S. Fund, the "Majority Members"), such other members who are admitted or substituted as "Members" and set forth on Schedule I hereto as "Minority Members" (the "Minority Members") and MapleWood Partners LP, a Delaware limited partnership (the "Manager") pursuant to the provisions of the Delaware Limited Liability Company Act, as the same may be amended from time to time (the "Act").

WHEREAS, the Majority Members and the Minority Members are contributing capital to AMC Investors II LLC (the "Company") and, in connection therewith, desire to set forth in their entirety the terms and conditions with respect to the operation of the Company and such other matters as are more fully set forth herein.

NOW THEREFORE, in consideration of the premises, mutual promises and covenants contained in this Agreement and intending to be legally bound, the parties hereto hereby agree as follows:

## ARTICLE I
## ORGANIZATIONAL MATTERS

Section 1.1.  **Name: Formation**.  The Company has been formed as a Delaware limited liability company by the filing on April 3, 2001, of a certificate of formation (the "Certificate") in the Office of the Secretary of State of the State of Delaware under and pursuant to Section 18-201 of the Act. Darlene Tucker is hereby acknowledged as an "authorized person", within the meaning of the Act, to execute, deliver and file the Certificate on behalf of the Company. The name of the Company shall be AMC Investors II LLC, or such other name as the Manager may from time to time hereafter designate.

Section 1.2.  **Purpose and Powers**.  (a)  The purpose of the Company shall be to purchase, hold, vote and dispose of securities of AMC Computer Corp., a New York corporation ("AMC"), and any successor entity and to otherwise exercise all rights as an owner of such securities, including, without limitation, to enter into the Stockholders Agreement, dated as of August 25, 2000, by and among AMC Investors LLC, AMC and the Stockholders named therein, as the same may be amended and restated from time to time.

(b)  The Company shall possess and may exercise all of the powers and privileges granted by the Act or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

(c)      Nothing in this Agreement shall be deemed to restrict in any way the freedom of any Member (as defined below) to conduct any other businesses or activities whatsoever without any accountability to the Company or any other Member.

Section 1.3. **Principal Place of Business.** (a) The principal office of the Company shall be located at such place as the Manager may designate from time to time.

(b)      The registered office of the Company in the State of Delaware is located at 2711 Centerville Road, Wilmington, Delaware 19808. The registered agent of the Company for service of process at such address is the Corporation Service Company.

Section 1.4. **Term.** The term of the Company shall commence on the date of filing of the Certificate in the Office of the Secretary of State of the State of Delaware and shall continue until terminated in accordance with the terms of this Agreement.

## ARTICLE II
## MEMBERS; OWNERSHIP; DISPOSITION OF INTERESTS; REPRESENTATIONS

Section 2.1. **Members.** (a) There shall be a single class of membership interests expressed in terms of Percentage Interests (as defined below). The initial Percentage Interest of the Members shall be as set forth in Schedule I hereto.

(b)      "Member" means the Majority Members and Minority Members executing this Agreement and all other persons or entities admitted as additional or substituted Members pursuant to this Agreement and the Act.

Section 2.2. **Title to Company Property.** All property owned by the Company, whether real or personal, tangible or intangible, and wherever located, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property.

Section 2.3. **Disposition of Interests.** (a) A Member may only Transfer its Percentage Interest in the Company in accordance with the provisions of this Section 2.3. Any Transfer in violation of this Section 2.3 shall be null and void and without any force and effect.

(b)      A Minority Member may Transfer in whole or in part such Member's Percentage Interest only with the consent of the Manager in its sole and absolute discretion; provided, however, that in the case of a Transfer by a Minority Member to an Affiliate of such Minority Member, such consent of the Manager shall not be unreasonably withheld. In connection with any such Transfer, such Transferee must agree in writing, in form and substance satisfactory to the Manager, to be bound by the terms of this Agreement and become a "Minority Member" hereunder and, in the case of a Transfer to an Affiliate of a Minority Member, such Affiliate must further agree to Transfer all of the Percentage Interest so Transferred back to the Transferring Minority Member immediately prior to such Affiliate ceasing to be an Affiliate of the Transferring Minority Member. A Majority Member may Transfer in whole or in part its Percentage Interest to an Affiliate of such Majority Member, provided that such Transferee

