# Exhibit A

Private Placement Memorandum

Confidential

# MAPLEWOOD EQUITY PARTNERS LP

## $300,000,000

## Limited Partnership Interests

This Private Placement Memorandum (the "Memorandum") is being furnished on a confidential basis to a limited number of sophisticated investors for the purpose of providing information about an investment in limited partnership interests ("Limited Partnership Interests") in MapleWood Equity Partners LP, a Delaware limited partnership (the "Fund"). By accepting this Memorandum, the recipient agrees to treat this information confidentially and not, directly or indirectly, to duplicate or disclose any portion of the information contained herein to any person who is not directly concerned with the recipient's investment decision without the prior written consent of MapleWood Management LP, the general partner of the Fund (the "General Partner").

It is contemplated that there will be two investment funds established by the General Partner with an aggregate target size of $300 million: (i) the Fund, a Delaware limited partnership to be established for U.S. investors and (ii) MapleWood Equity Partners (Offshore) Ltd., a Cayman Islands exempted company to be established for non-U.S. investors (the "Offshore Fund"). This Memorandum describes only the Fund.

The Limited Partnership Interests have not been registered with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended, for sale or resale, or with any agency of any state or other jurisdiction, nor is such registration contemplated. Neither the Commission nor any state securities commissioner or official of any state or other jurisdiction has passed on the accuracy or adequacy of this Memorandum or endorsed the merits of this offering. Any representation to the contrary is a criminal offense. There will be no public market for the Limited Partnership Interests, and the Limited Partnership Interests may not be sold or transferred except under limited circumstances as permitted under the limited partnership agreement of the Fund (the "Partnership Agreement"). Investors should be aware that they may be required to bear the financial risks of investment for an indefinite period of time and that no assurance can be given that the investment objectives described herein will be achieved or that investors will receive a return of their capital.

This Memorandum does not constitute an offer to sell or the solicitation of an offer to buy in any state or jurisdiction to any person to whom it is unlawful to make such offer or solicitation. No offering literature or advertising in any form shall be employed in the offering of the Limited Partnership Interests except this Memorandum. No person has been authorized in connection with this offering to make any representation or give any information with respect to the Limited Partnership Interests, except the information contained herein, and, if made or given, such representation or information must not be relied upon as having been authorized by the Fund, the General Partner, Salomon Smith Barney or any affiliate thereof. The delivery of this Memorandum does not imply that the information herein is correct as of any time subsequent to the date of this Memorandum. Salomon Smith Barney has not independently verified the information contained herein and makes no representation or warranty, express or implied, as to the accuracy or completeness of the information contained herein. Nothing contained herein is, or shall be relied on as, a promise or representation as to the future performance of the Fund.

In making an investment decision, investors must rely on their own examination of the Fund, including the merits and risks involved. Prospective investors are urged to consult with their own legal, tax, investment and accounting advisors with respect to the consequences of an investment in the Fund. In the event that any portion of this Memorandum is inconsistent with or contrary to any of the terms of the Partnership Agreement or the Subscription Agreement for the Fund, such Partnership Agreement or Subscription Agreement shall control.

An investment in the Limited Partnership Interests involves significant risks.  See "Certain Investment Considerations."

Each prospective investor is encouraged to meet with representatives of the Fund to discuss the terms and conditions attendant to an investment in the Fund and to verify the information contained herein.

Investors may direct questions regarding the information set forth herein to:

*General Partner:*
**MapleWood Management LP**
**201 S. Biscayne Boulevard, Suite 3180**
**Miami, Florida 33131**
**(305) 350-6800**

*Placement Agent:*
**Salomon Smith Barney**
**Private Funding Group**
**388 Greenwich Street**
**New York, NY 10013**
**(212) 816-3600**

June 1998

# MAPLEWOOD EQUITY PARTNERS LP

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Executive Summary | 1 |
| II. | Investment Highlights | 5 |
| III. | Investment Performance | 9 |
| IV. | Summary of Selected Principal Terms | 13 |
| V. | MapleWood Equity Partners LP | 23 |
| | A. Investment Strategy | 23 |
| | B. Transaction Sourcing | 27 |
| | C. Investment Criteria | 30 |
| | D. Transaction Process | 31 |
| | E. Fund Management | 33 |
| | F. Executive Advisory Board | 40 |
| VI. | Description of Prior Transactions | 45 |
| VII. | Certain Investment Considerations | 59 |
| VIII. | Certain Legal and Regulatory Matters | 63 |
| | Appendix A - Opinion of Deloitte & Touche LLP | |

[This page intentionally left blank]

# MAPLEWOOD EQUITY PARTNERS LP

## I. EXECUTIVE SUMMARY

MapleWood Equity Partners LP (the "Fund"), based in Miami, Florida, is being established by a group of principals (collectively, the "Principals") led by Robert V. Glaser, a former member of the original management team of Investcorp S.A. ("Investcorp"), an investment firm that is recognized as a leader in identifying companies with significant potential for revenue and profitability enhancement. The Principals include executives with significant investment, financial, and operating experience. The general partner of the Fund is MapleWood Management LP (the "General Partner") and the advisor for the Fund is MapleWood Partners LP ("MapleWood" or the "Advisor").

The Fund, together with MapleWood Equity Partners (Offshore) Ltd., an investment fund being organized by the General Partner for off-shore investors (the "Offshore Fund"), is seeking capital commitments of $300 million. The Fund will seek to achieve an internal rate of return ("IRR") in excess of 30% net to the limited partners in the Fund (the "Limited Partners").

The Fund plans to invest primarily in middle-market companies based in the United States with annual revenues between $25 million and $250 million. The General Partner intends to be a long-term investor in this market segment, does not intend to undertake larger transactions and believes that the Fund's focus on middle-market companies with significant growth potential will provide opportunities for exceptional returns to investors. The Fund will target companies that meet some or all of the following objectives:

- The Fund will focus on acquiring middle-market companies throughout the United States with annual revenues between $25 million and $250 million. There are approximately 60,600 companies in the U.S. in this revenue range, but only 6,400 companies with revenues between $250 million and $1 billion and 2,500 companies with revenues exceeding $1 billion.

- The Fund can invest throughout the United States; however, due to its location, contacts, and deal flow marketing program, the General Partner expects to have a comparative advantage in acquiring companies in the Southeastern United States. 21% of companies in the Fund's target size range are based in the Southeast while only 4.6% of competing buyout firms are based there.

- The Fund will seek control or influential minority positions in middle-market companies in industries where the General Partner has principal investing or operating experience, or unique access. These industries include consumer products, manufacturing, retailing and distribution.

- The Fund will be a growth-oriented investor, targeting companies with the potential to significantly expand revenues and profits within a five-year time frame.

- The Fund will consider U.S. investments where growth can be enhanced via international trade or expansion, particularly with Latin America. No more than 20% of the Fund's capital can be invested internationally. It is expected that these investments, if any, would be primarily in Latin America.

The General Partner has an experienced management team. Mr. Glaser was involved in the start-up phase of Investcorp and was a member of its worldwide management committee, the governing body of Investcorp. Investcorp's management committee was responsible for the overall strategic direction of the firm and, more specifically, for determining which investments would be undertaken by the firm. As a

member of this management committee, and as one of the senior deal team leaders in North America, Mr. Glaser was directly involved in fifteen transactions. As will be more fully described in Sections III and VI below, of these fifteen transactions, Mr. Glaser played a Major Role in seven of these transactions and a Contributing Role in eight of these transactions (each as defined in "Section III - Investment Performance"). Of the transactions in which Mr. Glaser played a Major Role, a realized annual IRR of approximately 81% on invested capital was achieved. The Principals expect to employ the same proven investment strategy utilized by Mr. Glaser during his 12-year tenure at Investcorp. In addition to his investment responsibilities at Investcorp, Mr. Glaser had significant managerial and administrative responsibilities from Investcorp's first year of operation until his departure from the firm. These experiences should be valuable to the launch and management of the Fund.

The General Partner and the Advisor are currently comprised of an experienced team of seven additional Principals who collectively possess broad experience in their respective fields of corporate acquisition, corporate management, finance, law and accounting. Two of these Principals, Mr. Glen Dell and Mr. David Kantes, have worked closely with Mr. Glaser in managing companies acquired by Investcorp and in financing Investcorp acquisitions, respectively. Mr. Glaser and Mr. Dell worked together in Investcorp's "Intensive Care Unit," a specialized post-acquisition group responsible for turning around Investcorp's portfolio companies which were experiencing operational difficulties. Mr. Kantes is well known in the field of acquisition financing, having served from 1993 to 1998 as president of Heller Business Credit, one of the leading financial institutions in providing acquisition financing to middle-market companies in the United States. Mr. Kantes has enjoyed a close working relationship with Mr. Glaser over the past twenty years, both in financing transactions undertaken by Mr. Glaser while at Investcorp, as well as while Mr. Glaser and Mr. Kantes worked together at Chase Manhattan Bank.

Also joining the General Partner and the Advisor is Mr. Talbert Navia, currently a partner at the international law firm of Chadbourne & Parke LLP and who has over fifteen years of experience in U.S. and Latin American transactions and has significant experience in mergers and acquisitions, joint ventures, capital markets and financings, with particular emphasis in Latin America. Messrs. Donnell Segalas, Joseph DaGrosa, Jr., Ali Musallam and Enrique Fahrion have also joined the General Partner, all of whom have substantial experience working for major U.S. financial institutions.

MapleWood's management team has demonstrated experience in successfully sourcing, financing and acquiring companies; managing companies through post-acquisition; expanding the growth of middle-market U.S. companies and profitably managing the disposition of companies.

