made investments with an acquisition value of approximately $7.5 billion. Most of these investments involved the acquisition of corporations in the United States and Europe. Mr. Glaser was responsible for the creation and staffing of Investcorp's U.S. operations and, by 1995, when Mr. Glaser left the firm, Investcorp had made approximately 35 investments in the United States, had approximately 50 U.S. employees, and had an investment portfolio representing equity investments exceeding $1.7 billion in companies with annual revenues exceeding $9 billion. Additionally, Mr. Glaser created Investcorp's "Intensive Care Unit" that included financial and operating professionals, eventually including Mr. Dell, a Principal, to intensively monitor the performance of Investcorp's portfolio companies that were performing below expectations. During his years at Investcorp, Mr. Glaser served on thirteen boards of directors on behalf of Investcorp.

From 1984 through 1995, Mr. Glaser was active in all areas of Investcorp's North American corporate investment activities, including:

- developing contacts with sources of potential investment opportunities
- screening and selecting opportunities
- conducting industry, business, financial and operating reviews of target investments
- leading transaction teams
- managing the due diligence process
- devising capital structures for investments
- conducting negotiations, as a principal, with sellers
- locating and negotiating senior and subordinated debt financing
- developing cash and stock incentive programs for operating management
- overseeing operating management of companies acquired
- managing the exit strategy for investments, both privately and through public offerings

In addition to his responsibilities in the corporate investment arena, Mr. Glaser served as Investcorp's Administrative Partner for the New York office and was a member of the firm's Administrative Committee that managed the firm's operations worldwide.

Prior to joining in the establishment of Investcorp, Mr. Glaser worked for ten years at The Chase Manhattan Bank, N.A. While at Chase he completed the Management Development, Global Credit and Advanced Management Programs. He initially worked in the domestic corporate lending group and later transferred to their international department.

Mr. Glaser received an M.B.A. from New York University, with majors in finance and international business. He also holds a B.A. in Political Science from the University of Buffalo. Mr. Glaser is a member of the National Association of Corporate Directors, is on the Board of Trustees of the National Foundation for the Advancement of the Arts, is a trustee of St. Thomas University, is a trustee of the Greater Miami Chamber of Commerce and is on the Board of Directors of Miami's Community Partnership for the Homeless Inc.

*David J. Kantes*

David J. Kantes, age 55, is a senior Principal and will lead one of the transaction teams.

Mr. Kantes is well known in the field of acquisition financing, with 25 years of experience in financing acquisitions of middle-market companies. Prior to joining MapleWood, Mr. Kantes was Group President, Heller Business Credit ("HBC"), having served in that position since 1993. At HBC Mr. Kantes closed

over $3 billion in transactions, including acquisitions, build-outs, consolidations, turn-arounds, expansions, and refinancings. Prior to joining HBC, Mr. Kantes was Executive Vice President, Chief Operating Officer, and co-founder of NatWest Credit Corp., serving in that capacity from 1986 to 1993. During this period, Mr. Kantes provided financing for Investcorp acquisitions and worked with Mr. Glaser. From 1985 to 1986, Mr. Kantes was Chief Credit and Portfolio Officer for the Citicorp Industrial Credit-Leveraged Finance Group. From 1983 to 1985, Mr. Kantes served as President and Chief Executive Officer of Talcott Business Credit. From 1973 to 1983, Mr. Kantes was employed by The Chase Manhattan Bank, N.A. where he initiated lending to leveraged buy-out transactions.

Mr. Kantes received an M.B.A. in Finance from Seton Hall University in 1968 and a B.S. in Finance from Duquesne University in 1966. Mr. Kantes is a former Chairman of the Commercial Finance Association, an international trade association comprising over 280 members, including all major U.S. financial institutions. Mr. Kantes is a member of the Board of Advisors, Arizona State University, First Intrastate School of Customer Service and was a Founder of Great Neck BankCorp. Mr. Kantes has also served as a Professor of Finance (Adjunct) at the Graduate Schools of Business of both Fordham University (1989-1993) and Seton Hall University (1968-1989).

*Glen A. Dell*

Glen A. Dell, age 62, is a senior Principal and will lead the post-acquisition team.

Mr. Dell has extensive financial and general management expertise with a diversified background in manufacturing, service and retail industries as well as extensive international experience. He also has experience in acquisitions, divestitures, financed restructuring and in turning around troubled companies. Mr. Dell was employed by Investcorp from 1992 to 1998 and worked for Mr. Glaser during part of this period. He was assigned to the post-acquisition management team of Investcorp's North American portfolio companies and participated in multiple post-acquisition management and operating roles. Prior to joining Investcorp, Mr. Dell was a management consultant, specializing in turn-arounds. He was Chief Financial Officer of the JWT Group, Inc., the parent holding company of J. Walter Thompson (advertising), Hill & Knowlton (public relations), Lord Geller (advertising) and Simmons (market research). From 1971 through 1984, Mr. Dell served in various management positions at International Paper Company, including Vice President of International Finance, Corporate Treasurer, Division Manager and Vice President and Group Executive. Prior to joining International Paper Company, Mr. Dell spent 14 years with the General Electric Company, serving in increasingly responsible financial management positions.

Mr. Dell received his B.A. from Amherst College in 1957 and is a graduate of GE's financial management and general management courses. He has served on the Boards of Directors of New York Stock Exchange listed corporations, including Riechhold Chemical Company and the JWT Group, Inc. He also served on the Board of Directors of Investcorp portfolio companies including Saks Holdings, Inc. and Lehigh Valley Dairy. He currently serves on the Boards of Directors of the Insurance Service Office, Star Markets Company, Burnham International and Kinnett Dairies.

*Talbert I. Navia*

Talbert I. Navia, age 42, is a senior Principal and will lead one of the transaction teams.

Mr. Navia has more than 15 years of experience in U.S. and Latin American transactions, including mergers and acquisitions, joint ventures, capital markets, financings and privatizations in such industries as

consumer products, financial services, retail, real estate, telecommunications and energy with particular emphasis in Latin America. Since 1995, Mr. Navia has been a partner and head of the Latin America Group at Chadbourne & Parke LLP, a major international law firm. Prior to joining Chadbourne & Parke LLP, Mr. Navia was the head of the Latin America Group of the New York office of Morrison & Foerster, another major international law firm, and served in that capacity from 1992 to 1995. Prior to 1992, Mr. Navia was a partner in the corporate department at Spengler, Carlson, Gubar, Brodsky & Frischling, a law firm concentrating on mergers and acquisitions and capital markets activity in the U.S. and Latin America.

Mr. Navia received his J.D. from Harvard Law School in 1980 and his B.A. in Economics from Iona College in 1977. He is a member of the Argentine-American Chamber of Commerce, Inc., Brazilian-American Chamber of Commerce, Inc., Colombian American Association, Council of the Americas and the United States-Mexico Chamber of Commerce.

Mr. Navia is currently a senior Principal and also a partner of Chadbourne & Parke LLP, legal counsel to the Fund. At the Initial Closing, Mr. Navia will resign as a partner of that firm.

*Donnell A. Segalas*

Donnell A. Segalas, age 40, is a senior Principal and will be responsible for sourcing investment opportunities for the Fund as well as managing the Fund's relationships with its U.S. investor base.

Mr. Segalas spent 12 years as a senior trader and structured finance professional while working for leading investment banking firms. In 1994, he joined Rodman & Renshaw as head of its Cross Border Finance Group, focusing on asset securitizations, private placements and initial public offerings. In 1990, he joined Tucker Anthony as Managing Director in charge of the Mortgage Backed Securities and Structured Finance Departments and was a member of the Steering and the Risk Management Committees. After completing the institutional equity and fixed-income sales and trading training program at Drexel Burnham Lambert Inc., he joined the newly formed Mortgage Backed Securities Department in 1984 and was involved in all collateralized mortgage obligations issued by Drexel Burnham Lambert Inc. from 1987 through 1990.

Mr. Segalas is a graduate of Denison University where he received a B.A. in Communications. Mr. Segalas is currently a member of the Board of Directors of Annaly Mortgage Management Inc., a New York Stock Exchange listed company.

*Joseph E. DaGrosa, Jr.*

Joseph E. DaGrosa, Jr., age 33, is a senior Principal and will be responsible for sourcing investment opportunities for the Fund, managing the Fund's relationships with its global investor base, and assisting Mr. Glaser in the management of Holdings, the General Partner and the Advisor.

Prior to joining MapleWood, Mr. DaGrosa was a founder and member of Beaconsfield Capital, LLC, a corporate financial advisory firm with offices in New York and Mexico City. While at Beaconsfield Capital, Mr. DaGrosa served as an advisor to a number of prominent companies including PCM Comunicaciones, and Centrax, a management led spin-off from Science Applications International Corporation, the world's largest private sector research and development company and Intellectual Property Security Company, a data encryption company. Prior to establishing Beaconsfield Capital, Mr. DaGrosa worked for PaineWebber Inc., one of the leading investment banks in the United States, in its Special

Accounts Group. In this capacity, Mr. DaGrosa oversaw client investment portfolios for many of PaineWebber's most significant offshore institutional and high net worth clientele.

Mr. DaGrosa earned a B.S. degree in Finance, Accounting and Statistics from Syracuse University. Mr. DaGrosa currently serves on the Boards of Directors of Centrax Corporation, Intellectual Property Security Company and on the United Nations International School Advisory Committee.

### Ali M. Musallam

Ali M. Musallam, age 39, is a senior Principal and is responsible for managing the Fund's international relationships, particularly in the Middle East. He will also assist in sourcing U.S. investment opportunities for the Fund.

Mr. Musallam has significant experience working for investment firms in the U.S. Mr. Musallam was most recently the founder of Subul Commercial Company, an investment service company based in Saudi Arabia, which assists investors in Arabian Gulf countries with their domestic and offshore corporate holdings. Mr. Musallam recently established and developed a soft drink company in Saudi Arabia. Prior to establishing Subul, Mr. Musallam was a partner at Gefinor USA, the buyout subsidiary of a merchant bank based in Geneva, which focuses in middle-market acquisitions. Prior to joining Gefinor, Mr. Musallam was Vice President - Special Accounts Group, Middle East region, for PaineWebber Inc., and was responsible for introducing specialized asset management and corporate finance products and services for institutional and high net worth clients in the Middle East.

Mr. Musallam received a B.A. degree in Business from King Abdulaziz University, Jeddah, Saudi Arabia, in 1983 and an M.B.A. from Nova University in 1987. He undertook postgraduate work in finance at the Harvard Business School and received a graduate certificate from Harvard University's Extension School in 1989. Mr. Musallam also received his Masters of Arts degree in International Relations with a specialization in International Finance from the Fletcher School of Law and Diplomacy at Tufts University.