2

agrees in writing to be bound by the terms of this Agreement and become a "Majority Member" hereunder and agrees to Transfer such Percentage Interest back to the Transferring Majority Member in the event that such Affiliate ceases to be an Affiliate of the Transferring Majority Member. Subject to the Tag-Along Rights provided for in Section 2.7, a Majority Member may also Transfer in whole or in part its Percentage Interest to a Person who is not an Affiliate of such Majority Member. Any Transfer not in compliance with this Section 2.3 shall be void and of no effect and shall be disregarded by the Company.

(c)     As used in this Agreement,

(i)     "Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity,

(ii)     "Transfer" means, with respect Percentage Interests, to sell, assign, transfer or otherwise dispose of, place or permit any encumbrance or other restriction upon, or grant any right (voting or otherwise) or interest in, any of such Percentage Interests, whether voluntarily, involuntarily, by operation of law or otherwise. Transferee and Transferring shall have correlative meanings,

(iii)     "Affiliate" means, with respect to any Person, any Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such first Person specified. For purposes of the definition of "Affiliate", "control" of a Person will mean (i) the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise or (ii) the beneficial ownership, directly or indirectly, of 50.1% or more of the equity interests in such Person.

**Section 2.4.  Additional Members.**  One or more additional Members may be admitted to the Company without the Transfer by an existing Member of all or any part of his Percentage Interest by the issuance of additional Percentage Interests with the consent of the Manager and of Members representing an aggregate of more than 50% of the Percentage Interests (a "Majority of the Members"), and upon such terms as are set for such new Percentage Interests by the Manager. Upon the issuance of additional Percentage Interests in accordance with this Section 2.4, the Percentage Interests of the Members admitted prior to such issuance shall be adjusted by the Manager in its sole discretion such that the sum of the Percentage Interests of all Members equals 100%.

**Section 2.5.  Liability to Third Parties.**  No Member shall have any personal liability for any obligation of the Company, whether such obligations arise in contract, tort or otherwise.

**Section 2.6.  Withdrawal.**  A Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company except with the consent of the Manager and Members representing an aggregate of at least 66 2/3% of the Percentage Interests (a "Super-Majority of the Members"). Under no circumstances shall a Member be entitled to receive the fair value of such Member's Percentage Interest in the Company (or any portion thereof) prior to the dissolution and winding up of the Company without the consent of the Manager and a Super-Majority of the Members.

3

Section 2.7. **Tag-Along Rights**. Subject to Section 2.8 below, no later than thirty (30) days prior to the proposed date of consummation of a Transfer by the Majority Members or their Affiliates of more than 5% of their aggregate Percentage Interests to a Person who is not an Affiliate of a Majority Member, the Majority Members shall provide the Minority Members with written notice of the proposed Transfer, including the name of the Person to whom or which it wishes to make such Transfer, the amount of their Percentage Interest proposed to be Transferred, and the price and other material terms and conditions of the proposed Transfer (a "Section 2.7 Notice"). Each Minority Member shall then have the right by notice given no later than ten (10) business days following receipt of the Section 2.7 Notice, to include in such Transfer up to a pro rata portion of the Percentage Interest held by such Minority Member on the same terms and conditions ("Tag-Along Rights"). The term "pro rata portion" as used above shall be determined by multiplying (A) the Percentage Interest of such Minority Member at such time and (B) the Percentage Interest proposed by the Majority Members to be Transferred; provided, however, that each Minority Member shall in all events have the right to Transfer a portion of its Percentage Interest which bears the same proportion to such Minority Member's aggregate Percentage Interest as the Percentage Interests actually Transferred by the Majority Members bears to the aggregate Percentage Interests of the Majority Members. If necessary, the Majority Members shall reduce their Percentage Interest to be included in the Transfer to permit such pro rata participation by such Minority Members.