The Fund will benefit from the General Partner's and the Advisor's Executive Advisory Board, which is comprised of experienced business leaders, the majority of whom have long and close personal ties to the Principals. As a result, the General Partner believes that the Executive Advisory Board will play a significant role in generating attractive investment opportunities. The Executive Advisory Board is also expected to provide senior level industry and operating expertise to the General Partner and to the Advisor. Some members of the Executive Advisory Board are expected to serve as directors of the Fund's portfolio companies ("Portfolio Companies").

MapleWood is comprised of three functional units which are a transaction unit, a post-acquisition unit and a marketing unit. The Principals believe that this structure is unique for a middle-market fund and that it will allow MapleWood to have better transaction flow, have better transaction execution ability and add significantly more value to the Fund's Portfolio Companies than other buyout firms operating in the middle-market.

The General Partner and the Advisor have an ownership structure that they believe is substantially different from that which is typical at other buyout firms and was developed to attract, recruit, motivate, compensate and retain a group of principals whose economic returns are closely linked to those of the Limited Partners. It is anticipated that all professionals, not just the initial Principals, will have an ownership stake in the General Partner and the Advisor, with ownership interests vesting over time (except for certain initial Principals). Additionally, a substantial portion of the annual profits available for distribution to the Principals will be allocated on a performance, not ownership, basis. Similarly, a substantial portion of the economic benefit of the General Partner's carried interest will also be allocated based on performance, not ownership interests, and (except for certain initial Principals) will also be subject to a vesting schedule.

The Fund expects to add value to Portfolio Companies through active management and oversight. The Fund will seek to invest in companies that can benefit from an active financial partner who can provide capital and management expertise to achieve aggressive growth and improve operating efficiencies. Messrs. Glaser and Dell have successfully implemented this strategy in past investments.

The Principals have significant international experience and will be able to assist Portfolio Companies to expand their business internationally, particularly into Latin America.

3

[This page intentionally left blank]

# MAPLEWOOD EQUITY PARTNERS LP

## II. INVESTMENT HIGHLIGHTS

The General Partner believes that the following factors make the Fund an attractive investment opportunity:

### Outstanding Investment Track Record

During Mr. Glaser's twelve year tenure as a member of Investcorp's management committee, the equity investments for which Mr. Glaser played a Major Role achieved a realized annual IRR of approximately 81% on approximately $311 million of capital invested. This performance was achieved in a number of industries over a 10-year investment period. The Principals intend to employ the same proven investment strategy utilized by Mr. Glaser at Investcorp. For a more detailed description of Mr. Glaser's investment performance and definitions of Major Role and Contributing Role, see "Section III. Investment Performance." In addition to Mr. Glaser, Mr. Dell was involved in a number of Investcorp transactions where he played a Contributing Role. Mr. Kantes has also had significant involvement in leveraged acquisition financings of middle-market companies, including a number of Investcorp's portfolio companies.

### Experienced and Tested Management Team

Although the Fund is a newly established entity, the Principals have significant experience in all aspects of corporate investments and many have worked closely together in the past.

Mr. Glaser was part of the founding team of Investcorp, was involved for over twelve years in principal investing as one of the senior members of Investcorp's North American acquisition team and had significant worldwide administrative responsibilities. Mr. Glaser had a Major Role on some of Investcorp's most successful acquisitions, including Tiffany & Co., Gucci Group N.V. and Prime Service, Inc. Prior to Investcorp, Mr. Glaser had a successful career as a commercial banker for Chase Manhattan Bank.

Mr. Kantes is well known in acquisition financing, having served most recently as president of Heller Business Credit, one of the leading financial institutions in providing acquisition financing to middle-market companies in the United States. Mr. Dell has over 25 years of senior level operating management experience and has overseen a number of Investcorp's portfolio companies. Mr. Glaser has worked closely with Mr. Kantes and Mr. Dell in financing and overseeing Investcorp's portfolio companies, respectively. Additionally, Mr. Navia has been extensively involved in advising senior management of U.S. and Latin American corporations on direct investments including acquisitions, joint ventures, capital markets and financings.

### Focused Middle-Market Strategy

The Fund intends to be a growth-oriented investor. The General Partner believes that carefully selected middle-market companies present better growth opportunities than larger companies.

The Fund will focus on middle-market companies with annual revenues between $25 million and $250 million. According to Dun & Bradstreet, there are approximately 60,600 companies in the United States within this revenue range, as compared to only 6,400 companies with revenues between $250 million and $1 billion and 2,500 companies with revenues of greater than $1 billion. The General Partner believes that carefully selected middle-marked companies present better growth opportunities than larger companies.

The General Partner also believes that many middle-market companies have less access to lower cost financing or the capital markets than larger companies, and therefore offer attractive purchase prices with the potential to achieve superior economic returns for Limited Partners.

There are almost seven times more companies with revenues of between $25 million and $250 million as there are companies with sales in excess of $250 million. Despite this fact, most buyout firms with capital and human resources similar to those of the Fund focus on acquisitions of companies with revenues in excess of $250 million in order to employ a larger amount of capital in a lesser number of transactions. Consequently, the General Partner believes that it will face less competition from these established buyout firms.

### Southeast Base

The Fund will invest in companies located throughout the United States. However, the General Partner believes that due to the Fund's location, contacts, and marketing program, the Fund will have a competitive advantage in acquiring companies in the Southeastern United States. According to Dun & Bradstreet, there are approximately 12,800 companies located in the Southeast with annual revenues between $25 million and $250 million (21% of the U.S. total in this revenue range). Of these 12,800 companies, there are approximately 8,900 companies operating in industries that the Fund will target: consumer products, manufacturing, retail and distribution.

Further, there are relatively few buyout firms based in the Southeast. According to Galante's Venture Capital & Private Equity Directory ("Galante"), there are approximately 87 buyout firms in the entire U.S. with available funds between $250 million and $500 million; only four of these, or 4.6%, are based in the Southeast.

### Substantial Transaction Flow

The General Partner believes that the ability of the Principals to generate transaction flow will be a competitive advantage for the Fund. The Principals have over 100 years of combined experience and believe that they have developed the insight and ability to recognize investment opportunities across industries and regions. The Principals believe that a proactive transaction flow marketing campaign, led by three Principals and including all other Principals, the substantial network of contacts of the eight Principals, and the substantial network of corporate contacts of the General Partner's Executive Advisory Board will lead to significant transaction flow. Furthermore, the General Partner believes that the Fund will also be a preferred buyer for many middle-market deal intermediaries and sellers due to the capital resources of the Fund and the depth and experience of the Principals in successfully closing transactions.

### Ability to Add Value Post Acquisition

The post-acquisition team, headed by Mr. Dell, will take a proactive role in working together with the management of a Portfolio Company to achieve the performance targets set forth in the strategic plan formulated at the time of acquisition. Mr. Dell had a similar role at Investcorp and has held senior management positions in a number of Investcorp's portfolio companies. Mr. Dell and Mr. Glaser have served on the boards of directors of Investcorp's portfolio companies. Between them, Mr. Dell and Mr. Glaser have sat on the boards of 16 of Investcorp's portfolio companies and 12 other corporate boards. Mr. Dell and Mr. Glaser have also worked to turn around Investcorp's portfolio companies which were experiencing operating difficulties, including Burnham Service Corporation and Dellwood Foods.

Examples of the active roles various Principals have had in post-acquisition management include:

- negotiating complex corporate governance structures with family ownership;

- negotiating flexible financing packages that provide for growth through internal capital expenditures or acquisitions;

- developing management compensation plans to encourage management to maximize the value of portfolio companies;

- adding global sourcing or distribution capabilities;

- redeploying or improving utilization of corporate assets;

- changing the strategic direction of the business;

- augmenting management or acting as interim manager when necessary;

- achieving liquidity through proactive exit planning.

The Principals believe that having a separate post-acquisition team, focused on building value after the acquisition, will provide the Fund with a competitive advantage.

**International Value Enhancement Capabilities**

The General Partner believes that the Fund will be uniquely positioned to capitalize on opportunities for Portfolio Companies to expand their businesses into Latin America. The General Partner believes that those middle-market companies currently active in, or seeking to be active in, international trade, particularly trade with Latin America, present attractive growth potential and investment opportunities.

The Fund expects to be particularly interested in considering investments in companies that currently import from, or export to Latin America, or have the potential to do so. According to the U.S. Department of Commerce, the dollar value of U.S. exports to Latin America in 1997 was $142 billion and the dollar value of imports from Latin America in 1997 was $148 billion. The General Partner believes that a significant amount of U.S. trade with Latin America is originated by companies with revenues of less than $250 million.

The General Partner believes that most U.S. buyout firms targeting middle-market companies have limited international experience and little focus on international trade. By contrast, all of MapleWood's eight Principals have international experience, and represent four nationalities. Five have lived outside the United States, and three have significant experience in Latin America. For these reasons, the General Partner believes it will be able to add significant value to Portfolio Companies active in, or seeking to be active in, international trade.

**Active Executive Advisory Board**

The General Partner and the Advisor have established an Executive Advisory Board comprised of experienced business leaders, each with years of experience in industry. The majority of these board members have long and close personal ties to the Principals. The Principals believe that the Executive Advisory Board will provide substantial transaction flow to the Fund. The Executive Advisory Board is also expected to take an active role in supporting pre-acquisition due diligence and increasing the value of the Fund's Portfolio Companies post acquisition. It is anticipated that members of the Executive Advisory Board will also provide strategic industry knowledge on those industries for which the members have

7

specific experience and that some Executive Advisory Board members will sit on the boards of directors of Portfolio Companies.

**Unique Ownership and Compensation Structure**

The General Partner and the Advisor have an ownership structure that is substantially different from that typical at many other buyout firms. It is anticipated that all Principals will be involved in the strategic decision-making process. All professionals, not just the initial Principals, will have a direct ownership stake in the General Partner and the Advisor, with ownership interests vesting over time (except for certain of the initial Principals).