### Enrique Fahrion

Enrique Fahrion, age 37, is a Principal and has over 14 years of international corporate finance experience with leading investment banking firms, multi-lateral organizations, the Argentine Government, and the corporate sector in Argentina. Mr. Fahrion's experience in Latin America includes the origination, coordination, and execution of a substantial number of investment banking transactions, including mergers and acquisitions, divestitures, U.S. registered equity and debt financing, Eurobonds, 144A debt, equity and fixed income funds, private equity and debt placements.

From 1992 through 1997, Mr. Fahrion acted as an investment banker in the Latin American Group at Salomon Smith Barney. Mr. Fahrion helped develop the bank's presence in South America, establishing new client relationships in Argentina, Brazil, Chile, Mexico, Peru and Venezuela. From 1990 to 1992, Mr. Fahrion led the Latin American efforts at Yamaichi Securities International (America), Inc., a subsidiary of Yamaichi Securities. Prior to 1991, Mr. Fahrion worked at The International Finance Corporation, The American University, the Ministry of Finance of the Argentine Government, and with several companies in Argentina.

Mr. Fahrion received his M.B.A. from The American University in 1990 and his M.A. in Business from the University of Belgrano in Buenos Aires, Argentina in 1984. Mr. Fahrion is also a Certified Public Accountant in Argentina.

## F.    Executive Advisory Board

### Overview

The General Partner and the Advisor have established an Executive Advisory Board comprised of experienced professionals who have achieved significant success in their respective fields and who are expected to provide significant transaction flow, advice, counsel, and expertise to the General Partner, the Advisor and the Fund.

The Executive Advisory Board will be comprised of individuals who have extensive business, financial, or government experience and will be helpful in generating attractive deal flow, assessing potential investment opportunities, assisting in the oversight of acquired companies and in maintaining relationships with investors. The General Partner will look to members of the Executive Advisory Board to bring investment opportunities to the Fund, to participate in the review of investment transactions in which they have relevant experience, and to sit on the boards of directors of Portfolio Companies.

The General Partner expects the Executive Advisory Board to be comprised of approximately six to twelve individuals. The Executive Advisory Board will meet two to four times per year with the senior Principals. Executive Advisory Board members will receive a retainer from MapleWood for sitting on the Executive Advisory Board, as well as incentive compensation when they assist in identifying investment opportunities successfully acquired by the Fund. They will also be separately compensated with an annual retainer and stock options for their services as directors of Portfolio Companies.

Biographical summaries of the current Executive Advisory Board members are provided below.

### Frank E. Weise, III

Frank E. Weise, III is President, Chief Executive Officer and a Director of the Cott Corporation, a leading worldwide retailer of non-alcoholic beverage products. Prior to joining Cott, he was the Chairman of the Board of CONFAB, the largest manufacturer and marketer of retailer branded sanitary and incontinency products, which was sold to Tyco Corporation in the first half of 1998.

Prior to CONFAB, Mr. Weise was employed at the Campbell Soup Company, where he served as the Senior Vice President of Finance and Chief Financial Officer from 1992 to 1995. From 1995 to 1997, Mr. Weise was President of Campbell's Bakery and Confectionery Division, with responsibility for $1.7 billion in sales and $200 million in operating income.

Mr. Weise was with Procter & Gamble from 1967 to 1992 and was Chief Financial Officer of various divisions during his tenure.

Mr. Weise is widely known as an industry operating specialist with 30 years of experience with leading consumer product companies who has demonstrated the ability to develop strategies for problem areas, and design and implement solutions that build shareholder value. Mr. Weise's demonstrated expertise in senior operating positions combined with his network of industry contacts is expected to be invaluable to the General Partner in its evaluation of various businesses as well as potential transaction flow. Mr. Weise maintains a residence in Florida.

### Hercules A. Segalas

Hercules A. Segalas is a managing director of PaineWebber Inc. where he is the head of PaineWebber's Global Consumer Products Investment Banking Group. Mr. Segalas has 40 years experience in the consumer product industry, having worked for Procter & Gamble in the U.S. and Europe for over ten years and three years at International Flavors and Fragrances before going to Wall Street in 1968.

The Global Consumer Products Group at PaineWebber encompasses the beverage, specialty retailers, mass merchandisers, department stores, food retailers, restaurants, over-the-counter pharmaceuticals, household products, personal care products and food industries. Mr. Segalas is regarded as having one of the broadest deal and personal networks on Wall Street. He has worked closely with many well-known buyout firms. His involvement has included exclusive sale mandates, deal origination, introduction of management teams and financing. Since 1988, Mr. Segalas' group at PaineWebber has completed over 275 transactions, 30% of these have been cross-border and many have been in association with buyout firms.

As one of the leading consumer products investment bankers on Wall Street, MapleWood believes that Mr. Segalas will bring invaluable industry contacts and transaction opportunities to the General Partner. Mr. Segalas maintains a residence in Florida. Mr. Segalas is the father of Donnell Segalas, a senior Principal.

### Arthur "A.J." Papetti

Arthur "A.J." Papetti is an Executive Vice President of Papetti's Hygrade Egg Products, Inc., a principal subsidiary of Michael Foods, Inc., a publicly traded company and a diversified food processor and distributor with particular interests in egg products. Michael Foods, Inc. and Papetti's Hygrade Egg Products, Inc. merged in 1997.

Mr. Papetti has spent 17 years with Papetti's Hygrade Egg Products, Inc./Michael Foods, Inc. Michael Foods, Inc. has in excess of $1 billion in sales annually and is the largest egg products company in the United States. The company has a nationwide distribution system with significant activity in the Southeastern United States supplying all major Fortune 500 food manufacturing companies.

Mr. Papetti also sits on the board of Michael Foods, Inc. His experience in virtually all operating aspects in this food product industry is expected to assist MapleWood in its identification of possible acquisition opportunities.

### Ron J. Ponder

Ron J. Ponder is currently President and Chief Executive Officer of Beechwood Data Systems, a leading technology firm providing software and integrated solutions for the telecommunications industry. Mr. Ponder has over 25 years of experience as a technology and business executive and has been recognized by many publications and industry organizations as one of the leaders of the information systems and telecommunications revolution.

Prior to joining Beechwood Data Systems, Mr. Ponder served as Executive Vice President of Operations and Service Management at AT&T, with responsibilities for AT&T's customer operations, including customer service and product management. He also had responsibilities for the AT&T Worldwide Intelligent Network and directed the company's information technology systems and development. He joined AT&T in 1993 as its first corporate Chief Information Officer.

Prior to joining AT&T, Mr. Ponder served as Executive Vice President, Systems and Operations, for Sprint Communications Corporation. Prior to Sprint, Mr. Ponder spent 17 years at Federal Express where he spearheaded the development of some of the most critical innovations in the overnight delivery industry.

Mr. Ponder was born in Arkansas and spent 22 years in Memphis, Tennessee. Mr. Ponder's experience with the world's leading technology/consumer/service corporation should prove invaluable to the Fund's corporate strategy. It is expected that Mr. Ponder's significant industry contacts will generate substantial transaction opportunities.

### Len J. Lauer

Len J. Lauer is a Senior Vice President in charge of Brand Management, Advertising and Public Relations at Sprint Corporation. Prior to joining Sprint he was the President and Chief Executive Officer of Bell Atlantic – New Jersey. During Mr. Lauer's tenure, Bell Atlantic-New Jersey grew to 17,000 employees, producing over $3.5 billion in annual revenue, with significant annual growth in revenues, net income and customer satisfaction. Mr. Lauer joined Bell Atlantic in 1992 as Vice President – Sales for Bell Atlantic's Large Business Services. Prior to Bell Atlantic, Mr. Lauer worked with IBM for 13 years as a sales and marketing executive. Mr. Lauer lives in Westwood, Kansas.

Mr. Lauer's significant experience and extensive contacts in the telecommunications and service industries should assist the Fund in the identification and assessment of potential acquisitions.

### Gen. Buster C. Glosson (Retired)

General Glosson is the President of Eagle Ltd., an aviation and high-tech consulting firm based in Charlotte, North Carolina. He is also the Chairman and Chief Executive Officer of Emirates Palomar Technology Services, a strategic planning and investment firm based in Abu Dhabi, United Arab Emirates. He is currently active on the board of several public and private companies. Additionally, he serves on the Central Intelligence Agency Director's National Security Advisory Panel.

General Glosson was a member of the United States Air Force from 1965 until 1994. Immediately prior to leaving military service in 1994, General Glosson served as Deputy Chief of Staff for Plans, Operations and Requirements where he was responsible for strategic planning, weapons system requirements, and day-to-day worldwide operations. Prior to being responsible for the United States Air Force's Operations, Plans and Requirements, General Glosson served as the Secretary of the Air Force's Director of Legislative Liaison where he formulated and executed Air Force legislative strategy with the Congress. During the Gulf War, General Glosson was Director of Air Campaign Plans in Riyadh, Saudi Arabia. His responsibilities included the planning of the Gulf War Air Campaign. Additionally, he is a command pilot with more than 3,600 hours in F-4s, F-5s and F-15s.

General Glosson's extensive contacts in the defense and aviation industries are expected to generate significant deal flow to the Fund. General Glosson was born in Greensboro, North Carolina and lives in Charlotte, North Carolina.

### Thomas B. Judge

Thomas B. Judge will be the General Partner's in-house advisor on the interests of Limited Partners.

Mr. Judge has been active in the private equity industry for the past eighteen years and currently serves as senior advisor to a number of firms, in the United States and Europe, active in various aspects of private

equity. He was inducted into the Private Equity Hall of Fame in 1995 and was considered the dean of institutional investors during his fifteen year private equity tenure at AT&T. During those fifteen years, he created and managed the AT&T venture capital portfolio that grew from zero in 1980 to commitments of $1.5 billion in 180 partnerships formed by 90 firms. Mr. Judge co-founded the Institutional Limited Partners Association. He retired from AT&T in September 1995.

[This page intentionally left blank]

# MAPLEWOOD EQUITY PARTNERS LP

## VI. DESCRIPTION OF PRIOR TRANSACTIONS

The following summaries describe the investment performance for those transactions in which Mr. Glaser played a Major Role at Investcorp. In addition, Mr. Kantes or Mr. Dell also played a role in many of these transactions. The General Partner believes that these investments are indicative of the Fund's intended strategy. Also included are summaries and information on transactions in which Mr. Glaser played a Contributing Role at Investcorp. Finally, additional information is included for representative transactions in which Mr. Kantes, although not an equity investor, played a role more significant than that typically played by a senior lender.