Section 2.8. **Exceptions to Tag-Along Rights**. The Tag-Along Rights of the Minority Members shall not pertain or apply to (a) pledges of Percentage Interests which create a mere security interest, direct or indirect, pursuant to a bona fide loan transaction, or to the acquisition (by virtue of the exercise of the security interest created by such pledge in accordance with its terms) or subsequent sale of such Percentage Interests by the pledgee, (b) any Transfer among the Majority Members and any of their Affiliates or (c) any Transfer by the Majority Members within twelve (12) months of the date of this Agreement, in one or more transactions, of up to an aggregate of 40% of the Percentage Interests held as of the date of this Agreement by each Majority Member for a purchase price equal to the amount of capital contributed to the Company by the Transferring Majority Member in respect of the Percentage Interest Transferred; provided, that in the case of Transfers described in the preceding clauses (b) and (c), the Transferee agrees to be bound by the terms of this Agreement.

Section 2.9 **Drag-Along Rights**. (a) If the Majority Members propose to Transfer not less than 25% of their aggregate Percentage Interests to one or more Persons who are not Affiliates of the Majority Members, the Majority Members may, at their option, require each Minority Member to sell a pro rata portion (based on its respective Percentage Interest) of the Percentage Interest of such Minority Member at such time ("Drag-Along Rights") to such Person or Persons on the same terms and conditions as the Majority Members (a "Section 2.9 Sale"). The Majority Members shall provide the Minority Members with written notice of such Section 2.9 Sale not later than the fifteen (15) days prior to the proposed Transfer (the "Section 2.9 Notice"). The Section 2.9 Notice shall identify the prospective Transferee, the aggregate Percentage Interest to be Transferred by the Majority Members and the Minority Members and the price and other material terms and conditions of the Transfer; provided, that the terms and conditions, including price and the right to receive any additional direct or indirect consideration to be received by the Majority Members or any of their Affiliates in connection therewith, shall, in any event, be the same for the Minority Members as for the Majority

4

Members and their Affiliates. The Minority Members shall be required to participate in such Transfer on such terms and conditions as are set forth in the Section 2.9 Notice and to tender all of the Percentage Interests of the Minority Members required as set forth above as set forth below. Not later than the 10th day following receipt of the Section 2.9 Notice, the Minority Members shall deliver to the Manager all documents required to be executed in connection with such Section 2.9 Sale. If the Minority Members should fail to deliver such documents to the Manager, then the Manager may execute such documents pursuant to the power of attorney granted in Section 7.1 hereof.

(b)    The Majority Members shall have a period of seventy-five (75) days after the delivery to the Minority Members of the Section 2.9 Notice to consummate the Section 2.9 Sale on the terms and conditions set forth in such Section 2.9 Notice. If the Section 2.9 Sale shall not have been consummated during such period, the Majority Members shall return to the Minority Members all documents in the possession of the Majority Members executed by such Minority Members in connection with such proposed Transfer, and all the restrictions on Transfers contained in this Agreement or otherwise applicable at such time with respect to Percentage Interests of the Members (other than the restrictions contained in the penultimate sentence of Section 2.9(a)) shall again be in effect.

(c)    Concurrently with the consummation of the Transfer of Percentage Interests of the Members pursuant to this Section 2.9, the Majority Members shall give notice thereof to the Minority Members, and shall remit upon receipt to the Minority Members the total consideration (by wire transfer of immediately available funds if such consideration is in the form of cash) for the certificates previously surrendered by the Members and Transferred pursuant hereto in proportion to their relative interest therein.

**2.10. Member Representations and Warranties.** Each Member hereby represents with respect to itself that as of the date of this Agreement:

(i)    Such Member is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all corporate or partnership power and authority to own its properties and assets and to carry on its business as it is now being conducted. Such Member has the power to execute, deliver and perform its obligations under this Agreement and has taken all action necessary to authorize the execution, delivery and performance by it of this Agreement. Such Member has duly executed and delivered this Agreement. This Agreement constitutes a legal, valid and binding obligation of such Member enforceable against such Member in accordance with its terms, except as such enforceability may be limited by (a) applicable bankruptcy, insolvency, reorganization, or other laws of general application affecting enforcement of creditors' rights or (b) general principles of equity that restrict the availability of equitable remedies.