Additionally, the General Partner and the Advisor intend to allocate a substantial portion of their annual profits to a bonus pool for its Principals and other professionals. Allocations from this bonus pool will be based upon performance, not ownership of the Firm. Similarly, the General Partner intends to allocate a substantial portion of its carried interest in each transaction to Principals and professionals, based upon performance, not ownership.

The General Partner and the Advisor have also established a vesting program to encourage their future principals and other professionals to stay with them. For these individuals, equity ownership in the General Partner and the Advisor will generally vest over a five year period. Additionally, carried interest allocations will also vest over a five year period, with each transaction having its own vesting schedule.

The General Partner and the Advisor believe that this structure, emphasizing shared profits, shared ownership, and shared carried interests, based primarily upon performance and not exclusively ownership, will help the General Partner and the Advisor recruit and retain high quality professionals for the long term. The Principals believe that this unique ownership, bonus, and carried interest structure will serve to provide a long-term commitment to the General Partner and the Advisor and help build a culture which will benefit the Limited Partners of the Fund.

**Extensive Financing Experience**

The Principals believe that their combined experience in the U.S. and international financial markets will provide the Fund with a competitive advantage. In middle-market transactions, the Principals believe that the ability of an investor to raise external financing, and therefore increase the probability of a successful closing, is more important to sellers and deal intermediaries than in larger transactions. MapleWood believes it has more financing expertise than most other buyout firms targeting the middle-market.

Specifically, Mr. Glaser and Mr. Kantes have considerable commercial banking experience and have structured transactions involving companies in the size range that the Fund intends to target. Mr. Kantes, who was a senior executive and senior credit officer at several financial institutions, with responsibility for overseeing their leveraged lending activities, will provide the Fund with significant experience in structuring financing for its acquisitions and its Portfolio Companies capital expenditure programs, including add-on acquisitions. Mr. Kantes, in his role as a senior executive at major financial institutions, has provided in excess of $7 billion in middle-market financings over the past twelve years and Mr. Navia, as a partner at two major international law firms, has advised U.S. and international corporations in acquisition financings and capital markets transactions. Mr. Segalas has significant experience in asset securitization.

Given the experience of the Principals in financing transactions, as well as the high level of deal activity anticipated by the Fund, the Principals expect to be a preferred client of financing sources.

# MAPLEWOOD EQUITY PARTNERS LP

## III. INVESTMENT PERFORMANCE

The following table summarizes the investment performance on those investments in which Mr. Glaser played a Major Role at Investcorp. The calculation of the individual Annual IRR on Investments set forth on the table has been reviewed by Deloitte & Touche LLP. The opinion of Deloitte & Touche LLP is set forth as Appendix A to this Memorandum.

Data used in preparing this Section was, except as otherwise indicated, derived from publicly-available sources, including press reports and Securities and Exchange Commission filings, and annual reports of Investcorp. In some cases, such data has been supplemented by information furnished by the Principals.

### Major Role Transactions

| Company | Industry | Date of Initial Investment | Transaction Value | Capital Invested | Date(s) of Realization | Realized Proceeds | Multiple of Equity Invested | Annual IRR on Investments [1] |
|---|---|---|---|---|---|---|---|---|
| | | | | *(dollars in millions)* | | | | |
| ffany & Co. | Specialty Retail | Oct. 1984 | $105.5 | $8.9 | May 1987 to Sept. 1989 [2] | $130.6 [2] | 14.7x | 120.2% [3] |
| rtram-Trojan/Riva | Manufacturing | March 1985 | 67.5 | 12.0 [4] | Nov. 1988 | 44.4 [5] | 3.7x | 41.7% [6] |
| ebles Inc. | Retail | Oct. 1986 | 81.9 | 8.5 | Jan. 1989 | 59.5 | 7.0x | 132.5% [3] |
| x Photo, Inc. | Photo Finishing | Sept. 1987 | 47.0 | 13.3 [7] | Aug. 1991 | 23.6 [7] | 1.8x | 18.1% |
| w York Department res of Puerto Rico | Retail | Jan. 1988 | 60.0 | 19.0 | Jan. 1993 | 19.0 [5] | 1.0x | 0.0% [6] |
| tcci Group N.V. | Specialty Retail | Sept. 1993 | 170.0 | 170.0 | Oct. 1995 to March 1996 | 889.2 | 5.2x | 94.6% [3] |
| ime Service, Inc. | Equipment Rental | Dec. 1994 | 305.0 | 79.0 | July 1997 | 662.3 | 8.4x | 126.6% [3] |
| tals | | | $836.9 | $310.7 | | $1,829.2 | 5.9x | 80.9% |

Notes
(1)  Except as otherwise indicated, represents gross annualized, pre-tax, compound IRR based on daily net cash flows.
(2)  Final 2.2607 million shares sold over a two and one-half year period, based upon Securities and Exchange Commission filings, at the average share price for the period, adjusted for stock splits.
(3)  Source: Securities and Exchange Commission filings and other publicly available sources.
(4)  Information confirmed by the agent bank for the acquisition facility.
(5)  Data derived from information referenced in Note 6.
(6)  Net returns to Investcorp's investors, based on published report. Source: *Arabian Business Magazine*, April 1998.
(7)  Information confirmed from a former joint venture partner in this transaction. Capital invested includes subordinated debt.

**Investcorp's Investment Approach**

Mr. Glaser was a member of Investcorp's worldwide management committee from 1983 to 1995. From 1984 through 1995, he was involved primarily in the North American investment activities, with additional responsibilities in its European investment activities, management and administration. To understand Mr. Glaser's investment experience while at Investcorp, it is important first to discuss the Investcorp approach to pursuing its corporate investment activities.

In North America, for example, Investcorp had a team of management committee members, ranging from two to four people, who were primarily responsible for executing all of its corporate investments in North America. Collectively, this team decided which investment opportunities Investcorp would pursue. Once it was determined that Investcorp would pursue an investment opportunity, typically one or two management committee members would jointly oversee the investment process, depending on the size and complexity of the contemplated transaction. This team would be responsible for undertaking due diligence, securing the necessary financing, closing the acquisition, monitoring the company throughout the holding period, and overseeing the company through final sale. Each corporate acquisition undertaken by Investcorp typically had more than one management committee member assigned to it.

The Investcorp approach emphasized teamwork and cooperation. On some transactions, an individual management committee member was one of the leaders in the acquisition of an investment, as well as played a substantial role in the financing, oversight or sale of the investment (a "Major Role"); on others, the individual did not lead the acquisition team, but played a role in some aspect of the execution of the acquisition, financing, oversight, or sale of the investment and did not play a material role in the creation of value (a "Contributing Role"). In some transactions, the individual member played virtually no role.

Those management committee members assigned to play a Major Role for a specific transaction assembled a team consisting of other Investcorp personnel, including "principals" (senior professionals with investment or financial experience) and financial analysts, as well as outside advisors, such as accountants, lawyers, appraisers, and consultants. This large group comprised the Investcorp team for a given transaction. Management committee members who led the team were responsible for the overall management of the acquisition team and also played other specific roles in the transaction.

**Major Role Transactions**

Mr. Glaser played a Major Role in seven transactions, detailed in the preceding table, including Tiffany & Co., Bertram-Trojan/Riva, Peebles Inc., Fox Photo, Inc., New York Department Stores of Puerto Rico, Inc., Gucci Group N.V., and Prime Service, Inc. These transactions are discussed in detail in "Section VI - Description of Prior Transactions."

**Contributing Role Transactions**

Mr. Glaser played a Contributing Role in eight transactions, including Burnham Service Corporation, Catherines Stores, Club Car, Color Tile, Dellwood Foods, Mueller Co., Saks Holdings, Inc. and Westsphere Capital. Although for these investments, Mr. Glaser did not play a material role in enhancing value, each investment and the annual IRR therefor (where available) are highlighted in "Section VI - Description of Prior Transactions."

**Other Significant Role Transactions**

David J. Kantes has been actively involved in financing companies in the Fund's target size range of between $25 million and $250 million in annual revenues for over 30 years, having closed approximately 500 transactions representing approximately $10 billion in financing, including over $8 billion in leveraged acquisition financing. Mr. Kantes' role often extended beyond that of a senior bank lender and extended into transaction sourcing, due diligence, investment rationale and post-acquisition advisory and management. "Section VI - Description of Prior Transactions" lists ten representative transactions where Mr. Kantes played such a role and details his role for three of those transactions, including Mr. Coffee, Inc., The North Face, Inc., and Learjet Corporation.