Data used in preparing this Section are, except as otherwise indicated, derived from publicly-available sources, including press reports and Securities and Exchange Commission filings, and annual reports of Investcorp. In some cases, such data has been supplemented by information furnished by the Principals.

### A.   Major Role Transactions

The Investcorp approach emphasized teamwork and cooperation. On Major Role transactions, an individual management committee member was one of the leaders in the acquisition of an investment, as well as played a substantial role in the financing, oversight or sale of the investment. On Contributing Role transactions, the individual did not lead the acquisition team, but played a role in some aspect of the execution of the acquisition, financing, oversight or sale of the investment and did not play a material role in the creation of value. Lastly, in some transactions, the individual member played virtually no role.

Those Investcorp management committee members assigned to play a Major Role for a specific transaction assembled a team consisting of other Investcorp personnel, including "principals" (senior professionals with investment or financial experience) and financial analysts, as well as outside advisors, such as accountants, lawyers, appraisers, and consultants. This large group comprised the Investcorp team for a given transaction. Management committee members who led the team were responsible for the overall management of the acquisition team and also played other specific roles in the transaction.

Mr. Glaser played a Major Role in seven transactions, detailed in the following pages.

# TIFFANY & CO.

Industry .................................................................................................................... Specialty Retail
Date of Initial Investment ................................................................................................ October 1984
Equity Invested .............................................................................................................. $8.9 million
Equity Investor............................................................................................................... Investcorp
Date of Realization ............................................................................................ May 1987 to September 1989
Realized Proceeds ........................................................................................................ $130.6 million
Realized IRR ..................................................................................................................... 120.2%

**Business Summary**    Tiffany & Co. ("Tiffany") is a retailer, designer, manufacturer and distributor of fine jewelry, timepieces, sterling silverware, china, crystal, stationery, leather goods and scarves. Sales are made through retail stores, direct marketing and leading international retailers.

**Background**    Investcorp was introduced to Tiffany management when Tiffany was being sold by Avon through an auction process. Tiffany initially attracted many acquirors but was considered to be difficult to finance due to its limited operating cash flow. To acquire Tiffany, Investcorp implemented an innovative capital structure for leveraged buyouts at that time - an asset protection loan. This transaction represented Investcorp's first major corporate investment in North America.

**Investment Rationale**    Investcorp believed this was an attractive investment opportunity due to (i) Tiffany's position in its market segment which resulted in a strong brand name, which was the pre-eminent name in the jewelry business, (ii) the strength of the management team, (iii) the growth potential of the business, especially through international opportunities and (iv) Tiffany's asset base, which was worth substantially more than the purchase price and therefore offered downside protection.

**Value Added**    Investcorp implemented a more efficient inventory management program which increased available cash while reducing costs. It established a compensation structure which incentivized management to grow the business and developed a plan for management to expand the revenue base of Tiffany internationally. In the years from acquisition to the company's initial public offering, revenues increased 35% from $135 million to $182 million, while operating profit increased from a loss of $3.5 million to $21.9 million.

**Exit**    Public equity markets

**MapleWood Participants**    Robert Glaser    Investcorp transaction co-leader. Other roles included: origination, negotiation and financing activities.

David Kantes    Financial consultant to Mr. Glaser regarding transaction financing structure

46

# BERTRAM-TROJAN/RIVA

Industry ................................................................................................................ Manufacturing
Date of Initial Investment ................................................................................... March 1985
Equity Invested .................................................................................................... $12.0 million
Equity Investor.................................................................................................... Investcorp
Date of Realization ............................................................................................. November 1988
Realized Proceeds ............................................................................................... $44.4 million
Realized IRR ....................................................................................................... 41.7%

| | |
|---|---|
| *Business Summary* | Bertram-Trojan/Riva ("Bertram") manufactured luxury sport fishing, convertible and motor yachts. In addition to the Bertram and Trojan Yacht divisions, the company included a marine service division and an Italian yacht company. |
| *Background* | Investcorp was introduced to Bertram through a limited auction process conducted by Bertram's then owner, Whitaker Corporation. |
| *Investment Rationale* | Investcorp was attracted to Bertram due to (i) its strong market position and brand name, (ii) its quality reputation, (iii) its international expansion opportunities, (iv) its opportunity to improve purchasing efficiencies, and (v) the strength of its management team. The Bertram division was known for its very high quality, durable fishing boats while the Trojan division was a leading name in pleasure yachts. |
| *Value Added* | Investcorp negotiated a capital expansion facility as part of the initial financing which allowed management to capitalize on its proprietary design work and develop a new model in addition to implementing a growth plan which included international expansion. The new model and international expansion led to sales growth from $70 million at the time of acquisition to over $125 million by 1988. |
| *Exit* | Private sale |
| *MapleWood Participants* | Robert Glaser — Investcorp transaction co-leader. Other roles included: origination, negotiation and financing activities. |
| | David Kantes — Acquisition financing provider |

47

## PEEBLES INC.

Industry ........................................................................................................................... Retail
Date of Initial Investment ............................................................................................... October 1986
Equity Invested ................................................................................................................ $8.5 million
Equity Investor ................................................................................................................. Investcorp
Date of Realization ........................................................................................................... January 1989
Realized Proceeds ............................................................................................................ $59.5 million
Realized IRR ..................................................................................................................... 132.5%

*Business Summary*

Peebles Inc. ("Peebles") operated 38 retail stores in Virginia, Maryland, Delaware, North Carolina and South Carolina at the time of acquisition. Peebles' stores were located primarily in small and medium sized towns providing middle-income consumers with brand-name and private label merchandise, including women's, men's and children's ready-to-wear apparel, accessories, shoes, cosmetics, housewares and furnishings.

*Background*

Peebles was a family owned business whose ownership was dispersed through the generations over several Peeble family members. The family decided to sell the business and the managing family members were introduced to Investcorp by an investment banker. This transaction represented one of the first leveraged buyouts in the department store retail category.

*Investment Rationale*

Investcorp believed Peebles was an attractive "buy and build" (unique for leveraged buyouts at this time) investment opportunity due to (i) its high level of profitability, (ii) leading position in its geographic market segment which resulted in a strong brand name, and (iii) a strong management team that was capable of running a much larger company. Investcorp identified a growth strategy that allowed Peebles to expand significantly with its existing management team.

*Value Added*

Investcorp negotiated a flexible financing package which enabled the company to finance internal growth and acquisitions, including the acquisition of a nine store Tennessee based department store chain in 1988. This growth strategy drove sales from $83 million at the time of acquisition to almost $150 million in 1989 and the number of stores from 38 to 49. Investcorp enhanced profitability by compensating management through equity ownership and negotiating a debt repurchase at a discount prior to exit.

*Exit*

Private sale

*MapleWood Participants*

Robert Glaser — Investcorp transaction leader. Other roles included: serving on board of directors and origination, negotiation, financing, oversight and sale activities.

David Kantes — Lead agent on acquisition financing and on refinancings relating to add-on acquisitions

# FOX PHOTO, INC.

| | |
|---|---|
| Industry | Photo Finishing |
| Date of Initial Investment | September 1987 |
| Equity Invested | $331,000 |
| Subordinated Debt Invested | $13 million |
| Total Capital Invested | $13.3 million |
| Equity Investor | Investcorp/Citicorp Venture Capital Ltd. |
| Date of Realization | August 1991 |
| Realized Proceeds | $23.6 million |
| Realized IRR | 18.1% |

**Business Summary**

Fox Photo, Inc. ("Fox"), one of the largest retail photo finishing companies in the U.S., had over 500 photo finishing outlets in 20 states at the time of acquisition. Fox provides high-quality photo developing services primarily to amateur photographers.

**Background**

Fox's parent corporation, formerly public, was being acquired by Eastman Kodak. The Newton family (founders of Fox and former owners) wanted to reacquire the retail photo business from Kodak, but needed financial investors to complete a transaction. Investcorp was introduced to management and acquired Fox's retail photo business in conjunction with Citicorp Venture Capital Ltd. The investment was structured with a subordinated debt component, which offered Investcorp downside protection with significant upside potential.

**Investment Rationale**

Fox was attractive due to (i) its leading market position in the Southern U.S., (ii) its excellent management team, (iii) the growth potential of its new mini-lab concept (photo finishing lab in supermarkets and Walmart stores), and (iv) the opportunity to open new stores in its existing markets. Investcorp believed that Fox could create shareholder value if capital was made available to management to open additional units while at the same time developing its mini-lab concept.

**Value Added**

Investcorp and Citicorp Venture Capital Ltd. negotiated a Senior Financing package that was flexible enough to allow management to aggressively pursue its growth strategy. During the time of Investcorp's investment, revenues at Fox increased significantly.

**Exit**

Private sale

**MapleWood Participants**

Robert Glaser    Investcorp transaction leader. Other roles included: serving on the board of directors and origination, negotiation, financing and sale activities.

49

# NEW YORK DEPARTMENT STORES OF PUERTO RICO INC.

Industry .................................................................................................................................Retail
Date of Initial Investment ...........................................................................................January 1988
Equity Invested ....................................................................................................$19.0 million
Equity Investor.............................................................................................................Investcorp
Date of Realization ....................................................................................................January 1993
Realized Proceeds ................................................................................................$19.0 million
Realized IRR ...................................................................................................................0.0%

**Business Summary**    New York Department Stores of Puerto Rico Inc. ("NYDS") was, at the time of
its acquisition by Investcorp, the largest independent department store chain in
Puerto Rico with over 16 stores.  The Company initially consisted of two
separate department store chains and an affiliated real estate company in Puerto
Rico.  The stores primarily targeted middle to low income consumers.

**Background**    Investcorp was introduced to NYDS through one of the principals of
WestSphere Capital, with whom Mr. Glaser had a relationship.  A retail
consultant had an option to acquire NYDS and needed a financial backer.
Investcorp acquired NYDS and the retail consultant became the CEO.

**Investment Rationale**    Investcorp believed this was an attractive investment opportunity due to the
(i) ability to improve the cost structure through synergies of merging two
retailers together, (ii) ability to grow sales through more efficient stocking of
stores, (iii) perceived significant barriers to entry in the Puerto Rico market and
(iv) high percentage of retail spending by consumers in Puerto Rico.
Additionally, Investcorp's downside was protected due to the value of the
company's real estate portfolio.