(ii)    Such Member is an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended. Such Member understands that the transferability of its Percentage Interest is limited by the terms of this Agreement and that such Member may be required to hold its Percentage Interest indefinitely. Such Member (either alone or together with its advisors) has sufficient

5

knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Company and is capable of bearing the economic risks of such investment. Such Member is acquiring its Percentage Interest for its own account, for investment and not with a view to the public resale or distribution thereof in violation of any securities laws.

(iii)    Such Member (A) has been furnished with or has had access to the information that it considers necessary or appropriate to make an informed investment decision with respect to its investment in the Company and that it has requested from the Company or the Manager, (B) has had an opportunity to discuss with the Manager the intended business and financial affairs of the Company and to obtain information necessary to verify any information furnished to it or to which it had access and (C) can bear the economic risk of (x) an investment in the Company indefinitely and (y) a total loss in respect of such investment.

(iv)    The execution, delivery and performance by such Member of this Agreement, do not and will not contravene any applicable law, except for such contraventions as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Member to timely perform its obligations under this Agreement. The execution, delivery and performance by such Member of this Agreement (i) will not (A) violate, result in a breach of or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under any contract to which such Member is a party or by which such Member is bound or to which any of its assets is subject, or (B) result in the creation or imposition of any lien upon any of the assets of such Member, except for any such violations, breaches, defaults or liens that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Member to timely perform its obligations under this Agreement, and (ii) will not conflict with or violate any provision of the certificate of incorporation or bylaws or other organizational documents of such Member.

(v)    No consent, authorization or order of, or filing or registration with, any governmental authority or other person or entity is required to be obtained or made by such Member for the execution, delivery and performance by it of this Agreement, except where the failure to obtain such consents, authorizations or orders, or make such filings or registrations, would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Member to timely perform its obligations under this Agreement.

## ARTICLE III
## CAPITALIZATION, ALLOCATIONS AND DISTRIBUTIONS

**Section 3.1. Percentage Interests and Voting Power.** (a) For all purposes of this Agreement, the term "Percentage Interest," as applied to a particular Member or Members shall mean such Member's or Members' personal property ownership right in the Company, expressed as a percentage, which shall entitle such Member or Members to share in the profits and losses of

6

the Company and to share in distributions made by the Company in accordance with Section 3.3 hereof.

(b)     Voting power under this Agreement shall be exercised based on the Percentage Interest of each Member.

**Section 3.2.  Capital Contributions.** (a) As of the date of this Agreement, the Members have contributed or are contributing an aggregate of $3,434,600 to the capital of the Company prior to or concurrently with the execution of this Agreement in accordance with their respective Percentage Interests and in such amounts as are set forth in Schedule I hereto.

(b)     No Member shall be required to make any additional capital contribution to the Company.  Members may make additional capital contributions to the Company with the approval of the Manager.  The Percentage Interests of the Members prior to any capital contribution shall be appropriately adjusted by the Manager taking into account the value of such Percentage Interests such that the sum of the Percentage Interests of all Members after such contribution equals 100%.

**Section 3.3.  Allocations and Distributions.** (a) All income, gain, loss, deduction and credit of the Company, and all distributions of cash and other assets of the Company, whether distributions of cash flow, capital or otherwise, shall be allocated to the Members in accordance with their respective Percentage Interests.

(b)     Distributions shall be made from time to time in such amounts as the Manager in the Manager's sole discretion shall determine; provided, however, that the Manager shall cause the Company to promptly distribute to the Members any cash proceeds realized by the Company from its investments less any reserve for expenses and liabilities of the Company, whether accrued or unaccrued, absolute or contingent, as the Manager in its sole discretion shall determine.

(c)     From and after a Public Offering (as defined below), any Member shall have the right, upon thirty (30) days written notice to the Manager, to require the Company to distribute in kind to such Member all or part of its pro rata share (determined with regard to its Percentage Interest) of securities of AMC held by the Company.  The Manager may require that as a condition to such in-kind distribution of securities of AMC, such Member shall make any necessary or desirable representations, warranties and covenants as the Manager shall determine in its sole discretion (including, without limitation, with respect to any "lock-up" arrangements entered into by the Company in connection with the Public Offering).  The Manager shall adjust the Percentage Interests of the Members to reflect such in-kind distribution in such manner as the Manager shall determine in its reasonable discretion.  "Public Offering" means any firmly underwritten public offering of the common stock of AMC by one or more investment banks which is sold pursuant to a registration statement filed by the Corporation pursuant to the Securities Act of 1933, as amended, and for a total offering amount of not less than $40 million (before deduction of underwriters commissions and expenses) and a per share price of at least $1.25 (as adjusted for any stock splits or similar events since the date of this Agreement).