[This page intentionally left blank]

# MAPLEWOOD EQUITY PARTNERS LP

## IV. SUMMARY OF SELECTED PRINCIPAL TERMS

The following is a summary of the principal terms of the Fund and is qualified in its entirety by reference to the detailed provisions of the Limited Partnership Agreement for the Fund (the "Partnership Agreement") and the related Subscription Agreement for the Fund (the "Subscription Agreement").

| | |
|---|---|
| **The Fund** | The Fund is being formed to make privately negotiated equity investments ("Investments"), primarily in middle-market companies based in the United States with annual revenues between $25 million and $250 million. The Fund (together with the Offshore Fund) will typically seek to purchase a controlling interest in each Portfolio Company but may also make non-controlling investments if it can take on an influential role in the management of the Portfolio Company. Investments are expected to include acquisitions, buyouts, recapitalizations, restructurings, "build-ups" and similar transactions. |
| **Fund Capital** | The Fund and the Offshore Fund have a combined target size of $300 million of capital commitments ("Commitments") from qualified investors. |
| **The General Partner and the Advisor** | The General Partner is the sole general partner of the Fund. Pursuant to a separate agreement (the "Advisory Agreement") between the Advisor and the Fund, the Advisor will provide investment advisory services to the Fund. All of the equity interest in the General Partner and the Advisor is owned directly or indirectly by the Principals and other employees of the General Partner and the Advisor. |
| | The Advisory Agreement provides that the Advisor will receive a portion of the Fee (as defined herein) as compensation for its services. In addition, the Advisor may separately perform services for, and be compensated by, Portfolio Companies. |
| **Limited Partnership Interests** | Pursuant to the Subscription Agreement, each investor will subscribe to acquire a limited partnership interest in the Fund (each, a "Limited Partnership Interest") for an aggregate amount equal to such investor's Commitment. Limited Partners will be entitled to distributions as described below under "Distributions." |
| **Minimum Commitment** | The minimum Commitment to the Fund by a Limited Partner will be $5 million, although the General Partner reserves the right, in its discretion, to accept Commitments of lower amounts. |
| **General Partner's Commitment** | The General Partner will make a Commitment (by subscribing to acquire a Limited Partnership Interest) aggregating at least 1% of all Commitments. |

13

**Closings**

The initial closing (the "Initial Closing") of the sale of Limited Partnership Interests will be held as soon as is practicable. Subsequent closings to admit new Limited Partners may be held at the discretion of the General Partner; however, no closings to admit new Limited Partners will be held after the date which is nine months from the date of the Initial Closing.

Each Limited Partner who is admitted to the Fund at a closing subsequent to the Initial Closing or who increases his Commitment subsequent to the Initial Closing (a "Later Admitted Limited Partner") will be required to contribute to the Fund (unless there has been a material change or significant event relating to an Investment that would justify a different valuation in the view of the General Partner), upon the date of admission or increase in its Commitment, an additional amount equal to (i) its pro rata share of Commitments previously drawn down and the Fee (as defined herein), in each case from the date of the Initial Closing, less (ii) its pro rata share of all distributions made to Limited Partners admitted at previous closings, plus interest on the net amount of the foregoing at the prime rate plus 2%. The net amount so contributed by Later Admitted Limited Partners (exclusive of amounts attributable to the Fee) will be refunded to previously admitted Limited Partners but will be subject to recall by the Fund (except for the interest component).

**Commitments and Draw Downs**

Upon admission to the Fund, each Limited Partner will undertake to make capital contributions ("Capital Contributions") in an aggregate amount equal to such Limited Partner's Commitment plus such additional amounts as may be required to pay the Fee. During the Investment Period (as defined below), and after the Investment Period in the circumstances described below, the Fund may, on an as-needed basis and upon ten days prior written notice to the Limited Partners, draw down funds from the Commitments in such amounts as the Fund shall require to make Investments or to pay Fund expenses.

**Investment Period**

The "Investment Period" will be the period beginning on the date of the Initial Closing and ending on the date which is the fifth anniversary of the date of the final closing of the Fund (the "Final Closing"). At the end of the Investment Period, no Limited Partner shall be required to make any Capital Contribution except in connection with (i) a follow-on investment in a Portfolio Company, (ii) an initial Investment in a Portfolio Company committed to by the Fund prior to the end of the Investment Period or (iii) Fund expenses and liabilities (including the Fee); provided, however, that in the case of clauses (i) and (ii) such follow-on or initial Investment must be closed within six months after the end of the Investment Period. In no event will a Limited Partner be required to make aggregate Capital Contributions in excess of the sum of (x) its Commitment and (y) such additional amounts as may be required to pay the Fee.

| | |
|---|---|
| **Term** | The Fund will terminate ten years after the date of the Final Closing, but may be extended at the discretion of the General Partner for up to three successive one-year periods. |
| **Co-Investment Opportunities** | The General Partner, at its discretion and pursuant to such terms as it deems appropriate, may offer co-investment opportunities to those Limited Partners and others who have expressed an interest in co-investing. |
| **Diversification** | The total investment by the Fund in any one Investment may not exceed 20% of the Fund's aggregate Commitments. In addition, up to 20% of the Fund's aggregate Commitments may be invested in Investments which are principally located outside of the United States. |
| **Bridge Financing** | The Fund may guarantee loans of, or provide interim financing to (collectively, "Bridge Financing"), a Portfolio Company in order to facilitate an Investment. Bridge Financing to a Portfolio Company, when added to the amount of the permanent investment by the Fund in such company may not exceed the lesser of (i) 35% of the aggregate Commitments or (ii) the remaining unfunded Commitments as of the time of the Bridge Financing. Bridge Financings refinanced within one year will be restored to the Limited Partners' unfunded Commitments and will be available to be recalled for future investments during the Investment Period. In such event, the principal amount of, and interest on, the Bridge Financing will not be included in calculating the Fund's or the Limited Partners' internal rates of return. |
| **Distributions** | Distributions from the Fund may be made at any time as determined by the General Partner. In general, current cash received from dividends, interest and other distributions from Investments, net of current expenses (including the Fee) ("Current Income"), will be distributed at least annually. Subject to certain permitted reinvestments (see "Permitted Reinvestments" below), proceeds from the sale of Investments or any portion of an Investment (net of disposition and related expenses) which are in the form of cash or marketable securities ("Disposition Proceeds") will be distributed as soon as practicable after receipt thereof. The General Partner will be entitled to withhold from any distributions, in its discretion, appropriate reserves for expenses and liabilities of the Fund as well as for any required tax withholdings. Amounts withheld for taxes will be treated as distributions for purposes of the calculations described below. |

Distributions of Current Income and Disposition Proceeds in respect of each Investment or portion thereof will be made to the Limited Partners participating in such Investment and the General Partner in the following amounts and order of priority:

(a) *Return of Capital and Costs:*  First, 100% to the Limited Partners (including the General Partner in its capacity as a holder of a Limited Partnership Interest) pro rata until such Limited Partners have received distributions of Current Income and Disposition Proceeds from all Investments that have been disposed of ("Realized Investments") equal to:

  (i) such Limited Partners' Capital Contributions for all Realized Investments and such Limited Partners' pro rata share of any unrealized losses on writedowns of the Fund's other Investments,

  (ii) such Limited Partners' Capital Contributions for all organizational and offering expenses and for the portion of the Fee allocated to the Realized Investments, and

  (iii) such Limited Partners' Capital Contributions for all other Fund expenses, including third party financing costs (the amounts described in clauses (i), (ii) and this clause (iii) being referred to collectively as "Realized Capital and Costs");

(b) *8% Preferred Return:*  Second, 100% to such Limited Partners until cumulative distributions of Current Income and Disposition Proceeds to such Limited Partners from Realized Investments represent an 8% compounded annual rate of return on such Limited Partners' Realized Capital and Costs;

(c) *General Partner Catch-up to 20% Overall Carried Interest:*  Third, 50% to such Limited Partners and 50% to the General Partner until cumulative distributions to the General Partner of Current Income and Distribution Proceeds from Realized Investments (exclusive of distributions attributable to the General Partner's Limited Partnership Interest) equal 20% of the total amounts distributed pursuant to clause (b) and this clause (c); and

(d) *80/20 Split:*  Thereafter, 80% to such Limited Partners pro rata and 20% to the General Partner (the distributions to the General Partner described in clause (c) and this clause (d) being referred to collectively as "Carried Interest Distributions").

16

Distributions relating to the partial disposition of Investments will be subject to the above formula, with the preferred return calculation and the Carried Interest Distributions being based on the original cost of, and the cumulative distributions being made with respect to, the disposed portion of such Investment.

Distributions of income from Bridge Financing will be made among the Limited Partners in proportion to their Capital Contributions that funded such Bridge Financing, as reasonably determined by the General Partner.

Distributions prior to the termination of the Fund may only take the form of cash or marketable securities. It is expected that all distributions of cash will be made in U.S. dollars. Upon termination of the Fund, distributions may also include restricted securities and other assets of the Fund for which the General Partner will seek a valuation from an independent leading investment banking firm or other appropriate independent expert. Such valuations will be reviewed by the Advisory Committee (as defined below).

**Reserve Account/Clawback**    The General Partner will establish a reserve account (the "Reserve Account") for the benefit of the Limited Partners and will deposit into such account 25% of the aggregate Carried Interest Distributions received by the General Partner (net of tax liabilities of the General Partner or any other person with respect to such amounts). Upon liquidation of the Fund, each Limited Partner shall receive a distribution, to the extent of its pro rata share of available funds in the Reserve Account, in such amount as is necessary, if any, so that the aggregate amount of Carried Interest Distributions received by the General Partner with respect to such Limited Partner during the total life of the Fund does not exceed the amount which the General Partner is entitled to receive with respect to such Limited Partner under the distribution procedures outlined under "Distributions" above had such distributions been made with respect to all Investments in the aggregate, as opposed to individually. To the extent that the funds in the Reserve Account are insufficient for the above described purpose, the General Partner will return funds to the Fund for distribution to the Limited Partners; provided, however, that the General Partner shall not be required to return to the Fund any amount which exceeds the cumulative Carried Interest Distributions received by the General Partner (net of tax liabilities in respect of such Carried Interest Distributions and amounts deposited by the General Partner into the Reserve Account).

17

To the extent that there are funds in the Reserve Account after all such distributions have been made to Limited Partners, such funds will be distributed to the General Partner. Income on the funds in the reserve account will be for the benefit of, and will be distributed to, the General Partner.

**Allocation of Profits and Losses**

All items of income, gain, loss and deduction will be allocated to the capital accounts of the Limited Partners and the General Partner in a manner generally consistent with the distribution procedures outlined under "Distributions" above.