**Value Added**    NYDS had significant management issues with the existing management team,
including decreasing revenues, which required Investcorp to devote substantial
time to the management of the business in order to avoid a loss for its investors.
Additionally, discount retailers began entering the market adding additional
competitive pressure.  Mr. Glaser and Mr. Dell took an active management role
in the company, implementing initiatives including replacing the CEO and hiring
a new management team, negotiating favorable lease terms with landlords,
negotiating with vendors, and selling certain real estate assets to reduce debt.
Mr. Dell was also involved in obtaining the assignment of leases to the new
owner, which was a key point for concluding a sale.

**Exit**    Private sale

**MapleWood Participants**    Robert Glaser    Investcorp transaction leader.  Other roles included serving
on the board of directors and origination, negotiation,
financing and sale activities.

Glen Dell    Post-acquisition management (including the position of
interim Chief Executive Officer).  Also served on board of
directors.

50

# GUCCI GROUP N.V.

Industry ..................................................................................................................Specialty Retail
Date of Initial Investment ............................................................................... September 1993
Equity Invested ....................................................................................................$170 million
Equity Investor..........................................................................................................Investcorp
Date of Realization ......................................................................... October 1995 to March 1996
Realized Proceeds ..............................................................................................$889.2 million
Realized IRR ...................................................................................................................94.6%

**Business Summary**    Gucci Group N.V. ("Gucci") is one of the world's leading designers, producers and distributors of high quality personal luxury accessories and apparel and is one of the best recognized and most prestigious international luxury brands. Its products include leather goods (handbags, small leather goods and luggage), shoes, ties and scarves, ready-to-wear, watches, gifts, jewelry, eyewear and perfume. Gucci distributes its merchandise through directly operated stores.

**Background**    By early 1989, Investcorp had assembled an effective 50% interest in various corporate entities around the world comprising the Gucci Group of companies; the remaining 50% was controlled by Maurizio Gucci. Gucci was not organized on a global basis into a cohesive operating company with centralized products and strategies; instead, each company often pursued very different product, merchandising and pricing strategies with different management teams. In 1993, Investcorp, as a result of a disagreement with Mr. Gucci, decided to acquire the remaining 50% of Gucci it did not control. Investcorp was able to negotiate the acquisition of this stake the same year.

**Investment Rationale**    Investcorp believed that acquiring the remaining 50% of Gucci was an attractive investment due to (i) Gucci's strong brand name, (ii) its high level of product quality, (iii) the impact new management could have on sales and profits. Additionally, the new global structure at Gucci introduced in 1991 by Investcorp made a public equity offering exit a realistic possibility.

**Value Added**    By 1991, at the insistence of Investcorp, the worldwide group of Gucci companies was reorganized, resulting in a truly global conglomerate with one parent company. Mr. Glaser led the corporate reorganization and the implementation of corporate governance provisions and global operating procedures. In 1993, Mr. Glaser led the team that acquired the remaining 50% of Gucci from Maurizio Gucci. Additionally, he was instrumental in choosing the new senior management team. During these periods, Mr. Glaser was Investcorp's primary representative for its investment in Gucci, and sat on the Board of Directors of several primary Gucci entities.

**Exit**    Public equity markets

**MapleWood Participants**

| | | |
|---|---|---|
| Robert Glaser | Investcorp transaction leader. Other roles included: serving on the board of directors of several Gucci entities and origination and negotiation activities. | |
| Glen Dell | Investcorp team member | |

## PRIME SERVICE, INC.

Industry ....................................................................................................Equipment Rental
Date of Initial Investment ....................................................................................December 1994
Equity Invested ...................................................................................................$79.0 million
Equity Investor........................................................................................................Investcorp
Date of Realization ..................................................................................................July 1997
Realized Proceeds ...............................................................................................$662.3 million
Realized IRR ...............................................................................................................126.6%

| | |
|---|---|
| *Business Summary* | Prime Service, Inc. ("Prime Service") is a leading equipment rental company in the U.S. Its operations consist primarily of renting equipment and, to a lesser extent, selling complementary parts, merchandise and used equipment to the construction, refining and industrial sectors. At the time of acquisition, Prime Service operated 74 rental equipment yards in 11 states, renting over 100 different types of equipment from its 30,000 item rental fleet. |
| *Background* | Prime Service was being sold by its French parent, Artemis S.A. Although a capital intensive business, the previous owners of Prime Service restricted its ability to make capital expenditures. In addition to the normal due diligence requirements, this acquisition had some particularly complicated environmental concerns. |
| *Investment Rationale* | Investcorp was attracted to Prime Service because it believed that if it unlocked the business's potential distribution capability through capital availability, superior returns could be generated. Prime Service had an excellent management team and superb information technology (both operating and reporting), but management had limited incentives to drive growth. Additionally, the equipment rental industry was highly fragmented, offering substantial add-on acquisition possibilities. |
| *Value Added* | Investcorp was instrumental in implementing a financial structure and capital spending plan which made funds available to management to rapidly expand its business. Prime Service was able to widen its customer base and increase its rental fleet through opening new locations and acquiring other rental companies. Additionally, Investcorp implemented new management cash and equity incentive plans linked to profitable growth at Prime Service. By opening new facilities and acquiring competition, revenues grew from $211.9 million to $326.6 million and operating income grew from $34.5 million to $60 million from 1994 to 1996. |
| *Exit* | Private sale (Following initial public offering in late 1996) |

| *MapleWood Participants* | Robert Glaser | Investcorp transaction leader (until late 1995). Other roles included: serving on the board of directors and origination, negotiation and finance activities. |
|---|---|---|
| | David Kantes | Co-lender on acquisition financing facility and refinancings related to add-on acquisitions |

## B.    Contributing Role Transactions

The Investcorp approach emphasized teamwork and cooperation.  On Major Role transactions, an individual management committee member was one of the leaders in the acquisition of an investment, as well as played a substantial role in the financing, oversight or sale of the investment.  In Contributing Role transactions, the individual did not lead the Investcorp acquisition team, but played a role in some aspect of the execution of the acquisition, financing, oversight, or sale of the investment and did not play a material role in the creation of value.  Lastly, in some transactions, the individual member played virtually no role.  The following are summaries of transactions in which Mr. Glaser and, in some cases, Mr. Dell, played a Contributing Role.

**Burnham Service Corporation**.  Messrs. Glaser and Dell were involved in Investcorp's post-acquisition management unit.  This company is currently in Investcorp's portfolio.  Roles included serving as board members and the interim Chief Executive Officer, the arranging of acquisition financing, hiring the Chief Executive Officer and other senior management, strategic decision making, development of international alliances, and technology investment.

**Catherines Stores**.  Mr. Glaser was involved in the post-acquisition management of Catherines Stores.  His roles included serving as a board member, arranging acquisition financing, and arranging the initial public offering and secondary equity offerings (Investcorp exit).

**Club Car**.  Mr. Glaser was primarily involved in the acquisition financing for Club Car.  His roles included serving as a board member and also arranging permanent financings.

**Color Tile**.  Mr. Glaser was involved in the sourcing of the Color Tile transaction.  He was involved in the initial sourcing and due diligence of the transaction (but not the acquisition closing).  Mr. Glaser also served as a board member until 1992.

**Dellwood Foods**.  Messrs. Glaser and Dell were involved in Investcorp's post-acquisition management unit.  Their roles in post acquisition management included serving as board members, hiring the Chief Executive Officer and other senior management, involvement in strategic decision making and overseeing the sale of the company.

**Mueller Co.**  Mr. Glaser introduced the financing source for this acquisition and renegotiated the credit facilities.

**Saks Holdings, Inc.**  Mr. Glaser arranged the initial financing for this acquisition of the holding company for Saks Fifth Avenue department stores.

**WestSphere Capital.**  Mr. Glaser originated Investcorp's investment in WestSphere, a Latin American investment fund.  He also negotiated and structured the transaction and was involved in post-acquisition management.

## Contributing Role Transactions

*(dollars in millions)*

| Company | Industry | Date of Initial Investment | Transaction Value | Capital Invested | Date of Realization | Realized Proceeds | Multiple of Equity Invested | Annual IRR on Investments[1] |
|---|---|---|---|---|---|---|---|---|
| Burnham Service Corporation [2] | Transportation | April 1988 | $160.0 | NA | NA | NA | NA | NA |
| Catherines Stores | Specialty Retail | Oct. 1987 | $58.9 | $11.5 | April 1992 | $38.0 | 3.3x | 125.6% [3] |
| Club Car | Manufacturing | Dec. 1986 | $57.0 | NA | Nov. 1988 | NA | NA | 98.7% [4] |
| Color Tile | Retail | Dec. 1989 | $450.0 | $50.0 | Dec. 1996 | $16.5 | 0.3x | (14.6)% [4] |
| Dellwood Foods | Dairy | Dec. 1985 | $51.0 | NA | May 1997 | NA | NA | 4.0% [4] |
| Mueller Co. | Manufacturing | May 1986 | $319.1 | $30.0 | July 1988 | $88.0 | 2.9x | 58.4% [3] |
| Saks Holdings, Inc. | Specialty Retail | July 1990 | $1,900.0 | $900.0 | NA | $1,267.8 [5] | 1.4x | 5.2% [3] |
| WestSphere Capital [6] | Investments | June 1989 | $2.0 | $2.0 | 1995 | $5.8 | 2.9x | 21.2% |

Notes:

| | |
|---|---|
| (1) | Except as otherwise indicated, represents gross annualized, pre-tax, compound IRR, based on daily net cash flows. |
| (2) | This company is currently in Investcorp's portfolio. |
| (3) | Source: Securities and Exchange Commission filings and other public sources. |
| (4) | Net returns to Investcorp's investors, based on a published report. Source: *Arabian Business Magazine,* April 1998. |
| (5) | Realized proceeds and unrealized value based on June 17, 1998 share price. |
| (6) | Data confirmed by the company. |

## C.    Other Significant Role Transactions

Mr. Kantes has been a long-time lender to leveraged investors in middle-market companies.  His role in many transactions often extended beyond the typical role of a senior lender.  The following table describes ten transactions where Mr. Kantes played a role beyond that normally provided by a commercial lender. They are representative of a number of situations where Mr. Kantes not only provided financing, but where his role extended into other aspects of the transaction, including transaction sourcing, due diligence, investment rationale and post-acquisition advisory and management.  Following the table are summaries of three representative transactions included in the table.  Mr. Kantes was not a principal at any of the equity investment firms listed in such summaries, and information regarding equity invested and IRR has been provided for comparative purposes only.  Data used in preparing the table and the summaries have been furnished by the Principals.  Except for The North Face, Inc., information concerning equity invested and IRR which appears in the summaries has been confirmed by the equity investors in such transactions.