7

# ARTICLE IV
## MANAGEMENT AND OPERATION

**Section 4.1. Management.** MapleWood Partners LP, a Delaware limited partnership, is hereby designated as the Manager of the Company, as such term is used in the Act. Except as otherwise provided in this Agreement, the Manager shall have full, complete, and exclusive authority to manage and control the business, affairs, and properties of the Company, to make all decisions regarding the same and to perform all other acts or activities customary or incident to the management of the Company's business. No Member shall have the power to bind the Company. The Manager shall not have any Percentage Interest nor have any right to share in the profits, losses or distributions of the Company.

**Section 4.2. Liability of Manager.** Neither the Manager nor any of its Affiliates, nor any of its or their respective officers, directors, members, managing members, partners, stockholders, agents, representatives or employees of any of the foregoing (each of the foregoing an "Indemnified Party") shall be liable to the Company or to any of the Members for any acts or omissions by such Indemnified Party or for any losses, claims, damages, expenses or liabilities (including attorneys' fees and expenses) incurred or allegedly incurred by the Company or any Member arising out of any action or inaction of any Indemnified Party except for any action or inaction determined by a court of competent jurisdiction to have constituted breach of fiduciary duty, gross negligence, fraud or willful misconduct on the part of such Indemnified Party; provided, however, that no Member (in its capacity as such) shall be an Indemnified Party for purposes of this Section 4.2. To the extent that an Indemnified Party is found by a court of competent jurisdiction to be liable to the Company under this Section 4.2 and such determination is later reversed on appeal, such Indemnified Party shall be entitled to receive interest at the Prime Rate on any assessed damages, to the extent actually previously paid by such Indemnified Party. "Prime Rate" means the rate per annum announced from time to time by Citibank, N.A. as its prime rate of interest.

**Section 4.3. Indemnification.** The Company shall indemnify and hold harmless each Indemnified Party from and against any losses, claims, damages, expenses, or liabilities (including reasonable attorneys' fees and expenses) incurred by any Indemnified Party (collectively, "Losses") arising out of or in relation to the Company (including without limitation, activities of the Manager hereunder) and/or resulting from, investigating, preparing for or defending any action, suit or proceeding, whether civil, criminal, legislative or otherwise (or any appeal thereof), to or in which any Indemnified Party may be made a party or otherwise become involved or with which any Indemnified Party may be threatened, in each case by reason of, or in connection with, the Indemnified Party being or having been associated with, or otherwise acting on behalf of or in furtherance of what the Indemnified Party reasonably believed to be in the interests of, or rendering advice to, the Company, including, without limitation, by reason of (i) having acted as a director, officer, employee, member, managing member, partner, stockholder, agent or consultant of, or in a similar capacity with, AMC Acquisition Corp., AMC Computer Corp. or any of their Affiliates or any Indemnified Party, (ii) any action or alleged action, or omission or alleged omission by any Indemnified Party in any such capacity or (iii) the activities of the Company or any Indemnified Party in respect of AMC Acquisition Corp. or AMC Computer Corp.; provided, however, that an Indemnified Party shall not be entitled to indemnification in respect of any Losses to the extent such Indemnified Party is

8

found by a court of competent jurisdiction to have constituted breach of fiduciary duty, gross negligence, fraud or willful misconduct on the part of such Indemnified Party. To the extent that an Indemnified Party is denied indemnification pursuant to this Section 4.3 by a court of competent jurisdiction and such determination is later reversed on appeal, such Indemnified Party shall be entitled to receive interest at the Prime Rate on any out-of-pocket Losses incurred by it.