**Other Activities of the General Partner and the Advisor**

Without the consent of Limited Partners holding a majority of the aggregate Limited Partnership Interests (excluding for this purpose the Limited Partnership Interest held by the General Partner), the General Partner and the Advisor may not act as manager or advisor to any other investment fund (other than the Offshore Fund) which has a substantially similar investment objective as the Fund until such time as (i) at least 70% (excluding amounts reserved for follow-on Investments) of the Fund's Commitments have been drawn down for Investments or for the payment of the Fund's expenses or (ii) the Investment Period has expired.

**Key Man Event**

A "Key Man Event" will be deemed to occur if Mr. Glaser leaves the employment of the General Partner or the Advisor or is unable or otherwise fails to perform his duties therefor. Upon the occurrence of a Key Man Event, the Fund will be prohibited from making further draw downs of Commitments unless within 90 days of such occurrence, the holders of a majority of the Limited Partnership Interests (excluding for this purpose the Limited Partnership Interest held by the General Partner) vote to allow the Fund to continue draw downs. Before the occurrence of a Key Man Event, the General Partner may, subject to such approval of the holders of a majority of the outstanding Limited Partnership Interests, substitute another person or persons for Mr. Glaser for purposes of determining the occurrence of a Key Man Event.

**The Fee**

The Fund will pay, semi-annually in advance, fees to the General Partner and the Advisor (together, the "Fee") in an aggregate amount equal to (i) 2.0% of the Fund's total Commitments, until the earlier of (x) the end of the Investment Period and (y) the draw down of all Commitments, and (ii) thereafter, 1.75% of total Commitments drawn down other than the amount of Commitments attributable to Investments that were sold or otherwise disposed of or permanently written off on or prior to the last day of the immediately preceding semi-annual period; provided, however, that for purposes of calculating the Fee, the Commitment of the General Partner shall be disregarded. The Fee will be paid on account of the management services to be provided to the Fund by the General Partner and the investment advisory services to be provided to the Fund by the Advisor and will be apportioned among the General Partner and the Advisor. Limited Partners' obligations to make Capital Contributions in

respect of the Fee will be in addition to Limited Partners' Commitments (and will not reduce unfunded Commitments).

**Organizational Expenses**

The Fund will bear organizational expenses (including legal fees) incurred in connection with the formation of the Fund up to $1 million. Organizational expenses in excess of this amount in connection with the formation of the Fund will be borne by the General Partner. All fees due placement agents in connection with the offering of Limited Partnership Interests will be borne by the Fund. However, the Fee will be reduced, on a dollar-for-dollar basis, in respect of such placement fees paid by the Fund.

**Other Expenses**

The Fund will be responsible for all expenses incurred by or on its behalf that are directly related to the identification and investigation of potential investments that are not consummated by the Fund ("Broken Deal Expenses"). The Fund will also be responsible for all expenses that are incurred in the identification, investigation, acquisition, restructuring, reinvestment and sale or other disposition of Investments, including professional fees and deal initiation expenses, to the extent that such expenses are not otherwise paid for by Portfolio Companies.

The Fund will also be responsible for all expenses directly related to its own operations and administration, including expenses of custodians, outside counsel and accountants, reasonable travel and other out-of-pocket expenses of the Advisory Committee, and insurance or litigation expenses, and any taxes, fees or other governmental charges levied against the Fund.

**Portfolio Company Fees**

Transaction, "break-up," and investment banking fees paid to the General Partner or the Advisor by Portfolio Companies or third parties in connection with any unconsummated transactions of the Fund, or in connection with the initial acquisition of Investments, will first be applied to reimburse the Fund for Broken Deal Expenses and then will be retained 60% by the party receiving such fees with the balance being applied to the Fee.

**Permitted Reinvestment**

During the Investment Period, the General Partner may retain and reinvest in Investments proceeds from dispositions to the extent representing a recovery of original invested capital (but not gains or income) received by the Fund within one year from the date an Investment is made, or may distribute and again draw down and reinvest such amounts. The distribution of any such amounts during the Investment Period will increase the Limited Partners' unfunded Commitments accordingly.

| | |
|---|---|
| **Offshore Fund** | The General Partner is simultaneously sponsoring the formation of the Offshore Fund. It is the intent, but not the obligation, of the General Partner that investments of the Fund and the Offshore Fund, other than short-term investments of cash, will be substantially parallel and in proportion to the aggregate Commitments of the Fund and the Offshore Fund. |
| **Advisory Committee** | The Fund will have an advisory committee (the "Advisory Committee") which will be comprised of representatives of not less than three Limited Partners. The General Partner will designate the representatives to the Advisory Committee. The Advisory Committee will provide such advice as is requested by the General Partner in connection with potential conflicts of interest, allocations of expenses among Investments, valuations and such other matters as the General Partner may reasonably request. |
| **Transfer of Interests** | A Limited Partner may not sell, assign or transfer any of its Limited Partnership Interest without the prior written consent of the General Partner, which consent may be withheld in the sole discretion of the General Partner. Transfers will also be subject to the requirement that the Fund shall have received an opinion of counsel: (i) to the effect that the transfer (a) does not cause the Fund to terminate for U.S. federal income tax purposes and (b) does not require the Fund to be registered under the Investment Company Act of 1940 or the General Partner or the Advisor to be registered under the Investment Advisers Act of 1940, and (ii) covering other customary matters. Transferees will be required to provide customary representations, warranties and covenants regarding transfer restrictions and other matters. |
| **Reports** | As soon as practicable after the end of each fiscal year of the Fund, the Fund will cause to be mailed to each Limited Partner an audited balance sheet, statement of income and expense and statement of cash flow of the Fund for such fiscal year and such other information as is reasonably necessary for Limited Partners to complete their tax returns. |
| **Indemnification** | The Fund will indemnify and hold harmless each of the General Partner, the Advisor, their affiliates and any of their respective officers, directors, members, managing members, partners, stockholders, employees, advisory board members or agents (each, an "Indemnified Person") from and against any losses, claims, damages, expenses or liabilities (including reasonable attorney's fees and expenses) incurred by such Indemnified Person in connection with the Fund's activities, unless such losses, claims, damages, expenses or liabilities arise from such Indemnified Person's willful malfeasance, bad faith or gross negligence. |
| | No Indemnified Person will be liable to the Fund or the Limited Partners for any act or omission by such Indemnified Person, unless such act or omission constitutes such Indemnified Person's willful malfeasance, bad |

faith or gross negligence.

**Tax Considerations**

The Fund will be classified as a partnership for U.S. federal tax purposes. As a result, the Fund will not be subject to U.S. federal income tax, and in general, each Limited Partner will be required to include in computing its U.S. federal income tax liability its allocable share of the items of income, gain, loss, deduction and credit of the Fund, regardless of whether corresponding distributions have been made by the Fund to that Limited Partner. Each prospective investor is advised to consult its own tax advisor as to the tax consequences of making an investment in the Fund. See "Section VIII - Certain Legal and Regulatory Matters - Tax Considerations."

**ERISA**

The General Partner intends to operate the Fund as a "venture capital operating company" (within the meaning of U.S. Department of Labor regulations) so that the assets of the Fund will not be considered "plan assets" under the Employee Retirement Income Security Act of 1974 ("ERISA"). Investors subject to ERISA should carefully review the ERISA matters discussed under "Section VIII - Certain Legal and Regulatory Matters - ERISA Considerations" and should consult with their own ERISA advisors as to the consequences of making an investment in the Fund.

**Excuse and Exclusion**

A Limited Partner may be excused from paying all or part of its Commitment in respect of a particular Investment on the grounds that its participation in such Investment would cause a violation of any law, regulation or administrative practice to which it is subject. To be so excused, the Limited Partner must adhere to the procedures specified in the Partnership Agreement.

The General Partner may exclude a Limited Partner from a particular Investment if the General Partner determines in good faith that a significant delay, extraordinary expense or materially adverse effect on the Fund, the General Partner, the Advisor, any Portfolio Company or any of their respective affiliates or future investments is likely to result from such Limited Partner's participation in such Investment.

The excused or excluded Limited Partner's unfunded Commitment will not be reduced as a result of any excuse or exclusion. The General Partner may issue new capital calls to Limited Partners who are not excused or excluded Limited Partners, but no Limited Partner will be required to fund amounts in excess of its unfunded Commitment.

**Group Trust**

Because the Fund may realize income that would be taxable if allocated directly to an otherwise tax-exempt Limited Partner, investors that are plans subject to ERISA and certain governmental retirement plans will, upon request, be given the opportunity to invest in the Fund through a separate vehicle that will qualify as a tax-exempt group trust (the "Group Trust"). The Group Trust will participate as a Limited Partner of the

Fund.  Although the Group Trust will generally be exempt from U.S. federal income taxation, it will be required to report and pay tax on its allocable share of any "unrelated business taxable income" or "unrelated debt-financed income" within the meaning of Sections 512 and 514 of the Internal Revenue Code.  However, investors in the Group Trust will not be required to report such income separately.  Investors in the Group Trust will share in the net income and distributions of the Group Trust in accordance with their contributions.

| | |
|---|---|
| **Certain Investment Considerations** | Prospective investors should carefully review the matters discussed in "Section VII - Certain Investment Considerations" and "Section VIII - Certain Legal and Regulatory Matters." |
| **Confidentiality** | Each Limited Partner must agree to keep confidential all matters relating to the Fund and its affairs (including communications from the General Partner and the Advisor), except as otherwise required by law. |
| **Counsel to the Fund** | Chadbourne & Parke LLP |
| **Auditors to the Fund** | Deloitte & Touche LLP |
| **Placement Agent** | Salomon Smith Barney |

# MAPLEWOOD EQUITY PARTNERS LP

## V. MAPLEWOOD EQUITY PARTNERS LP

### A.    Investment Strategy

**Overview**

The General Partner is establishing the Fund with the objective of achieving exceptional long-term returns to investors, primarily through privately negotiated acquisitions of middle-market companies with annual revenues between $25 million and $250 million located in the United States. In addition, the Fund may invest up to 20% of its Commitments outside of the U.S., but expects that any international investments made will be in Latin America.