### Other Significant Role Transactions

| Company | Date | Transaction Value ($ in Millions) | Loan Amount ($ in Millions) | Sales Revenue ($ in Millions) | Comments |
|---|---|---|---|---|---|
| Aetna Industries, Inc. | 1989 | $110 | $75 | $125 | Leveraged acquisition of O.E.M. automotive component supplier |
| A.P. Parts | 1987 | $170 | $60 | $150 | Leveraged acquisition of O.E.M. and after-market global exhaust system manufacturer |
| Chief Auto Parts | 1997 | $225 | $100 | $250 | Recapitalization of retail automotive parts chain |
| Gerber Children's Wear, Inc. | 1995 | $80 | $65 | $110 | Leveraged acquisition of infants' and children's wear supplier |
| Hamilton Beach, Inc. | 1987 | $100 | $77 | $170 | Leveraged acquisition of consumer appliance firm |
| Learjet Corporation | 1987 | $145 | $95 | $125 | Leveraged acquisition of aircraft and aerospace concern |
| McCulloch Corporation | 1996 | $110 | $60 | $200 | Leveraged acquisition of global lawn and garden products manufacturer |
| Mr. Coffee, Inc. | 1987 | $75 | $35 | $125 | Leveraged acquisition of consumer appliance manufacturer |
| The North Face, Inc. | 1994 | $95 | $65 | $110 | Leveraged acquisition of high-performance sports apparel firm |
| Selmar Musical Investments | 1989 | $120 | $75 | $90 | Leveraged acquisition of musical instrument manufacturer |

# MR. COFFEE, INC.

Industry ............................................................................................................ Consumer Products
Date................................................................................................................................ 1987
Lender ......................................................................................................... NatWest Credit Corp.
Loan Amount.............................................................................................................. $35 million
Equity Investor................................................................................................... McKinley Allsopp

**Business Summary**

Mr. Coffee, Inc. ("Mr. Coffee") is a leading producer of brand name automatic drip coffee makers and offers an extensive line of automatic drip coffee makers, coffee filters, replacement decanters, coffee bean grinders, and mug and decanter warmers.

**Background**

Mr. Coffee was owned by multiple family members. The growing competitiveness of the domestic market, coupled with the increased capital needs required to fund product design, research and development, advertising and aggressive growth exceeded the management capability and the capital capacity of the private owners of Mr. Coffee. Due to these factors, the private owners of Mr. Coffee put the company up for sale in an auction process. As part of the acquisition process, a complex product liability issue needed to be addressed to avoid future liability.

**Investment Rationale**

Given Mr. Kantes recent experience with Proctor Silex and Hamilton Beach, he was asked to review the transaction along with McKinley Allsopp. Mr. Kantes was familiar with the success factors and dynamics of this industry and identified the value in the transaction. Mr. Kantes believed Mr. Coffee was an attractive investment due to (i) its strong brand name, (ii) the current under-management of the business (and the impact professional management could have on sourcing and research and development), and (iii) improvement potential in production/assembly from capital expenditures. Additionally, the product liability litigation was reviewed and the acquisition structured such that it would not be a potential liability to the business.

**Value Added**

Upon acquisition, a new senior operating management team was hired and Mr. Coffee transitioned from a niche U.S. manufacturer to a global consumer appliance design and procurement marketing firm. Sourcing from Asia was put in place, and Mr. Coffee became more of an assembler and distributor, minimizing its manufacturing operations. The financing was structured to allow capital to be invested to further develop the already strong Mr. Coffee brand name. The business improved dramatically in a short period of time and accomplished a successful public offering.

**Exit**

Public equity markets

**MapleWood Participant**

David Kantes     Acted as lead agent in connection with acquisition financing (both bridge and permanent); provided structuring advice; and performed due diligence. Mr. Kantes was involved in this transaction from inception through refinancing

**Equity Investor**

McKinley Allsopp and affiliates provided approximately $3 million in equity capital for this transaction and realized an IRR of approximately 50%.

# THE NORTH FACE, INC.

Industry ........................................................................................................... Outdoor Apparel
Date........................................................................................................................... 1994
Lender ......................................................................................................Heller Business Credit
Loan Amount.........................................................................................................$65 million
Equity Investor....................................................................................................... J.H. Whitney

| | |
|---|---|
| **Business Summary** | The North Face, Inc. ("North Face") designs and distributes technically sophisticated outerwear, skiwear, functional sportswear, tents, sleeping bags, backpacks and daypacks, all under The North Face name. North Face believed that The North Face brand was the world's premier brand of high-performance outdoor apparel and equipment. |
| **Background** | North Face's parent was in bankruptcy, under financial distress with no liquidity. North Face was being auctioned under Chapter 11 proceedings, with potential buyers and their financing sources examining a transaction. Over 20 lenders showed no interest in financing an acquisition of the company due to the difficulty in isolating the true financial performance of the company from its parent. Mr. Kantes, while at Heller Business Credit, came across this situation and introduced North Face to the equity sponsor that undertook the acquisition and facilitated the capital investment. |
| **Investment Rationale** | Mr. Kantes was attracted to North Face due to (i) its strong brand name, (ii) its ability to implement Asian sourcing and associated logistics management and (iii) the value in the company's trademarks. Concurrent with the acquisition, North Face sold the rights to its trademark in Japan and Korea which materially reduced the initial equity investment needed. |
| **Value Added** | North Face capitalized on its brand name with a comprehensive consumer advertising campaign which led to a dramatic revenue increase, from $87 million in 1994 to $158 million in 1996. Complete sourcing (cut, sew and finish) in Asia and on-site quality inspection was implemented, including synchronizing the logistics function (i.e. inventory management). |
| **Exit** | Public equity markets |
| **MapleWood Participant** | David Kantes    David Kantes acted as lead agent in connection with acquisition financing; provided structuring advice; performed due diligence and introduced the equity sponsor. |
| **Equity Investor** | J.H. Whitney and affiliates provided the majority of the equity capital for this transaction. |

# LEARJET CORPORATION

Industry .................................................................................................................................. Aerospace
Date of Initial Investment ................................................................................................................ 1987
Lender .................................................................................................................. NatWest Credit Corp.
Loan Amount .......................................................................................................................... $95 million
Equity Investor .......................................................................................................... Integrated Resources

**Business Summary**        Learjet Corporation ("Learjet") was a diversified aerospace manufacturing firm
producing aircraft parts and components for the Boeing 737 aircraft, complex
aerospace booster components, executive aircraft and a unique military C-22
procurement and supply program in addition to being a fuel based operations
(refueling) operator.

**Background**        Mr. Kantes knew Learjet from his prior employment at Citicorp. Learjet was a
troubled and undercapitalized manufacturer and was being sold through an
auction process. The military supply and procurement business of the company
was very difficult to understand and business by business analysis was complex
to model due to substantial intra-year cash flow swings (up to $200 million).

**Investment Rationale**        Mr. Kantes believed that the complexity of operating various manufacturing
sites, managing the C-22 military program and struggling to bring new aircraft
models to market all offered a unique value opportunity for Integrated
Resources. Mr. Kantes realized that the value of the individual assets could
best be captured through a sale/divestiture of certain assets so management
could focus it efforts on remaining businesses. Additionally, Learjet had been a
recognized name in corporate aircraft since 1964.

**Value Added**        A new top management team was hired who quickly sold the refueling
operations and began to shut down or divest certain military operations. This
enabled management to focus on the executive jet business. The financing
structure offered Learjet the capital needed to design new models and be
competitive. Sales in the executive jet business increased materially during the
period of ownership.

**Exit**        Private sale

**MapleWood
Participant**        David Kantes        Acted as lead agent; provided structuring advice and
performed due diligence.

**Equity Investor**        Integrated Resources provided approximately $20 million in equity capital for
this transaction and realized an IRR of approximately 93.8%.

# MAPLEWOOD EQUITY PARTNERS LP

## VII.  CERTAIN INVESTMENT CONSIDERATIONS

*Investment in the Fund involves a high degree of risk.  There can be no assurance that the Fund's investment objectives will be achieved or that a Limited Partner will receive a return of its capital.  The following considerations should be carefully evaluated before making an investment in the Fund.*

### Risks of Realization of Investments

Given the nature of the investments contemplated by the Fund, there is a significant risk that the Fund will be unable to realize its investment objectives by sale or other disposition of Investments at attractive prices or that the Fund will otherwise be unable to complete any exit strategy with respect to its Investments.  In particular, these risks could arise from changes in the financial condition or prospects of the business or entity in which an Investment is made, changes in national or international economic conditions, and changes in laws, regulations, fiscal policies or political conditions of countries in which Investments are made.

In addition, it is unlikely that there will be a public market for the securities held by the Fund.  The Fund will generally not be able to sell these securities publicly unless their sale is registered under applicable securities laws, or unless an exemption from such registration requirements is available.  In some cases, the Fund may also be prohibited by contract from selling such securities for a period of time or otherwise be restricted from disposing of such securities.  Furthermore, the types of investments made by the Fund may require a substantial length of time to liquidate.

### Long-Term Investments

The return of capital and the realization of gains, if any, will occur only upon the partial or complete disposition of a Fund Investment.  It is expected that Investments will not generally be sold until a number of years after they are made.  Prior to such time, there will generally be no current return on the Investment.

### Startup Nature of Fund

The Fund itself has no previous operating history and will be entirely dependent upon the General Partner and the Advisor, which in turn will rely upon the expertise of Mr. Glaser, the Principals and MapleWood's other investment and advisory professionals.  Should Mr. Glaser or one or more of the Principals or the other investment professionals of the General Partner and the Advisor become incapacitated or in some other way cease to participate in the management of the Fund, the Fund's performance could be adversely affected.  Prospective investors should bear in mind that past performance is not necessarily indicative of future results, and there can be no assurance that the Fund will be able to achieve the same level of returns as were described in "Section III - Investment Performance" and in "Section VI - Description of Prior Transactions" in connection with prior transactions with which Mr. Glaser and certain of the other Principals were involved.

### Leverage

To the extent that any investment of the Fund is made in a business or entity (including an entity formed to effect the acquisition of another business or entity) with a leveraged capital structure, such investment will be subject to increased exposure to adverse economic factors such as a significant rise in interest rates, a

severe downturn in the economy or deterioration in the condition of such business or entity or the industry in which it operates. In the event such a business or entity is unable to generate sufficient cash flow to meet principal and interest payments on its indebtedness, the value of the Fund's equity investment in such business or entity could be significantly reduced or even eliminated.