## ARTICLE V
## BOOKS AND REPORTS

**Section 5.1.** **Books of Account.** (a) Appropriate books of account shall be kept at the principal office of the Company, and each Member (i) shall have access to all books, records and accounts and the right to make copies thereof, and (ii) may consult with the Manager, all under such reasonable conditions and restrictions as the Manager may prescribe.

(b)    The Manager shall, in its good faith judgment, determine all items of profits and losses and distributions on the Company's books of accounts at such times and in such amounts as are required to make the financial statements provided to the Members pursuant to Section 5.2 not materially misleading under the Company's method of accounting.

**Section 5.2.** **Reports.** (a) The books and records of the Company shall be audited and certified as of the end of each fiscal year by nationally recognized independent public accountants selected by the Manager. As soon as practicable after the end of each fiscal year (and no event later than 90 days after the end of such fiscal year), the Company will cause to be mailed to each Member (i) a statement prepared by the Company setting forth such Member's capital account and the amount of such Member's allocable share of the Company's items of income, gain, loss, deduction or credit for such year, in sufficient detail to enable it to prepare its federal, state and other U.S. or foreign tax returns and (ii) an audited balance sheet, statement of income and expense and statement of cash flow of the Company for such fiscal year, all prepared on a basis which the Manager determines is consistent with federal income tax requirements and/or generally accepted accounting principles and which basis is consistently applied.

(b)    As soon as practicable after the end of each of the first three fiscal quarters in a fiscal year (and no event later than 60 days after the end of each such fiscal quarter), the Manager shall deliver to each Member a balance sheet, statement of income and expense and statement of cash flow of the Company for such fiscal quarter.

(c)    The Company shall also cause to be mailed to each Member upon request such other information as shall be required by such Member in order to enable it to file any of such Member's tax returns and will also from time to time furnish such other information as such Member may reasonably request for the purpose of enabling it to comply with any reporting or filing requirements imposed by any governmental agency or authority pursuant to any statute, rule, regulation or otherwise. As soon as practicable after the end of each fiscal year (and no event later than 90 days after the end of such fiscal year), the Company shall cause to be mailed to each Member a Schedule K-1.

9

Section 5.3. **Tax Matters.** (a) The Manager shall cause the Company's accountants to prepare all federal, state and local tax returns of the Company for each year for which such returns are required to be filed and, after approval of such returns by the Manager, shall cause such returns to be timely filed. The Manager shall determine the appropriate treatment of each item of income, gain, loss, deduction and credit of the Company and the accounting methods and conventions applicable under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of any such item or any other method or procedure related to the preparation of such tax returns. The Manager may cause the Company to make any and all elections permitted by such tax laws (including, without limitation, an election under Section 754 of the Internal Revenue Code of 1986, as amended).

(b) In the event of an income tax audit of any tax return of the Company, the filing of any amended return or claim for refund in connection with any item of income, gain, loss, deduction or credit reflected on any tax return of the Company, or any administrative or judicial proceedings arising out of or in connection with any such audit, amended return, claim for refund or denial of such claim, (i) the "Tax Matters Partner" shall be authorized to act for the Company and all Members, and (ii) all expenses incurred by the Tax Matters Partner in connection therewith (including, without limitation, attorneys', accountants' and other experts' fees and disbursements) shall be treated as expenses of the Company. The Company and each Member hereby designate the Manager as the "Tax Matters Partner" for purposes of Section 6231(a)(7) of the Internal Revenue Code of 1986, as amended, this Section 5.3(b) and for all other purposes.

Section 5.4. **Fiscal Year.** The fiscal year of the Company shall end on the 31st day of December of each year.

# ARTICLE VI
## DISSOLUTION, LIQUIDATION, AND TERMINATION

Section 6.1. **Dissolution.** The Company shall be dissolved and its affairs shall be wound up upon the first to occur of any of the following:

(a) the Manager delivers a written notice of dissolution to the Members;

(b) the unanimous written consent of the Members;

(c) sixty (60) days after the date on which the Company ceases to hold any securities of AMC Computer Corp. (or any successor entity); or

(d) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

Section 6.2. **Liquidation and Termination.** On dissolution of the Company, the Manager shall act as liquidator of the Company or, if the Manager is unable to act as liquidator of the Company, then a Person selected by a Majority of the Members shall act as liquidator of the Company. The liquidator shall forthwith commence the winding up of the Company's business and the liquidation of its property. The liquidator shall have full power and authority, subject to the provisions of this Section 6.2, to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and

10

businesslike manner. All proceeds from the sale or disposition of the property of the Company shall, to the maximum extent permitted by law, be applied as in the following order of priority:

(a) payments to creditors, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities (including contingent or unmatured liabilities) of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for distributions owing to Members; and

(b) distributions to the Members in accordance with their respective Percentage Interests.