The General Partner and the Advisor intend to implement an investment strategy which is derived from the strategy employed by Mr. Glaser with considerable success at Investcorp. The equity investments for which Mr. Glaser played a Major Role at Investcorp achieved a realized annual IRR of approximately 81% on approximately $311 million of capital invested, resulting in realized proceeds and profits of approximately $1.82 billion and $1.51 billion, respectively. This IRR was achieved over a ten-year investment period, which spanned a number of business and economic cycles.

**Investment Strategy**

The Fund intends to implement a growth and operating oriented, "buy and build" investment strategy which includes:

*Establishing Control or Influential Equity Positions.*

An essential element of the investment strategy of the Fund will be the exercise of management control of its Portfolio Companies by itself or in conjunction with others. To ensure this, the Fund generally intends to invest in situations where it will, alone or in conjunction with the Offshore Fund, have a majority equity position or an influential minority position. Furthermore, the General Partner intends to structure Investments with appropriate corporate governance provisions to allow for control or adequate influence of Portfolio Companies. MapleWood intends to have an active role in the operating, strategic, and financial planning of all of the Fund's Portfolio Companies.

*Sharp Focus on Middle-Market Companies.*

The Fund will focus on acquiring middle-market companies with annual revenues between $25 million and $250 million, a market segment in which the Principals have demonstrated experience and success. The General Partner believes that this segment is larger, with more potential investment opportunities, and is less efficient, with less competition for investment, than the larger company segment. The General Partner therefore believes that the middle-market segment offers attractive investment opportunities and valuations.

According to Dun and Bradstreet, there are approximately 60,600 companies in the United States with revenues between $25 million and $250 million, as compared to only approximately 6,400 companies in the United States with revenues between $250 million and $1 billion, and approximately 2,500 companies in the United States with revenues in excess of $1 billion. In absolute terms, there are approximately seven

times the number of companies with revenues of from $25 million to $250 million as there are companies with revenues in excess of $250 million.

The General Partner believes that many buyout funds with similar capital and human resources as the Fund focus on larger revenue size companies in order to employ more capital in a fewer number of transactions. Despite the large number of companies in the $25 million to $250 million revenue range, relatively few buyout firms target these companies. According to Galante, there are approximately 87 buyout firms in the U.S. with available funds of $250 million to $500 million. Of these, only four are based in the Southeast. The Principals believe that the competition from these established buyout groups for portfolio companies in the target annual revenue range between $25 million and $250 million should be less competitive, resulting in better investment opportunities and more attractive prices, and therefore, superior economic returns for the Fund's Limited Partners.

### Southeast Base

Although the Fund will consider investment opportunities throughout the United States, the General Partner believes that, as a Miami-based fund, the Fund will have a competitive advantage in acquiring companies in the Southeast for the following reasons:

- The General Partner intends to have a proactive, Southeastern oriented deal flow marketing campaign.

  The General Partner is developing a deal sourcing database which already has over 4000 contacts and which will be targeted for mailings, calls, and in person visits. Particular emphasis will be placed on contacts in the Southeastern states of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Virginia and West Virginia.

- There are a large number of potential investment opportunities in the Southeast.

  Approximately 20% of the gross domestic product of the United States is generated in the Southeast. In the United States there are approximately 60,600 companies with revenues of between $25 million and 250 million; approximately 12,800, or 21%, are based in the Southeast.

- There are relatively few U.S. buyout firms with resources comparable to the anticipated resources of the Fund which are based in the Southeast and target Southeastern investments.

  There are approximately 87 buyout funds in the United States with available funds between $250 million and $500 million; only four of these, or 4.6%, are based in the Southeast.

For these reasons, the General Partner believes it will be able to differentiate itself in generating attractive Southeastern investment opportunities.

### Industry Focus

The Fund will focus on middle-market companies in the consumer products, manufacturing, retailing and distribution industries. The Principals have experience in principal investing, operating and financing activities in each one of these industries.

### Growth Orientation

The Fund will seek companies which present the opportunity to significantly expand revenues and profits within a five-year time frame. The Principals believe that companies in the $25 million to $250 million revenue size range often present significant growth potential.

The General Partner believes that many companies in this targeted size range often lack the capital necessary to realize their growth potential. Investment opportunities in this size range are often family owned businesses, where current family members or owners are no longer willing or able to provide growth capital. Companies in this size range are also often subsidiaries of large corporations that have reorganized, restrategized, or downsized, and no longer provide adequate capital or entrepreneurial oversight to encourage rapid growth. Additionally, companies in this size range are sometimes under-capitalized, stand-alone firms, with growth potential.

The Fund will strategically invest in those types of opportunities where the Fund's capital will help unlock a Portfolio Company's growth potential.

### Management Partnership

The Fund will seek investment opportunities where the capital resources of the Fund, combined with the talent of the Portfolio Company's operating management team, can combine to produce rapid, profitable growth. Operating management of the companies the Fund invests in will be the beneficiaries of cash and equity incentive programs, linked to the achievement of growth targets, that will be designed to align the interests of management to the financial returns of the Fund's investment in the Portfolio Company.

### Creating Value through Active Management

The Fund will seek to invest in companies that can benefit from an active financial partner who can provide access to capital to finance growth. The General Partner believes that a Portfolio Company's growth can be generated both internally, through improved managerial and financial strategic focus, and externally through selective strategic acquisitions.

MapleWood has an organization structure which includes a separate post-acquisition team, to be headed by Mr. Dell. The Principals believe that this structure is not typical for buyout firms targeting middle-market acquisitions.

Prior to undertaking an investment, it is anticipated that the post-acquisition team will assist the transaction teams by being actively involved in human resource due diligence, including assessing the quality and adequacy of a potential investment opportunity's management team. The post-acquisition team will also devise a management incentive program, including employment contracts, annual cash bonus opportunities, stock purchase programs and stock option plans, linked to management's achievement of growth-oriented performance targets.

Once an acquisition is completed, the post-acquisition team will be responsible for monitoring the Portfolio Company management's achievement of its strategic and operating plans. Each Portfolio Company will have its own board of directors, with directors drawn not only from MapleWood and its Executive Advisory Board, but also independent directors whose experience and judgment can assist the Portfolio Company. The Portfolio Company will provide monthly financial and operating reports, and will propose annual updates to its strategic plan and annual budgets.

25

MapleWood expects to be actively involved with the material financing related activities of Portfolio Companies. For example, the selection of auditors, legal advisors, consultants, commercial banks and investment banks will all be undertaken by the board of directors selected by MapleWood. Additionally, MapleWood, through its transaction teams, will execute financings, re-financings, acquisitions, divestitures and investment exits. Additionally, it is anticipated that the purchasing power of the combined Portfolio Companies will be combined in such areas as insurance, employee benefits, communications, package deliveries and other areas to lower the costs of goods and services across the Portfolio.

Mr. Glaser and Mr. Dell have undertaken similar direct operating roles in numerous portfolio companies and have developed strategies for improving returns. For example, Mr. Glaser and Mr. Dell were among the first in the industry to utilize the portfolio approach in negotiating with suppliers and vendors to reduce operating costs for Investcorp's portfolio companies. This approach involved aggregating the needs of Investcorp's entire portfolio of companies in negotiating new purchase agreements with suppliers and vendors, resulting in much more favorable pricing. This strategy resulted in dramatic savings, particularly for such major expense items as telephone and equipment leasing expenses.

*Enhancing International Value*

As part of its investment strategy, the Fund will seek to acquire companies where there are opportunities to enhance value through expanding their business with or in Latin America. The Fund will be particularly interested in companies that currently import from, or export to, Latin America, or have the potential to do so.

According to the U.S. Department of Commerce, the dollar value of U.S. exports to Latin America in 1997 was approximately $142 billion and the dollar value of U.S. imports from Latin America in 1997 was approximately $148 billion. Trade pacts such as the North American Free Trade Agreement, the Mercosur Agreement (a trade agreement among Brazil, Argentina, Paraguay and Uraguay) and the Andean Pact have already increased trade and foreign direct investment in Latin America and it is expected that these trends will continue. The General Partner believes that a significant amount of U.S. exports and imports are originated by companies with revenues of less than $250 million.

MapleWood believes that it has the capacity to assist Portfolio Companies to expand their international trade, particularly with Latin America. MapleWood's eight principals represent four nationalities, five have lived and worked out of the United States, and three have significant experience in Latin America.

In the past, the Principals have successfully created value through the implementation of international expansion initiatives for portfolio companies. Such initiatives have included sourcing raw materials, components, parts and manufacturing facilities offshore to reduce costs and expanding distribution channels to new markets to increase revenue from international sources.

In addition to enhancing the value of U.S. based Portfolio Companies, the Principals may diversify the Fund's portfolio, on an opportunistic basis, through direct international acquisitions, primarily in Latin America. The Principals have an extensive network of contacts who are excellent sources of potential investment opportunities in Latin America. The General Partner expects that these international investment opportunities will occur primarily in Latin America and will be subject to a maximum allocation of up to 20% of the Fund's total Commitments.