### Limited Number of Investments

The Fund may participate in only a limited number of Investments and, as a consequence, the aggregate return on a Limited Partner's investment in the Fund may be substantially adversely affected by the unfavorable performance of even a single Investment of the Fund. A Limited Partner's participation in Investments of the Fund may be limited by virtue of the General Partner's right to exclude a Limited Partner from participating in any Investment of the Fund, if the General Partner determines in its discretion that, among other things, such participation might otherwise have certain materially adverse effects on the Fund or any of its affiliates, any Portfolio Company or any future Investment of the Fund or any of its affiliates, including if such participation would be likely to result in violations of law or the imposition of materially burdensome regulatory or legal requirements, or as a result of certain circumstances relating to such Limited Partner.

### Availability of Investment Opportunities

The business of identifying and structuring investments of the types contemplated by the Fund is highly competitive, and involves a high degree of uncertainty. Furthermore, the availability of investment opportunities generally will be subject to market conditions as well as, in some cases, the prevailing regulatory or political climate. Accordingly, there can be no assurance that the Fund will be able to identify and complete attractive investments in the future or that it will be able to invest fully its committed capital.

### Investment Structuring and Financial Projections

The General Partner will generally establish the capital structure of Portfolio Companies on the basis of financial projections for such companies. Projected operating results will normally be based primarily on management judgments. In all cases, projections are only estimates of future results, which are based on assumptions made at the time the projections are developed. There can be no assurance that the projected results will be obtained and actual results may vary significantly from the projections. General economic conditions, which are not predictable, can have a material adverse impact on the reliability of projections. Also, the securities in which the Fund will invest will typically be among the most junior in a Portfolio Company's capital structure, and thus subject to the greatest risk of loss.

### Passive Investment

The Advisor will be the exclusive provider of investment advisory services to the Fund and will have responsibility for seeking out and evaluating investment opportunities on behalf of the General Partner and the Fund and in structuring investments. The Limited Partners will not make decisions with respect to the acquisition, management, disposition or other realization of any Investment, or other decisions regarding the Fund's business and affairs.

### Restrictions on Transfer and Withdrawal

Limited Partnership Interests are not transferable except with the consent of the General Partner, which consent may be withheld in the sole and absolute discretion of the General Partner. Limited Partners may

not withdraw capital from the Fund other than in the form of distribution proceeds when and as distributed by the Fund. The Limited Partnership Interests have not been registered under the securities laws of any jurisdiction, and, therefore, cannot be resold unless they are subsequently registered under applicable securities laws or an exemption from registration is available. It is not contemplated that registration of the Limited Partnership Interests under any jurisdiction's securities laws will ever be effected. There is no public market for the Limited Partnership Interests and one is not expected to develop. Limited Partners must be prepared to bear the risks of owning Limited Partnership Interests for an indefinite period of time.

## Asset Valuations

With certain limited exceptions, valuations of investment proceeds with respect to Investments of the Fund will be determined by the General Partner and will be final and conclusive as to all Limited Partners. However, the General Partner may, in its discretion, seek advice from the Fund's Advisory Committee regarding the valuation of investment proceeds.

## Risk of Dilution

Limited Partners who become such at subsequent closings will participate in existing Investments of the Fund, diluting the interest of existing Limited Partners. Such Later Admitted Limited Partners will generally purchase their Limited Partnership Interests at the same price as the initial Limited Partners and will also pay their pro rata portion of the Fee and certain expenses incurred from the inception of the Fund plus interest thereon. There can be no assurance that such payments will reflect the fair value of the Fund's existing Investments at the time such Later Admitted Limited Partners acquire their Limited Partnership Interests.

## Investments Outside the United States

The Fund may make limited portfolio Investments outside of the United States that involve certain factors not typically associated with investing in the United States, including economic and political risks. The General Partner and the Advisor will analyze information with respect to political and economic environments and the particular legal and regulatory risks in countries outside the United States before making Investments, but no assurance can be given that a given political or economic climate or that particular legal or regulatory risks might not adversely affect an Investment by the Fund.

## Recourse to the Fund's Assets

The Fund's assets, including any Investments made by the Fund and any funds held by the Fund, are available to satisfy all liabilities and other obligations of the Fund. In connection with the disposition of an Investment, the Fund may be required to make representations about the business and financial affairs of a Portfolio Company typical of those made in connection with the sale of a business. The Fund also may be required to indemnify the purchasers of such Portfolio Companies to the extent that any representations made by the Fund prove to be inaccurate. These arrangements may result in contingent liabilities, which might reduce or delay the amounts that can be distributed to Limited Partners.

## Reliance on Management

The Fund will seek to monitor the performance of each investment through active participation by MapleWood on the boards of directors of Portfolio Companies and by maintaining an ongoing dialogue with each Portfolio Company's management team. However, it will be primarily the responsibility of a Portfolio Company's management to operate the Portfolio Company on a day-to-day basis. Although it is

the intent of the Fund to invest in companies with strong operating managements having a successful track record, there can be no assurance that the existing management team, or any new one, will be able to successfully operate a Portfolio Company.

## Consequences of Default

In the event that a Limited Partner fails to fund any of its Commitment when required, such Limited Partner's interest in the Fund and its Investments may be reduced and such Limited Partner may be precluded from further investment in the Fund.

## Conflicts of Interest

There will be occasions when the General Partner, the Advisor, the Principals or their respective affiliates may encounter conflicts of interest in connection with the Fund. Certain actual and potential conflicts of interest are described below. By acquiring Limited Partnership Interests, each Limited Partner will be deemed to have acknowledged the existence of such actual and potential conflicts of interest and to have waived any claim with respect to the existence of any such conflict of interest. Pursuant to the Partnership Agreement, an Advisory Committee of representatives of Limited Partners will be established, and the General Partner may in certain situations choose to seek the approval of the Advisory Committee with respect to conflicts of interest. The General Partner may also choose to seek the approval of Limited Partners with respect to certain conflict situations. Such approval may be sought from Limited Partners having a majority of the outstanding Limited Partnership Interests. Any such approval by the Advisory Committee or Limited Partners will be binding upon the Fund and all the Limited Partners.

*Compensation for Services.* It is contemplated that the Advisor will normally seek to perform investment banking and other services for, and will expect to receive customary investment banking compensation from, Portfolio Companies, or other parties in connection with transactions related to such Portfolio Companies or otherwise. Such compensation could include financial advisory fees or fees in connection with mergers and acquisitions activities. Except as specifically set forth in this Memorandum and the Partnership Agreement, such compensation will not be shared with the Fund or its Limited Partners.

*Management of the Fund.* The officers and employees of the General Partner and the Advisor will, pursuant to the Partnership Agreement and the Advisory Agreement, devote such time to the performance of their respective obligations as the General Partner and the Advisor, in their sole discretion, deem necessary to carry out the operations of the Fund effectively. The General Partner and the Advisor may not act as manager or advisor to any other investment fund (other than the Offshore Fund) which has a substantially similar investment objective as the Fund until such time as (i) at least 70% (excluding amounts reserved for follow-on Investments) of the Fund's Commitments have been drawn down for Investments or for the payment of the Fund's expenses or (ii) the Investment Period has expired. After such time, neither the General Partner nor the Advisor will be subject to any prohibitions against their acting as manager or advisor to another investment fund.

# MAPLEWOOD EQUITY PARTNERS LP

## VIII.  CERTAIN LEGAL AND REGULATORY MATTERS

### SECURITIES LAW MATTERS

The Limited Partnership Interests described herein are not being registered under the Securities Act of 1933, as amended (the "Securities Act"), or any other securities laws, including state securities or blue sky laws. The Limited Partnership Interests will be offered and sold only to "accredited investors" as defined in Regulation D under the Securities Act. The Limited Partnership Interests will be offered without registration in reliance upon the Securities Act exemption for transactions not involving a public offering. Accordingly, investors will be required to make certain representations to the Fund, including that they are acquiring a Limited Partnership Interest for their own account, for investment purposes only and not with a view to its distribution.

The Fund will be exempt from registration under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Fund will rely on either or both of the exemptions contained in Sections 3(c)(1) and 3(c)(7) of the Investment Company Act. Section 3(c)(1) exempts from registration an issuer not making a public offering whose outstanding securities are beneficially owned by not more than 100 persons meeting certain conditions. Section 3(c)(7) exempts an issuer not making a public offering whose outstanding securities are owned only by "qualified purchasers" as defined in the Investment Company Act. The Fund will obtain appropriate representations and undertakings to ensure that its investors meet the necessary conditions so that the Fund will be exempt from registration under the Investment Company Act pursuant to either or both of Sections 3(c)(1) and 3(c)(7).

None of the General Partner, the Advisor or any of their respective affiliates will be registered under the Investment Advisers Act of 1940 as an investment advisor.

### ERISA CONSIDERATIONS

Before purchasing a Limited Partnership Interest, a prospective investor that is an employee benefit plan subject to ERISA (an "ERISA Plan") should determine whether an investment in the Fund is consistent with the fiduciary requirements of Section 404 of ERISA, in particular whether the investment is prudent considering the ERISA investor's requirements for liquidity, and whether the investment would result in a nonexempt "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended from time to time (the "Code").

In determining whether an investment in the Fund would satisfy the fiduciary requirements of ERISA or result in a "prohibited transaction", the fiduciary should consider whether the assets of the Fund will be considered "plan assets" within the meaning of U.S. Department of Labor Regulation 29 C.F.R. § 2510.3-101 (the "Plan Asset Regulations"). Under the Plan Asset Regulations, the assets of an entity in which an ERISA Plan acquires an equity interest that is neither a "publicly offered" security nor a security issued by an investment company registered under the Investment Company Act of 1940, are considered to be assets of the ERISA Plan for purposes of the fiduciary requirements (including the general prohibition set forth in Section 404(b) of ERISA against maintaining the indicia of ownership of ERISA Plan assets outside of the jurisdiction of the district courts of the United States) and "prohibited transaction" rules unless the entity is an "operating company", or equity participation in the entity by ERISA Plans and other "benefit plan investors" are not "significant", within the meaning of the Plan Asset Regulations.

It is intended that the Fund qualify as a "venture capital operating company" (a "VCOC") under the Plan Asset Regulations. A VCOC is a form of operating company that (a) invests primarily in entities engaged in the production or sale of a product or service other than the investment of capital and (b) obtains certain management rights with respect to the entities in which it invests. Assuming that the Fund at all times qualifies as a VCOC, the assets of the Fund will not be considered to be assets of any investor that is an ERISA Plan for purposes of the fiduciary responsibility or "prohibited transaction" provisions of ERISA or the Code.

The Partnership Agreement confers on the General Partner the authority to take any action necessary or desirable to ensure that none of the Fund's assets would be deemed to be "plan assets", including, without limitation, making structural, operating or other changes in the Fund, selling or otherwise disposing of an investment, canceling the remaining Commitment of any Limited Partner, requiring the sale in whole or in part of any Limited Partnership Interest or dissolving the Fund.

Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA) are not subject to the fiduciary responsibility or "prohibited transaction" provisions of ERISA or the Code but may be subject to restrictions under state or local law.

**The above discussion is a summary of some of the material ERISA considerations applicable to prospective investors that are ERISA Plans. It is not intended to be a complete discussion or to be construed as legal advice or a legal opinion. Prospective investors should consult their own counsel on these matters.**

## TAX CONSIDERATIONS

The following is a summary of certain aspects of the taxation of the Fund and Limited Partners in the Fund which should be considered by a potential investor and is based on representations by the Fund concerning the activities to be carried out by the Fund. In view of the complexities of the income tax laws applicable to securities transactions, a prospective Limited Partner is urged to consult its tax advisor in order to understand fully the various tax consequences of such an investment in its particular situation. This summary of certain tax considerations applicable to the Fund is considered to be a correct interpretation of existing laws and regulations in force on the date of this document. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this document.

### United States

The following discussion summarizes certain principal U.S. federal income tax consequences to Limited Partners who are U.S. Holders (as defined below) arising from the acquisition, ownership and disposition of a Limited Partnership Interest and is based upon the advice of Chadbourne & Parke LLP. The summary does not purport to be a comprehensive description of all of the tax considerations that may be relevant to a decision to invest in the Fund. The actual tax consequences of the acquisition, ownership and disposition of a Limited Partnership Interest will vary depending upon the particular circumstances of each prospective investor. The discussion which follows also does not address the U.S. federal income tax consequences relating to every potential investment which the Fund might make, including investments in other "flow-through" entities, nor does it deal with the tax consequences applicable to all categories of investors, some of which (such as dealers in securities or commodities, investors that do not hold their Limited Partnership Interests as capital assets, banks, thrifts, insurance companies, Limited Partners that own (directly, indirectly or by attribution) 10% or more of the outstanding Limited Partnership Interests, and, except as

64

otherwise provided, Limited Partners who acquire Limited Partnership Interests other than in connection with this offering) may be subject to special rules. Furthermore, since the Fund has been organized for investors that are U.S. Holders, the following discussion does not address the tax consequences to Limited Partners, if any, that are Non-U.S. Holders (as defined below) arising from the acquisition, ownership and disposition of a Limited Partnership Interest. In view of the number of different jurisdictions where local laws may apply to Limited Partners, the summary below also does not describe the local tax consequences to potential investors arising from the acquisition, ownership and disposition of a Limited Partnership Interest.

This summary is based on the provisions of the Code, Treasury regulations thereunder, and administrative and judicial interpretations thereof, all as in effect as of the date hereof, but all of which are subject to change (possibly on a retroactive basis) and to differing interpretations. There can be no assurance that the U.S. Internal Revenue Service (the "IRS") will not take a contrary view, and no ruling from the IRS has been or will be sought.

**Prospective investors are advised to consult their own tax advisers as to the United States or other tax consequences of an investment in a Limited Partnership Interest, including the effect of any state, local or foreign tax laws.**

*General.* For purposes of this summary, a "U.S. Holder" includes a beneficial owner of a Limited Partnership Interest that is: (1) a citizen or resident of the United States; (2) a corporation, partnership or other entity created or organized in or under the laws of the United States or any state thereof; (3) a trust which is subject to primary supervision by a court within the United States and with respect to which one or more United States fiduciaries have the authority to control all substantial decisions; or (4) an estate the income of which is subject to U.S. federal income tax regardless of its source. A "resident" of the United States includes an individual who (1) is lawfully admitted for permanent residence in the United States and present in the United States during a calendar year or any prior calendar year, (2) is present in the United States for 183 days or more during a calendar year, or (3) (i) is present in the United States for 31 days or more during a calendar year, (ii) is present in the United States for an aggregate of 183 days or more, on a weighted basis, over a three-year period ending in such calendar year, and (iii) does not have a closer connection to a "tax home" located outside of the United States. A "Non-U.S. Holder" is any beneficial owner of a Limited Partnership Interest that is not a U.S. Holder, unless and to the extent an investment in a Limited Partnership Interest is made in connection with the conduct of a U.S. trade or business.

*Classification of the Fund.* The Fund will be classified as a partnership and not as an association taxable as a corporation for U.S. federal income tax purposes.

*Taxation of Fund Operations.* As a partnership for U.S. federal income tax purposes, the Fund will not itself be subject to U.S. federal income tax; however, the Fund must file an annual partnership information return with the IRS which reports the results of its operations.

(i)     *Taxation of Current Income.*

Each Limited Partner will be required to include in income for U.S. federal income tax purposes such Limited Partner's "partnership" share of the income, gains, losses, deductions and credits of the Fund for the taxable year ending within or concurrently with the taxable year of the Limited Partner. It is possible that such allocable income will exceed the amount of distribution made to such Limited Partner. Each Limited Partner's "partnership" share of any item of income, gain, loss, deduction or credit will be determined in accordance with the provisions of the Partnership Agreement. The Fund will provide each

Limited Partner with information necessary to enable such Limited Partner to include in its U.S. federal income tax return such items of income, gain, loss, deduction and credit arising from its investment in the Fund.

The character and the source (either U.S. or foreign) of each item of income, gain, loss or deduction of the Fund generally will be determined as if the Limited Partner had directly derived such income, gain, loss or deduction. Accordingly, any interest and dividends earned, gains or losses recognized and deductions incurred by the Fund generally will retain their character in the hands of a Limited Partner. Corporate Limited Partners will be entitled to the dividends received deduction (that is otherwise available to U.S. corporate domestic shareholders) with respect to dividends received from U.S. corporations, but not non-U.S. corporations. Interest and dividends received from foreign sources will be passive income or, in the case of certain Limited Partners, financial services income for U.S. foreign tax credit purposes; however, foreign source interest income will constitute high withholding tax interest if a non-U.S. withholding tax is imposed at a rate of 5 percent or more.

Gains and losses recognized by the Fund generally will be U.S. source. Under recently enacted legislation, the maximum non-corporate U.S. federal income tax rate on net capital gains is 20 percent for capital assets held for more than 18 months and 28 percent for capital assets held for more than 12 months but not more than 18 months; and for taxable years beginning after December 31, 2000, the maximum capital gains rate for capital assets acquired after December 31, 2000 and held more than 5 years will be 18 percent. Net capital gains on the sale of capital assets held for one year or less are subject to U.S. federal income tax at ordinary income tax rates. For corporate Limited Partners, all capital gains are currently taxed at the same rate as ordinary income. The deductibility of capital losses is subject to limitations. For non-corporate Limited Partners, net capital losses not in excess of U.S. $3,000 are deductible against ordinary income in the year incurred, with any excess carried forward indefinitely to offset capital gains in such years and other income not in excess of U.S. $3,000. For corporate Limited Partners, capital losses can only be used to offset capital gains recognized during the year incurred or during the permitted carryback and carryforward period.

If the Fund receives any payment in a currency other than the U.S. dollar, for U.S. federal income tax purposes, the amount of income derived therefrom will be equal to the U.S. dollar value of the foreign currency on the date such income is derived, regardless of whether the payment is in fact converted into U.S. dollars. Gain or loss, if any, realized by the Fund on a sale, conversion or other disposition of the foreign currency will be U.S.-source ordinary income or loss.

Depending upon the particular investments made by the Fund, withholding tax, capital gains tax and other taxes may be imposed by taxing authorities located in other taxing jurisdictions on income or gains derived by the Fund. Subject to certain conditions and limitations, a Limited Partner may be entitled to claim a credit (or, alternatively, a deduction) for U.S. federal income tax purposes for its allocable share of the non-U.S. income taxes incurred by the Fund. In addition, if a corporate Limited Partner owns (directly or indirectly through the Fund) at least 10% of the voting stock of a non-United States corporation, such Limited Partner generally will be entitled to the indirect foreign tax credit under Section 902 of the Code with respect to foreign income taxes paid by non-United States corporations from which the Fund receives dividends. The rules relating to the determination of the U.S. foreign tax credit are complex, and prospective investors should consult their own tax advisors with respect thereto.

A Limited Partner's adjusted basis in a Limited Partnership Interest will generally be the cost of acquiring the Limited Partnership Interest (including any additional capital contributions made by such Limited Partner to the Fund), decreased by any distributions made to such Limited Partner by the Fund, and

increased by the Limited Partner's allocable share of any income or gain, and decreased by the Limited Partner's allocable share of any deduction or loss, realized by the Fund.

A non-corporate Limited Partner's ability to deduct its partnership share of fees and expenses incurred in connection with Fund investments may in certain circumstances also be limited under generally applicable rules pertaining to itemized deductions.

(ii)    *Nonliquidating Distributions.*

A nonliquidating cash distribution made by the Fund to a Limited Partner with respect to a Limited Partnership Interest will reduce such Limited Partner's adjusted basis in its Limited Partnership Interest by the amount of such distribution and, to the extent in excess of such tax basis, will be treated as gain from the sale or exchange of such Limited Partnership Interests. For a discussion of the U.S. federal income tax rates which apply to gain, if any, recognized on a non-liquidating cash distribution made by the Fund, see "-(i) Taxation of Current Income," above. Nonliquidating distributions of property will reduce (but not below zero) the Limited Partner's adjusted basis in its Limited Partnership Interest by the amount of the Fund's adjusted basis in such property immediately before the distribution, but will not result in the realization of taxable income to such Limited Partner. Under certain circumstances, marketable securities are treated as cash for these purposes.

(iii)    *Taxation Upon Disposition of Limited Partnership Interests.*

Subject to the discussion below of the consequences of a foreign corporation in which the Fund owns stock being treated as a Controlled Foreign Corporation (as defined below) or a Passive Foreign Investment Company (as defined below), gain or loss realized by a Limited Partner on the sale or other disposition of a Limited Partnership Interest will be subject to U.S. federal income taxation, as capital gain or loss, in an amount equal to the difference between such Limited Partner's adjusted basis in the Limited Partnership Interest and the amount realized on its disposition. Gain or loss realized on the disposition of a Limited Partnership Interest will be U.S.-source gain or loss for purposes of the U.S. foreign tax credit limitation.