The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator(s) shall continue to operate the Company properties with all the power and authority of the Manager hereunder. The liquidator may, in its sole discretion, distribute property in kind to the Members pursuant to clause (b) above in lieu of disposing of property of the Company for cash. In kind distributions shall be made to the maximum extent practicable, unless the Members otherwise agree, ratably to the Members in accordance with their Percentage Interests.

Section 6.3. **No Restoration of Negative Capital Accounts.** Except as required under applicable laws of the State of Delaware, or in respect of any negative balance resulting from a distribution in contravention of this Agreement, at no time shall a Member with a negative balance in its capital account have any obligation to restore such negative balance.

Section 6.4. **Cancellation of Filings.** Upon completion of the distribution of Company assets as provided in Section 6.2 hereof, the Company is terminated, and the Manager shall file a certificate of cancellation with the Secretary of State of the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

# ARTICLE VII
# GENERAL PROVISIONS

Section 7.1 **Power of Attorney.** Each Member, by execution of this Agreement or a counterpart hereof, irrevocably constitutes and appoints the Manager, with full power of substitution, his agent and attorney-in-fact in his name, place and stead to make, execute, swear to, verify, acknowledge, amend, file, record, deliver and publish (a) any certificate of limited liability company or amendments to any certificate of limited liability company required to be filed on behalf of the Company pursuant to the Act, (b) a counterpart of any amendment to this Agreement for the purpose of substituting as a Member a permitted Transferee or Transferees of a Member or for the purpose of admitting an additional Member, (c) a counterpart of this Agreement for the purpose of filing or recording such counterpart in any jurisdiction in which the Company may own property or transact business, (d) all certificates and other instruments necessary to qualify or continue the Company as a limited liability company in the jurisdictions where the Company may own property or transact business, (e) any other instrument which is now or which may hereafter be required by law to be filed on behalf of the Company which does not increase the obligations of any Member, (f) any instrument which may be necessary to consummate a Section 2.9 Sale and (g) any other certificates or instruments necessary, advisable or appropriate to conduct the business and affairs of the Company which do not increase the

11

obligations of any Member. The power of attorney granted by this Section 7.1 is irrevocable and shall survive the Transfer by any Member of all or any part of his interest in the Company and, being coupled with an interest, shall survive the incapacity or other legal disability of each such Member. Any person dealing with the Company may, without further inquiry, conclusively presume and rely upon the fact that any certificate or instrument described in this Section 7.1 and executed by such agent and attorney-in-fact is authorized, valid and binding.

Section 7.2. **Notices.** Except as otherwise expressly provided in this Agreement, any notice or demand required or permitted to be given or made to or upon any party hereto pursuant to any of the provisions of this Agreement shall be deemed to have been duly given or made for all purposes if (i) in writing and delivered by overnight courier or by hand against receipt, or sent by certified or registered mail, postage prepaid, return receipt requested, or (ii) sent by telegram, telecopy, telex or other electronic means and followed by a copy delivered or sent in the manner provided in clause (i) above, to such party at the following address:

<table>
<tr><td>To the Manager or the Company at:</td><td>c/o MapleWood Holdings LLC<br>255 Aragon Avenue<br>Suite 300<br>Coral Gables, Florida 33131<br>Telecopier: (305) 350-6810<br>Attention:   Co-Investment<br>               Administration Department<br>Re:  AMC Investors II LLC</td></tr>
<tr><td></td><td>With a copy to:<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166-0193<br>Telecopier: (212) 351-4035<br>Attention:  Scott A. Kislin, Esq.</td></tr>
<tr><td>To a Member at:</td><td>its address as set forth on Schedule I hereto</td></tr>
</table>

or such other address as any party hereto may at any time, or from time to time, direct by notice given to the other party in accordance with this Section 7.2. The date of giving or making of any such notice or demand shall be the earlier of the date of actual receipt, or three business days after such notice or demand is sent, or, if sent in accordance with clause (ii), the business day next following the day such notice or demand is actually transmitted.