## B.    Transaction Sourcing

The Principals believe that their ability to generate acquisition opportunities will be a competitive advantage for the Fund. The Principals have over 100 years of combined experience in the United States and Latin America and believe that they have developed the insight and ability to recognize investment opportunities across industries and regions. The collective contacts of the Principals and of the Executive Advisory Board will assist the Fund in identifying attractive investment opportunities. Three of the Principals, Messrs. DaGrosa, Segalas and Musallam, will have specific responsibility for sourcing investment opportunities for the Fund through a proactive origination campaign. To develop transaction sourcing, MapleWood will have an origination plan comprised of three essential elements:

- Proactive Origination Campaign        • Principal Network        • Advisory Board Network

***Proactive Origination Campaign.*** Three of the Principals, Messrs. DaGrosa, Segalas and Musallam, will have specific responsibility for sourcing investment opportunities for the Fund through a proactive origination campaign. While the Fund will consider investing throughout the United States, the Principals believe that as a Miami-based fund, the Fund will have a comparative advantage in the Southeastern region of the United States. MapleWood is developing a proprietary database which already has over 4,000 institutions and individual contacts. Using this database, MapleWood is developing a proactive calling program that focuses specifically on the following deal channels to source investment opportunities:

- Local and Regional Accounting Firms
- Local and Regional Commercial Banks
- Local and Regional Law Firms
- Regional Investment Banking Firms
- Business Brokers
- Industry Specialists and Advisors

In addition to traditional deal sources in major financial centers, the calling program will particularly target contacts based in the Southeast, including Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia. The calling program will be the primary responsibility of Messrs. DaGrosa, Segalas, and Musallam. These three Principals will lead the program, with the extensive involvement by all the Principal. Each Principal will have responsibilities for specific city and state contacts.



Indicates states of primary focus

*Principal Network*.  MapleWood is comprised of a seasoned team of eight Principals who possess significant experience in principal investing, as well as in complementary disciplines, including operating management, investment and commercial banking, acquisition and structured finance and law.  This multi-disciplined background serves as a base from which relationships and contacts can be leveraged to promote significant deal flow.

| Principal | Sources of Transaction Flow |
|---|---|
| **Robert V. Glaser** | • Extensive relationships and connections in the commercial banking, investment banking, legal, accounting and corporate communities<br>• Significant business development experience as founding member of Investcorp, including multiple contacts with investment opportunity sources<br>• Launched Investcorp's deal flow program with major and regional investment banks |
| **David J. Kantes** | • Directly managed over 250 loan officers, maintaining strong relationships with many of them<br>• Relationships with numerous CEOs and owners of middle-market companies<br>• Extensive relationships in the commercial lending, legal, accounting and corporate communities |
| **Glen A. Dell** | • Vast corporate network, including numerous managers developed throughout the U.S., during his 25 plus years of operating experience |
| **Talbert I. Navia** | • Extensive relationships with business owners, management consultants, accountants, commercial bankers, investment bankers and law firms in the U.S. and Latin America |
| **Donnell A. Segalas** | • Extensive relationships in both the investment banking and corporate communities |
| **Joseph E. DaGrosa, Jr.** | • Substantial corporate relationships<br>• Large high net worth network and corporate relationships |
| **Ali M. Musallam** | • Business development experience |
| **Enrique W. Fahrion** | • Substantial contacts with owners and managers in the corporate and financial service industries throughout Latin America, who are expected to be particularly helpful in identifying U.S. companies poised for international growth |

*Advisory Board Network.* In addition to the resources of the Principals, the General Partner and the Advisor have established an Executive Advisory Board comprised of experienced business leaders who have achieved notable success in their respective fields. The Executive Advisory Board is expected to play a significant role in generating attractive deal flow and evaluating potential investment opportunities.

| Name | Experience | Sources of Transaction Flow |
| --- | --- | --- |
| Frank E. Weise, III | • Cott Corporation - President and CEO and Director<br>• CONFAB - Chairman of the Board<br>• Campbell Soup - President-Bakery and Confectionery Division; Senior Vice President - CFO<br>• Procter & Gamble - CFO of various divisions | • Significant operating experience and contacts in the consumer products industries |
| Hercules A. Segalas | • PaineWebber Inc. - Managing Director and Head of Global Consumer Products Investment Banking | • Extensive contacts in consumer products industries |
| Arthur J. Papetti | • Papetti's Hygrade Egg Products Inc. - Executive Vice President (A principal subsidiary of Michael Foods Inc.) | • Significant operating experience and contacts in the food products industry |
| Ron J. Ponder | • Beachwood Data Systems - President and CEO<br>• AT&T - Executive Vice President, Operations & Service Management | • Significant operating experience and extensive contacts in the technology/consumer/service industry sectors |
| Len J. Lauer | • Sprint Corp. - Senior Vice President<br>• Bell Atlantic New Jersey - Former President and CEO | • Significant operating experience and extensive contacts in the telecommunications industry |
| Buster C. Glosson | • U.S. Air Force - Retired Lieutenant General<br>• Chairman and CEO of a Middle East - based technology services company<br>• Advisor to the Chairmen and CEOs of several major defense contractors | • Extensive contacts in defense and aviation industries<br>• Significant business experience and extensive contacts in the Middle East |
| Thomas B. Judge | • AT&T Investment Management Corporation - Managed $1.5 billion private equity portfolio | • Significant investing experience and extensive contacts in the private equity industry |

The General Partner believes that these three elements, its proactive origination campaign, the extensive network of its Principals and the extensive contacts of its Executive Advisory Board, combined with its middle-market focus, will provide a significant flow of investment opportunities for the Fund.

29

## C. Investment Criteria

The Fund will target companies that have some or all of the following characteristics:

*Target Size.* The Fund intends to target companies with annual revenues between $25 million and $250 million.

The Fund will invest a minimum of 80% of the Fund's Commitments in U.S. companies. Within the U.S., the Fund will consider investment opportunities from all geographic regions. However, the Fund believes it will be particularly poised to develop preferential opportunities with companies based in the Southeast. No more than 20% of Commitments will be invested internationally. The Fund expects to invest this international portion primarily in Latin America, where the General Partner and the Advisor have in-house expertise.

*Market Position.* The Fund intends to invest in companies with strong market positions and the opportunity to be leaders in their respective market or geographic niches. A strong market position provides a company with a competitive advantage and the ability to minimize the impact of industry and economic downturns. The Principals have experience in identifying such companies.

*Growth Orientation.* It is intended that the Fund will be a growth-oriented investor, not a break-up investor, and as such, the Fund intends to seek companies with strong growth prospects. An important objective will be to provide the capital for growth, as well as offering the expertise of the Principals and the Executive Advisory Board to assist a Portfolio Company's management to identify and implement appropriate growth strategies.

The Fund will seek to invest in companies that have already established an infrastructure that is capable of supporting growth. For example, a company that has assembled a management team capable of managing growth would be particularly attractive. Similarly, a company that has already invested to develop its distribution or management information systems, allowing it to expand its business with limited additional capital expenditures, is another example of a company that the General Partner would find attractive.

*Potential for International Growth.* The Fund will be especially interested in U.S. based companies where there is the potential for expanding growth into Latin America through trade, acquisitions, sourcing, manufacturing, distribution or licensing.

*Management.* The Fund will seek to invest in companies with strong senior management teams with proven track records. In virtually all cases, management will participate in the growth and profitability of portfolio investments through appropriate bonus plans, share purchase programs and stock option plans.

*Industry Focus.* The Fund will focus on industries where the Principals or members of the Executive Advisory Board have relevant investment or operating experience, such as consumer products, manufacturing, retailing and distribution. Approximately 40,000 of the 60,600 companies in the U.S. with annual revenues between $25 million and $250 million are in the consumer products, manufacturing, retail and distribution industries.

*Identifiable Exit.* Each Portfolio Company is expected to have the potential to be an attractive publicly traded company, have potential value to strategic or financial acquirers or otherwise provide the Fund with a liquidity event within a reasonable period of time.

## D.    Transaction Process

MapleWood has substantial in-house resources to assist in the evaluation of potential investments and the execution of transactions. Primary responsibility for each investment opportunity will be assigned to a transaction team.

*Identification of Investment Opportunities*. The Principals anticipate receiving and reviewing numerous investment opportunities as a result of their proactive deal flow origination campaign, the extensive network of the Principals and the extensive contacts of the Executive Advisory Board.

*Screening Investment Opportunities*. All investment opportunities will be screened by a transaction team leader who will compare each opportunity's characteristics to the Fund's investment strategy and investment criteria. The investment opportunity will be discussed at meetings of the Investment Committee, where decisions to allocate human and financial resources to an investment opportunity will be made.

*Due Diligence.* The Principals believe that the due diligence process is an integral part in targeting attractive investment opportunities and in avoiding problem investments. Furthermore, the due diligence process is integral in acquisition negotiations where a properly executed due diligence process can have a material impact on the final price paid for an investment.

Once a potential investment opportunity has been cleared for review by the Investment Committee, a transaction team will be assembled and assigned to the opportunity. That transaction team will conduct a preliminary evaluation of the investment opportunity's industry, business, financial condition and management. This preliminary evaluation will be presented to the Investment Committee for further discussion.

After a decision by the Investment Committee to proceed further, the transaction team, along with the post-acquisition team, will undertake an intensive due diligence review, including hiring outside lawyers, accountants and, relevant specialist advisors, in order to achieve a thorough understanding of a potential investment's industry, business, operations, management, growth potential, as well as its strengths and weaknesses.

The transaction team will review an investment opportunity's operations, including sales and marketing, manufacturing, production, warehousing, distribution, accounting, financial management, financial controls, information systems, environmental risk management, risk management, and all other key areas, to identify potential strengths and areas for improvement.

The post-acquisition team will assist in due diligence and will particularly focus on human resource due diligence, assessing the quality and adequacy of a potential investment opportunity's management team. They will also devise a management incentive program, including employment contracts, annual bonus opportunities, stock purchase programs, and stock option plans, linked to management's achievement of its performance targets.

The Principals, especially Messrs. Glaser, Kantes, Dell and Navia, have extensive experience in leading and conducting this due diligence process. In addition, MapleWood will seek input from the Executive Advisory Board members and providers of debt financing in analyzing investment opportunities.