Upon liquidation or termination of the Fund, no gain will be recognized by a Limited Partner except to the extent of the excess of (1) the sum of any cash (including, under certain circumstances, marketable securities) distributed to such Limited Partner over (2) such Limited Partner's adjusted basis in its Limited Partnership Interest immediately before the liquidation or termination. Any such gain generally will be capital gain. Gain will not be recognized by a Limited Partner on the distribution of property other than money; the Limited Partner will take a basis in such distributed property equal to the basis of such Limited Partner's Limited Partnership Interest (reduced by any money distributed). A Limited Partner generally will not recognize loss upon the liquidation or termination of the Fund, unless it receives only money and the amount thereof is less than its adjusted basis in its Limited Partnership Interest.

(iv)    *Controlled Foreign Corporations.*

Certain United States persons who own stock in a foreign corporation that is a "controlled foreign corporation" (a "CFC") for an uninterrupted period of 30 days or more during a taxable year must include in their income their pro rata share of certain income ("Subpart F income") of the CFC for the year, regardless of whether any portion of such income is distributed by the CFC to such shareholders. In addition, gains realized by the Fund on the sale or other disposition of a CFC may, under certain circumstances, be characterized, in whole or in part, as ordinary income.

Subpart F income generally includes income or gain derived from portfolio-type investments, such as dividends, interest and capital gains arising from such investments. Subpart F income, however, does not include any such type of income which is subject to an effective rate of income tax in the local jurisdiction that is greater than 90 percent of the maximum United States corporate income tax rate.

A CFC is any non-United States corporation in which "United States shareholders" own, directly, indirectly or by attribution, more than 50 percent of either (a) the total combined voting power of all classes of voting stock or (b) the total value of the stock. For this purpose, a "United States shareholder" is generally a United States citizen, resident, partnership or domestic corporation that owns, directly or indirectly, 10 percent or more of the total combined voting power of all classes of the corporation's voting stock. Therefore, based on the Fund's anticipated investment strategy, certain of the Investments made by the Fund will be CFCs, and the Fund will be a "United States shareholder" of such CFCs. Accordingly, all Limited Partners (even those with a less than 10 percent indirect interest in a CFC) will be taxed on their pro rata share of each CFC's Subpart F income.

It is anticipated that the Fund will generally invest in non-United States corporations which are engaged in an active operating business and, therefore, such corporations will generate little or no Subpart F income subject to the CFC rules. Furthermore, since Subpart F income is treated as a deemed dividend, corporate Limited Partners owning (directly or indirectly through the Fund) 10 percent of the total combined voting power of the CFC may be entitled, subject to certain limitations, to receive a foreign tax credit for foreign income taxes paid by the CFC.

(v)    *Passive Foreign Investment Companies.*

A special U.S. federal income tax regime applies if the Fund directly or indirectly owns stock in a foreign corporation which is a "Passive Foreign Investment Company" (a "PFIC"). A foreign corporation is a PFIC for any taxable year if either (a) 75 percent or more of its gross income is passive income or (b) 50 percent or more of the value of its gross assets (based on a quarterly average) consists of assets that produce or are held for the production of passive income. Under a "look-through" rule, if a foreign corporation owns at least 25 percent of the value of the shares of another corporation, the first corporation will be deemed directly to own its pro rata share of the second corporation's assets and to have directly received its pro rata portion of its gross income. In general, passive income includes dividends, interest, rents, royalties and certain securities, commodities and foreign currency exchange gains.

Unless the qualified electing fund ("QEF") election described below is made, a beneficial owner of a PFIC is required to allocate to each day in its holding period for the shares held a pro rata portion of any distribution received on such shares which is treated as an "excess distribution." Generally, an excess distribution is any distribution that is greater than 125 percent of the average annual distributions received by such owner in the three preceding years (or such shorter period as the owner may have held such shares). Any amount of the excess distribution treated as allocable to a prior PFIC taxable year would be subject to a deferred U.S. federal income tax charge. In addition, with some exceptions, any gain recognized on a disposition or deemed disposition of the shares held would be treated as an excess distribution that would be subject to a deferred U.S. federal income tax charge in a similar manner.

If the Fund directly or indirectly owns stock in a PFIC, unless the QEF election described below is made by the Fund, any "excess distribution" received by the Fund will be treated as such in computing the taxable income of each Limited Partner; and a disposition of a Limited Partnership Interest by a Limited Partner will be considered for this purpose to be a disposition of stock of the PFIC to the extent that the Limited Partnership Interest represents an indirect interest in the PFIC.

The PFIC rules described above would not apply to any foreign corporation that is a CFC in which the Fund is a United States shareholder. In addition, such rules would not apply to any Limited Partner with respect to a PFIC if the Fund made a QEF election for such PFIC's first taxable year as a PFIC to treat such PFIC whose shares the Fund holds as a QEF for U.S. federal income tax purposes. If the Fund made such a QEF election, and if the PFIC complied with certain reporting requirements, each Limited Partner would be required to include annually in gross income its pro rata share of the PFIC's ordinary income (including net foreign currency gains in excess of losses) and net realized capital gains, whether or not such amounts are actually distributed to the Fund. However, there can be no assurance that an effective QEF election can be made because this would require the foreign corporation concerned to comply with certain U.S. tax accounting, record-keeping and reporting requirements.

It is anticipated that the Fund will generally invest in non-United States corporations that are engaged in an active operating business and, therefore, that such non-United States corporations will not be PFICs. The Fund intends to manage its affairs, to the extent consistent with its investment objectives, so as to avoid investing in foreign corporations which are PFICs.

(vi)    *U.S. Tax-Exempt Investors' Unrelated Business Taxable Income.*

If the Fund derives income which would be considered "unrelated business taxable income" as defined in Section 512 of the Code if derived directly by an Limited Partner which is an organization exempt from tax under Section 501(a) of the Code, such Limited Partner's allocable share of the Fund's income would be subject to tax. A tax-exempt organization subject to tax on its allocable share of the Fund's unrelated business taxable income may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of unrelated business taxable income.

Under Section 512(a) of the Code, "unrelated business taxable income" is generally the excess of gross income from any unrelated trade or business conducted by an exempt organization (or by a partnership of which the exempt organization is a member) over the deductions attributable to such trade or business, with certain modifications. These modifications, which are set forth in Section 512(b) of the Code, provide that unrelated business taxable income generally does not include, among other things, dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of a trade or business. Therefore, except as provided below, a Limited Partner which is a tax-exempt organization should not realize unrelated business taxable income to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from the unrelated business taxable income under Section 512(b) of the Code.

A tax-exempt organization under Section 501(a) of the Code is also subject to tax with respect to its "unrelated debt-financed income" (and its allocable share of the Fund's "unrelated debt-financed income") pursuant to Section 514 of the Code. In general, unrelated debt-financed income consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the 12 month period prior to disposition.

Income and gains derived by a tax-exempt organization from the ownership of debt-financed property are taxable in the proportion to which such property is financed by "acquisition indebtedness" during the relevant period of time. To the extent a tax-exempt organization borrows money to finance its investment

in the Fund, such organization would be subject to tax on the portion of its income which is unrelated debt-financed income even though such income may constitute an item otherwise excludable from unrelated business taxable income, such as dividends.  In addition, if the Fund were to incur indebtedness with respect to its operations, a Limited Partner which is a tax-exempt organization may be subject to tax on the portion of its distributive share of the Fund's income which is unrelated debt-financed income.

Although no assurances can be given, the Fund intends to manage its affairs, to the extent consistent with its investment objectives, so as to avoid earning unrelated business taxable income and unrelated debt-financed income.

### Other Tax Jurisdictions

Depending upon the particular investments made by the Fund, withholding tax, capital gains tax and other taxes may be imposed by taxing authorities located in other taxing jurisdictions on income or gains derived by the Fund.

**The foregoing is a summary of some of the material tax rules and considerations affecting Limited Partners, the Fund, and the Fund's proposed operations and does not purport to be a complete analysis of all relevant tax rules and considerations, nor does it purport to be a complete listing of all potential tax risks inherent to acquiring, owning or disposing of Limited Partnership Interests. Prospective investors in the Fund are urged to consult their own tax advisors.**

## ADDITIONAL INFORMATION

This Memorandum is intended to present a general outline of the policies and structure of the Fund, the General Partner and the Advisor. The Fund's Partnership Agreement and the Subscription Agreement, which together specify the rights and obligations of the Limited Partners, and other documents pertaining to the Fund, the General Partner and the Advisor should be thoroughly reviewed by a prospective investor. The summary herein of certain provisions of such agreements is necessarily incomplete and is qualified by reference to the definitive form of such agreements.

Potential investors and their advisors are invited to ask questions of and obtain additional information from the General Partner concerning the Limited Partnership Interests described herein, the terms and conditions of the offering and any other relevant matters. Such information will be provided to the extent the General Partner possesses such information or can acquire it without unreasonable effort or expense.

## HOW TO PURCHASE LIMITED PARTNERSHIP INTERESTS

Prospective investors may purchase Limited Partnership Interests by executing and delivering to the General Partner a Subscription Agreement and a purchaser questionnaire (the "Purchaser Questionnaire") in the forms to be provided. No purchase of a Limited Partnership Interest shall be effective until the Subscription Agreement is accepted by the General Partner and the prospective investor has executed and delivered the Purchaser Questionnaire. Initial payment for Limited Partnership Interests will not be required until the Initial Closing, or if such closing has already occurred, at a Subsequent Closing. If this offering is terminated, all amounts received from prospective investors will be returned promptly without interest.

[This page intentionally left blank]

# MAPLEWOOD EQUITY PARTNERS LP

## Appendix A - Opinion of Deloitte & Touche LLP

[This page intentionally left blank]

**Deloitte &
Touche**

Deloitte & Touche LLP
Two World Financial Center
New York, New York 10281-1414

Telephone: (212) 436-2000
Facsimile: (212) 436-5000

MapleWood Management LP:

We have examined the mathematical accuracy only of the individual annual internal rate of return on investments ("Annual IRR on Investments") calculations in the accompanying Investment Performance section of the Private Placement Memorandum dated June 1998 for MapleWood Equity Partners LP. Our examination was made in accordance with standards established by the American Institute of Certified Public Accountants and, accordingly, included such procedures as we considered necessary under the circumstances.

These Annual IRR on Investments calculations are the responsibility of MapleWood Management LP ("MapleWood"). We have not examined any of the underlying financial data used as the basis for calculating the Annual IRR on Investments. Accordingly, we do not express an opinion on the Annual IRR on Investments.

In our opinion, the Annual IRR on Investments referred to above has been calculated in accordance with the underlying financial data as provided by MapleWood as referred to in the notes set forth in the Investment Performance section of the Private Placement Memorandum.

This report is solely for the use and information of MapleWood in the Private Placement Memorandum referred to above, and should not be used for any other purpose.

*Deloitte & Touche LLP*

New York, New York
June 17, 1998

Deloitte Touche
Tohmatsu