Section 7.3. **Amendment.** This Agreement may be amended only by an instrument in writing executed by the Manager and by a Super-Majority of the Members; provided, however, that no such amendment shall be effective if such amendment would adversely affect the rights and/or obligations of a Member (including by amending this proviso) with respect to expenses, capital contributions, allocations of income or loss and distributions hereunder without the prior consent of such Member; provided, further, that the Manager may make amendments to this Agreement without the approval of any Member for the purpose of curing any ambiguity or

12

correcting or supplementing any provision contained herein or in any amendment hereof which may be defective or inconsistent with any other provision contained herein or in any amendment hereof, or making any amendments in order to comply with the Act, or adding Minority Members to Schedule I hereto, or making such other provisions in regard to matters or questions arising under this Agreement as shall not adversely affect the rights, benefits or obligations of a Member. The Manager shall provide prompt written notice of all amendments to this Agreement.

Section 7.4. **Entire Agreement.** This Agreement constitutes the entire agreement with respect to the subject matter hereof and supersedes any and all prior and contemporaneous contracts, understandings, negotiations and agreements with respect to the Company and the subject matter hereof, whether oral or written.

Section 7.5. **Severability.** Every provision in this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

Section 7.6. **Governing Law.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other persons or circumstances is not affected thereby, and that provision shall be enforced to the greatest extent permitted by law.

Section 7.7. **Assignment; Successors and Assigns.** Each Member, by execution of this Agreement or a counterpart hereof, agrees that it will not assign, sell, transfer, delegate, or otherwise dispose of, whether voluntarily or involuntarily, any right or obligation under this Agreement other than as otherwise required or expressly permitted herein. Any purported assignment, transfer, or delegation in violation of this Section 7.7 shall be null and void. Subject to the foregoing limits on assignment and delegation, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. Except for those enumerated above, this Agreement does not create, and shall not be construed as creating, any rights or claims enforceable by any person not a party to this Agreement.

Section 7.8. **Specific Performance.** Each of the Members, by execution of this Agreement or a counterpart hereof, acknowledges and agrees that in the event of any breach of this Agreement, the non-breaching Members would be irreparably harmed and could not be made whole by monetary damages. It is accordingly agreed that the Members will waive the defense in any action for specific performance that a remedy at law would be adequate and that the Members, in addition to any other remedy to which they may be entitled at law or in equity, shall be entitled to compel specific performance of this Agreement.

13

IN WITNESS WHEREOF, the undersigned has duly executed this Agreement as of the date first set forth above.

MAPLEWOOD EQUITY PARTNERS LP
By MapleWood Management LP, its general partner
    By MapleWood Holdings LLC, its general partner

By: _____
Name: Robert J. Reale
Title: Member

MAPLEWOOD EQUITY PARTNERS (OFFSHORE) LTD.
By MapleWood Management LP, its manager
    By MapleWood Holdings LLC, its general partner

By: _____
Name: Robert J. Reale
Title: Member

MAPLEWOOD PARTNERS LP, as Manager
By MapleWood Holdings LLC, its general partner

By: _____
Name: Robert J. Reale
Title: Member

14

## Schedule I

### Majority Members

| Name | Capital Contribution | Percentage Interest |
|---|---|---|
| MapleWood Equity Partners LP<br>c/o MapleWood Management LP<br>255 Aragon Avenue, Suite 300<br>Coral Gables, Florida 33131 | $2,396,554 | 69.77680% |
| MapleWood Equity Partners<br>(Offshore) Ltd.<br>c/o MapleWood Management LP<br>255 Aragon Avenue, Suite 300<br>Coral Gables, Florida 33131 | $1,038,046 | 30.22320% |
| Total | $3,434,600 | 100.00000% |

### Minority Members

There are no Minority Members.

80172127_3.DOC