*Negotiations*. The transaction team leader, in conjunction with Mr. Glaser, will lead negotiations with the seller of the investment opportunity. Drawing upon Mr. Glaser's experience at Investcorp, MapleWood

believes that successful purchase negotiations require the intense involvement of a senior Principal. The transaction team leader will negotiate price, terms, conditions, and representations and warranties, as well as integrating the results of MapleWood's business review and its technical due diligence, to conclude a purchase agreement designed to minimize investment risk.

The post-acquisition team leader, in conjunction with Mr. Glaser, will lead discussions with operating management to devise a management incentive program, including employment contracts, annual bonus opportunities, stock purchase programs, and stock option plans, linked to management's achievement of its performance targets.

*Financing Transactions.* The transaction team leader, utilizing the assets of the investment opportunity, along with its historical and projected financial performance, will design a recommended capital structure for the investment. Once reviewed and approved by the Investment Committee, the transaction team leader will be responsible to identify potential financing sources and to negotiate financing facilities.

The Principals have significant experience in financing acquisitions. Specifically, both Mr. Glaser and Mr. Kantes have been commercial lenders in their careers and have structured acquisition financing for companies in the size range that the Fund intends to target. Mr. Kantes has been a senior executive and senior credit officer for a number of the large financial institutions, participating in middle-market leveraged financing, while overseeing their leveraged lending activities. He is well known in the field and has personally trained over 250 lending officers now specializing in leveraged acquisition financing. In addition, Mr. Segalas has significant experience in asset securitization.

*Investment Approval.* After due diligence, seller negotiations, and financing arrangements are completed, the Investment Committee will provide its final concurrence to conclude the investment transaction.

*Post-Acquisition Management.* The post-acquisition team, lead by Mr. Dell, will be part of the investment approval and due diligence process. The team will focus on evaluating the viability of the strategic plan presented by the management of the investment opportunity as well as helping to design and implement proper corporate governance provisions and management incentives.

Once a transaction is closed, the post-acquisition team will be responsible for overseeing the management's achievement of the Portfolio Company's operating plans, configuring the Portfolio Company's board of directors and controlling the purchasing decisions for the Portfolio Company. MapleWood will seek opportunities where it can clearly apply the benefits of having an experienced separate post-acquisition team.

*Exit Strategy.* The Fund intends to make investments with a three to five-year holding period but may hold Portfolio Companies for shorter or longer periods of time. Every Portfolio Company is expected to have the potential to be an attractive publicly traded company, have potential value to strategic or financial acquirers or otherwise provide the Fund with a liquidity event within a reasonable period of time. Depending on market conditions and the specific characteristics of a particular company, the General Partner may plan for a recapitalization of the business, a public offering of equity, an outright sale to a strategic buyer or a merger with another industry player. The General Partner may also consider disposing of individual business segments of a Portfolio Company to realize value. The Principals have experience in each of these methods for exiting corporate investments and will work towards long-term value maximization of the Fund's investment portfolio.

Decisions about exit timing and format will be made by the Investment Committee. A transaction team will be assembled to execute the exit transaction.

## E.    Fund Management

**Overview**

The Fund will be managed by the Principals through the General Partner. The General Partner will manage, control and operate the Fund. The Advisor will provide investment advisory services to the Fund. Investment decisions will be made by an Investment Committee of the General Partner. The General Partner believes that the multi-disciplined background of the Principals will provide a distinct advantage to the Fund in selecting, managing and exiting Portfolio Companies.

**Organization Structure**

MapleWood is organized along distinct functional lines. This structure will allow the Principals to focus on their specific core strengths. MapleWood believes that the skills to identify an attractive investment opportunity, the skills to execute an acquisition and the skills required to oversee a Portfolio Company post-acquisition are different. The marketing team will focus on locating transaction opportunities. The transaction teams will focus on analyzing attractive investment opportunities, conducting due diligence and negotiating, financing and closing acquisitions. The post-acquisition team will carefully monitor the performance of Portfolio Companies.

MapleWood's organizational structure is as follows:



**Executive Management**

Mr. Glaser is responsible for the strategic and tactical management and oversight of the General Partner, the Advisor, MapleWood Holdings LLC ("Holdings") (the general partner of the General Partner and the Advisor) and all functional units. All of the senior Principals will report to Mr. Glaser. Mr. Glaser's role will be similar to that of a Chairman and Chief Executive Officer, reporting to a board, which he will chair, composed of the other Principals and future senior professionals. As a chairman and chief executive officer does, Mr. Glaser has the authority to conduct all day-to-day affairs of the General Partner and the Advisor. Certain strategic decisions, however, will require a vote of the Principals, whose voting rights are based on their respective vested ownership.

**Transaction Teams**

Mr. Glaser will spend the majority of his time overseeing MapleWood's transaction teams and working closely with Mr. Dell in overseeing the post-acquisition process.

As transaction team leaders, Messrs. Kantes and Navia will work closely with Mr. Glaser in overseeing the execution of investment transactions. MapleWood intends to staff the firm with experienced professionals and analysts such that each transaction team will have at least one experienced professional and one to two analysts.

The General Partner will target to invest between $90 million and $125 million of the Fund's capital each year and will target to close approximately two to four deals annually, with an estimated average acquisition value of $100 to $150 million for each deal. Consequently, each transaction team will not be required to close more than two deals per year. This will allow each team to devote considerable time to transaction sourcing and execution activities.

**Post-Acquisition Team**

Mr. Dell will lead MapleWood's post-acquisition team, which will include operating and financial professionals and financial analysts. It will be this team's responsibility to continuously monitor the performance of each Portfolio Company. The primary goals of the post-acquisition team will be to provide active financial oversight of Portfolio Companies, to assist Portfolio Companies in implementing their growth and operating plans, and to improve and manage purchasing decisions of Portfolio Companies, both on a company-specific basis as well as across the entire Fund portfolio. Additionally, if necessary, the team will seek to identify any problems at Portfolio Companies in their formative stages, while they should be more easily manageable, and to work with operating management to develop and implement plans to address these issues.

It is intended that Mr. Dell will sit on the board of directors of each of the Fund's Portfolio Companies. It is expected that the transaction team leader responsible for the acquisition will also sit on the board, but Mr. Dell will have primary responsibility to actively monitor the Portfolio Company's performance. MapleWood will also utilize outside board members on the boards of its Portfolio Companies. Members of the Executive Advisory Board will be candidates for these positions, although MapleWood intends to also draw on outside expertise.

The General Partner believes that this separation of the transaction team from post-acquisition management will be a major strategic enhancement to the way many buy-out firms operating in the middle-market approach the management of their portfolios.

**Marketing Team**

MapleWood believes that an ongoing and proactive marketing program focused on developing investment opportunities will provide it with a strategic advantage in the marketplace. To this end, three senior Principals, Messrs. DaGrosa, Segalas and Musallam will lead this marketing effort. MapleWood has targeted local and regional accounting and law firms, business brokers and regional investment banks as high potential sources of deal flow and is developing a proprietary database, which currently includes over 4,000 potential contacts.

As part of their marketing responsibilities, Messrs. DaGrosa, Segalas and Musallam will also be responsible for maintaining strong lines of communications with Limited Partners. Mr. Tom Judge, a member of the Executive Advisory Board and former senior officer of AT&T's Pension Plan's Alternative Investment Portfolio, will serve as an advisor to the General Partner to assist the General Partner in its interaction with the Limited Partners.

### Investment Committee

The General Partner will have a formal Investment Committee (the "Investment Committee") that will make the decision to invest the Fund's capital in a specific transaction. Mr. Glaser will chair this committee. The Investment Committee will include voting and non-voting members. All professionals on the transaction and post-acquisition teams will be non-voting members of the Committee, and will be able to discuss investment opportunities. Voting members of the committee will be selected by a majority vote of the vested ownership interests of the Principals. Decisions of the Committee will be taken by majority vote of the members, not by ownership interests, with Mr. Glaser's concurrence required for decisions.

### Unique Ownership and Compensation Structure

The General Partner and the Advisor have an ownership structure that is substantially different from that typical at many other buyout firms. It is anticipated that all professionals, not just the initial Principals, will have an ownership stake in the General Partner and the Advisor with ownership interests vesting over time (except for certain initial Principals). Additionally, a substantial portion of annual profits available for distribution to the Principals will be allocated on a performance, not ownership, basis. Similarly, a substantial portion of the economic benefit of the General Partner's carried interest will also be allocated based on performance, not ownership, and (except for certain initial Principals) will also be subject to a vesting schedule. The Principals believe that this unique ownership structure will allow the General Partner and the Advisor to attract, recruit, motivate, compensate and retain a group of Principals whose economic returns are closely linked to those of Limited Partners.

### Biographies of the Principals

#### *Robert V. Glaser*

Robert V. Glaser, age 47, is the Managing Member of Holdings, the general partner of the General Partner and the Advisor, and is responsible for the strategic oversight and management of those entities and the Fund. Mr. Glaser is also Chairman of the Investment Committee overseeing the Fund's investment activities.

Mr. Glaser has extensive experience in all aspects of leveraged acquisitions, including creating deal flow, assessing acquisition candidates, conducting due diligence, negotiating with sellers, arranging senior and subordinated debt financing, post-acquisition management, and oversight of the investment disposition process. Mr. Glaser also has firsthand experience in the establishment of an investment firm, and in its management and administration.

Prior to the formation of the General Partner and the Advisor, Mr. Glaser served as a member of the worldwide management committee of Investcorp, a Luxembourg and Bahrain based investment firm. Mr. Glaser joined Investcorp in 1983 and was involved in the start-up phase of the firm during its first year of operation. Mr. Glaser had previously worked with Investcorp's founder, Nemir Kirdar, at Chase Manhattan Bank. During Mr. Glaser's tenure at Investcorp, the firm raised approximately $2.5 billion and

35